COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(BOSTON)

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| Martha Kristian and James D. Masterman, | ) | Civil Action No. |
| Plaintiffs, | ) | |
| v. | ) | |
| Comcast Corporation and AT&T Broadband, | ) | |
| Defendants. | ) | |

03cv12466

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE SHERMAN ANTITRUST ACT AND JURY DEMAND

Plaintiffs, on behalf of themselves and on behalf of the Class of those similarly situated,

brings this action for treble damages under the antitrust laws of the United States against

Defendants Comcast Corporation and its subsidiary, AT&T Broadband.

## INTRODUCTION

1.     Congress has attempted to protect the public against the growing market

dominance of cable television companies by encouraging competition in local markets as a

matter of national policy.  In doing so, Congress passed the Cable Television Consumer

Protection Act of 1992 to promote competition among cable operators.  A cornerstone of this

legislation was a prohibition against exclusive cable franchises for a particular geographic area,

so that cable companies would directly compete against each other.  In 1996, Congress

deregulated cable television, once again for the express purpose of promoting competition.

Despite passage of the 1992 and 1996 Congressional legislation, large cable companies,

including Defendants, have violated federal antitrust law and carved out their own respective

44429

areas of operation to the exclusion of competition from other cable companies. As a consequence of this illegal activity, cable prices have increased significantly beyond the rate of inflation.

2.    Rather than compete against one another, large cable companies such as Defendants have divided and allocated markets through a series of agreements "swapping" customers and "clustering" cable systems in geographic areas. Such conduct has allowed a cable company, including Comcast, in a particular "cluster" to acquire or maintain monopoly power, raise prices, engage in anticompetitive conduct and limit choice for cable consumers to effectively the only game in town--the cable services of the "cluster" monopoly cable company. This lawsuit seeks an injunction, treble damages and other relief against Defendants for their violations of federal antitrust law arising from Defendants' imposition of horizontal market restraints by entering into and implementing agreements with competitors to "swap" their respective cable customers, in violation of Section 1 of the Sherman Act and Comcast's unlawful acquisition or maintenance of monopoly power, or its attempted monopolization of the relevant market, in its "cluster" in the Boston, Massachusetts area, in violation of Section 2 of the Sherman Act.

## NATURE OF THE ACTION

3.    Plaintiffs bring this action against Defendants for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

4.    Defendants have imposed horizontal market restraints by entering into and implementing agreements with competitors to exchange or "swap" their respective cable television assets, including subscribers. Through the imposition of such horizontal market restraints, Comcast has been able to avoid meaningful competition and Comcast's cable

subscribers in Comcast's Boston, Massachusetts "cluster" have paid higher prices for cable television services than they would have absent Defendants' unlawful conduct. Defendants' conduct in entering into and implementing agreements allocating markets, territories and customers for cable television services constitutes a *per se* violation of Section 1 of the Sherman Act.

5.      Comcast also has engaged in conduct constituting unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Comcast has willfully acquired or maintained monopoly power in the relevant product market (multichannel video programming services) within the relevant geographic market (Comcast's Boston cluster, as defined below). Comcast's willful acquisition or maintenance of monopoly power in the relevant market is the result of exclusionary, anticompetitive conduct, including, without limitation, entering into and implementing illegal agreements with competitors to allocate territories, markets and customers through the "swapping" of cable television subscribers. Through such unlawful conduct, Comcast has excluded potential competitors from within the relevant geographic market and Plaintiffs and members of the Class, as a result of Comcast's unlawful conduct, have been forced to pay higher prices for cable television in the relevant market than they would have paid in the absence of Comcast's unlawful conduct.

6.      Through such unlawful conduct, Comcast has attempted to monopolize the relevant market. Comcast has engaged in such conduct with the specific intent to monopolize and, through such conduct, has demonstrated a dangerous probability of achieving monopoly power in the relevant market. Comcast's attempt to monopolize the relevant market also violates Section 2 of the Sherman Act.

## PARTIES

### PLAINTIFFS

7.      Plaintiff Martha Kristian is an individual who resides in Hanover, Plymouth County, Massachusetts. During the time period covered by this complaint, Plaintiff has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

8.      Plaintiff James D. Masterman is an individual who resides in Needham, Norfolk County, Massachusetts. During the time period covered by this complaint, Plaintiff has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

### DEFENDANTS

9.      Comcast, formally known as AT&T Comcast Corporation, is a Pennsylvania corporation with its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania 19102. Comcast was formed through the acquisition on November 18, 2002 by Comcast Holdings Corporation of AT&T Broadband, the cable business of AT&T Corp., a New York corporation with its office and principal place of business at 900 Routes 202-206 North, Bedminster, New Jersey.

