IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(BOSTON)

|  |  |  |
|---|---|---|
| Martha Kristian, *et al.*, | ) | |
| | ) | No. 03CV12466 EFH |
| Plaintiffs, | ) | The Honorable Edward F. Harrington |
| | ) | |
| v. | ) | |
| | ) | |
| Comcast Corporation, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**CLASS PLAINTIFFS' SURREPLY MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

47825

## TABLE OF CONTENTS

ARGUMENT ...................................................................................................................................1

I.  COMCAST'S PREEMPTION ARGUMENT IS NOT PROPERLY RAISED,
    AND IN ANY EVENT, IT IS WITHOUT MERIT BECAUSE THERE IS
    NO IRRECONCILABLE CONFLICT BETWEEN STATE AND
    FEDERAL LAW ......................................................................................................1

    A.   Comcast Has Waived Any Preemption Argument...................................1

    B.   Comcast Has Failed to Show a Conflict Between Federal and State Law .............1

    C.   The Uncontradicted Facts of Record Demonstrate That Comcast Has
         Violated FCC Regulations And the Terms of Comcast's Own Contracts in
         Failing to Provide the Requisite Notice of the Purported Arbitration
         Clauses .................................................................................................................4

    D.   Comcast's Argument Regarding Retroactivity is Specious ....................................6

II. COMAST HAS NOT REFUTED PLAINTIFFS' FULLY SUPPORTED
    SHOWING THAT ENFORCEMENT OF COMCAST'S ARBITRATION
    CLAUSES WOULD PRECLUDE PLAINTIFFS FROM EFFECTIVELY
    VINDICATING THEIR SHERMAN ACT CLAIMS................................................7

    A.   Comcast's Contention That The Prohibition Against Class Actions Will
         Allow Vindication of Plaintiffs' Antitrust Claims Ignores The Facts Of
         Record and Reality.............................................................................................7

    B.   Comcast's Contention That Plaintiffs May Vindicate Their Statutory
         Rights Through the Very Limited Arbitration Discovery Procedures
         Is Wrong..............................................................................................................10

    C.   Comcast's Arbitration Clauses Impose A One-Year Limitations Period In
         Contravention Of The Four-Year Sherman Act Statute of Limitations
         Period And Thereby Prevent Plaintiffs From Vindicating Their Full
         Statutory Rights .................................................................................................11

    D.   Comcast's Attempts to Walk Away From the Terms Of Their
         Arbitration Clauses are Unavailing.....................................................................12

    E.   This Court, Not An Arbitrator, Should Decide Whether Comcast's
         Arbitration Clauses Preclude Plaintiffs From Vindicating Their
         Statutory Rights .................................................................................................14

III.    COMCAST HAS NOT REBUTTED PLAINTIFFS' STRONG SHOWING
        THAT COMCAST'S ARBITRATION PROVISIONS ARE
        UNCONSCIONABLE ........................................................................................... 14

IV.     THE UNCONSCIONABLE PROVISIONS OF COMCAST'S
        ARBITRATION CLAUSES CANNOT BE SEVERED .......................................... 16

CONCLUSION ................................................................................................................ 18



## TABLE OF AUTHORITIES

### Cases

*Acorn v. Household Int'l, Inc.*, 211 F. Supp. 2d 1160, 1174 (N.D. Cal. 2002)............................ 17

*Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256 (3d Cir. 2003)....................................................... 17

*Andresen v. Diorio*, 349 F.3d 8, 13 (1st Cir. 2003) ......................................................................... 1

*Bischoff v. DirectTV, Inc.*, 180 F. Supp. 2d 1097 (C.D. Cal. 2002) ............................................... 16

*Boomer v. AT&T*, 309 F.3d 414 (7th Cir. 2002) ....................................................................... 4, 15

*Cadillac Auto Co. of Boston v. Engeian*, 339 Mass. 26 (1959) ..................................................... 18

*Carll v. Terminix Int'l Co., L.P.*, 793 A.2d 921, 925 (Pa. Super. 2002) ....................................... 17

*Choice Sec. Sys., Inc. v. AT&T Corp.*, No. 97-1774, 1998 WL 153254 (1st Cir. Feb. 25, 1998) .......................................................................................................................................... 6, 7

*Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003) .................................................... 1

*Coutin v. Young & Rubicam P.R., Inc.*, 124 F.3d 331, 339 (1st Cir. 1997).................................... 9

*DIRECTV, INC. v. Mattingly*, 829 A.2d 626, 638-39 (Md. 2003)................................................... 6

*Drayton v. Pilgrim's Pride Corp.*, No. Civ.A. 03-2334, 2004 WL 765123, at \*4 (E.D. Pa. 2004) ................................................................................................................................................ 3

*Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 788 (9th Cir. 2002) ....................... 17

*Fluehmann v. Assocs. Fin. Servs.*, 2002 WL 500564 .................................................................... 6

*Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)............................................................. 2, 3

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)............................................. 8, 14

*Gomez v. Rivera Rodriguez*, 344 F.3d 103, 115 (1st Cir. 2003)...................................................... 8

*Graham Oil Co. v. Arco Prods. Co.*, 43 F.3d 1244, 1249 (9th Cir. 1995)..................................... 17

*Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79 (2000) ...................................................... 14

*Green v. Fund Asset Mgmt.*, 245 F.3d 214, 230 (3d Cir. 2001) .................................................. 1, 3

*Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) ........................................................................... 9

*Hurlbut v. Gantshar*, 674 F. Supp. 385, 392 (D. Mass. 1987)..................................................... 15

*In re One Bancorp. Sec. Litig.*, 134 F.R.D. 4, 10 n.5 (D. Me. 1991)............................................. 1

*In re Universal Serv. Fund Billing Practices Litig.*, 300 F. Supp. 2d 1107 (D. Kan. 2003) ....................................................................................................................... 4, 6, 7, 14

*Intergen v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003)..................................................................... 6

*Johnson v. West Suburban Bank*, 225 F.3d 366 (3d Cir. 2000)..................................................... 10

*Life & Health Ins. Co. of Am. v. Fed. Ins. Co.*, Civ. A. No. 92-6736, 1995 WL 263551, at \*1 (E.D. Pa. May 2, 1995) .......................................................................................................... 8

*Luna v. Household Fin. Corp III.*, 236 F. Supp. 2d. 1166 (W.D. Wash. 2002)............................. 10

*Lytle v. CitiFinancial Servs., Inc.*, 810 A.2d 643........................................................................... 10

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) ........................................................ 10

*Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508-09 (2d Cir. 1997), cert. denied, 434 U.S. 861 (1977)............................................................................................................................ 8

*Mattox v. Decision One Mortg. Co., LLC*, No. CIV. A. 01-10657- GAO, 2002 WL 31121087 at \*2 (D. Mass. Sept. 26, 2002).............................................................................. 14, 16

*Mattingly v. Hughes Elec. Corp.*, 810 A.2d 498, 508 (Md. App. 2002)......................................... 6

*McNulty v. H&R Block, Inc.*, 843 A.2d 1267 (Pa. Super. 2004) .................................................. 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 635 (1985) ................. 13, 14

*Parilla v. IAP Worldwide Servs. VI, Inc.*, 368 F.3d 269, 285 (3d Cir. 2004) ......................... 13, 14

*Plaskett v. Bechtel Int'l, Inc.*, 243 F. Supp. 2d 334, 345 (D. Vi. 2003) ........................................ 17

*Snowden v. Checkpoint Check Cashing*, 290 F.3d 631 (4th Cir. 2002)..........................................10

*State of Texas v. Synchronal Corp.*, 800 F. Supp. 1456, 1459-60 (W.D. Tex. 1992)................. 2, 3

*Ting v. AT&T*, 182 F. Supp. 2d 902 (N.D. Cal. 2002)............................................................ 10, 12

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ................................................................. 2, 3, 4, 15

*Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 592 (7th Cir. 2000) ............... 9

## Statutes

15 U.S.C. § 15............................................................................................................................... 13

15 U.S.C. § 15............................................................................................................................... 12

47 U.S.C. § 552(c) ..................................................................................................................... 2, 3

47 U.S.C. § 201(b) ................................................................................................................... 4, 15

47 U.S.C. § 202(a) ................................................................................................................... 4, 15

47 U.S.C. § 552(d)(1) ................................................................................................................. 2, 3

47 U.S.C. § 552(d)(2) ................................................................................................................. 2, 3

Pursuant to Local Rule 7.1 and the accompanying motion of Plaintiffs to file a surreply, Class Plaintiffs respectfully submit this Surreply[1] Memorandum in response to Defendants' (hereinafter "Comcast") Reply Brief In Support Of Their Motion To Compel Arbitration ("Defs.' Reply").

## ARGUMENT

## I. COMCAST'S PREEMPTION ARGUMENT IS NOT PROPERLY RAISED, AND IN ANY EVENT, IT IS WITHOUT MERIT BECAUSE THERE IS NO IRRECONCILABLE CONFICT BETWEEN STATE AND FEDERAL LAW.

### A. Comcast Has Waived Any Preemption Argument.

Realizing that there is no valid agreement to arbitrate, Comcast now argues that state contract law is preempted by federal law. By asserting preemption for the first time in its Reply Brief,[2] Comcast has waived the argument. *Andresen v. Diorio*, 349 F.3d 8, 13 (1st Cir. 2003) ("This argument, even if adequate, would be forfeit because it is presented for the first time in the reply brief."); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003) ("Litigation is not a game of hopscotch . . . . [A] litigant should not be allowed to switch from theory to theory like a bee in search of honey."); *In re One Bancorp. Sec. Litig.*, 134 F.R.D. 4, 10 n.5 (D. Me. 1991) ("Plaintiffs advanced [an argument] for the first time in their reply memorandum . . . . The Court does not address that argument, as it should have been raised in Plaintiffs' first memorandum in support of the motion."). In any event, Comcast's newly raised preemption argument is meritless.

### B. Comcast Has Failed to Show a Conflict Between Federal and State Law.

"[T]he party claiming preemption bears the burden of demonstrating that federal law preempts state law." *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 230 (3d Cir. 2001). Comcast bases its preemption argument upon the following sentence contained in the Cable Act: "A cable operator may

---

[1] For the Court's information, this Surreply is identical to the Surreply filed in *Rogers v. Comcast Corp.*, No. 04-10142 EPH, except for an additional paragraph on page 5 of the *Rogers* Surreply that relates to Class Plaintiff Pinella.

[2] Comcast's initial memorandum in support of its motion to compel arbitration relied on cases applying state contract formation principles. *See* Defendants' Memorandum of Law in Support of Their Motion to Compel Arbitration at 8, 11-13. It did not claim that state contract law was preempted by or even conflicted with federal law.

