IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(BOSTON)

| | |
|---|---|
| Martha Kristian,<br><br>Plaintiff,<br><br>v.<br><br>Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Holdings, LLC, and Comcast MO Group, Inc.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 03-CV-12466-EFH |
| Jack Rogers and Paul Pinella,<br><br>Plaintiffs,<br><br>v.<br><br>Comcast Corporation and AT&T Broadband,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 04-10142-EFH |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE
MASSACHUSETTS ANTITRUST ACT AND JURY DEMAND**

Pursuant to Fed.R.Civ.P. 15(a) and the accompanying Assented-To Motion For Leave to Consolidate the *Kristian* and *Rogers* Actions and to File a Consolidated Amended Complaint, to which Defendants, by counsel, have consented, Plaintiffs submit for filing this Consolidated Amended Class Action Complaint For Violations Of The Sherman Antitrust Act And The Massachusetts Antitrust Act And Jury Demand.

Plaintiffs, on their own behalf and on behalf of the Class of those similarly situated, bring this action for treble damages under the antitrust laws of the United States and the Commonwealth of Massachusetts against Defendants, including Defendant Comcast Corporation and its subsidiaries, affiliates and predecessors and its predecessors' subsidiaries and affiliates (collectively referred to as "Comcast"). "Defendants" includes both Comcast, and AT&T Corporation's cable businesses ("AT&T") which are now merged with Comcast.

## INTRODUCTION

1.      This class action challenges illegal conduct by Defendants designed to eliminate and prevent competition in the cable industry, in violation of Sections 1 and 2 of the Sherman Act and Sections 4 and 5 of the Massachusetts Antitrust Act.  Deregulation of the cable markets in the 1990s by Congress was intended to end exclusive cable franchises and bring about competition in the cable industry.  But Defendants and other large cable companies have avoided competing with one another by allocating the nation's regional markets among themselves. Defendants and other cable companies have accomplished this division of markets through acquisitions of competitors and then "swaps" of customers in one geographic area for customers in another, thereby "clustering" their cable systems in particular regions.  These actions have allowed them to acquire or maintain monopoly power in particular geographic clusters, including the Boston, Massachusetts cluster.  Having moved out of the clusters of competitors, and arranged for the departure of competitors from their own clusters, the cable companies are freed from the threat of actual or potential competition from other cable providers in those markets. The result is that regional markets remain dominated by a single cable provider, with no effective competition.

2.      This conduct has allowed cable companies, including Defendants, to acquire or maintain monopoly power in regional markets, engage in anticompetitive conduct, charge supra-competitive prices, and limit choice for cable consumers to effectively the only game in town – the cable services of the "cluster" monopoly cable company.  This lawsuit challenges the horizontal allocation of markets and the willful acquisition and maintenance of monopoly power by the Defendants in the Boston cable market.

3.      Defendants engaged in swaps of cable systems and cable subscribers in their respective monopoly markets, or clusters, to allocate among them customers of cable services and thereby maintain (and increase) their monopoly power in their respective clusters, including Boston.  These swaps included a swap between AT&T and Cablevision Systems Corp. and an attempted swap between AT&T and Charter Communications.

4.      Thereafter, as part of a merger between Comcast and AT&T, Comcast acquired AT&T's cable subscribers and monopoly in the Boston area, furthering the willful acquisition and/or maintenance of monopoly power by Defendants in the Boston area cable market.  As part of the merger, Comcast assumed the liability of AT&T for its violations of antitrust law, including AT&T's liability for such violations relating to the Boston area cable market and AT&T's allocation of cable subscribers.

5.      Defendants continue to acquire from, and/or swap cable customers with their competitors, again allocating cable customers with their competitors and resulting in the willful acquisition and/or maintenance of monopoly power in the Boston cluster.  Defendants' past and continuing conduct violates both Sections 1 and 2 of the Sherman Act and Sections 4 and 5 of the Massachusetts Antitrust Act.

3

6.      Defendants have maintained cable prices at, and further increased prices to, supra-competitive levels in the Boston cluster as a direct result of Defendants' antitrust violations.

7.      Plaintiffs and members of the Class seek an injunction, treble damages and other relief against Defendants for their violations of Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act, including Defendants' imposition of horizontal market restraints by conspiring with and entering into and implementing agreements with competitors to "swap" their respective cable customers (and thus to eliminate themselves as actual and potential competitors and further raise barriers to entry by other potential competitors); and for Defendants' unlawful acquisition or maintenance of monopoly power, or their attempted monopolization of the relevant markets, in Defendants' "cluster" in the Boston, Massachusetts area, in violation of Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act.

## NATURE OF THE ACTION

8.      Plaintiffs bring this action against Defendants, the owners and operators of multiple cable television systems, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 5 of the Massachusetts Antitrust Act, M.G.L. c. 93 §§ 4 and 5.

9.      The relevant geographic market is Comcast's Boston cluster, as defined in paragraph 31.a(2).

10.      The relevant product market is defined as multichannel video programming services, which are distributed by multichannel video programming distributors ("MVPDs"), including cable television operators such as Defendants, overbuilders and direct broadcast satellite operators.

4

11.     Defendants have imposed horizontal market restraints by conspiring with and entering into and implementing agreements with competitors to eliminate actual and potential competition from them and other competitors by exchanging or "swapping" their respective cable television assets, including subscribers.  Through the imposition of such horizontal market restraints, Defendants have been able to avoid and have restrained and suppressed meaningful competition and Defendants' cable subscribers in the Boston "cluster" have paid higher prices for cable television services than they would have absent Defendants' unlawful conduct. Defendants' conduct in entering into and implementing agreements allocating markets, territories and customers for cable television services violates, including as *per se* violations of, Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act.   Defendants conduct, including Defendants' acquisition of a competitor cable company and its cable subscribers in the Boston cluster, as set forth in this Complaint, further constitutes conduct in restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act.