10.      Defendant AT&T Broadband, formally a division of AT&T Corp., was acquired by Comcast Corporation on November 18, 2002. The acquisition occurred in several steps. First, AT&T contributed its cable business, including substantially all the assets, liabilities and businesses represented by AT&T Broadband Group, to a newly formed holding company, AT&T Broadband Corp. Next, AT&T Broadband was spun off from AT&T Corp. Finally, Comcast and AT&T Broadband combined to form the new Comcast Corporation. Upon completion of these transactions on November 18, 2002, AT&T Broadband became a wholly owned subsidiary of Comcast, with its principal place of business located at 1500 Market Street, Philadelphia, Pennsylvania 19102.

11.    Before combining, AT&T Broadband and Comcast were two separate, independent owners and operators of multiple cable systems, operating at the same level of competition in the cable industry. At the time of the transactions described in paragraphs 8 and 9, Comcast was the third largest cable operator in the United States, and AT&T owned the largest cable operator in the United States. Upon acquiring AT&T's cable business on November 18, 2002, Comcast became the largest cable operator in the country. Comcast serves over twenty-one million cable subscribers.

12.    During the Class Period alleged herein, Defendants have provided and continue to provide cable television services in the United States by means of interstate commerce.

13.    Defendants' business activities as described in this Complaint were within the flow of and substantially affected interstate trade and commerce.

## JURISDICTION AND VENUE

14.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief, treble damages, and Plaintiffs' costs of this suit, including reasonable attorney fees, against Defendants for the injuries sustained by Plaintiffs and other similarly situated Class members by reason of Defendants' violations of Sections 1 and 2 of the Sherman Act.

15.    Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

16.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b) and (c), because Comcast transacts business, or otherwise is found within this District.

## CLASS ALLEGATIONS

17.    a.    As used in this paragraph and Complaint:

(1)    "Basic Cable Services" means the separately available basic tier of video programming services to which subscription is required for access to other tiers of cable service offered by Comcast and which includes the retransmission of local television broadcast signals and public, educational and governmental access channels.

(2)    "Comcast's Boston cluster" includes the following counties in which Comcast's cable franchises are located:  Barnstable, Essex, Middlesex, Nantucket, Norfolk, Plymouth, Suffolk and Worcester, Massachusetts; and Belknap, Hillsborough, Merrimack, Rockingham and Strafford, New Hampshire.

b.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the following class:

> All cable television customers who subscribe or subscribed since December 8, 1999, to video programming services (other than solely to basic cable services) from Defendants in Comcast's Boston cluster.  The class excludes governmental entities, Defendants, Defendants' subsidiaries and affiliates and this Court.

18.    Plaintiffs do not yet know the exact size of the Class and such information is in the exclusive control of Defendants.  However, based on the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class members is at least over 2 million cable subscribers, and that the members of the Class are located throughout the Boston, Massachusetts and surrounding area.  Consequently, joinder of all members of the Class would be impracticable.

19.    Plaintiffs will fairly and adequately protect the interests of the Class members, and has engaged counsel experienced and competent in antitrust and class action litigation.  Plaintiffs have no interests antagonistic to those of the other members of the Class.

20.    Plaintiffs' claims are typical of the claims of the Class in that each paid for non-basic or cable programming services and was injured by the same wrongful conduct of Defendants alleged in this Complaint.  The violations of the antitrust laws, the effects of such violations and the relief sought are common to Plaintiffs and the members of the Class.

21.    The rights of Plaintiffs and the Class members involve common questions of law and fact that would predominate over questions affecting only individual members of the Class. Whatever difficulties may exist in the management of the Class are generally outweighed by the advantage of that procedure, including but not limited to providing claimants with a method for redress of claims that might otherwise not warrant individual litigation.

22.    The questions of law and fact common within the Class include, but are not limited to:

a.    whether Defendants' conduct in imposing horizontal market restraints by entering into agreements with competitors to "swap" their respective cable systems and customers violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.    whether Comcast's conduct in possessing and willfully acquiring or maintaining monopoly power in, or attempting to monopolize,  the relevant market and engaging in the acts and practices alleged in this Complaint constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2;

c.    whether Defendants' acts caused prices for cable television services in the relevant market to be artificially high and not competitive;

d.     whether Plaintiffs and the members of the Class were injured by Defendants' acts;

e.     the measure of damages by which Defendants' conduct injured all members of the Class; and

f.     whether the Class is entitled to injunctive relief as a result of Comcast's continuing conduct.