47825

1

provide notice of service and rate changes to subscribers using any reasonable written means at its sole discretion." 47 U.S.C. § 552(c). Comcast then asserts that state law is contrary to federal law, but never explains how state law is actually in conflict with federal law. Comcast's claim of preemption does not withstand scrutiny under the language of the Cable Act or legal principles applicable to preemption.

In requiring the Federal Communications Commission ("FCC") to establish minimum customer service standards for cable operations, Congress provided that "[n]othing in this subchapter shall be construed to prohibit any State . . . from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter." 47 U.S.C. § 552(d)(1). Furthermore, Congress made clear that state laws providing for customer service requirements exceeding the standards set by the FCC, or any state law that *"addresses matters not addressed by the standards set by the [FCC] under this section"* are fully preserved. 47 U.S.C. § 552(d)(2) (emphasis added). *See also Ting v. AT&T*, 319 F.3d 1126, 1145 (9th Cir. 2003) ("[T]he deregulated marketplace encompasses state laws of general applicability. . . . State contract and consumer protection laws, including California's CLRA [Consumer Legal Remedies Act] and unconscionability law, form part of the competitive framework to which the FCC defers."); *State of Texas v. Synchronal Corp.*, 800 F. Supp. 1456, 1459-60 (W.D. Tex. 1992) (holding that § 552(c) did not preempt the state's action for false and misleading advertising and noting that "Congress' express purpose is to authorize, not preempt, application of state law in the realm of consumer protection in the cable television industry.").

To establish preemption based on an alleged conflict between federal and state law, Comcast has the heavy burden to show "it is impossible for a private party to comply with both state and federal requirements, . . . [or] state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (citations and quotations omitted). In addition, there is a "strong presumption against preempting state

47825

2

common law and statutory provisions regulating areas historically within the state's police power that the Defendants must overcome in order to make their case." *Drayton v. Pilgrim's Pride Corp.*, No. Civ. A. 03-2334, 2004 WL 765123, at \*4 (E.D. Pa. Mar. 31, 2004). Comcast cannot satisfy its burden of proof.

Section 552(c) merely acknowledges that a cable provider can use reasonable means for giving notice of changes in cable service contracts to subscribers. The cable provider then sets forth the means selected to provide such notice in the contract between the cable provider and subscriber, which is precisely what Comcast has done here. *See infra* at 4-5. There simply is no conflict with federal law to apply state contract principles to determine whether a valid and enforceable arbitration provision exists between Comcast and Class Plaintiffs. *See Green*, 245 F.3d at 223 (denying claim of conflict preemption and stating that, "[i]n short, establishing that federal law overlaps state law is, by itself, insufficient to establish that federal law preempts state law.").

Nor has Comcast shown that state contract law would be "an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Freightliner*, 514 U.S. at 287. The only congressional objective Comcast cites regarding § 552 is to "ensure that consumers have sufficient warning about rate and service changes so that they can choose to disconnect their service prior to implementation of the change." *See* Defs.' Reply at 4 (citing H.R. 104-204, 1996 U.S.C.C.A.N. 10, 79). Rather than conflict with federal law, the application and enforcement of state contract rights ensures that a cable provider properly notifies the subscriber of contract changes. Moreover, Congress has specifically stated in the Cable Act that application of state law is consistent with the purpose and objectives of § 552. *See, e.g.*, § 552(d)(1) and (2); *Synchronal*, 800 F. Supp. 1456; *In re Policy and Rules Concerning the Interstate, Interexchange Marketplace*, 12 F.C.C.R. 15,014, at ¶ 77 (1997) (FCC stating that "the Communications Act does not govern other issues, such as *contract formation* and breach of contract . . . .") (cited in *Ting*, 319 F.3d at 1133).

47825

3

Comcast has not cited a single case finding that § 552 preempts state law. Nor do the decisions

referred to by Comcast, *In re Universal Serv. Fund Billing Practices Litig.*, 300 F. Supp. 2d 1107 (D.

Kan. 2003), and *Boomer v. AT&T*, 309 F.3d 404 (7th Cir. 2002), support Comcast's position. Both

cases dealt with 47 U.S.C. §§ 201(b) and 202(a), which imposed extensive and substantive regulation

of telephone long distance rates, terms, and conditions. Sections 201(b) and 202(a) were found in

those cases to preempt state law because, as stated in *Boomer*, "it is either impossible to comply with

both state and federal law, or . . . state law conflicts with a federal objective." 309 F.3d at 417. *But see

Ting*, 319 F.3d 1126 (concluding that the same provisions did not preempt state law). In contrast, §

552 and the FCC regulations adopted pursuant thereto merely set a minimum standard for giving

notice to cable subscribers. Comcast has failed to demonstrate how this minimum federal standard or

the related federal policy conflict with state law.

## C.    The Uncontradicted Facts Of Record Demonstrate That Comcast Has Violated FCC Regulations And the Terms Of Comcast's Own Contracts in Failing to Provide the Requisite Notice of the Purported Arbitration Clauses.

Comcast's preemption argument is not only unfounded, but ironic. It has violated the FCC

regulations promulgated pursuant to the very law, § 552, it relies on for its preemption claim. Comcast

also failed to comply with the terms of its own cable subscriber agreements.

The FCC regulations require Comcast to provide written information annually to all of its

subscribers on designated subjects, including "conditions of subscription," and requires Comcast to

notify subscribers thirty (30) days in advance of any "significant changes" to such information. 47

C.F.R. §§ 76.1602 and 76.1603. As Comcast points out, the purpose of the 30-day notice requirement

is to ensure that cable consumers have sufficient advance notice of changes in rates and services to

allow them to make informed decisions on whether to cancel their services. Defs.' Reply at 4.

Comcast contractually provided through at least some of its predecessor companies, and at least

as recently as November 2002, that it could only amend its subscriber agreements for changes in rates

47825

4

and charges. *See* Pls.' Opp'n Mem. at 17-18. However, Comcast has not provided the applicable pre-existing subscriber contracts of the Class Plaintiffs as part of its motion to compel to prove that it was authorized under the contract to impose an arbitration clause.[3] *Id.* at 14-15.

Even Comcast's 2002 and 2003 Policies and Practices state that "[w]e will send you a written, electronic or other appropriate notice informing you of any changes and the Effective date."[4] Devine Decl., Exs. A-B. Comcast's Boston cluster Rule 30(b)(6) witness confirmed at his deposition that no 30-day or any other notice with an effective date was provided to subscribers with respect to the 2002 and 2003 arbitration clauses Comcast is attempting to enforce. Devine Depo. at 54:4-56:6, 60:6-63:1. For all the above reasons, Comcast failed to comply with FCC regulations as well as its own contract provisions and therefore no agreement to arbitrate exists between Comcast and the Class Plaintiffs. Pls.' Opp'n Mem. at 18-19.

In response, Comcast claims that since November/December 2001[5] it annually mailed as a bill stuffer "Policies and Practices" containing an arbitration clause to Boston cluster subscribers. Defs.' Reply at 2. As indicated above, however, it is undisputed that Comcast did not provide any separate notice, including an advance 30-day notice or the effective date, of the 2002 and 2003 arbitration

---

[3] Comcast includes as part of its Reply a portion of 2000 Policies and Practices that allegedly does not restrict contract changes to rates and charges. Defs.' Reply at 3 n.4. The use of this new factual material and the argument related thereto by Comcast in its Reply Brief is improper and should be disregarded. *See supra* at 1. Moreover, the document offered by Comcast pre-dates the November 2002 Terms and Conditions of Comcast, which specifically restricts contract changes to rates and charges. Pls.' Opp'n Mem. at 17-18. In any event, Comcast has still failed to meet its burden of proof by showing that the applicable pre-existing subscriber contract of Class Plaintiffs authorized the imposition of an arbitration clause.

[4] The 2001 Policies and Practices contain the same language. Declaration of Jessica N. Servais (Aug. 2, 2004), Ex. A.

[5] Comcast fails to point out that it is not seeking to enforce the purported arbitration clause contained in the 2001 Policies and Practices. Pls. Opp'n Mem. at 2 n.1. In addition, the 2001 arbitration provision is even more draconian than the arbitration provisions it is attempting to enforce. It includes terms of the kind contained in the 2002 and 2003 arbitration clauses, as well as, for example, language prohibiting the arbitrator from awarding any damages not expressly authorized by the agreement even if otherwise authorized by statute or other applicable law; providing that if a party challenges arbitratiblity in court and the court finds the claims arbitrable, "then all of the costs and expenses, including reasonable attorneys' fees . . . shall be reimbursed by the non-compliant party to the requesting party"; and providing that Comcast, if it prevails in the arbitration, may recover from the subscriber the fees and expenses it paid to the arbitrator. Servais Decl. (August 2, 2004), Ex. A.

47825

5

clauses it is trying to enforce here.[6]

Similarly without merit is Comcast's contention that the mere continued use by a subscriber of

cable services allows Comcast to unilaterally impose an arbitration clause. The court in *Mattingly v.*

*Hughes Elec. Corp.*, 810 A.2d 498, 508 (Md. App. 2002), rejected the same argument of another

provider of video program services and concluded under basic contract law principles that no

agreement to arbitrate existed. In so doing, the court stated:

> DIRECTV has cited no "arbitration amendment" case to support the proposition
> it advocates in this case – that a consumer accepts the terms of an amendment
> adding an arbitration clause to a customer agreement merely by continuing to
> accept that service, *without regard to whether the consumer received notice of*
> *that amendment in accordance with the change of terms provision in the*
> *customer agreement.*

*Id.* (emphasis in original). *See also DIRECTV, INC. v. Mattingly*, 829 A.2d 626, 638-39 (Md. 2003)

(upholding denial of motion to compel arbitration on grounds that "initial customer agreement was not

validly modified to include an arbitration amendment"); Pls.' Opp'n Mem. at 15-18. The same

analysis and result apply to this case.