12.     Defendants also have engaged in conduct constituting unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 5 of the Massachusetts Antitrust Act, M.G.L. c. 93, § 5.  Defendants have willfully acquired or maintained monopoly power in the relevant product market (multichannel video programming services) within the relevant geographic market (Comcast's Boston cluster, as defined below).  Defendants' willful acquisition or maintenance of monopoly power is the result of exclusionary, anticompetitive conduct, including, without limitation: 1) conspiring with and entering into and implementing illegal agreements with competitors to allocate territories, markets and customers in connection with the "swapping" of cable television subscribers; 2) acquiring competitor cable companies and their cable subscribers in the Boston cluster; 3) engaging in discriminatory and highly

5

discounted pricing practices aimed at areas in which competitor cable companies operate in the relevant geographic  market, which practices have an anticompetitive effect in the relevant geographic market; and 4) disconnecting cable lines entering various consumers' homes that are provided by competitor cable companies.

13.     Through such unlawful conduct, Defendants have excluded actual and potential competitors from the relevant geographic market and Plaintiffs and members of the Class, as a result of Defendants' unlawful conduct, have been forced to pay higher prices for cable television in the relevant geographic market than they would have paid in the absence of Defendants' unlawful conduct.

14.     Through such unlawful conduct, Defendants have attempted to monopolize the relevant geographic market.  Defendants have engaged in such conduct with the specific intent to monopolize and, through such conduct, have demonstrated a dangerous probability of achieving monopoly power in the relevant geographic market.   Defendants' attempt to monopolize the relevant geographic market also violates Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act.

## PARTIES

### PLAINTIFFS

15.     Plaintiff Martha Kristian is an individual who resides in Hanover, Plymouth County, Massachusetts.  During the time period covered by this Complaint, Plaintiff Kristian has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

16.     Plaintiff Jack Rogers is an individual who resides in Arlington, Middlesex County, Massachusetts.  During the time period covered by this Complaint, Plaintiff Rogers has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

6

17.     Plaintiff Paul Pinella is an individual who resides in Winchester, Middlesex County, Massachusetts.  During the time period covered by this Complaint, Plaintiff Pinella has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

## **DEFENDANTS**

18.     Comcast, formerly known as AT&T Comcast Corporation, is a Pennsylvania corporation with its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania 19102.  Comcast was formed through a merger on November 18, 2002 with AT&T.  The merger occurred in several steps.  First, AT&T transferred to Comcast Cable Communications Holdings the assets, liabilities and businesses represented by AT&T Broadband Group, which was the broadband business of AT&T.   Next, AT&T spun-off Comcast Cable Communications Holdings to its shareholders.  Then, Comcast Holdings and Comcast Cable Communications Holdings each merged with a different, wholly-owned subsidiary of Comcast, and Comcast Holdings and AT&T shareholders received Comcast shares.  Through these transactions, Comcast and AT&T combined to form the new Comcast Corporation (formerly AT&T Comcast Corporation).  The merger resulted, as a matter of law and pursuant to the merger agreements between AT&T and Comcast, in Comcast's assumption of AT&T's liability for the antitrust violations alleged in this Complaint.

19.     Defendant Comcast Holdings Corporation, formerly Comcast Corporation and predecessor to Defendant Comcast Corporation, is a Pennsylvania Corporation with its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania 19102, and is a wholly-owned subsidiary of Comcast.

20.     Defendant Comcast Cable Communications Holdings, Inc. (formerly AT&T Broadband Corp., a cable subsidiary of AT&T Corp.), is a Delaware corporation with its

principal place of business at 1500 Market Street, Philadelphia, Pennsylvania 19102, and is a wholly-owned subsidiary of Comcast Corporation.

21.    Defendant Comcast Cable Holdings, LLC (formerly AT&T Broadband, LLC, a cable subsidiary of AT&T Broadband Corp.), is a Delaware limited liability company with its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania 19102, and is a wholly-owned subsidiary of Comcast Cable Communications Holdings, Inc.

22.    Defendant Comcast Cable Communications, Inc., a Delaware corporation with its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania 19102, is an indirect wholly-owned subsidiary of Comcast Corporation.

23.    Defendant Comcast MO Group, Inc. (formerly MediaOne Group, Inc., a cable subsidiary of AT&T Broadband Corp.), is a Delaware corporation with its principal place of business located at 1500 Market Street, Philadelphia, Pennsylvania 19102.

24.    Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications Holdings, Inc., Comcast Cable Communications, Inc., Comcast Cable Holdings, LLC, and Comcast MO Group, Inc., are collectively included within "Comcast" as used in this Complaint.

25.    Before combining, AT&T and Comcast were two separate, independent owners and operators of multiple cable systems, operating at the same level of competition in the cable industry.  At the time of the transactions described in paragraph 18, Comcast was the third largest cable operator in the United States, and AT&T owned the largest cable operator in the United States.  Upon acquiring AT&T's cable business on November 18, 2002, Comcast became the largest cable operator in the country.  Comcast serves over twenty-one million cable subscribers.

8

26.     During the Class Period, Defendants have provided and continue to provide cable television services in the United States by means of interstate commerce.

27.     Defendants' business activities as described in this Complaint were within the flow of and substantially affected interstate trade and commerce.

## JURISDICTION AND VENUE

28.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 12 of the Massachusetts Antitrust Act, M.G.L. c. 93, § 12, for injunctive relief, treble damages, and Plaintiffs' costs of this suit, including reasonable attorney's fees, against Defendants for the injuries sustained by Plaintiffs and other similarly situated Class members by reason of Defendants' violations of Sections 1 and 2 of the Sherman Act and Sections 4 and 5 of the Massachusetts Antitrust Act.

29.     Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Sections 3 and 12 of the Massachusetts Antitrust Act, M.G.L. c. 93 §§ 3 and 12.  This Court has supplemental jurisdiction over the Massachusetts state law claims pursuant to 28 U.S.C. § 1367.

30.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b) and (c), because Comcast transacts business, maintains offices, or otherwise is found within this District.

## CLASS ALLEGATIONS

31.     a.     As used in this paragraph and Complaint:

(1)     "Basic cable services" means the separately available basic tier of video programming services to which subscription is required for

access to other tiers of cable service offered by Comcast and which

includes the retransmission of local television broadcast signals and public,

educational and governmental access channels.