23.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy, because it permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence and effort. Class treatment will also permit the adjudication of claims by smaller Class members, who could not afford individually to litigate antitrust claims against the large corporate defendant.

## GENERAL ALLEGATIONS

## DEREGULATION OF CABLE INDUSTRY

24.     In 1992, to address the increasing market power of cable operators and "to promote competition in the delivery of diverse sources of video programming and to assure that the widest possible diversity of information sources are made available to the public," Congress passed the Cable Television Consumer Protection Act of 1992. To further and encourage competition, Congress prohibited local jurisdictions from awarding exclusive franchises for cable systems. 47 U.S.C. § 541(a)(1).

25.     In 1996, Congress passed the Telecommunications Act of 1996, 47 U.S.C. § 251 (the "1996 Act"), to encourage competition, including competition among cable television providers. Through the 1996 Act, Congress sought to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of

advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Cong. Rep. 104-458, 1996 WL 46795, at 1 (1996). U.S. Code Cong. & Admin. News 1996, at 124.

26.    Pursuant to the 1996 Act, 47 U.S.C. § 543, the FCC's authority to regulate the rates charged for non-basic or cable programming services (those channels that are not on a cable system's basic tier and for which there is no per-channel or per-program charge) was terminated for services provided after March 31, 1999.  Therefore, the rates charged for such cable services are determined by the cable companies themselves.  Neither the FCC nor any state or local entity has the authority to review rates for such cable services or to investigate allegations that such rates are excessive.

## CABLE INDUSTRY:  INCREASED CONSOLIDATION, SKYROCKETING PRICES AND LIMITED CONSUMER CHOICES

27.    Despite Congress' intention of promoting competition in the cable industry to benefit the public, the cable industry has become increasingly consolidated, consumers' choices among cable operators have been eliminated or substantially narrowed, and in monopoly "clusters" created by large cable companies, including Defendants, cable prices have increased significantly more than in areas where competition exists.

28.    In its 2002 report on competition in the cable market, the FCC found that cable companies continue to dominate the market for multichannel video services.  As of June 2002, the FCC determined that cable operators provided video programming to more than three-quarters (76.5%) of all multichannel video subscribers nationwide.  *In the Matter of Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming, Ninth Annual Report,* MB Docket No. 02-145, released December 31, 2002, ("Ninth Video Competition Report") ¶4.  As a result of increased consolidation within the cable industry, as

cable operators acquired and traded cable systems and subscribers, the ten largest cable operators serve approximately 85% of all cable subscribers. *Id.* ¶14. In 1995, prior to passage of the Telecommunications Act of 1996, the top ten cable companies served approximately 73.22% of all cable subscribers. *In the Matter of Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming. Second Annual Report*, App. G at Table 2 (1995). In its 2002 report on video competition, the FCC concluded, "The market for the delivery of video programming to households continues to be highly concentrated." *Ninth Video Competition Report* ¶113.

29.    The FCC has determined that only approximately 2% of all cable consumers reside in areas with effective competition and only approximately 1.3% of cable consumers are served by an overbuilder (a competing cable system operator).

30.    Studies confirm that competition from another cable company is essential to restrain the prices of a dominant cable provider. For example, in its October 2002 report, the United States General Accounting Office (GAO) determined that "the presence of a second cable franchise (known as an overbuilder) does appear to restrain cable prices" and that "in franchise areas with a second cable provider, cable prices are approximately 17 percent lower than in comparable areas without a second cable provider." GAO, *Report to the Subcommittee on Antitrust, Competition. and Business and Consumer Rights, Committee on the Judiciary, U.S. Senate: Telecommunications, Issues in Providing Cable and Satellite Television Service (2002) ("GAO's 2002 Cable Report"),* at 9. In its October 2003 report, the GAO found that competition from a wire-based cable provider (a competitor using a wire technology, such as a second cable company) is limited to very few (about 2% of) markets; however, in markets where such competition from a second wireline cable company exists. cable rates are significantly lower--by

approximately 15%--than cable rates in markets without competition from a second wireline cable operator. GAO, *Report to the Chairman, Committee on Commerce, Science, and Transportation, U.S. Senate: Telecommunications, Issues Related to Competition and Subscriber Rates in the Cable Television Industry* ("*GAO's 2003 Cable Report), at* 3, 9 and 10.