## D.     Comcast's Argument Regarding Retroactivity is Specious.

In response to Plaintiffs' showing that the language of Comcast's 2002 and 2003 arbitration

clauses does not apply retroactively to claims arising before they allegedly became effective, Comcast

presents a puzzling argument. It contends that the arbitration clauses in *In re USF*, 300 F. Supp. 2d

1107, and *Choice Sec. Sys., Inc. v. AT&T Corp.*, No. 97-1774, 1998 WL 153254 (1st Cir. Feb. 25,

1998) (both refusing to give retroactive effect to an arbitration clause), were limited to disputes arising

out of the subject agreement or products provided under the agreement, whereas Comcast's arbitration

---

[6] Contrary to Comcast's contention and as indicated in Pls.' Opp'n Mem. at 14-15 (citing *Intergen v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003)), Comcast, as the moving party, clearly has the burden to establish that each of the Class Plaintiffs and Comcast entered into cable service agreements containing arbitration provisions. *Fluehmann v. Assocs. Fin. Servs.*, No. CIV. A. 01-40076-NMG, 2002 WL 500564, at *5 (D. Mass. Mar. 29, 2002), cited by Comcast, similarly states: "A party seeking to compel arbitration must therefore show, at the outset, that arbitration is consistent with the clear intent of the parties and the plain language of the contract." Comcast has simply failed to satisfy its burden.

6

provisions also includes claims relating to the "services provided." Defs.' Reply at 6 n. 10. This distinction is irrelevant.

Like the 2002 and 2003 arbitration clauses Comcast is seeking to enforce here, the arbitration provisions in both *In re USF* and *Choice Sec. Sys.* contained references to the services or products provided under the subject agreements. See Pls. Opp'n Mem. at 19-20. Furthermore, there simply is no language in these 2002 and 2003 arbitration provisions stating that they apply to claims preceding the adoption of the arbitration provisions.[7] The language of the arbitration clauses Comcast seeks to enforce therefore clearly does not apply to claims that arose before they allegedly took effect. *Id.*

Moreover, Comcast asserts that even if the arbitration clauses are not given retroactive effect they should at least apply to claims arising after November/December 2001 when Comcast first adopted an arbitration provision. Defs.' Reply at 6 n.10. Comcast, however, is not attempting to enforce the 2001 arbitration provision, which is even more onerous than the unlawful 2002 and 2003 arbitration provisions it is attempting to enforce. *See supra* note 5. Accordingly, there is no basis for giving any effect to the 2001 arbitration provision.

## II.   COMCAST HAS NOT REFUTED PLAINTIFFS' FULLY SUPPORTED SHOWING THAT ENFORCEMENT OF COMCAST'S ARBITRATION CLAUSES WOULD PRECLUDE PLAINTIFFS FROM EFFECTIVELY VINDICATING THEIR SHERMAN ACT CLAIMS.

### A.   Comcast's Contention That The Prohibition Against Class Actions Will Allow Vindication of Plaintiffs' Antitrust Claims Ignores The Facts Of Record And Reality.

Comcast's contention that there is no right to a class action under the Sherman Act or the Clayton Act, Defs.' Reply at 11, completely misses the point. The question is not whether there is a right to a class action, but whether enforcement of Comcast's arbitration clauses prohibiting class actions will preclude Class Plaintiffs from vindicating their federal antitrust claims. If so, Comcast's

---

[7] In contrast, language in Comcast's 2001 arbitration provision, which Comcast is not attempting to enforce, refers to disputes "arising before or after the effective date" of the provision. Servais Decl. (August 2, 2004), Ex. A.
47825

7

arbitration clauses are unenforceable. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20,

28 (1991) (courts may compel arbitration only "so long as the prospective litigant effectively may

vindicate [his or her] statutory cause of action in the arbitral forum.").

Plaintiffs have submitted overwhelming facts demonstrating that the prohibition against class

actions contained in Comcast's arbitration clauses will absolutely preclude them from pursuing their

antitrust claims. Pls.' Opp'n Mem. at 4-7; Declarations of Todd, Sedran[8], and Beyer. Comcast

submits no evidence to the contrary.

Nor does Comcast ever challenge the common sense economic reality that no consumer or

lawyer will spend millions of dollars in order to recover a few hundred, or, at most, several thousand

dollars. Plaintiffs have demonstrated that courts repeatedly recognize the unyielding reality of this

simple point. *See* Pls.' Opp'n Mem. at 4-7.

A very recent Seventh Circuit opinion written by Judge Posner succinctly states that the option

there, as here, is either proceeding on a class basis or not proceeding at all:

> It would hardly be an improvement to have in lieu of this single class
> action 17,000,000 suits each seeking damages of $15 to $30. . . . The
> *realistic* alternative to a class action is not 17,000,000 individual suits,
> but zero individual suits, as only a lunatic or a fanatic sues for $30. But
> a class action has to be unwieldy indeed before it can be pronounced an
> inferior alternative   no matter how massive the fraud or other
> wrongdoing that will go unpunished if class treatment is denied – to no
> litigation at all.

*Carnegie v. Household Int'l., Inc.*, No. 04-8008, 04-8009, 2004 WL 1588083, at *6 (7th Cir. July 16,

---

[8] Comcast suggests that the Court disregard or strike the declarations of J. Owen Todd and Howard Sedran. *See* Defs.'
Reply at 11 n.15. Unlike the case law Comcast cites, the declarations are based on the declarants' personal knowledge as a
former judge and an attorney, respectively, regarding the *practical* difficulties of having Class Plaintiffs' statutory antitrust
claims vindicated through arbitration on an individual basis and do not state any legal conclusions regarding the claims
themselves. These declarations are proper. *See Gomez v. Rivera Rodriguez,* 344 F.3d 103, 115 (1st Cir. 2003) (finding
abuse of discretion to exclude attorney's testimony regarding his legal advice because it was "not the kind of legal opinion
testimony" that would be inadmissible); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508-09 (2d Cir. 1997), *cert.
denied*, 434 U.S. 861 (1977) (stating that the opinion of an attorney only constitutes a legal opinion if it goes "to the legal
obligations of the parties under the contract") (citations omitted); *Life & Health Ins. Co. of Am. v. Fed. Ins. Co.*, Civ. A. No.
92-6736, 1995 WL 263551, at *1 (E.D. Pa. May 2, 1995) (attorney's opinion admissible where he "does not opine as to the
legal duties that arise under the law, or tell the jury what conclusion to reach.").

47825

8

2004). The unchallenged facts of record and the legion of supporting cases cited in Plaintiffs' Opposition establish that Comcast's class action bar in its arbitration clauses prevents Class Plaintiffs from vindicating their antitrust claims under the Sherman Act.

Comcast nonetheless argues that Plaintiffs' position "rests entirely on [Plaintiffs'] incorrect assertion that they cannot recover statutory costs and attorneys' fees in the arbitral forum" and suggests that the class action device is essential only in cases in which statutory costs and attorneys' fees are unavailable. Defs.' Reply at 12. However, even assuming that Comcast's arbitration clauses allow recovery of costs and fees, *see infra* at 12-13, as indicated above it is simply nonsensical for a litigant or lawyer to advance millions of dollars in fees or costs to collect potentially a mere fraction of that amount. The cost ineffectiveness of such an approach is obvious and no reasonable litigant or attorney would pursue such an endeavor. *See, e.g.,* Todd Decl. ¶ 8; Sedran Decl. ¶¶ 9-11.

Moreover, due to the disparity between the damages and the expenses of litigation, a Class Plaintiff proceeding on an individual basis would not be able to recover all of his or her expenses even if the Plaintiff prevailed in the litigation. *See Hensley v. Eckerhart,* 461 U.S. 424, 448 (1983) (Brennan, J., concurring in part and dissenting in part) ("Any system for awarding attorney's fees that did not take account of the relationship between the results and fees would fail to accomplish Congress's goal of checking insubstantial litigation."); *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585, 592 (7th Cir. 2000) (if plaintiff "had incurred attorney's fees that were disproportionate to a reasonable estimate of the value of its claim, it could not recover all those fees, but only . . . the amount that would have been reasonable to incur had the value of the claim been estimated reasonably rather than extravagantly."); *Coutin v. Young & Rubicam P.R., Inc.,* 124 F.3d 331, 339 (1st Cir. 1997) ("[I]t is appropriate for a trial court to consider the skimpiness of the relief when adjusting the lodestar figure.").

Additionally, numerous courts have invalidated arbitration provisions containing class action

bans, even though statutory costs and attorneys' fees were available. *See, e.g., Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) (class action under the Fair Debt Collection Practices Act, which permits prevailing party to recover costs and attorneys' fees per 15 U.S.C. § 1692k(a)(3)); *Lytle v. CitiFinancial Servs., Inc.*, 810 A.2d 643 (class action under the Truth in Lending Act, which permits prevailing party to recover costs and attorneys' fees per 15 U.S.C. § 1640(a)(3)); *Luna v. Household Fin. Corp. III*, 236 F. Supp. 2d 1166 (W.D. Wash. 2002) (class action under TILA and the Homeowners Equity Protection Act, which provide for the recovery of costs and attorneys' fees per 15 U.S.C. § 1640(a)(3)); *Ting v. AT&T*, 182 F. Supp. 2d 902 (N.D. Cal. 2002) (class action under Consumer Legal Remedies Act, which permits recovery of prevailing party's attorneys' fees, costs, and expenses per Cal. Civ. Code § 1780).

Comcast also selectively quotes from *Johnson v. West Suburban Bank*, 225 F.3d 366 (3d Cir. 2000). In *Johnson*, the court specifically did not decide whether statutory rights could be vindicated under an arbitration clause because "Johnson does not argue that the arbitral forum selected in the agreement is somehow inadequate to vindicate any of his rights under the [statute]." *Id.* at 373-74.[9] Here, for all the reasons stated in Plaintiffs' Opposition and this Surreply, Plaintiffs have shown that arbitration will not permit Class Plaintiffs to vindicate their statutory rights under the Sherman Act.

Clearly, the class action ban in Comcast's arbitration clauses prevents Class Plaintiffs from vindicating their statutory rights.

## B.    Comcast's Contention That Plaintiffs May Vindicate Their Statutory Rights Through the Very Limited Arbitration Discovery Procedures Is Wrong.

In response to Class Plaintiffs' showing that the limitations of discovery inherent in the very concept of arbitration further preclude them from vindicating their antitrust claims in arbitration, Comcast argues that "discovery is expressly contemplated and permitted under the Rules of the AAA,

---

[9] Likewise, *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631 (4th Cir. 2002), does not support Comcast's contention because it did not specifically involve a vindication claim, and in any event, the court indicated that based on the facts of that case the plaintiff had not proven the inadequacy of the "arbitral forum."
47825

JAMS and NAF" and that this case "will require little, if any discovery . . . ." Defs.' Reply at 13. This contention has no merit.