(2)    "Comcast's Boston cluster" means those areas covered by

Comcast's cable franchises, or any of its subsidiaries or affiliates, located

in Boston, Massachusetts and geographically contiguous areas, or areas in

close geographic proximity to Boston, Massachusetts, which is comprised

of the areas covered by Comcast's cable franchises, or any of its

subsidiaries or affiliates, located in the following counties:  Barnstable,

Essex, Middlesex, Nantucket, Norfolk, Plymouth, Bristol, Suffolk and

Worcester, Massachusetts; and Belknap, Hillsborough, Merrimack,

Rockingham and Strafford, New Hampshire.

b.    Plaintiffs bring this class action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) on behalf of the following class:

> All cable television customers who subscribe or subscribed at any time
> since December 1, 1999, to the present to video programming services
> (other than solely to basic cable services) from AT&T and/or Comcast, or
> any of their subsidiaries or affiliates, in Comcast's Boston cluster.  The
> class excludes governmental entities, Defendants, Defendants' subsidiaries
> and affiliates and this Court.

32.    Plaintiffs do not yet know the exact size of the Class and such information is in

the exclusive control of Defendants.  However, based on the nature of the trade and commerce

involved, Plaintiffs believe that the total number of Class members exceeds two million persons,

who are located throughout the Boston, Massachusetts and surrounding area.  In its 2005 Annual

Report, Comcast estimates that the number of Comcast cable subscribers in Boston,

Massachusetts is one million.  Consequently, joinder of all members of the Class would be impracticable.

33.    Plaintiffs will fairly and adequately protect the interests of the Class members, and have engaged counsel experienced and competent in antitrust and class action litigation. Plaintiffs have no interests antagonistic to those of the other members of the Class.

34.    Plaintiffs' claims are typical of the claims of the Class in that each paid for non-basic or cable programming services and was injured by the same wrongful conduct of Defendants alleged in this Complaint.  The violations of the antitrust laws, the effects of such violations and the relief sought are common to Plaintiffs and the members of the Class.

35.    The rights of Plaintiffs and the Class members involve common questions of law and fact that would predominate over questions affecting only individual members of the Class. Whatever difficulties may exist in the management of the Class are generally outweighed by the advantages of that procedure, including but not limited to providing claimants with a method for redress of claims that might otherwise not warrant individual litigation.

36.    The questions of law and fact common within the Class include, but are not limited to:

a.    whether Defendants' conduct in imposing horizontal market restraints by entering into agreements with competitors to allocate markets, territories and customers for cable television service violates Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act, including as *per se* violations;

b.    whether Defendants' conduct in possessing and willfully acquiring or maintaining monopoly power in, or attempting to monopolize,  the relevant market and engaging

in the acts and practices alleged in this Complaint violates Section 2 of the Sherman Act, 15

U.S.C. § 2, and Section 5 of the Massachusetts Antitrust Act;

      c.     whether Defendants' acts caused prices for cable television services in the

relevant market to be artificially high and not competitive;

      d.     whether Plaintiffs and the members of the Class were injured by

Defendants' acts;

      e.     the measure of damages by which Defendants' conduct injured all

members of the Class; and

      f.     whether the Class is entitled to injunctive relief as a result of Defendants'

continuing conduct.

      37.     Class action treatment is superior to the alternatives, if any, for the fair and

efficient adjudication of this controversy because it permits a large number of injured persons to

prosecute their common claims in a single forum simultaneously, efficiently and without

unnecessary duplication of evidence and effort.  Class treatment will also permit the adjudication

of claims by individual consumer class members, who could not afford to individually litigate

antitrust claims against the large corporate defendants.  Without class treatment, Plaintiffs and

members of the proposed Class will be unable to vindicate their statutory antitrust claims.

## GENERAL ALLEGATIONS

## DEREGULATION OF CABLE INDUSTRY

      38.     In 1992, to protect the public against the increasing market power of cable

operators and to promote competition among cable operators, Congress passed the Cable

Television Consumer Protection Act of 1992.  To further and encourage competition, Congress

prohibited local jurisdictions from awarding exclusive franchises for cable systems. 47 U.S.C. § 541(a)(1).

39.     In 1996, Congress deregulated cable television and passed the Telecommunications Act of 1996, 47 U.S.C. § 251 (the "1996 Act"). Through the 1996 Act, Congress sought to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Cong. Rep. 104-458, 1996 WL 46795, at 1 (1996), U.S. Code Cong. & Admin. News 1996 at 124.

40.     Pursuant to the 1996 Act, 47 U.S.C. § 543, the FCC's authority to regulate the rates charged for non-basic, or cable programming services (those channels that are not on a cable system's basic tier and for which there is no per-channel or per-program charge) was terminated for services provided after March 31, 1999. Therefore, the rates charged for such cable services are determined by the cable companies themselves, including Defendants. Neither the FCC nor any state or local entity has the authority to review rates for such cable services or to investigate allegations that such rates are excessive.

41.     Despite passage of the 1992 and 1996 Congressional legislation, large cable companies, including Defendants, have violated federal antitrust law and carved out their own respective areas of operation to the exclusion of competition from other cable companies.

### CABLE INDUSTRY:  INCREASED CONSOLIDATION, SKYROCKETING PRICES AND LIMITED CONSUMER CHOICES

42.     Despite Congress' intention of promoting competition in the cable industry to benefit the public, the cable industry has become increasingly consolidated, consumers' choices among cable operators have been eliminated or substantially narrowed, and in monopoly

"clusters" created by large cable companies, including Defendants, cable prices have increased significantly more than in areas where competition exists.