31.    The FCC has also found that the prices charged by large cable companies are restrained by the presence of an overbuilder in the market. In its 2001 annual report on cable prices, the FCC determined, solely based on information provided by cable operators, that cable prices on average were 6.3% lower in areas where the incumbent cable operator faced effective competition from overbuilders. *In the Matter of Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Rates for Basic Service, Cable Programming Service, and Equipment,* (2001) ("*FCC's 2001 Report on Cable Prices")* ¶8. In its 2002 report on cable prices, the FCC determined, again solely based on information provided by cable operators, that cable prices were on average 6.4% lower in areas where the incumbent cable operator encounters effective competition from an overbuilder. *In the Matter of Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Rates for Basic Service, Cable Programming Services, and Equipment* ("FCC's *2002 Report on Cable Prices"*) ¶28.

32.    By contrast, the presence of competition from a direct broadcast system (DBS) provider does not restrain, or restrains only slightly, the prices of cable services provided by large cable companies. The FCC has determined that in areas where DBS has achieved a degree of market presence, there is no significant effect on prices for cable service. *FCC's 2002 Report on Cable Prices* ¶45. In its October 2002 report, the GAO also found that the presence of DBS companies has not led to lower cable prices. *GAO's 2002 Cable Report,* at 9. In its October

2003 report, the GAO determined that DBS competition is associated with only a slight reduction in cable rates. *GAO's 2003 Cable Report*, at 11.

## DEFENDANTS' CLUSTERING SCHEME

33.    Defendants' clustering scheme has been perpetrated in part by Defendants' entering into and implementing agreements to exchange or "swap" Defendants' cable customers in other areas of the country for the cable customers of competitor cable system operators in Comcast's cluster in and around Boston, Massachusetts.  Examples of such "swap" agreements entered into by Defendants include the following:

a.    In or about December, 1999, AT&T Broadband entered into a "swap" agreement with a competitor cable company, Charter Communications, which involved the exchange of approximately 632,000 cable subscribers between the companies in various parts of the country. As part of this "swap" agreement, AT&T Broadband obtained from Charter Communications cable subscribers in the Boston and Worcester, Massachusetts areas.

b.    In or about April, 2000, AT&T Broadband and a competitor cable company, Cablevision Systems Corporation, entered into agreements under which AT&T Broadband received cable systems serving approximately 357,850 subscribers in Boston and Eastern Massachusetts. In return, Cablevision Systems Corporation acquired cable systems from AT&T Broadband serving approximately 125,500 subscribers in northern New York suburbs and approximately $878 million in AT&T stock and approximately $284 million in cash.  This "swap" transaction closed in or about January 2001.  On November 18, 2002, Comcast acquired AT&T Broadband, including AT&T Broadband's customers in Comcast's Boston cluster.

34.  As a result of such unlawful "swapping" agreements and transactions described in paragraph 33, potential competitors were removed from Comcast's Boston cluster and Defendants were able to raise prices within Comcast's Boston cluster.

35.  The purpose and effect of Defendants' conduct in entering into and implementing such unlawful "swapping" agreements and transactions was unreasonably to restrain, suppress and eliminate competition for cable television service in Comcast's Boston cluster.

36.  Defendants' conduct in imposing horizontal territory, market and customer allocations in the manner alleged in this Complaint has had the following effects, among others:

a.  Competition, including price competition, for cable television service has been, and will continue to be restrained, suppressed, and/or eliminated;

b.  Competitors have been, and will continue to be restrained from entering into the areas subject to the allocation agreements;

c.  Comcast has increased prices for cable programming services to artificially high, non-competitive levels and, unless enjoined, will continue to maintain prices at such levels; and

d.  Cable subscribers have been, and will continue to be deprived of the benefits of free and open competition.

37.  Pursuant to the swapping agreements described above in paragraph 33, Defendants have not competed in the cable television markets in which they exchanged subscribers in the "swap" agreements, and the other cable companies involved in such "swapping" agreements have not competed against Defendants in Comcast's Boston cluster.

38.  According to their own submissions to the FCC in connection with Comcast's acquisition through merger of AT&T's cable business, Comcast and AT&T did not compete

against each other in their respective cable television markets before the companies combined, the companies did not study or evaluate the feasibility of such competition and the companies did not intend to compete in each other's cable markets.