Plaintiffs have demonstrated that each of the arbitration service providers identified in Comcast's arbitration clauses severely restricts discovery. Servais Decl. ¶¶ 3-6; Pls.' Opp'n Mem. at 10-11. Plaintiffs' unrebutted declarations also establish that prosecution of this antitrust case will involve expert witnesses and numerous complex fact issues, requiring extensive discovery. Beyer Decl. ¶¶ 6 and 7; Todd Decl. ¶ 6; Sedran Decl. ¶ 9; Pls.' Opp'n Mem. at 4-5. As J. Owen Todd points out in his Declaration (¶ 9):

> Additionally, plaintiffs would be further effectively precluded from vindicating their statutory antitrust claims in arbitration under the limited discovery available in arbitration proceedings. This complex antitrust litigation will require the full array of open and liberal discovery rights and methods provided for under the Rules of Civil Procedure. Plaintiffs could not effectively pursue their antitrust claims without access to such discovery. Discovery is restricted in arbitration and consequently does not afford plaintiffs adequate opportunity to vindicate their claims.

Comcast has not provided any support for a contrary conclusion.

**C.   Comcast's Arbitration Clauses Impose A One-Year Limitations Period In Contravention Of The Four-Year Sherman Act Statute Of Limitations Period And Thereby Prevent Plaintiffs From Vindicating Their Full Statutory Rights.**

Comcast's arbitration provisions state: "YOU MUST CONTACT US WITHIN ONE (1) YEAR OF THE DATE OF THE OCCURRENCE OF THE EVENT OR FACTS GIVING RISE TO A DISPUTE . . . OR YOU WAIVE THE RIGHT TO PURSUE A CLAIM BASED UPON SUCH EVENT, FACTS OR DISPUTE." Policies and Practices ¶ 10, Devine Decl., Exs. A-B.

Comcast argues that the above language does not operate to shorten the applicable statute of limitations. Defs.' Reply at 13-15. The plain language Comcast chose, however, makes clear that failure to contact Comcast within one year "of the occurrence of the event or facts giving rise to the dispute" means that "you waive the right to pursue a claim based upon such event, facts or dispute."

47825

11

Such a provision clearly operates to shorten the four-year limitations period under the Sherman Act, 15

U.S.C. § 15(b), because any subscriber who fails to contact the company within the one-year period

purportedly waives his or her claim. Consequently, Comcast's arbitration provisions drastically

shorten the statutory period adopted by Congress, thereby further precluding Class Plaintiffs from

vindicating their full federal statutory rights.[10]

## D.    Comcast's Attempts To Walk Away From The Terms Of Their Arbitration Clauses Regarding Treble Damages and Costs and Fees Are Unavailing.

Although the language of the subscriber agreements indicates otherwise,[11] Comcast now

interprets its subscriber contracts to allow recovery of costs and fees in arbitration. It also states that

treble damages, although explicitly prohibited by the Policies and Practices, "may" be recoverable

under the Policies and Practices.[12] Defs.' Reply at 9-10.

For purposes of deciding the enforceability of the arbitration clauses, Comcast's last minute

concessions of the meaning of the otherwise contrary plain language of the pertinent portions of the

subscriber agreements should not be considered. *Cf. Parilla v. IAP Worldwide Servs. VI, Inc.*, 368

F.3d 269, 285 (3d Cir. 2004) (refusing to give effect to after-the-fact offer to waive certain provisions

of arbitration clause). The face of the documents certainly indicates that recovery of treble damages,

costs, and fees are prohibited, *see* Pls.' Opp'n Mem. at 8, and would therefore deter a consumer from

pursuing his or her rights. *Parilla*, 368 F.3d at 285 n.17 ("If the provision, as drafted, would deter

---

[10] The cases relied on by Comcast do not support a different result. *See* Defs.' Reply at 14-15. None of them include analysis of an arbitration provision, the vindication of statutory rights related thereto, or even a claim of unconscionability.

[11] Section 13 of the Policies and Practices likewise provides "YOU ARE RESPONSIBLE FOR ALL COSTS THAT YOU INCUR IN THE ARBITRATION, INCLUDING, BUT NOT LIMITED TO, YOUR EXPERT WITNESS OR ATTORNEY FEES." Devine Decl., Exs. A-B.

[12] Section 8 of the Policies and Practices states: "IN NO EVENT SHALL WE . . . HAVE ANY LIABILITY FOR PUNITIVE, TREBLE, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES . . . SUCH LIMITATION OF LIABILITY APPLIES IN ALL CIRCUMSTANCES, REGARDLESS OF WHETHER SUCH DAMAGES MAY BE AVAILABLE UNDER APPLICABLE LAW, AND THE PARTIES HEREBY WAIVE THEIR RIGHTS, IF ANY, TO RECOVER ANY SUCH DAMAGES. YOUR SOLE AND EXCLUSIVE REMEDIES UNDER THIS AGREEMENT ARE AS EXPRESSLY SET FORTH IN THIS AGREEMENT." Devine Decl., Exs. A -B.
47825

12

potential litigants, it is unenforceable . . . .") (quoting *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 675 (6th Cir. 2003)).

Comcast's concessions are also very manipulative. Comcast initially incorporated restrictive language in its subscriber contracts that clearly appeared to limit consumer rights, but now, when its contracts are challenged, it stipulates that the contracts means something, or may mean something, other than initially represented. It would have been simple for Comcast to have clearly communicated the meaning it now ascribes to them in the initial agreements, but instead it used language that discouraged consumers from pursuing their rights. This type of deception should not inure to Comcast's benefit.

In any event, Comcast fails to address the indisputable economic fact that no rational consumer or lawyer can be expected to advance the millions of dollars in attorneys' fees and the hundreds of thousands of dollars in expert witness fees required in order to prosecute the antitrust claims involved in this case. The huge disparity between the prohibitive up-front expenditures and the minimal potential recovery on an individual claim basis presents an insurmountable bar to effective vindication of Class Plaintiffs' rights. *See supra* at 8-10. Nor does Comcast address the fact that the comparatively miniscule potential damage recovery would limit the ability to recover the full amount of the expended costs and fees. *See supra* at 9-10.

As for treble damages, although Comcast does not commit to whether the Policies and Practices allow such recovery, the plain language of the contract clearly precludes treble damages. *See supra* note 12. Congress expressly allowed successful antitrust plaintiffs to recover treble damages, 15 U.S.C. § 15, to deter violations of federal antitrust laws. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 635 (1985). By precluding or even creating uncertainty regarding the recovery of treble damages, Comcast effectively prevents Class Plaintiffs from fully vindicating their statutory rights.

47825

13

**E.    This Court, Not An Arbitrator, Should Decide Whether Comcast's Arbitration Clauses Preclude Plaintiffs From Vindicating Their Statutory Rights.**

Comcast suggests that the arbitrator should decide whether Plaintiffs are precluded from vindicating their antitrust claims under the terms of Comcast's arbitration clauses. *See* Defs.' Reply at 8-9. Comcast is wrong as a matter of law.

Courts decide whether a litigant can vindicate rights in an arbitration proceeding. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79 (2000) (in deciding vindication issue, Court stated that arbitration may not be compelled if prospective litigant is unable to effectively "vindicate [his or her] statutory cause of action in the arbitral forum.") (quoting *Mitsubishi*, 473 U.S. at 637); *Gilmer*, 500 U.S. at 28 (same). Since courts cannot compel arbitration unless a prospective litigant can vindicate his or her rights in arbitration, the Court, not an arbitrator,[13] must necessarily decide this threshold issue. *See also Mattox v. Decision One Morg. Co., LLC*, No. CIV. A. 01-10657 – GAO, 2002 WL 31121087, at *2 (D. Mass. Sept. 26, 2002) (citing *Green Tree* and deciding vindication issue).

**III.    COMCAST HAS NOT REBUTTED PLAINTIFFS' CLAIM THAT COMCAST'S ARBITRATION PROVISIONS ARE UNCONSCIONABLE.**

Comcast contends that state unconscionability principles are preempted by federal law. However, as discussed *supra* at 1-5, the Cable Act does not present irreconcilable conflicts with state law, including state unconscionability principles.

As for Comcast's assertion that state procedural unconscionability law is preempted, one of the cases relied on by Comcast for this proposition, *In re USF*, 300 F. Supp. 2d 1107 (D. Kan. 2003), actually concludes otherwise. The *USF* case specifically states that the Communications Act does not preempt state procedural unconscionability principles. As the *USF* court held:

> [P]laintiffs' procedural unconscionability arguments challenge the validity of the contract formation process itself, not the actual propriety of the terms and

---

[13] The cases Comcast cites for a contrary proposition are clearly inapplicable to this case. None of them deal with the threshold issue of whether the prospective litigant can vindicate his or her rights in arbitration.

47825

14

conditions of the service contract. The FCC's *Order on Reconsideration*
distinguishes those types of contract formation challenges and places them
outside of the preemptive scope of the [Communications Act].

*Id.* at 1121; *see also Ting*, 319 F.3d at 1126 (holding that state unconscionability laws did not conflict
with the provisions of the Communications Act); *supra* at 2-4.

Comcast also argues that the FCC and Congress "expressly authorized cable operators to
provide complaint resolution procedures in their subscriber agreements," Defs.' Reply at 17, and
therefore state law of substantive unconscionability is preempted with respect to the terms of
Comcast's arbitration clauses. However, federal law generally permitting "complaint resolution
procedures" does not conflict with state law that addresses whether the particular terms of arbitration
chosen by Comcast are "oppressive" and therefore substantively unconscionable under Massachusetts
state law.

Unlike the extensive and substantive regulation of telephone long distance rates, terms and
conditions under 47 U.S.C. § 201(b) and 202(a) involved in the *USF* and *Boomer* cases cited by
Comcast, the federal law relied on here by Comcast does not regulate the substantive terms of an
arbitration provision. The application of state substantive unconscionability principles therefore does
not conflict with federal law or policy. Indeed, Comcast's suggestion that Congress and the FCC
intended to allow Comcast to impose unconscionable terms of arbitration with impunity is absurd. *See
supra* at 2-4.

In response to Plaintiffs' demonstration that Comcast's arbitration provisions are procedurally
and substantively unconscionable, *see* Pls.' Opp'n Mem. at 11-13, Comcast summarily states that
Plaintiffs' procedural unconscionability argument is "unavailing." Defs.' Reply at 17. Based on the
factual record in this case, however, Comcast's arbitration clauses are classic examples of adhesion

contracts where the required inequality of bargaining power is apparent.[14] Pls.' Opp'n Mcm. at 11-12.

In fact, another case relied on by Comcast, *Bischoff v. DirectTV, Inc.*, 180 F. Supp. 2d 1097

(C.D. Cal. 2002), Defs.' Reply at 5-6, further supports Plaintiffs' position. *Bischoff* concluded that the

arbitration provision of a provider of video program services was procedurally unconscionable. As the

court stated:

> [T]he Court agrees with Plaintiffs that the Customer Agreement signed by Guzik
> was a contract of adhesion as it was a form contract imposed by the party with
> superior bargaining power and Plaintiffs could not negotiate the terms, but could
> only "take them or leave them." Therefore, the Court finds the arbitration
> agreement to be procedurally unconscionable as a finding of a contract of
> adhesion is essentially a finding of procedural unconscionability.