43.     In its 2002 report on competition in the cable market, the FCC found that cable companies continue to dominate the market for multichannel video services.  As of June 2002, the FCC determined that cable operators provided video programming to more than three-quarters (76.5%) of all multichannel video subscribers nationwide.  *In the Matter of Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming, Ninth Annual Report*, MB Docket No. 02-145, released December 31, 2002, ("Ninth Video Competition Report") ¶ 4.  As a result of increased consolidation within the cable industry, as cable operators acquired and traded cable systems and subscribers, the ten largest cable operators serve approximately 85% of all cable subscribers.  *Id.* ¶ 14.  In 1995, prior to passage of the Telecommunications Act of 1996, the top ten cable companies served approximately 73.22% of all cable subscribers.  *In the Matter of Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming, Second Annual Report*, App. G at Table 2 (1995).  In its 2002 report on video competition, the FCC concluded, "The market for the delivery of video programming to households continues to be highly concentrated."  *Ninth Video Competition Report* ¶ 113.

44.     The FCC has determined that only approximately 2% of all cable consumers reside in areas with effective competition and only approximately 1.3% of cable consumers are served by an overbuilder (a type of competing cable system operator).

45.     Studies confirm that competition from another cable company is essential to restrain the prices of a dominant cable provider.  For example, in its October 2002 report, the United States General Accounting Office (GAO) [effective July 7, 2004, now known as the

General Accountability Office] determined that "the presence of a second cable franchise (known as an overbuilder) does appear to restrain cable prices" and that "in franchise areas with a second cable provider, cable prices are approximately 17 percent lower than in comparable areas without a second cable provider." GAO, *Report to the Subcommittee on Antitrust, Competition, and Business and Consumer Rights, Committee on the Judiciary, U.S. Senate: Telecommunications, Issues in Providing Cable and Satellite Television Service (2002) (GAO's 2002 Cable Report)* at 9. In its October 2003 report, the GAO found that competition from a wire-based cable provider (a competitor using a wire technology, such as a second cable company) is limited to very few (about 2% of) markets; however, in markets where such competition from a second wireline cable company exists, cable rates are significantly lower— by approximately 15%--than cable rates in markets without competition from a second wireline cable operator. GAO, *Report to the Chairman, Committee on Commerce, Science, and Transportation, U.S. Senate: Telecommunications, Issues Related to Competition and Subscriber Rates in the Cable Television Industry ("GAO's 2003 Cable Report")* at 3, 9 and 10. In its February 2004 report – involving a study comparing six cities with a second wire-based cable provider (a broadband service provider, or BSP, offering a bundle of cable television, Internet and local telephone services) with six cities without such a second cable competitor – the GAO found that expanded basic cable telephone rates were 15% to 41% lower in 5 of the 6 studied markets with a second cable competitor (BSP) compared to their matched markets without such a competitor. GAO, *Report to the Subcommittee on Antitrust, Competition Policy and Consumer Rights, Committee on the Judiciary, U.S. Senate: Telecommunications, Wire-Based Competition Benefited Consumers in Selected Markets* (2004) at 15. The GAO found that "[t]he ultimate

result of the BSP operations, along with incumbent's response, is substantially lower prices for consumers." *Id*. at 12.

46.     The FCC has found that the prices charged by large cable companies are restrained by the presence of an overbuilder in the market.  In its 2001 annual report on cable prices, the FCC determined, solely based on information provided by cable operators that the FCC does not audit, that cable prices on average were 6.3% lower in areas where the incumbent cable operator faced effective competition from overbuilders.  *In the Matter of Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Rates for Basic Service, Cable Programming Service, and Equipment* (2001) ("*2001 Report on Cable Prices*") ¶ 8.  In its 2002 report on cable prices, the FCC determined, again solely based on information provided by cable operators that is not audited by the FCC, that cable prices were on average 6.4% lower in areas where the incumbent cable operator encounters effective competition from an overbuilder.  *In the Matter of Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Rates for Basic Service, Cable Programming Services, and Equipment* ("*2002 Report on Cable Prices*") ¶ 28.

47.     By contrast, the presence of competition from a direct broadcast system (DBS) provider does not restrain, or restrains only slightly, the prices of cable services provided by large cable companies.  The FCC has determined that in areas where DBS has achieved a degree of market presence, there is no significant effect on prices for cable service.  *FCC's 2002 Report on Cable Prices* ¶ 45.  In its October 2002 report, the GAO also found that the presence of DBS companies has not led to lower cable prices.  *GAO's 2002 Cable Report* at 9.  In its October

56256.1

2003 report, the GAO determined that DBS competition is associated with only a slight reduction in cable rates. *GAO's 2003 Cable Report* at 11.

48.      In its 2004 report on the cable market, the FCC indicated that between year-end 1993 and the end of June 2003, cable prices rose 53.1%, while prices generally, as measured by the Consumer Price Index, increased 25.5%. *In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming Services*, Tenth Annual Report (2004) at 56.

## DEFENDANTS' MONOPOLY AND ANTICOMPETITIVE PRACTICES

49.      Defendants willfully acquired and maintained monopolies and unreasonably restrained trade in the Boston cluster by acquiring competitor cable companies.

50.      Defendants further willfully maintained, acquired and exercised monopoly power and unreasonably restrained trade in the Boston cluster by engaging in horizontal market allocations in the form of "swap" agreements with competitor cable companies.

### Defendants' Clustering Scheme ---Acquisitions

51.      Defendants perpetrated their clustering scheme, in part, by acquiring cable systems and cable subscribers from competitor cable companies in Comcast's Boston cluster.

52.      For example, a significant acquisition by Defendants resulting in the addition of cable systems and cable subscribers in the Boston cluster was an acquisition by AT&T of MediaOne Group, Corp. ("MediaOne"), which was announced on or about May 6, 1999 and closed on or about June 15, 2000. Through the acquisition, AT&T obtained MediaOne's cable systems and cable subscribers, including about 1.5 million subscribers in and around Boston, Massachusetts and neighboring parts of New Hampshire.

**Defendants' Clustering Scheme-----Swaps**

53.     Defendants have perpetrated their clustering scheme, in part, by conspiring with and entering into and implementing agreements with competitors to exchange or "swap" cable systems, including cable customers ("swap agreements" or "swaps").  Through these swap agreements, Defendants sought to obtain and obtained competitors' cable systems and cable subscribers in Comcast's Boston cluster in exchange for Defendants' cable systems and cable subscribers in another part of the country.  The swapping and clustering physically removed actual and potential competitors from the Comcast Boston cluster, making the competitors' return to those areas financially unattractive if not wholly uneconomic, and further raised barriers to entry for other competitors.