39.    Within its cluster in and around Boston, Massachusetts, Comcast has raised its rates for non-basic tier cable services above the rates that would be charged in a competitive environment.

## VIOLATIONS ALLEGED

### COUNT I

#### *Per Se* Violation of Section 1 of the Sherman Act

40.    Plaintiffs incorporate paragraphs 1-39 as if fully set forth herein.

41.    Defendants have engaged in a strategy of allocating territories, markets and customers among competitors at the same level of the cable television market structure.

42.    Defendants have imposed horizontal market restraints, specifically the allocation of territories, markets and customers through agreements to "swap" or exchange cable television assets, including subscribers, with other cable companies.  Examples of such "swapping" agreements and transactions are set forth above in paragraph 33.

43.    Defendants' conduct of imposing horizontal territory, market and customer allocations by entering into and implementing unlawful "swapping" agreements, arrangements or devices constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

44.    As a proximate result of the horizontal territory, market and customer allocations effected through the "swapping" agreements entered into and implemented by Defendants, Plaintiffs and members of the Class have paid more, and will continue to pay more for cable programming services than they would have otherwise paid, and accordingly have suffered, and

will continue to sustain injury and damages in an amount to be determined according to proof at the time of trial.

## COUNT II

### Monopolization

45.    Plaintiffs incorporate paragraphs 1 - 44 as if fully set forth herein.

46.    The relevant geographic market is Comcast's Boston cluster, as defined in paragraph 17.a.(2).

47.    The relevant product market is defined as multichannel video programming services, which are distributed by multichannel video programming distributors ("MVPDs"), including cable television operators such as Comcast, overbuilders and direct broadcast satellite operators.

48.    Comcast possesses monopoly power in the relevant product market within the relevant geographic market.

49.    Upon information and belief, Comcast controls approximately 80% of cable subscribers within the relevant geographic market. Upon information and belief, Comcast possesses at least a 75% share of the relevant product market within the relevant geographic market.

50.    Comcast has willfully obtained or maintained its monopoly through anticompetitive means, including the acts and practices set forth in this Complaint.

51.    Defendants have imposed horizontal market restraints, specifically the allocation of territories, markets and customers through agreements to "swap" or exchange cable television assets, including subscribers, with one or more other cable companies in order to monopolize the relevant geographic market. Examples of such "swapping" agreements and transactions are set forth above in paragraph 33.

52.    As a result of such unlawful "swapping" agreements and transactions, Defendants' potential competitors were removed from the relevant geographic market and Defendants were able to raise prices within the relevant geographic market. The purpose and effect of such "swapping" agreements and transactions was unreasonably to restrain, suppress and eliminate competition for cable television service in the relevant geographic market.

53.    Defendants' conduct of imposing horizontal territory, market and customer allocations by entering into and implementing swapping agreements, arrangements or devices, which is unlawful as a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, constitutes anticompetitive conduct through which Comcast has willfully acquired or maintained monopoly power in the relevant market.

54.    Potential cable company competitors, including overbuilders, to large incumbent cable operators such as Comcast face significant barriers to entry into the market. These high barriers to entry into the MVPD market faced by potential cable company competitors, include, among other things, overcoming the significant capital costs required for entry; obtaining the necessary cable franchises from local governmental authorities; overcoming the "clustering" scheme engaged in by Defendants and other large cable operators; and overcoming anticompetitive acts and practices of the incumbent monopolist cable company, including Defendants' conduct in entering into the "swapping" agreements or transactions set forth above in paragraph 33.

55.    Comcast's willful acquisition or maintenance of monopoly power in the relevant market was the result of the exclusionary, anticompetitive conduct alleged in this Complaint, specifically including Defendants' conduct in entering into and implementing illegal agreements

with other cable companies to allocate territories, markets and customers through the "swapping" of cable television systems and subscribers.

56.    Comcast exercised its monopoly power by raising prices for its cable television subscribers to artificially high, noncompetitive levels within the relevant geographic market.

57.    Comcast's anticompetitive conduct in the relevant market, as set forth in this Complaint, has had the following effects, among others:

        a.    Competition, including price competition, for cable programming services has been, and will continue to be restrained, suppressed and/or eliminated;

        b.    Competitors or potential competitors have been, and will continue to be restrained from entering into the relevant market;

        c.    Comcast has increased prices for cable services to artificially high, noncompetitive levels and, unless enjoined, will continue to maintain prices at such levels; and

        d.    Subscribers to cable services have been, and will continue to be deprived of the benefits of free and open competition.