*Id.* at 1107 (citation and internal quotation marks omitted).

Comcast's discussion of the substantive component of unconscionability essentially rehashes

the same flawed arguments it made with respect to Plaintiffs' inability to vindicate their statutory

rights and ignores the prevailing case law cited by Plaintiffs in their Opposition Memorandum at 12-13

and notes 4, 7 and 8. Also without merit is Comcast's suggestion, Defs.' Reply at 18, that an

arbitrator, rather than the Court, should decide whether an arbitration provision is unconscionable.

*See, e.g., Mattox*, 2002 WL 31121087, at *3 (deciding whether arbitration provision is

unconscionable). Indeed, courts, not arbitrators, have repeatedly struck down arbitration clauses as

unconscionable. *See* Pls.' Opp'n Mem. at 11-12 and notes 4, 7 and 8.

Comcast's arbitration provisions are patently unconscionable.

## IV.    THE UNCONSCIONABLE PROVISIONS OF COMCAST'S ARBITRATION
CLAUSES CANNOT BE SEVERED.

Comcast contends that if the Court finds one or more provisions of its arbitration clauses to be

---

[14] Comcast's reliance on *Hurlbut v. Gantshar*, 674 F. Supp. 385, 392 (D. Mass. 1987), is misplaced because it did not specifically address procedural unconscionability, but instead appeared to assume that the contract in that case was procedurally unconscionable. Instead, the court determined that the waiver of the right to a jury trial was not *substantively* unconscionable in that case.

16

unconscionable,[15] the Court should merely sever those provisions. Defs.' Reply at 19-20. Severance is clearly inappropriate under the facts of this case.

It would be fundamentally unfair to allow Comcast, which drafted the unlawful provisions, to merely modify the defective arbitration clauses. Severance is particularly inappropriate here, where the terms of arbitration, including the arbitration requirement itself which severely restricts discovery, prevent Class Plaintiffs from pursuing their statutory rights. Numerous cases refuse to sever unconscionable provisions from an arbitration agreement.[16]

The class action ban by itself is such an essential part of the arbitration provisions that it cannot merely be severed. For example, in *McNulty v. H&R Block, Inc.*, 843 A.2d 1267 (Pa. Super. 2004), the court struck the entire arbitration provision because it contained an unconscionable class action ban. As the court stated:

> As applied to facts of this case, the *enforcement of the arbitration provision* would work to deny the allegedly injured parties access to justice and is therefore unconscionable. We believe that this determination of unconscionability satisfies the FAA in that it represents grounds in both law and equity for *the defeat of the arbitration provision*.

*Id.* at 1274 (emphasis added; footnote omitted); *see also Carll*, 793 A.2d at 926 (in refusing to sever a

---

[15] The concept of severance does not apply to Class Plaintiffs regarding their inability to vindicate their statutory rights. Under applicable Supreme Court precedent, the Court cannot compel arbitration if the actual terms of the arbitration provision preclude the Class Plaintiffs from vindicating statutory rights. *See supra* at 14; Pls.' Opp'n Mem. at 3.

[16] *See, e.g. Carll v. Terminix Int'l Co., L.P.*, 793 A.2d 921, 925 (Pa. Super. 2002) (concluding that unenforceable limitation on damages provision to arbitration agreement was not severable); *Plaskett v. Bechtel Int'l, Inc.*, 243 F. Supp. 2d 334, 345 (D. Vi. 2003) (refusing to sever two unconscionable terms from an arbitration agreement because "the arbitration provisions are permeated with these unconscionable terms, making severance inappropriate."); *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 271 (3d Cir. 2003) (refusing to sever, court stated that "[b]ecause the sickness has infected the trunk, we must cut down the entire tree."); *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 788 (9th Cir. 2002) (refusing to sever where arbitration agreement was "so permeated with unconscionable clauses that we cannot remove the unconscionable taint from the agreement"); *Graham Oil Co. v. Arco Prods. Co.*, 43 F.3d 1244, 1249 (9th Cir. 1995) (finding severance inappropriate because "blatant misuse of the arbitration procedure serves to taint the entire clause."); *Acorn v. Household Int'l, Inc.*, 211 F. Supp. 2d 1160, 1174 (N.D. Cal. 2002) (stating that severance of arbitration agreement was not appropriate because "the purpose of the arbitration agreement is not to transfer claims to a more expeditious forum, but to deter . . . customers from bringing claims."); *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 697 (Cal. 2000) (finding severance of arbitration agreement inappropriate because the "defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the [proponent's] advantage.").

single unconscionable provision from an arbitration clause, court stated that the arbitration provision and a separate unconscionable provision "are not distinct. The same contractual provision that directs arbitration limits the authority of the individual conducting that arbitration."). Comcast does not argue otherwise. Defs.' Reply at 19-20 (suggesting provisions that could be severed, but not referencing class action ban).

The Massachusetts case cited by Comcast in support of its severance argument, *Cadillac Auto Co. of Boston v. Engeian*, 339 Mass. 26 (1959), actually supports Plaintiffs' position. In that case, the court considered whether an unlawful forum selection clause in a guaranty contract invalidated the whole guaranty agreement. The court severed the entire forum selection clause, but refused to void the guaranty contract. Similarly, here Plaintiffs are seeking invalidation of the entire arbitration clause, not the whole subscriber contract.

The Court should strike down Comcast's arbitration provisions in their entirety.

## CONCLUSION

For all of the reasons discussed in Class Plaintiffs' Opposition and in this Surreply, Defendants' Motion to Compel Arbitration must be denied.

Dated: August 2, 2004

Respectfully submitted,

Samuel D. Heins
Stacey L. Mills
Alan I. Gilbert
David Woodward
Jessica N. Servais
HEINS MILLS & OLSON, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 338-4605
Fax: (612) 338-4692

John Peter Zavez (#555721)
Noah Rosmarin (#630632)
ADKINS KELSTON & ZAVEZ, P.C.
90 Canal Street
Boston, MA 02114
Tel: (617) 367-1040
Fax: (617) 742-8280

Ann D. White
Carol A. Mager
MAGER WHITE & GOLDSTEIN, LLP
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA 19046
Tel: (215) 481-0273
Fax: (215) 481-0271

Barry Barnett
Max Tribble, Jr.
SUSMAN GODFREY LLP
901 Main Street, Suite 4100
Dallas, TX 75202
Tel: (214) 754-1900
Fax: (214) 754-1933

Jonathan Shaw
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3100
Seattle, WA 98101
Tel: (206) 516-3836
Fax: (206) 516-3883

Robert N. Kaplan
Gregory K. Arenson
Christine M. Fox
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

Lynn Lincoln Sarko
Mark A. Griffin
John H. Bright
Raymond J. Farrow
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200

47825

Seattle, WA  98101
Tel:  (206) 623-1900
Fax:  (206) 623-3384


Michael Hausfeld
Stewart Weltman
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699

Marc H. Edelson
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA  18901
Tel:  (215) 230-8043
Fax:  (215) 230-8735

**ATTORNEYS FOR PLAINTIFFS**

47825

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on Defendants' counsel of record by United States Mail on this 2nd day of August, 2004, addressed as listed below.

*Alan S. Gilbert*

Darryl J. May
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Tel: (215) 864-8103
Fax: (215) 864-9167

George L. Paul
WHITE & CASE LLP
601 Thirteenth Street, N.W.
Suite 600 SouthWashington, D.C. 20005-3807
Tel: (202) 626-3600
Fax: (202) 639-9355

Jaime Bianchi
WHITE & CASE LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, FL 33131-2352
Tel: (305) 371-2700
Fax: (305) 3585744

***Counsel for Defendants***

47825

## **EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS
(BOSTON)

Martha Kristian, *et al.*,                 )
                                            )        No. 03CV12466EFH
            Plaintiffs,                     )        The Honorable Edward F. Harrington
                                            )
    v.                                      )
                                            )
Comcast Corporation, *et al.*,              )
                                            )
            Defendants.                     )
                                            )

## DECLARATION OF JESSICA N. SERVAIS

I, Jessica N. Servais, hereby declare as follows:

1.      I am an attorney with the law firm of Heins Mills & Olson, P.L.C., counsel for

Plaintiffs in this matter. This declaration is based on my personal knowledge.

2.      Attached as Exhibit A to this declaration is a true and correct copy of the New England

area AT&T Broadband Policies and Practices for 2001 as provided to Plaintiffs' Counsel, Alan I.

Gilbert, from Defense Counsel, Jaime A. Bianchi, on March 15, 2004.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of August, 2004 at Minneapolis, Minnesota.

                                            *Jessica N. Servais*
                                            Jessica N. Servais

Certificate of Service

I hereby certify that a true and correct copy of the
foregoing document was served on Defendants' counsel
of record by United States Mail on this 2nd day of August, 2004.

*Jessica M. S.*

47894.1

## **EXHIBIT A**

LOS ANGELES
MIAMI
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.

BERLIN
BRATISLAVA
BRUSSELS
BUDAPEST
DRESDEN
DÜSSELDORF
FRANKFURT
HAMBURG
HELSINKI
ISTANBUL
LONDON
MILAN
MOSCOW
PARIS
PRAGUE
ROME
STOCKHOLM
WARSAW

ALMATY
ANKARA
BANGKOK
BOMBAY/MUMBAI
HO CHI MINH CITY
HONG KONG
JAKARTA
SHANGHAI
SINGAPORE
TOKYO

JEDDAH
RIYADH

MEXICO CITY
SÃO PAULO

JOHANNESBURG

# WHITE & CASE

LIMITED LIABILITY PARTNERSHIP

WACHOVIA FINANCIAL CENTER, SUITE 4900
200 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131-2352

TELEPHONE: (1-305) 371-2700
FACSIMILE:  (1-305) 358-5744/5766

DIRECT DIAL: 305-995-5259

March 15, 2004

## VIA FACSIMILE AND U.S. MAIL

Alan I. Gilbert, Esq.
Heins, Mills & Olson, P.L.C.
3550 IDS Center
80 South Eight Street
Minneapolis, Minnesota 55402

Re:     Kristian and Masterman v. Comcast Corporation et al.
        Case No. 03CV12466 EFH
        Rogers and Pinella v. Comcast Corporation and AT&T Broadband
        Case No. 04-10142 EFH

Dear Alan:

        Enclosed please find the Policies and Practices ("PNP") issued by the AT&T Legacy cable systems in New England.  PNP became effective in September 2001.