54.     Even where a swap was announced but not completed, the understanding in the industry that the swap was imminent and that Defendants were, through the swap, about to gain even greater market share in the Boston cluster, had the effect of (1) deterring potential competitors from entering the Boston cluster, and (2) permitting Defendants to maintain their prices for cable services at, and further increase their prices for cable services to, supra-competitive levels.

55.     Examples of Defendants' swaps in the Boston cluster include:

      a.     A swap between AT&T and Charter Communications ("Charter"), which was announced on or about December 1, 1999 and was terminated on or about July 6, 2000.  Through the swap, AT&T was to obtain Charter cable systems and cable subscribers including more than 200,000 subscribers in and around Worcester, Massachusetts.  In exchange, Charter would have received AT&T cable systems and cable subscribers in St. Louis, Missouri; Birmingham, Alabama; and parts of Illinois and Georgia.  In

2001, AT&T and Charter consummated a swap of different AT&T and Charter cable systems and cable subscribers located in other parts of the country.

b.　　A swap between AT&T and Cablevision Systems Corp. ("Cablevision"), which was announced on or about April 18, 2000 and closed on or about January 8, 2001. Through the swap, AT&T obtained Cablevision cable systems and cable subscribers including 362,000 subscribers in and around Boston, Massachusetts including 38 suburbs. In exchange, Cablevision received AT&T cable systems and cable subscribers in the northern New York suburbs plus cash and stock. The swap was contingent on AT&T's completion of its acquisition of MediaOne.

56.　　Through the completed MediaOne acquisition and Cablevision swap, AT&T, at that time the largest cable provider in the country, gained approximately two million subscribers in the Boston area, making the Boston cluster AT&T's largest. Describing AT&T's acquisition of MediaOne and the swap with Cablevision, AT&T Broadband's then President and CEO, Daniel Somers, told the *Boston Globe*, "It's just neat to own Boston lock, stock, and barrel." Peter J. Howe, *Broadband Hitting Goals, AT&T Says*, BOSTON GLOBE, July 12, 2000, at D1.

## THE AT&T/COMCAST MERGER

57.　　On or about December 19, 2001, AT&T and Comcast announced that AT&T's cable business would merge into Comcast. The merger closed on or about November 18, 2002. As a result of the merger, Comcast acquired AT&T's cable systems and more than 13 million AT&T cable subscribers, including the acquisition of AT&T's cable subscribers in the Boston, Massachusetts area.

58.     The merger between AT&T and Comcast and the creation of Defendant Comcast Corporation resulted, as a matter of law, in Comcast's assumption of AT&T's liabilities for the antitrust violations alleged in this Complaint.

59.     In accordance with the merger, Comcast acquired the assets and agreed to assume the liabilities of AT&T.  Specifically, pursuant to the merger, including the Agreement and Plan of Merger dated December 19, 2001 By and Among AT&T Corp., AT&T Broadband Corp., Comcast Corporation, AT&T Broadband Acquisition Corp., Comcast Acquisition Corp. and AT&T Comcast Corporation, implementing the merger, AT&T Comcast Corporation (the parent corporation created under the merger agreement), acquired the assets and assumed the liabilities of the AT&T Broadband Group (AT&T's cable businesses).   Pursuant to the merger, AT&T Comcast Corporation became Defendant Comcast Corporation.

60.     As a result of the unlawful swap agreements and transactions described in this Complaint, Defendants' actual and potential competitors were removed from the Boston cluster and Defendants were able to exclude actual and potential competitors from, and raise prices within, the Boston cluster.

61.     The purpose and effect of Defendants' conduct in entering into and implementing such unlawful swap agreements and transactions were to unreasonably restrain, suppress and eliminate competition for cable television service in the Boston cluster and to maintain Defendants' monopoly in that cluster.

62.     Defendants' conduct set forth in this Complaint, including the imposition of horizontal territory, market and customer allocations, has had the following effects, among others:

a.   Competition, including price competition, for cable television service has been, and will continue to be restrained, suppressed, and/or eliminated.

b.   Competitors have been, and will continue to be, restrained from entering into the areas subject to the allocation agreements and Defendants' unlawful conduct has raised entry barriers to actual and potential competition, including from overbuilder competitors and from former competitors that ceased or reduced cable operations and sold or abandoned infrastructure necessary to effective competition in the Boston cluster.

c.   Defendants have increased prices for cable programming services to artificially high, supra-competitive levels and, unless enjoined, will continue to maintain and increase prices at such levels.

d.   Cable subscribers have been, and will continue to be, deprived of the benefits of free and open competition, including lower prices for Comcast's cable services in the Boston cluster that would result from effective competition.

e.   Prices for Comcast's cable services in the Boston cluster would be lower in the absence of Comcast's violations of the Sherman Act and the Massachusetts Antitrust Act as set forth in this Complaint.

63.   In connection with the swap agreements and transactions described in this Complaint, Defendants have not competed in the cable television markets in which they exchanged subscribers pursuant to a swap agreement and otherwise acquired subscribers in the transactions, and the other cable operators involved in such swap agreement or transactions have not competed against Defendants in the Boston cluster.

21

64.    Defendants' conduct in entering into and implementing the illustrative swap agreements identified in this Complaint constitute unlawful horizontal restraints on competition and agreements to divide and allocate markets and to maintain Defendants' monopoly in the Boston cluster.   Additionally, AT&T's swap with Cablevision was subject to a non-compete agreement or other provisions restricting competition between AT&T and Cablevision in the cable services market.

65.    As a result of Defendants' antitrust violations set forth in this Complaint, and continuing through the Class Period, Defendants have maintained prices for non-basic cable services at, and have further increased such prices to, supra-competitive levels in the Boston cluster.