58.    Comcast's willful acquisition or maintenance of monopoly power was not the result of a superior product, business acumen or historical accident.

59.    There is no legitimate procompetitive business justification for the anticompetitive actions and conduct which facilitated Comcast's monopolization of the relevant market.

60.    Comcast's possession and willful acquisition or maintenance of monopoly power in the relevant market and the exclusionary, anticompetitive conduct alleged in this Complaint constitute a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

61.    Plaintiffs and members of the Class were injured in their business or property by Comcast's monopolization of the relevant market as alleged in this Complaint. Without limiting the generality of the foregoing, Plaintiffs and members of the Class have been forced to pay higher prices for cable television in the relevant market than they would have paid in the absence of Comcast's unlawful conduct.

## COUNT III

### Attempted Monopolization

62.    Plaintiffs incorporate paragraphs 1 - 61 as if fully set forth herein.

63.    Comcast has engaged in the anticompetitive conduct alleged in this Complaint with the specific intent to monopolize the relevant product market in the relevant geographic market.

64.    Comcast's conduct as set forth in this Complaint constitutes and demonstrates a dangerous probability of Comcast achieving monopoly power in the relevant product market in the relevant geographic market.

65.    Comcast's attempt to monopolize the relevant product market in the relevant geographic market constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

66.    Plaintiffs and members of the Class have been injured in their business or property by Comcast's attempt to monopolize the relevant market as alleged in this Complaint. Without limiting the generality of the foregoing, Plaintiffs and members of the Class have been forced to pay higher prices for cable television in the relevant market than they would have paid in the absence of Comcast's unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A.      That this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and that reasonable notice to the Class be provided in compliance with Fed. R. Civ. P. 23(c)(2);

B.      That the Court adjudge and decree that Defendants' conduct in imposing horizontal territory, market and customer allocations by entering into and implementing agreements with competitors to "swap" cable systems and subscribers constitutes a *per se* violation of Section 1 of the Sherman Act;

C.      That the Court adjudge and decree that Comcast's conduct as alleged in this Complaint constitutes unlawful monopolization, or attempted monopolization, in violation of Section 2 of the Sherman Act;

D.      That judgment be entered against Defendants and in favor of the Plaintiffs and the members of the Class for damages as allowed by law, together with costs of suit (including expert costs), and reasonable attorney fees as provided by law;

E.      That the judgment so entered include trebling of damages determined to have been sustained by Plaintiffs and the members of the Class for damages as allowed by law, together with costs of suit (including expert costs), and reasonable attorney fees as provided by law;

F.      That Comcast be enjoined from continuing the unlawful monopolization, or attempt to monopolize conduct alleged in this Complaint and that Defendants be enjoined from entering into or implementing "swap" agreements allocating territories, markets or customers.

G.      That the Court award Plaintiffs and members of the Class pre-judgment and post-judgment interest as permitted by law; and

H.    That the Court award Plaintiffs and members of the Class such other and further relief as may be necessary and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

DATED: December 8, 2003

John Peter Zavez (#555721)
Noah Rosmarin (#630632)
ADKINS KELSTON & ZAVEZ, P.C.
90 Canal Street
Boston, MA  02114
Tel: (617) 367-1040
Fax:  (617) 742-8280

Ann D. White
Carol A. Mager
MAGER WHITE & GOLDSTEIN, LLP
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA 19046
Tel:  (215) 481-0273
Fax:  (215) 481-0271

Samuel D. Heins
Stacey L. Mills
Alan I. Gilbert
Daniel C. Hedlund
David Woodward
HEINS MILLS & OLSON, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Tel:  (612) 338-4605
Fax:  (612) 338-4692

Barry Barnett
Max Tribble, Jr.
SUSMAN GODFREY LLP
901 Main Street, Suite 4100
Dallas, TX  75202
Tel:  (214) 754-1900
Fax:  (214) 754-1933

44429

Jonathan Shaw
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3100
Seattle, WA 98101
Tel: (206) 516-3836
Fax: (206) 516-3883

Robert N. Kaplan
Gregory K. Arenson
Christine M. Fox
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

Lynn Lincoln Sarko
Mark A. Griffin
John H. Bright
Raymond J. Farrow
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384

Michael Hausfeld
Stewart Weltman
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

**Counsel for Plaintiffs**