        Should you have any further questions, please do not hesitate to contact me.

                        Sincerely,

                        *Jaime Bianchi*

                        Jaime A. Bianchi

Enclosures

JAB/mp

cc:     George Paul, Esq. (w/ encls.)
        Mark Berthiaume, Esq. (w/ encls.)

# IMPORTANT NOTICES TO OUR CUSTOMERS

Your Local Cable Company's
Policies & Practices

Notice to Customers Regarding Policies,
Complaint Procedures & Dispute Resolution



AT&T Broadband

Book II: Revised 9/01

## NOTICE TO CUSTOMERS REGARDING POLICIES, COMPLAINT PROCEDURES AND DISPUTE RESOLUTION

When the Federal Communications Commission (FCC) issued its technical and customer service standards, it adopted regulations which require all cable television operators to establish a process for resolving questions or complaints customers may have about billing for the services provided or the quality of the television signals delivered or other services we provide, and to notify customers of those procedures.

We are dedicated to providing quality cable television service to our customers and to assuring that each problem is resolved to the customer's satisfaction. These customer service procedures, in addition to many other issues, are covered in material generally provided to you at the time of installation and annually thereafter once you have become a customer.

This notice summarizes some of the procedures that you need to know to help us answer questions and resolve complaints you may have about billing for the services you receive and the quality of the television signals or other cable services we provide.

For those of our customers receiving service through commercial accounts, bulk rate arrangements with multiple dwelling owners, or similar arrangements, some of the policies, procedures and services herein may not apply. Please refer to the terms and conditions of documents reflecting such separate arrangements. Where such documents are inconsistent with the policies, procedures and information relating to service set forth herein, the terms and conditions of such separate arrangements shall apply.

## AT&T BROADBAND'S POLICIES AND PRACTICES

The following Policies and Practices, set forth below, are used when providing you cable television and other cable Services. We may change them in the future and will notify you if that occurs. We will continue to review our Policies and Practices as part of our commitment to continually review and improve the quality of Services we provide. We will send you a written, electronic, or other appropriate notice informing you of any changes and the Effective Date. If you find the change unacceptable, you have the right to cancel your Service. However, if you continue to receive Service after the Effective Date of the change, we will consider this your acceptance of the change.

## I. DEFINITIONS

As used in these Policies and Practices:

"We", "Company", "us", or "our" means AT&T Broadband, LLC and all affiliated entities using the brand name "AT&T Broadband", including your local cable company, its employees, authorized agents, and its parents, subsidiaries and affiliated companies.

"You", "your", or "Customer" means the customer identified on the work order that was signed to begin your cable TV service and any other person using the Services provided to you or authorized by you to access or modify your account.

"Home" means the place you live, including a single-family home, apartment, other residence, or any other type of dwelling unit, where your Service is installed.

"Service(s)" means the cable TV programming, cable internet access or any other cable service that we provide to you.

"Hourly service charge" means the hourly charge you pay us for certain services. The hourly service charge is calculated using the rules and regulations of the Federal Communications Commission ("FCC"). It is designed to recover the costs of servicing, installing and maintaining customer equipment.

"Installed" means either installed or activated.

"Inside Wire" or "Inside Wiring" means the cable that runs inside your home to a point 12 inches outside of your home, and includes any extra outlets, splitters, connections, fittings or wall plates attached to it.

"Equipment" means one or more of the following: cable modem, digital consumer terminal or digital receiver ("DCT"), converter, converter-descrambler, remote control unit, security device, addressable control module, A/B switch, coaxial cable ("cable") which is not inside wiring, parental lock-out device, or any other device installed in or around your home, whether or not provided by us, necessary or convenient for you to receive cable TV programming or other Services from us. Inside wiring is not Equipment.

## 2. PAYMENT FOR SERVICE

We provide Service to you on a month-to-month basis. Charges for Service start within 24 hours after Service is installed. The charges for one month's Service, any deposits, and any installation or equipment lease fees are payable when Service is installed. After that, we will bill you each month in advance for Service (except for pay-per-view movies or events, which are sometimes billed after they are provided to you).

Case 1:03-cv-12466-REK   Document 15   Filed 06/04/2004   Page 32 of 36

due date. You agree to pay us promptly, in full, by the payment due date for that Service and for any other charges due us, including any administrative late fee(s) and related fees, charges and assessments due to late payments or nonpayments, and any returned check fees, plus other separate and additional charges as described below.

If we do not receive your payment by the due date stated on the bill, you may be charged such fees, charges and assessments, plus the other separate and additional charges. Not withstanding the foregoing, accounts are not considered delinquent until 30 days following the billing due date. Late fees will not be added until eight business days following the date of delinquency. Delinquent accounts are subject to a maximum charge of 5% of the balance due as a one-time late fee.

The administrative late and related fee(s), charges and assessments related to late payment and nonpayment are intended to be reasonable advance estimates of costs resulting from late payments or nonpayments of our customers. We will tell you the amount of these fees and other separate or additional charges at or before the time you subscribe to and receive our Services, prior to the time we implement or assess new ones, and in our annual mailings to you thereafter. You may avoid these fees and other separate or additional charges relating to late payment and nonpayment by making sure that your payment is received by us on or before the due date on the bill. If your payment is not received by the due date on the bill, you agree to voluntarily pay these fees and any other separate and additional charges, fees, and assessments as a condition of receiving our Services.

We do not anticipate that you will make partial payments or pay your bill late, and the administrative late fee(s) and other related charges, fees, and assessments related to late payment and nonpayment are set in advance because it would be difficult to know in advance: (a) whether or not you will pay your bill on time, (b) if you do pay late, when you will actually pay your bill, if ever, and (c) what costs we will incur because of your late payment or nonpayment. We do not extend credit to our customers and the administrative fee(s), related fees, charges and assessments are not interest, a credit service charge or a finance charge. Our late fee practices may be revised to comply with applicable state or local laws, rules or regulations.

Charges for your cable Service may be billed to you together with other Services that you receive from us or our affiliated companies. Payment of any such bill for multiple Services is due in full on the indicated payment due date. Any failure to pay such bill in its entirety after the due date may result in administrative or late fees and/or disconnection of Service with respect to any or all of the Services billed. Any partial payment of a bill will be allocated by us among and between such Services and amounts charged at our discretion, subject only to applicable law.

If you change the Services you receive, we may charge you a change of service fee such as upgrade or downgrade charge. The amount of such fee may vary by office location. There is no charge for a downgrade made within 30 days of notice of a rate increase or a substantial change in programming. If you have any questions, please contact your local cable company identified on your bill in your monthly billing mailings or ask the representative you talk to when requesting a change in Service. A listing is also provided to our customers annually in a mailing or bill stuffer.

You may pay your bill by mailing payment to the address specified on your bill. We do not assume the risk of undelivered mail and payment shall be deemed made on the first business day after your payment is delivered to us. If we have an office that we have designated as a Cable Store in your area, you may deliver your payment to the Cable Store, and it will be deemed received when delivered or, if not on a regular banking day, on the next such day. If our representative collects payment from you at your home, there may be an additional charge for that service.

You agree to pay all taxes, franchise fees, and other charges, if any, which are now or in the future may be assessed because you receive our Service.

If there are any billing errors or other requests for credit, you must bring those to our attention within six (6) months of the time you receive the bill for which you are seeking correction.

Payments received from you will be deemed to be paid voluntarily.

## 3. CHANGES IN SERVICES AND CHARGES

Subject to applicable law, we have the right to change our Service and Equipment and our prices or fees, at any time. We also may rearrange, delete, add to or otherwise change the Service provided on our Basic Service or other levels of Service. If this change affects you, we will provide you notice of the change and its Effective Date. The notice may be provided on your monthly bill, as a bill insert, in a newspaper or by other permitted communication. If you find the change unacceptable, you have the right to cancel your Service. However, if you continue to receive Service after the Effective Date of the change, we will consider this your acceptance of the change. Please take the time to read the monthly messages and to review your bill carefully to make sure your name and address are correct. You will generally be billed at the same time each month.

To the extent required by law, after notice to you of a retiering of our Services or a price increase, you may obtain changes in service tiers at no additional charge. Otherwise, changes made by you of the Services you receive may result in upgrade, downgrade or change of service charges as further described herein. Please refer to our the Products and Services Price List we have supplied to you for details or call us at the number on your monthly bill if you have questions. A list of charges is also provided to our customers annually in a mailing or bill stuffer.

## 4. TERMINATION OF SERVICE

You may not assign or transfer the service without our written consent.

The provisions of these Policies and Practices, including the dispute resolution process (Section 10) shall survive termination, amendment or expiration of your relationship with the Company, your receipt of Services, or any other relationship between us.

### a. Voluntary Termination.

Unless you have otherwise agreed (such as where you have agreed in advance to receive Service over a specified period of time), you have the right to cancel your Service for any reason at any time by giving us notice. We will refund any balance due to you approximately thirty (30) days of the later of (i) your notice to us of the discontinuance of Service or (ii) the return of any Equipment you may have.

### b. Involuntary Termination/Effect on other AT&T Services.

Subject to applicable law, if you become delinquent, or fail to comply with any provision contained in these Policies and Practices, we have a right to terminate your Service or any other Service included within your bill. We may also, without limitation, require you to pay all past due charges, an installation charge and a minimum of one month's advance charges before we reconnect your Service. Further, if you do not reconnect, any rental equipment must be returned to us. A handling fee may be charged for returned checks

In either termination event, if you have a payment credit for any reason (including, without limitation, an unreturned security deposit or prepayment) at the time of your termination of service, such payment credit will be set off against any amount, which you owe us before its remittance to you.

## 5. EQUIPMENT

Except for the Inside Wiring which we consider your property regardless of who installed it, the Equipment installed by us or provided to you by us belongs to us or other third parties, unless you have purchased it. We may, at our option, supply new or reconditioned Equipment to you.

You must have our prior written consent to sell or give away our Equipment, and our Equipment may only be used in your home.

If you cease to be our customer, you are responsible for returning our Equipment to us or our designee. If you move, do not leave our Equipment in your vacant home or with anyone else. Our Equipment must be returned to us in one of our representatives in working order, normal wear and tear excepted, or you will be charged the amount set forth in the current Products and Services Price List, or the revised amount of which you have subsequently been given notice, or if no amount has been specified for the particular model of Equipment involved, the retail price for a new replacement.