66.    Plaintiffs and other members of the Class at all times relevant to this Complaint have been, and continue to be, injured in their property and have suffered, and continue to suffer, damages as a result of Defendants' antitrust violations.  Plaintiffs and members of the Class have paid and continue to pay supra-competitive prices for cable services in Comcast's Boston cluster as a result of Defendants' antitrust violations set forth in this Complaint.

67.    Defendants' unlawful conduct, including the unlawful swapping and other transactions set forth in this Complaint, constitutes a continuing course of conduct that has harmed and continues to harm Plaintiffs and members of the Class through Defendants' maintenance of, and increases to, the supra-competitive rates charged by Defendants for cable services in Comcast's Boston cluster.

## VIOLATIONS ALLEGED

## COUNT I

### Violation of Section 1 of the Sherman Act

68.     Plaintiffs incorporate all of the above paragraphs as if fully set forth herein.

69.     Defendants have conspired and engaged in a strategy of allocating territories, markets and customers among competitors at the same level of the cable television market structure.

70.     Defendants have imposed horizontal market restraints, specifically the allocation of territories, markets and customers through agreements to "swap" or exchange cable television assets, including subscribers, with other cable companies.  Examples of such swap agreements are set forth above in paragraphs 55.a. and 55.b.

71.     Defendants conspired, entered into and implemented such market allocating "swap" agreements for the purpose, and with the effect of, eliminating, suppressing and preventing actual and potential competition for cable television service and unreasonably restraining trade in the Boston cluster.

72.     Defendants' conduct of imposing horizontal territory, market and customer allocations by conspiring with and entering into and implementing unlawful swap agreements, arrangements or devices constitutes violations, including *per se* violations, of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Massachusetts Antitrust Act, M.G.L. c. 93, § 4.

73.     Defendants' conduct, including Defendants' acquisition of a competitor cable company and its cable subscribers in the Boston cluster, as set forth in this Complaint, constitutes contracts and conduct in restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act.

74.    As a proximate result of Defendants' restraints on trade and the horizontal territory, market and customer allocations effected through the "swap" agreements entered into and implemented by Defendants, Plaintiffs and members of the Class have paid more, and will continue to pay more for cable programming services than they would have otherwise paid, and, accordingly, have suffered, and will continue to suffer antitrust injury and damages in an amount to be determined according to proof at the time of trial.

## COUNT II

### Monopolization

75.    Plaintiffs incorporate all of the above paragraphs as if fully set forth herein.

76.    Defendants possessed, and Comcast continues to possess, monopoly power in the relevant product market within the relevant geographic market.

77.    Upon information and belief, Comcast controls virtually 100% of cable subscribers within the relevant Boston area geographic market.  Upon information and belief, Comcast possesses approximately a 94.6% share of the relevant product market within the relevant Boston area geographic market.

78.    Defendants have willfully obtained or maintained their monopoly through anticompetitive means as set forth in this Complaint.

79.    Defendants have imposed unreasonable horizontal market restraints, specifically the allocation of territories, markets and customers in connection with agreements to "swap" or exchange cable television assets, including subscribers, with other cable companies in order to monopolize the relevant geographic market.  Examples of such "swap" agreements and transactions are set forth above in paragraphs 55.a. and 55.b.

80.    As a result of such unlawful "swap" agreements and transactions, Defendants' competitors were removed from the relevant geographic market and Defendants were able to

56256.1

exclude competitors from, and raise prices within, the relevant geographic market.  The purpose and effect of such swap agreements and transactions was to unreasonably restrain, suppress and eliminate competition for cable television service in the relevant geographic market.

81.    Defendants' conduct of imposing horizontal territory, market and customer allocations by conspiring with and entering into swap agreements, arrangements or devices with other cable companies, which is unlawful as a violation, including a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Massachusetts Antitrust Act, M.G.L. c. 93, § 4, and unreasonably restraining trade through the acquisitions of competitor cable companies and their cable subscribers in the Boston cluster in further violation of Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act, constitutes anticompetitive conduct through which, in part, Defendants have willfully acquired or maintained monopoly power in the relevant market.

82.    Defendants further engaged in conduct excluding, preventing or interfering with competition in the relevant market.  Examples of such anticompetitive conduct are set forth below in paragraphs 83-94.

83.    Defendants have refused to provide to competitors access in the relevant geographic market to essential video programming controlled by Defendants and needed by competitors to compete against Defendants in the relevant geographic market.

84.    Comcast is a joint owner of New England Cable News ("NECN"), one of the largest cable news networks in the country, serving over 2.7 million households in more than 850 communities located throughout New England, including cable subscribers in Comcast's Boston cluster, and other communities in Massachusetts, Maine, New Hampshire, Vermont, Connecticut and New York.  NECN provides news, weather, business and sports coverage, as well as

25

documentaries.  NECN offers a significant competitive marketing advantage, as Comcast has acknowledged by advertising within the relevant geographic market that NECN is available only on Comcast.

85.    In order to foreclose, eliminate and/or suppress competition, Comcast has denied access to and carriage of NECN to unaffiliated cable companies directly competing with Comcast in the relevant geographic market, while allowing access to and carriage of NECN by unaffiliated cable companies in the New England area that do not directly compete with Comcast.

86.    Comcast has targeted marketing campaigns and deep price discounts to areas in which competitor cable companies operate in the relevant geographic market.  Such discriminatory, anticompetitive pricing practices constitute the offer and provision by Comcast of nonuniform cable rates and prices to only certain customers within the relevant geographic market served by Comcast.   Comcast did not provide notice of, or offer or provide such discounted rates to its own subscribers throughout its franchise areas in the relevant geographic market, or to the public generally in the relevant geographic market.

87.    For example, upon information and belief, in Comcast's franchise areas in the relevant geographic market, Comcast has offered to certain of its subscribers who contact Comcast in order to switch their cable services to a competitor cable company, significant price discounts and favorable terms if the customer commits to remaining with Comcast for a certain minimum time period.  Such discounts and terms are not offered, nor disclosed by Comcast, to other Comcast customers or the public generally in the relevant geographic market.