You are responsible for preventing the loss of or damage to our Equipment within your home. We request that our Equipment in your possession be covered by your homeowners, renters, or other insurance. You will be directly responsible for repair, replacement and other costs, damages, fees and charges if you do not return our Equipment to us in an undamaged condition.

If you have us repair or maintain the Inside Wiring, we will charge you additionally, either by the hour or flat fee, for that service. We are not responsible for problems with the operation of your television or television-related equipment. We do not service television receivers or any other television-related equipment (such as VCR's, home antennas, or other cable-compatible equipment) not owned by us, even if it is attached to the cable or Equipment.

None of the Equipment supplied by us nor any of our cable placed outside your home or property in connection with the installation of the Equipment and Service shall be deemed fixtures, or in any way part of your real property, unless you purchase our cable to the extent permitted by law when Service ends. The Equipment supplied by us may be removed by us, at our option, at any time during or following the termination of your Service, and you agree to allow us access to your home for such purposes.

We consider Inside Wiring to be your property, regardless of who may have installed it. Unless otherwise agreed upon by Company and you in writing, you will continue to be responsible for the repair and maintenance of the Inside Wire. You may install Inside Wiring, such as additional cable wiring and outlets. Regardless of who does the work, the internal wiring within your home must not interfere with the normal operations of your local cable system. Inside Wire maintenance may not be your responsibility if you rent your home. Contact your landlord or building manager to determine responsibility.

### NOTICE OF AVAILABILITY OF CONVERTERS FOR ADDITIONAL OUTLETS.

Subscribers who install their own additional receiver connections may not be able to receive all channels carried on our cable system without additional equipment. For those television sets that are not truly compatible with the cable system, some television channels may not be receivable without additional equipment.

### 6. ACCESS TO CUSTOMERS' HOMES

You authorize us or our designees to enter into your home, in your or your representative's presence, or upon your property during normal business hours or by appointment, to install, inspect, maintain, replace, remove or otherwise deal with the Service and Equipment supplied by us. This authorization includes allowing us or such designee to be on your property outside your home at reasonable times even if you are not at home. You authorize us or our designee to make connections and perform other tasks that are necessary or desirable to enable us to provide Service to you or others, including connecting and making necessary attachments to your Inside Wiring. If you are not the owner of your home, you are responsible for obtaining any necessary approval from the owner to allow us into your home to perform the functions specified above. In addition, you agree to supply us or our designee, if we ask you to, with: (a) the owner's name, address and phone number; (b) proof that you may give us access on the owner's behalf; or (c) consent from the owner of the home.

### 7. PRIVATE VIEWING OF UNAUTHORIZED SERVICE AND USE OF EQUIPMENT

We provide Service to you for your private home viewing, use and enjoyment. You agree that the programming provided over the cable system will not be viewed in areas open to the public. The programming may not be rebroadcast, transmitted or performed, nor may admission be charged for its viewing without first obtaining written consent, in advance, from us and our programming supplier(s). This consent may be withheld at the sole discretion of either of us.

Your local cable company may not have the right to distribute pay-per-view programming to commercial establishments. You may not order or request pay-per-view programming for receipt, exhibition or taping in a commercial establishment. You may neither exhibit nor assist in the exhibition of pay-per-view programming in a commercial establishment unless explicitly authorized to do so, in advance, by us and our program provider(s). You may not move your converter to another location or

use the converter at any other than your home or location where Service was installed by us without our prior written authorization. If you fail to abide by this restriction, you will be held liable for any claims made against you or Company on account of any unauthorized commercial exhibition.

You agree not to attach any unauthorized device to our Equipment. If you make any unauthorized connection or modification to the Equipment or any other part of the cable TV system, you will be in breach of these Policies and Practices, and we may terminate your Service and recover such damages as may arise as a result of your breach.

Much of the Equipment necessary to receive our Services is available both from us and others. Regardless of whether you purchase such Equipment or lease such Equipment from us, you are responsible for assuring that such Equipment does not interfere with the normal operations of our local cable system and other communications systems and devices. For example, you agree not to install anything to intercept or receive or to assist in intercepting or receiving, or which is capable of intercepting or receiving any Service offered over our cable system, unless specifically authorized to do so by us. You are responsible to pay for all Services received or otherwise provided to your household. You also agree that you will not attach anything to the Inside Wire or Equipment, whether installed by you or us, which singly or together results in a degradation of our cable system's signal quality or strength. You may not attach any device or equipment to your Inside Wiring in a way that impairs the integrity of our local cable system, such as creating signal leakage, which may cause a violation of government regulations, or attaching devices or equipment which, alone or together, result in a degradation of signal quality. Further, Services or signals provided by us which are carried on or transmitted through the Inside Wire or Equipment provided by us may not be commingled with signals or services provided by others.

We can recover damages from you for tampering with any of our Equipment or any other part of our cable system or for receiving unauthorized service.

You must return our Equipment when you are no longer a customer. In some cases, you may also choose to buy Equipment from an independent store. However, analog converters with descrambling capabilities should only be obtained from us. In fact, should you see advertisements for cable converters that have descramblers in them (so-called "pirate boxes" or "black boxes"), you should understand that these devices may be illegal to sell or use, unless authorized by us. Because of the need to protect our scrambled Services, we will not authorize the use of any analog converter/descrambler not provided by us. A digital converter/descrambler purchased at a retail store must be authorized by us through the use of a special security device. People who use illegal converters/descramblers may be stealing cable service. This practice may unfairly result in increased prices to our honest customers.

### 8. LIMITED 30-DAY WARRANTY AND LIMITATION OF LIABILITY

EXCEPT AS EXPLICITLY SET FORTH IN THE TERMS AND CONDITIONS OF SPECIFIC SERVICES WE PROVIDE TO YOU, WE WARRANT FOR A PERIOD OF 30 DAYS FROM THE DATE OF OUR INSTALLATION OR REPAIR AT YOUR HOME THAT OUR SERVICE AND THE EQUIPMENT WE HAVE INSTALLED OR REPAIRED WILL MEET ACCEPTED INDUSTRY STANDARDS AND BE FREE FROM DEFECTS IN MATERIALS OR WORKMANSHIP. IF YOU REPORT ANY FAILURE TO CONFORM TO THIS WARRANTY TO US WITHIN THAT 30-DAY-PERIOD, WE WILL REPERFORM THE NONCONFORMING SERVICES AND REPAIR OR REPLACE THE NONCONFORMING EQUIPMENT. SUCH REPERFORMANCE OF WORK OR REPAIR OR REPLACEMENT OF NONCONFORMING EQUIPMENT SHALL CONSTITUTE OUR ENTIRE LIABILITY AND YOUR SOLE REMEDY UNDER THIS WARRANTY, WHETHER CLAIMS OR REMEDIES ARE SOUGHT IN CONTRACT OR TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE).

IN NO EVENT SHALL WE OR OUR EMPLOYEES OR AGENTS HAVE ANY LIABILITY FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM OUR PROVISION OF OR FAILURE TO PROVIDE ANY EQUIPMENT OR SERVICES TO YOU, OR FROM ANY FAULT, FAILURE, DEFICIENCY OR DEFECT IN

THE FOREGOING WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN OR IMPLIED, IN FACT OR IN LAW. WE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, DISCLAIM ANY AND ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

EXCEPT AS EXPRESSLY REQUIRED BY LAW, WE WILL NOT BE LIABLE FOR ANY DELAY OR FAILURE TO PERFORM OUR OBLIGATIONS, INCLUDING INTERRUPTIONS IN SERVICE, IF SUCH DELAY OR NONPERFORMANCE ARISES IN CONNECTION WITH ANY ACTS OF GOD, FIRES, EARTHQUAKES, FLOODS, STRIKES OR OTHER LABOR DISPUTES, UNUSUALLY SEVERE WEATHER, ACTS OF ANY GOVERNMENTAL BODY, OR ANY OTHER CAUSE BEYOND OUR REASONABLE CONTROL.

THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS. AND YOU MAY ALSO HAVE OTHER RIGHTS.

### 9. CUSTOMER COMPLAINT PROCEDURES

If you have any complaint regarding the Service, including billing service and quality of the television signals we deliver, you should contact us at the telephone number on your monthly bill or in writing to inform us. If you can see images or hear sound from scrambled premium or adult channels that you do not subscribe to, you may have these channels blocked free of charge. We also maintain a local business office that is open weekdays, except holidays, for customer visits. We will promptly try to resolve the problem. If you are dissatisfied with our resolution of the complaint, you may notify the responsible official for your community (please refer to your cable bill for the agency's name and address).

We maintain a toll-free telephone access line that will be available to you 24 hours a day, seven days a week, every day of the year. When you call about a service problem, a customer service representative (CSR) will attempt to determine the nature of the problem. If possible, the CSR will help you resolve the problem over the telephone. If the problem cannot be resolved during the call, the CSR will schedule a service technician to visit your home. If our workload permits, the service technician will be dispatched the same day. Our CSRs and service technicians are well-trained and have authority to attempt to resolve a customer's problem, including replacement of any non-operating equipment, in order to provide quality service.

We offer an "appointment window" for installation, service calls, or other installation activities that is either a specific time, or, at a maximum, a four-hour time block during normal business hours. We commit to a policy to not cancel our appointment with you after the close of business in the business day prior to a scheduled appointment. If we are running late for an appointment, we will attempt to contact you and will, as necessary, attempt to reschedule to a time that is convenient for you.

Emergencies that affect signal quality, such as fallen utility poles, violent storms or very cold weather, may interfere with reception of cable Service. We are committed to have one of our crews promptly correct outages or other service-related problems occurring as a result of an emergency situation. We pledge a prompt response at any time if a large area of the system is experiencing technical difficulties.

We will maintain complaint records for at least a one-year period. In addition, those records will be available for inspection by the franchise authority or the FCC.

We urge you to call us at the phone number printed on your bill any time you have questions or concerns about your Service, including VCR hookup questions or problems. If you are unable to get a problem resolved to your satisfaction, you may write or call the AT&T Broadband Corporate Offices as described in Section 14 of these Policies and Practices.

In addition, if you are dissatisfied with our handling of your complaint, you may contact the local franchising authority. The address of the responsible officer for your franchising authority is noted in Section 14.

IT IS IMPORTANT THAT YOU READ THIS ENTIRE SECTION CAREFULLY BECAUSE IT AFFECTS RIGHTS THAT YOU MAY HAVE HAD OTHERWISE. THIS SECTION PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION WITH A FAIR HEARING BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION.

a. Binding Arbitration. The Federal Arbitration Act, not state law, shall govern the arbitrability of all disputes between you and the Company regarding these Policies and Practices and the Service, including any and all claims concerning the validity, construction, performance and enforcement of these Policies and Practices. However, Colorado or federal law shall apply to and govern, as appropriate, any and all claims, causes of action, remedies and damages arising between you and the Company regarding these Policies and Practices and the Services, whether arising from or stated in contract, statute common law, or any other legal theory, without regard to Colorado's choice of law principles.