88.    As another example of Comcast's anticompetitive targeted marketing campaigns, price discounts and nonuniform cable rates in areas in which Comcast faces competition, in or

about September – December, 2004, Comcast extended through door-to-door visits to customers

of a competitor cable company, Braintree Electric and Light Department ("BELD"), in Braintree,

Massachusetts, an offer comparing BELD's rates with Comcast's offered discounted rates and

offering those deeply discounted rates for a period of sixteen (16) months of cable service to

Braintree customers who switched to Comcast.  Comcast made this offer only to existing

customers of BELD in Braintree, Massachusetts.  Upon information and belief, Comcast's

discounted offer was not made to any of Comcast's subscribers in or around Braintree, or to

other Comcast subscribers or any other actual or potential subscribers in the relevant geographic

market.

89.    BELD had started offering cable services in Braintree, Massachusetts, in or about

September 2000, after which BELD continued to gain market share and customers in Braintree,

Massachusetts, despite the presence of AT&T, Comcast's predecessor, and subsequently

Comcast, as the incumbent cable provider in Braintree.  Comcast made the above door-to-door

deeply discounted offer only to customers of BELD in an attempt to prevent or eliminate

competition and to drive BELD, Comcast's only wireline cable competitor in Braintree, out of

business.  The sales force retained by Comcast to extend this door-to-door anticompetitive offer

of deeply discounted rates exclusively to BELD customers were instructed not to leave a copy of

the written offer with the BELD customers whose homes were visited.  As a result of Comcast's

deeply discounted, anticompetitive offer, certain customers of BELD switched to Comcast.

BELD complained to the Massachusetts Attorney General, the Massachusetts Department of

Telecommunications and Energy and to local franchising authority officials about Comcast's

anticompetitive, nonuniform pricing practices.  Comcast then discontinued the offer.

90.     As another example of Comcast's anticompetitive, nonuniform, discounted price offers made only to customers of competitors, Comcast offered deep discounts only to cable customers of a competitor, RCN, in the relevant geographic market, including RCN customers in Burlington, Waltham and Dedham, Massachusetts.  These offers, which were entitled by Comcast as the "RCN Offer" and were made only to RCN cable subscribers and, upon information and belief, not to Comcast's own subscribers in the above communities or to the public generally in the relevant geographic market, provided prices for non-basic cable services, and phone and Internet services, that were deeply discounted from (more than 40% less than) Comcast's purported regular rates.  The offers represented that the deeply discounted rates would apply for one year if the RCN customers receiving the offer switched to Comcast.  The offers were made for the purpose of preventing, suppressing or eliminating competition, and eliminating RCN as a competitor within the relevant geographic market.

91.     Plaintiffs and members of the Class were injured in their business or property by Comcast's anticompetitive acts set forth in this Complaint, which were designed to restrain, eliminate, preclude or suppress competition and which caused Plaintiffs and members of the Class to pay supra-competitive prices.  As a result of such anticompetitive conduct designed to prevent or destroy competition, Comcast was able to maintain its monopoly power and impose supra-competitive cable prices within the Boston cluster.

92.     As a result of Comcast's anticompetitive nonuniform targeted price discounts in areas in which Comcast faced potential competition, Plaintiffs and members of the Class were required to pay such supra-competitive prices and to subsidize, through the payment of such prices, the discounted cable prices Comcast made available only to consumers offered the anticompetitive, nonuniform, targeted discount rates.

93.     Upon information and belief, Comcast has disconnected cable lines entering various consumers' homes that are provided by competitor cable companies, as part of the competitors' provision of cable services to the consumers' homes, despite the fact that Comcast knows, or should know, that such cable lines belong to its competitors.

94.     For example, in performing field audits of the provision of cable services in the relevant geographic market, Comcast has disconnected cable lines entering various consumers' homes that are provided by a competitor cable company as part of the competitor's provision of cable services to the consumers' homes.  Comcast has disconnected the competitor's service in these homes despite the fact that such cable lines are clearly marked as those of the competitor and that Comcast therefore knows, or should know, that the cable lines are not those of Comcast but of the competitor.

95.     Potential cable company competitors, including overbuilders, face significant barriers to entry into the market.  These high barriers to entry into the MVPD market include, among other things, overcoming the significant capital costs required for entry or re-entry; obtaining the necessary cable franchises from local governmental authorities; accessing essential video programming, including local sports and news programming; overcoming the "clustering" scheme engaged in by Defendants and other large cable operators, specifically the anticompetitive acts and practices of the incumbent monopolist cable company, including Defendants' acts and practices as set forth in this Complaint.

96.     Defendants' willful acquisition or maintenance of monopoly power in the relevant market was the result of the exclusionary, anticompetitive conduct alleged in this Complaint. Such conduct by Defendants includes, among other things, conspiring with and entering into and implementing illegal agreements with other cable companies to allocate territories, markets and

customers in connection with the "swapping" of cable television systems and subscribers in

Comcast's Boston cluster; unreasonably restraining trade and willfully acquiring or maintaining

monopoly power through acquisitions of competitor cable companies and their cable subscribers

in the Boston cluster; engaging in nonuniform, discriminatory and highly discounted pricing

practices aimed at areas in which competitor cable companies operate in the relevant geographic

market, which practices have an anticompetitive effect in the relevant geographic market; and

disconnecting cable lines entering various consumers' homes that are provided by competitor

cable companies.

97.    Defendants have exercised and continue to exercise their monopoly power by

raising prices for cable television subscribers to artificially high, noncompetitive levels within

the relevant geographic market.

98.    Defendants' anticompetitive conduct in the relevant market, as set forth in this

Complaint, has had the following effects, among others:

      a.    Competition, including price competition, for cable programming services

has been, and will continue to be restrained, suppressed and/or eliminated;

      b.    Competitors or potential competitors have been, and will continue to be,

restrained from entering into the relevant market and Defendants'

unlawful conduct has raised entry barriers to potential competition,

including from overbuilder competitors and from former competitors that

ceased or reduced cable operations and sold or abandoned infrastructure

necessary to effective competition in the Boston cluster.

    c.    Defendants have maintained and increased prices for cable services at artificially high, supra-competitive levels and, unless enjoined, will continue to maintain and increase prices at such levels.

    d.    Subscribers to cable services have been, and will continue to be deprived of the benefits of free and open competition, including lower prices for Defendants' cable services in the Boston cluster that would otherwise result from effective competition.

    e.    Prices for Comcast cable services in the Boston cluster would be lower in the absence of Comcast's violations of the Sherman Act and the Massachusetts Antitrust Act as set forth in this Complaint.