ANY AND ALL DISPUTES ARISING BETWEEN YOU AND THE COMPANY (WHETHER BASED IN CONTRACT, STATUTE, REGULATION, ORDINANCE, TORT (INCLUDING, BUT NOT LIMITED TO, FRAUD, ANY OTHER INTENTIONAL TORT OR NEGLIGENCE), COMMON LAW, CONSTITUTIONAL PROVISION, RESPONDEAT SUPERIOR, AGENCY OR ANY OTHER LEGAL OR EQUITABLE THEORY), WHETHER ARISING BEFORE OR AFTER THE EFFECTIVE DATE, MUST BE RESOLVED BY FINAL AND BINDING ARBITRATION. THIS INCLUDES ANY AND ALL DISPUTES BASED ON ANY PRODUCT, SERVICE OR ADVERTISING CONNECTED TO THE PROVISION OR USE OF THE SERVICE.

A single arbitrator will be selected in accordance with the rules of the American Arbitration Association (the "AAA"). The arbitration will be conducted under the applicable procedures and rules of the AAA that are in effect on the date the arbitration is filed unless this dispute resolution section is inconsistent with those procedures and rules, in which case, this dispute resolution section will prevail. These procedures and rules may limit the amount of discovery available to you or us. The arbitrator will apply applicable statutes of limitation, will honor claims of privilege recognized by law, and will take reasonable steps to protect customer account information and other confidential or proprietary information, including the use of protective orders to prohibit disclosure outside the arbitration, if requested to do so by you or the Company. The arbitrator will make any award in writing, but need not provide a statement of reasons unless requested by a party. Upon a request by you or us, the arbitrator will provide a brief statement of the reasons for the award. An award rendered by the arbitrator may be entered in any court having jurisdiction over the parties.

The arbitration of any dispute involving $10,000 or less shall be conducted in accordance with the Consumer Arbitration Rules of the American Arbitration Association ("AAA"), as modified by the Policies and Practices, which are in effect on the date a dispute is submitted to the AAA. The AAA's Commercial Arbitration Rules and fee schedules will apply to any disputes in excess of $10,000. Both you and the Company shall have the right to be represented by counsel in an arbitration. In conducting the arbitration and making any award, the arbitrator shall be bound by and strictly enforce the terms of these Policies and Practices and may not limit, expand, or otherwise modify their terms.

If any portion of these Policies and Practices (or any portion of this dispute resolution section) is determined to be illegal or unenforceable, then that provision may be deleted or modified and the remainder of such Policies and Practices (or the remainder of this dispute resolution section) shall be given full force and effect.

b. No Class Action or Consolidated Proceedings. All parties to the arbitration must be individually named. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED

REPRESENTATIVE CAPA... ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED. By consenting to submit your claims to arbitration, you may be forfeiting your right to share in any class action awards. This dispute resolution section will not apply to any individual claims you filed in a lawsuit prior to the Effective Date of these Policies and Practices nor to the claims of a class certified prior to the Effective Date of these Policies and Practices. This dispute resolution section will apply to all other claims, including class claims where a class has not yet been certified, even if the facts and circumstances upon which the claims are based occurred or existed before the Effective Date of these Policies and Practices.

c.    Limitation of Available Damages, Including Punitive or Exemplary Damages and Attorney's Fees. THE ARBITRATOR MAY AWARD ONLY ACTUAL COMPENSATORY DAMAGES SUPPORTED BY ADMISSIBLE EVIDENCE (EVEN IF GREATER DAMAGES ARE AUTHORIZED BY STATUTE). THE ARBITRATOR CANNOT AWARD DAMAGES THAT ARE NOT EXPRESSLY AUTHORIZED BY THIS SECTION 10c AND CANNOT AWARD CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, TREBLE, PUNITIVE OR EXEMPLARY DAMAGES UNDER ANY CIRCUMSTANCES REGARDLESS OF WHETHER SUCH DAMAGES MAY BE AVAILABLE UNDER APPLICABLE LAW, AND THE PARTIES HEREBY WAIVE THEIR RIGHTS, IF ANY, TO RECOVER ANY SUCH DAMAGES. THE ARBITRATOR ALSO CANNOT AWARD ATTORNEYS' FEES. YOU AND THE COMPANY BOTH WAIVE ANY CLAIMS FOR AN AWARD OF DAMAGES OR ATTORNEYS' FEES THAT ARE EXCLUDED OR LIMITED UNDER THIS SECTION 10c AND/OR BY APPLICABLE LAW.

Notwithstanding the limitations set forth in the preceding paragraph, should it become necessary to resort to court proceedings to enforce a party's compliance with the dispute resolution and arbitration process set forth herein, and the court directs, orders or otherwise requires compliance herewith, then all of the costs and expenses, including its reasonable attorneys' fees, incurred by the party requesting such enforcement shall be reimbursed by the non-complying party to the requesting party.

This dispute resolution section does not prevent either party from seeking interim injunctive relief from a court in order to preserve the status quo or to protect assets until the arbitration has been commenced and the arbitrator has an opportunity to consider the matter of interim relief.

d.    Arbitration Information and Filing Procedures. Before you submit a dispute to arbitration, you must first send written notice to us addressed to: Customer Dispute Center, c/o Litigation Database Administrator, AT&T Broadband Legal Department, 188 Inverness Drive West, Englewood, CO 80112, and give us an opportunity to resolve the dispute. Similarly, before the Company takes a dispute to arbitration, it must first attempt to contact you at your U.S. postal address on the Company's account records, and give you an opportunity to resolve the dispute.

You agree that if you do not contact us within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute (except with respect to billing disputes which are subject to the shorter time limitations set forth in section 2, above), you waive the right to pursue, in any forum, including arbitration or courts, a claim based upon such event, facts or dispute.

If the dispute cannot be resolved satisfactorily within sixty (60) days from the date you or the Company is notified (as set forth above) by the other party of a dispute, then either party may contact the AAA in writing at AAA Service Center, 134555 Noel Road, Suite 1750, Dallas TX 75240-6620, and request arbitration of the dispute. You shall send a copy of any such contact with the AAA to us addressed to: Customer Arbitration Demand Center, c/o Litigation Database Administrator, AT&T Broadband Legal Department, 188 Inverness Drive West, Englewood CO 80112. Information about the arbitration process and the AAA's Arbitration Rules and its fees are available

from the AAA ... the Internet at http://www.adr.org, or by contacting AAA at the above address. The arbitration will be based on written submissions of the parties and the documents relating to the dispute, unless either party requires that the arbitration be conducted using the AAA's telephone or in-person procedures. Additional charges may apply for these procedures.

Any in-person arbitration will be conducted at a location that the AAA selects in the state of your address at which you receive Service from us. Any arbitration shall remain confidential. Neither you nor the Company may disclose the existence, content or results of any arbitration or award, except as may be required by law, or to confirm and enforce an award.

e.    Fees and Expenses of Arbitration. You must pay the applicable AAA filing fee when you submit your written request for arbitration to the AAA. The AAA's filing fee and administrative expenses for a document arbitration will be allocated according to the AAA's Rules, except that for claims of less than $1,000, you will only be obligated to pay a filing fee of $15 and we will pay all of the AAA's other costs and fees. If you elect an in-person arbitration process, you must pay your share of the higher administrative fee and the additional costs for this process. Unless applicable substantive law provides otherwise, each party will pay its own expenses to participate in the arbitration, including attorneys' fees and expenses for witnesses, document production and presentation of evidence. The prevailing party may, however, seek to recover the AAA's fees and the expenses of the arbitrator from the other party.

f.    Collection Proceedings. Nothing contained herein shall preclude the Company from using a collection agency or attorney to collect money that you owe us. In such event, you agree to pay the reasonable costs of collection or collection agency, reasonable attorneys' fees and administrative costs, including arbitration expenses.

## 11. NOTICE

Except as provided in paragraph 3 above or otherwise permitted by law, if we send you notice, it will be considered given when deposited in the U.S. mail, addressed to you at your last-known address, or hand delivered to you or to your home. We may provide electronic or telephone notice to you, which shall be deemed given when left with you. If you give notice to us, it will be deemed given when received by us.

## 12. CHANGES TO POLICIES AND PRACTICES

These Policies and practices are subject to amendment, modification or termination if required by law or regulation. We will notify you of changes to these Policies and Practices. Any changes proposed by you will only be effective when accepted in writing by one of our senior officers, within their sole discretion.

## 13. PRODUCTS AND SERVICES PRICE LIST.

Please note that the Products and Services Price List is changing and that the new List was not available at the time this Notice was printed. A separate Products and Services Price List with rates effective as of January 1, 2002, will be provided to AT&T Broadband customers in the near future.

**IV. IMPORTANT INFORMATION**

We urge you to call the AT&T Broadband cable office at the phone number printed on your bill any time you have questions or concerns about your service, VCR hookup questions or problems, or any other aspect of the cable television service, which we take pride in providing to you.

If you are unable to get a problem resolved to your satisfaction at the local level, you may write or call the AT&T Broadband Corporate Offices with concerns and complaints.

AT&T Broadband<br>
188 Inverness Drive West<br>
Englewood CO 80112<br>
(303) 858-3000

In addition, if you are unsatisfied with our handling of your complaint, you may contact the local franchising authority.

In Massachusetts you may contact the Consumer Division of the Department of Telecommunications and Energy toll-free at 1 800-392-6066, or write at One South Station, Boston, MA 02110. Your local franchise authority is the Cable Division of the Department of Telecommunications and Energy, One South Station, Boston MA 02110.

## New Hampshire and Maine Customers

The Offices of the Attorney General, Consumer Protection and Antitrust Bureau have the authority to enforce Consumer Protection Laws and provide assistance in the mediation of consumer complaints. Customers should file written complaints concerning any alleged misrepresentations and unfair or deceptive practices of the cable company.

Office of the Attorney General, Department of Consumer Fraud and Antitrust, State House Station #6, Augusta ME 04333

Office of the Attorney General, Consumer Protection and Antitrust Bureau, 25 Capital Street, Concord, NH 03301.

## Products and Services Price List

Please note that the Products and Services Price List is changing and that the new List was not available at the time this Notice was printed. A separate Products and Services Price List with rates effective s of January 1, 2002, will be mailed to AT&T Broadband customers in the near future.