99.    Defendants' willful acquisition or maintenance of monopoly power was not the result of a superior product, business acumen or historical accident.

100.    There is no legitimate procompetitive business justification for the anticompetitive actions and conduct which facilitated Defendants' monopolization of the relevant market.

101.    Defendants' possession and willful acquisition or maintenance of monopoly power in the relevant market and Defendants' exclusionary, anticompetitive conduct as alleged in this Complaint violate Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 5 of the Massachusetts Antitrust Act, M.G.L. c. 93, § 5.

102.    Plaintiffs and members of the Class were injured in their business or property by Defendants' monopolization of the relevant market as alleged in this Complaint. Without limiting the generality of the foregoing, Plaintiffs and members of the Class have been forced to

pay higher prices for cable television in the relevant market than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT IV

### Attempted Monopolization

103.    Plaintiffs incorporate all of the above paragraphs as if fully set forth herein.

104.    Defendants have engaged in the anticompetitive conduct alleged in this Complaint with the specific intent to monopolize the relevant product market in each of the relevant geographic markets.

105.    Defendants' conduct as set forth in this Complaint constitutes and demonstrates a dangerous probability of Defendants achieving monopoly power in the relevant product market in each of the relevant geographic markets.

106.    Defendants' attempt to monopolize the relevant product market in each of the relevant geographic markets constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 5 of the Massachusetts Antitrust Act, M.G.L. c. 93 § 5.

107.    Plaintiffs and members of the Classes have been, and continue to be, injured in their business or property by Defendants' attempt to monopolize the relevant markets as alleged in this Complaint.  Without limiting the generality of the foregoing, Plaintiffs and members of the Class have been forced to pay higher prices for cable television services in the relevant market than they would have paid in the absence of Defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A.    That this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and that reasonable notice to the Class be provided in compliance with Fed. R. Civ. P. 23(c)(2);

B.      That the Court adjudge and decree that the horizontal territory, market and customer allocation agreements and other transactions as set forth in this Complaint are unreasonable restraints of trade in violation of Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act;

C.      That the Court adjudge and decree that Defendants' conduct as alleged in this Complaint constitutes unlawful monopolization, or attempted monopolization, in violation of Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act;

D.      That judgment be entered against Comcast and in favor of the Plaintiffs and the members of the Class for damages as allowed by law, together with costs of suit (including expert costs), and reasonable attorney's fees as provided by law;

E.      That the judgment so entered include trebling of damages determined to have been sustained by Plaintiffs and the members of the Class for damages as allowed by law, together with costs of suit (including expert costs), and reasonable attorney fees as provided by law;

F.      That Comcast be enjoined from continuing the unlawful monopolization, or attempt to monopolize conduct alleged in this Complaint;

G.      That the Court award Plaintiffs and members of the Class pre-judgment and post-judgment interest as permitted by law; and

H.      That the Court award Plaintiffs and members of the Class such other and further relief as may be necessary and appropriate.

56256.1

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues triable of right by a jury.

DATED: July 28, 2006.                    /s/ David Woodward
                                           Samuel D. Heins
                                           Stacey L. Mills
                                           David Woodward
                                           Jessica N. Servais
                                           HEINS MILLS & OLSON, P.L.C.
                                           3550 IDS Center
                                           80 South Eighth Street
                                           Minneapolis, MN  55402
                                           Tel:  (612) 338-4605
                                           Fax:  (612) 338-4692


                                           /s/ John Peter Zavez
                                           John Peter Zavez (#555721)
                                           Noah Rosmarin (#630632)
                                           ADKINS KELSTON & ZAVEZ, P.C.
                                           90 Canal Street
                                           Boston, MA  02114
                                           Tel: (617) 367-1040
                                           Fax:  (617) 742-8280

                                           Barry Barnett
                                           John Turner
                                           Jason Fulton
                                           SUSMAN GODFREY LLP
                                           901 Main Street, Suite 5100
                                           Dallas, TX  75202
                                           Tel:  (214) 754-1900
                                           Fax:  (214) 754-1933

                                           Carol A. Mager
                                           MAGER & GOLDSTEIN, LLP
                                           Liberty Place, 21st Floor
                                           1650 Market Street
                                           Philadelphia, PA 19103
                                           Tel: (215) 640 -3280
                                           Fax: (215) 640 -3281

                                           Ann D. White
                                           LAW OFFICES OF ANN D. WHITE, P.C.
                                           One Pitcairn Place, Suite 2400
                                           165 Township Line Road
                                           Jenkintown, PA  19046
                                           Tel: (215) 481-0274
                                           Fax: (215) 481-0271

Marc H. Edelson (#51834)
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA  18901
Tel:  (215) 230-8043
Fax:  (215) 230-8735

Robert N. Kaplan
Gregory K. Arenson
Christine M. Fox
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY  10022
Tel:  (212) 687-1980
Fax:  (212) 687-7714

Lynn Lincoln Sarko
Mark A. Griffin
John H. Bright
Raymond J. Farrow
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Tel:  (206) 623-1900
Fax:  (206) 623-3384

Anthony J. Bolognese (#36937)
Joshua H. Grabar (#82525)
BOLOGNESE & ASSOCIATES, LLC
1617 JFK Blvd., Suite 650
Philadelphia, PA  19103
Tel:  (215) 814-6750
Fax:  (215) 814-6764

Michael Hausfeld
Stewart Weltman
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699

**Counsel for Plaintiffs**

56256.1

**CERTIFICATE OF SERVICE**

I certify that on 28 July 2006, I caused a true copy of the foregoing document to be served electronically via the Court's electronic filing system on counsel of record.

/s/  John Peter Zavez
John Peter Zavez

56256.1