## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARTHA KRISTIAN, | ) | Civil Action No. 03-CV- |
| | ) | 12466-EFH |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMCAST CORPORATION, COMCAST | ) | |
| HOLDINGS CORPORATION, COMCAST | ) | |
| CABLE COMMUNICATIONS, INC., | ) | |
| COMCAST CABLE  HOLDINGS, LLC, and | ) | |
| COMCAST MO GROUP, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| JACK ROGERS and PAUL PINELLA, | ) | Civil action No. 04-CV- |
| | ) | 10142-EFH |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMCAST CORPORATION and AT&T | ) | |
| BROADBAND | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE
## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Timothy C. Blank
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Telephone:  (617) 728-7100
Facsimile:  (617) 426-6567

Attorneys for Defendants

Michael S. Shuster
Sheron Korpus
Alycia Regan Benenati
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

Attorneys for Defendants

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

SUMMARY OF FACTS .................................................................................................. 4

    Comcast and the Cable Industry Generally ............................................................. 4

    Plaintiffs and the Putative Class ........................................................................... 5

    The Alleged Cable System Transactions ................................................................ 6

    The CAC's Conclusory Allegations That The Transacting Parties Were "Competitors" ......... 6

    The CAC's Conclusory Allegations That Higher Prices
    "Resulted From" The Cable System Transactions ................................................... 7

    The Cable System Transactions Received Regulatory Scrutiny And Approval ............... 7

    The CAC's Allegations of Injury To Persons Other Than Plaintiffs ......................... 8

ARGUMENT ................................................................................................................. 9

    I.   THIS COURT NEED NOT ADOPT ALLEGATIONS IN THE CAC
        THAT ARE PURELY CONCLUSORY OR CONTRADICTED BY
        JUDICIALLY NOTICEABLE FACTS ............................................................... 9

    II.  THE CAC FAILS TO STATE VIABLE ANTITRUST CLAIMS BASED ON
        COMCAST'S CABLE SYSTEM TRANSACTIONS ...................................... 10

      A. Plaintiffs Lack Antitrust Standing To Challenge The Cable System Transactions .... 10

          1.  Comcast And The Counterparties To The Cable System
              Transactions Were Not "Competitors" ................................................ 11

          2.  Comcast And The Counterparties To The Cable System
              Transactions Served Different Franchise Areas ................................... 12

          3.  Comcast And The Counterparties To The Cable System
              Transactions Were Not "Overbuilders" ............................................. 12

          4.  Because The Cable System Transactions Were Competition- Neutral, Plaintiffs
              Lack Standing To Assert An Antitrust Claim ...................................... 13

      B. The CAC Fails To State A Claim Under Section 1 Of The
         Sherman Act Or Section 4 of the Massachusetts Antitrust Act ............................ 16

      1.   The CAC Fails To Allege A *Per Se* Violation.................................................... 16

      2.   The CAC Fails To State A Section 1 Claim Under The Rule Of Reason ............ 18

          a.   Plaintiffs Fail To Plead A Relevant Market.................................................... 18

             1.   Plaintiffs' Market Definition Does Not Correspond To The Area In Which Comcast Faces Competition ................................ 19

             2.   Plaintiffs' Market Definition Is Improperly Limited To Comcast's Service Area ........................................................................... 21

          b.   Plaintiffs Fail To Plead Facts Showing That The Cable System Transactions Produced Any Anticompetitive Effect.......................... 22

   C.   Plaintiffs' Acquisition-Related Allegations Fail To State A Claim Under Section 2 Of The Sherman Act Or Section 5 Of The Massachusetts Antitrust Act ............... 25

      1.   Plaintiffs Fail To Plead A Relevant Geographic Market ...................................... 25

      2.   The Cable System Transactions Were Not The Type Of Predatory Or Anticompetitive Conduct Required To State A Section 2 Claim ......................... 26

III. THE CAC FAILS TO STATE A CLAIM BASED ON COMCAST'S ALLEGED CONDUCT TOWARD COMPETITORS ................................................... 27

   A.   Plaintiffs Lack Antitrust Standing To Challenge Comcast's Alleged Conduct Vis-À-Vis Competitors.................................................... 27

   B.   Plaintiffs Fail To Allege A Relevant Geographic Market ........................................... 30

   C.   The Competitor-Related Conduct Alleged In The CAC Cannot Support Claims For Monopolization Or Attempted Monopolization ....................................... 30

      1.   NECN ................................................................................................................... 30

      2.   Price Discounts ................................................................................................... 31

      3.   Alleged Disconnection of Competitor Lines ..................................................... 34

CONCLUSION.................................................................................................................. 35

1409116

TABLE OF AUTHORITIES

CASES

Am. Tel. & Tel. Co. v. IMR Capital Corp., 888 F. Supp. 221 (D. Mass. 1995)................10

Americana Indus. Inc. v. Wometco de Puerto Rico Inc., 556 F.2d 625,
(1st Cir. 1977) ...................................................................................................32

Amtrol, Inc. v. Vent-Rite Valve Corp., Civ. A. No. 85-0681-Y,
1986 U.S. Dist. LEXIS 25337 (D. Mass. May 19, 1986) ................................14

Aspen Skiing Co. v. Aspen Highlands Skiing Corp. 472 U.S. 585 (1985) ......................31

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,
459 U.S. 519 (1983) ...............................................................................11, 12, 29

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) ........................31, 32

AT&T v. IMR Capital Corp., 888 F. Supp. 221 (D. Mass. 1995) .....................................31

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994) ..............................................................13

Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227 (1st Cir. 1983) ........................32

Benjamin v. Aroostook Med. Ctr., 937 F. Supp. 957 (D. Me. 1996) ...............................26

Berkey Photo Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir. 1979) .........................26

Betkerur v. Aultman Hosp. Assoc., 78 F.3d 1079 (6th Cir. 1996) ...................................17

Bocobo v. Radiology Consultants of S. Jersey, 305 F. Supp. 2d 422,
4237 (D. N.J. 2004)............................................................................................14

Boston Scientific Corp. v. Schneider (Eur.) AG, 983 F. Supp. 245
(D. Mass. 1997) .....................................................................................................9

Bristol-Myers Squibb v. Copley, 144 F. Supp. 2d 21 (D. Mass. 2000) .....................15, 28

Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc., 441 U.S. 1
(1979) ..................................................................................................................17

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209
(1993) ..................................................................................................................32

Brotech Corp. v. White Eagle Int'l Tech. Grp., Inc., No. Civ. A. 03-232,
2004 WL 1427136 (E.D. Pa. June 21, 2004) ........................................................14, 15

Brown Shoe Co. v. United States, 370 U.S. 294 (1962) ....................................19

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) ...............17

City of Pittsburgh v. West Penn Power Co., 147 F.3d 256
(3d Cir. 1998) .............................................................................10, 13, 14, 15

Coastal Fuels Inc. v. Caribbean Petroleum Corp., 79 F.3d 182
(1st Cir. 1996) ...........................................................................................19

Coffey v. Healthtrust, Inc., 955 F.2d 1388 (10th Cir. 1992) ............................23

Cont'l Cablevision of Ohio v. American Elec. Power Co., 715 F.2d 1115
(6th Cir. 1983) ...........................................................................................23

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984) .............17, 18

Davis v. S. Bell Tel. & Tel. Co., No. 89-2839-CIV-NESBITT, 1994 WL 912242,
(S.D. Fla. Feb. 1, 1994) ..............................................................................33

Discon Inc. v. Nynex Corp., 86 F. Supp. 2d 154 (W.D.N.Y. 2000) .................21

DM Research Inc. v. College of Am. Pathologists, 170 F.3d 53
(1st Cir. 1999) .............................................................................................9

Doyle v. Hasbro, Inc., 103 F.3d 186 (1st Cir. 1996) .........................................9

Dry v. Methodist Med. Ctr. of Oak Ridge, Inc., 893 F.2d 1334 (table),
1990 WL 3489 (6th Cir. Jan. 19, 1990) ......................................................11

Eastern Food Serv., Inc. v. Pontifical Catholic Univ. of Puerto Rico Serv. Ass'n,
222 F. Supp. 2d 131 (D. P.R. 2002) ............................................................18

Egan v. Athol Memorial Hosp., 971 F. Supp. 37 (D. Mass. 1997),
aff'd, 134 F.3d 361 (1st Cir. 1998) ..............................................................9

Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir. 2001) .....................................15

Gianna Enter. v. Miss World (Jersey) Ltd., 551 F. Supp. 1348,
(S.D.N.Y. 1982) .........................................................................................27

Glaberson v. Comcast Corp., Civ. A. No. 03-6604
(E.D. Pa. Aug. 31, 2006) ..............................................14, 15, 18, 28, 29

Hahn v. Rifkin/Narragansett S. Fla. CATV Ltd. P'ship,
941 F. Supp. 1196 (S.D. Fla. 1996) ...................................................33

Hecht v. Pro-Football, Inc., 570 F.2d 982, 994 (D.C. Cir. 1977) ......................................14

Howe v. Bank for Int'l Settlements Inc., 194 F. Supp. 2d 6
(D. Mass. 2002) ...................................................................................10, 29

In re Air Passenger Computer Reservation Sys., 727 F. Supp. 564
(C.D. Cal. 1989) ...................................................................................33

Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984) ...............................22

Jetro Cash & Carry Enter., Inc. v. Food Distrib. Ctr., 569 F. Supp. 1404
(E.D. Pa. 1983) .....................................................................................17

Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922 (1st Cir. 1984) ................................26

Marco Island Cable, Inc. v. Comcast Cablevision of the South, Inc.,
No. 2:04-cv-26-FtM-29DNF, 2005 U.S. Dist. LEXIS 45116
(M.D. Fl. July 3, 2006) ........................................................................28

Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 208 F.3d 655
(8th Cir. 2000) ......................................................................................19

Monahan's Marine, Inc. v. Boston Whaler Inc., 866 F.2d 525 (1st Cir. 1989) .................33

Northern Pac. Ry. Co. v. United States, 356 U.S. 1 (1958) ..............................................16

N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284
(1985) ...................................................................................................16

Ocean State Physicians Health Plan Inc. v. Blue Cross & Blue Shield of R.I.,
83 F.2d 1101 (1st Cir. 1987) ................................................................26

Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370
(7th Cir. 1986) ......................................................................................30

PSW, Inc. v. Visa USA, Inc., No. C.A. 04-347T, 2006 WL 519670
(D. R.I. Feb. 28, 2006) ........................................................................15

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 922 F. Supp. 1055
(E.D. Pa. 1996), aff'd, 124 F.3d 430 (3d Cir. 1997) ......................................18, 22

RSA Media Inc. v. Media Group Inc., 260 F.3d 10 (1st Cir. 2001) ....................................11

Serpa Corp. v. McWane, Inc., 199 F.3d 6 (1st Cir. 1999) ................................9, 10, 11, 34

Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield, 373 F.3d 57
(1st Cir. 2004) ........................................................................................................22

Sullivan v. Tagliabue, 25 F.3d 43 (1st Cir. 1994) .....................................................10, 11

Suzuki of W. Mass., Inc. d/b/a/ AllPower v. Outdoor Sports Expo Inc.,
126 F. Supp. 2d 40 (D. Mass. 2001) ...........................................................................9

Texaco Inc.v. Dagher, 126 S. Ct. 1276 (2006) ...............................................16, 17, 18, 23

Tri-State Rubbish Inc. v. Waste Mgmt, Inc., 998 F.2d 1073 (1st Cir. 1993) ..................32

Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566
(2d Cir. 1990) ........................................................................................................30

United States v. Eastman Kodak Co., 63 F.3d 95 (2d Cir. 1995) ......................................22

Verizon Communications v. Law Offices of Curtis V. Trinko, LLP,
540 U.S. 398 (2004) ...........................................................23, 24, 25, 26, 29, 31

Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256
(2d Cir. 2001) ....................................................................................................31, 32

Wells v. Wells, 400 N.E.2d 1317 (Mass. App. Ct. 1980) ...................................................25

Wojcieszek v. New England Tel. & Tel. Co., 997 F. Supp. 527
(D. Mass. 1997) .............................................................................................15, 25, 33

## STATUTES

47 U.S.C. § 18.........................................................................................................5

47 U.S.C. § 214(a) ...................................................................................................5

47 U.S.C. § 310(d) ...................................................................................................5

47 U.S.C.§ 531..........................................................................................................4

47 U.S.C. § 537..........................................................................................................5

47 U.S.C. §§ 541-543 ...............................................................................................4

47 U.S.C. § 544..........................................................................................................4

47 C.F.R. §76.56 ...................................................................................................4

47 C.F.R. § 76.111 .................................................................................................4

47 C.F.R. § 76.205-209 ..........................................................................................4

47 C.F.R. §§ 76.225 ...............................................................................................4

47 C.F.R. § 76.601-640 ..........................................................................................4

47 C.F.R. § 76.1301 ...............................................................................................4

47 C.F.R. § 76.1713 ...............................................................................................4

M.G.L. ch. 93 § 4 ...................................................................................................9

Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Holdings, LLC, Comcast MO Group, Inc. and AT&T Broadband (collectively "Comcast") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint For Violations of the Sherman Antitrust Act and the Massachusetts Antitrust Act, dated July 28, 2006 (the "CAC").

## PRELIMINARY STATEMENT

The CAC suffers from fundamental defects fatal to any antitrust complaint.  In the first of its two parts, it complains of two transactions whereby Comcast's predecessor, AT&T Broadband,[1] acquired assets belonging to two other companies, but critically fails to allege any facts demonstrating that those other companies were AT&T Broadband's <u>competitors</u> (merely calling them "competitors" without more is precisely the kind of purely conclusory allegation courts have repeatedly held to be insufficient).  In the CAC's second part, it complains of alleged anticompetitive conduct directed against Comcast's competitors (<u>none</u> of which was a party to any of the transactions referred to above), but fails to plead the elements of those claims <u>and</u> fails to allege any basis for permitting <u>Plaintiffs</u> to pursue those claims when the allegedly injured competitors themselves are the proper plaintiffs to pursue them.

Overall, the CAC is long on antitrust buzz words but short on <u>facts</u>.  This is not surprising, given that the transaction-based claims -- that is, the claims predicated on transactions entered into between AT&T Broadband and other cable companies pursuant to which AT&T Broadband acquired those companies' cable franchises, assets and customers -- were extensively reviewed and approved by federal, state and local officials.  The Supreme Court has very

---

[1] AT&T Broadband merged with Comcast in 2002. (CAC ¶¶ 18, 57-59)

1

recently cautioned against courts wading into regulated industries to find antitrust violations

where the regulators responsible for those industries have already addressed the matters

complained of. The simple fact here is that, if the transactions and conduct complained of in the

CAC truly gave rise to antitrust violations, the Federal Communications Commission, the

Federal Trade Commission, and the municipal and local franchising authorities that reviewed the

conduct alleged would have so found. Given that they did not, the Court should bring a

profoundly skeptical eye to the CAC's prototypically bald and conclusory allegations of

competitive wrongdoing.

That Plaintiffs are straining to fashion antitrust claims where none exist is underscored

not merely by the fact that the two consummated transactions they complain of -- an asset swap

and an asset acquisition entered into by AT&T Broadband, Comcast's predecessor-in-interest --

were approved at all levels of government, but also by the fact that the CAC complains of (and in

fact was amended to add) a third transaction that was never consummated. This smacks of

desperation and is entirely frivolous; indeed, if the CAC were predicated solely on this one

transaction, sanctions would be in order.

The CAC is divorced from market reality in other respects as well. The cable industry is

predicated on franchising. Without a cable franchise in a given geographic area, a cable

company cannot provide cable service to that area. Thus, a second cable company can only

compete with an incumbent, franchised cable provider if the second company has the necessary

franchise permitting it to do so. The CAC calls Comcast and the parties it (via its predecessor

AT&T Broadband) transacted with "competitors," but the CAC does not allege that Comcast on

the one hand, or the transaction counterparties on the other, ever applied for, let alone received,

the franchise rights necessary to compete in the others' area. Without those franchise rights,

these companies could not, as a matter of law, have competed with each other in those areas.

2

Even when franchise rights are obtained, the CAC's own allegations are clear that a second cable company can only compete with the incumbent by becoming an overbuilder. Overbuilding is a very specific business model under which a second cable company applies for and receives the necessary franchises, and raises the necessary capital, to enter into an incumbent, franchised cable provider's franchise territory for the purpose of building an entirely new and separate cable infrastructure (with all of the enormous cost and risk one would expect) for the purpose of providing cable service in that franchise territory. As alleged in the CAC, the overbuilding business is so unappealing that only 1.3% of consumers nationwide live in areas serviced by overbuilders. (CAC ¶ 44) The CAC does not allege that Comcast or its transacting counterparties ever wanted or had taken the necessary steps to be in this line of business, let alone that they actually entered each other's franchise areas as overbuilders.

Courts have found that no antitrust standing exists in circumstances such as this where the transactions at issue did not eliminate any competition. In effect, the allegations of the CAC demonstrate that the challenged transactions had <u>no</u> effect on competition because, from the perspective of subscribers in the affected areas, there was <u>never</u> competition between the transacting parties. All that occurred through these acquisitions was the substitution of one franchised cable provider for another -- classically competition-neutral (and therefore non-actionable) events. Subscribers could only obtain cable service from one cable provider pre-transaction, and were in no different position post-transaction. Thus, the CAC fails to plead <u>any</u> antitrust injury, a deficiency fatal not only to Plaintiffs' standing, but also to Plaintiffs' ability to show the necessary harm to competition required by both the Sherman Act and the Massachusetts Antitrust Act.

The CAC's attempts to characterize the asset acquisitions complained of in the CAC as *per se* illegal horizontal market allocations is equally untenable. *Per* se treatment is never

applied to transactions like those alleged in the CAC -- (1) asset swaps and acquisitions (2) disclosed to, and approved by, public authorities. The CAC is devoid of any facts that could support its "market allocation" theory, let alone on a *per se* basis.

The CAC's allegations concerning conduct purportedly directed against competitors in the putative Boston cluster are equally deficient: The allegations fail to make out any Section 2 violation or corresponding state law antitrust violation.

For all these reasons, the CAC does not -- and cannot -- set forth a violation of the antitrust laws and should be dismissed in its entirety, without leave to replead.

## SUMMARY OF FACTS

### Comcast and the Cable Industry Generally

The cable television industry is one of the most heavily regulated industries in the United States. For example, the Federal Communications Commission ("FCC"), which has congressionally mandated authority to oversee this industry, has enacted regulations imposing, inter alia, technology, carriage, content, programming, and customer service requirements.[2] Additionally, cable providers can only operate their systems pursuant to franchises granted by state and/or local franchising authorities, which generally impose additional service, quality, and customer service requirements.[3] Mergers, asset acquisitions, and other business combinations within the cable industry are subject to intense scrutiny, and require the approval of the FCC, the

---

[2] See, e.g., 47 C.F.R. §§ 76.601-640 (technical requirements and testing rules); id. § 76.56 (non-commercial and local channel carriage rules); id. § 76.111 (cable sports blackout); id. § 76.225 (commercial limits in childrens' programs); id. §§ 76.225, 76.205-209 (content rules); id. § 76.1301 (programming ownership rules); id. § 76.1713 (customer complaint resolution).

[3] See, e.g., 47 U.S.C. §§ 541-543 (general power to grant non-exclusive franchises, and power to levy fees and regulate rates); id. § 531 (franchising authority to set and enforce requirements for educational and public interest programming); id. § 544 (franchising authority's power to set technical requirements for franchise applicants).

4

Federal Trade Commission ("FTC") or the Antitrust Division of the Department of Justice

("DOJ"), and local franchising authorities.[4]

    In compliance with the requirements set forth at the federal, state, and local levels of

government, and by virtue of strategic acquisitions and substantial investments in new

technologies, Comcast has proven itself to be an industry leader whose advanced offerings

beyond basic cable service include digital cable, video on demand, high-definition television

(HDTV), digital video recording (DVR), pay-per-view programming, and premium channel

programming.

**Plaintiffs and the Putative Class**

    Plaintiffs are three individuals residing in Hanover, Plymouth County, Massachusetts

(Martha Kristian), Arlington, Middlesex County, Massachusetts (Jack Rogers), and Winchester,

Middlesex County, Massachusetts (Paul Pinella).  (See CAC, ¶¶ 15-17)  Plaintiffs allege that,

"during the time period covered by [the CAC]," they were and/or have continued to be

subscribers of "non-basic cable programming services provided by Comcast."  (See id.)

    Though they reside in only two counties in Massachusetts, Plaintiffs profess to represent

Comcast cable subscribers residing in nine counties in Massachusetts and five counties in New

Hampshire.  (See CAC, ¶ 31(a)-(b))  Plaintiffs characterize the "areas covered by Comcast's

cable franchises ... located in" the foregoing Massachusetts and New Hampshire counties as

"Comcast's Boston cluster" (CAC, ¶ 31(a)(2)) and  purport to bring this action on behalf of

---

[4] See id. § 537 (franchise authority's power to authorize transfer of ownership); id. § 214(a)
(FCC to approve or deny acquisition of lines based on public interest criteria); id. §
310(d) (public interest criteria for FCC's assessment of transfer of station license); id. § 18
(Clayton Act scrutiny of acquisition by FTC or DOJ).

All cable television customers who subscribe or subscribed at any time since December 1, 1999, to the present [the 'Putative Class Period'] to video programming services (other than solely to basic cable services) from AT&T and/or Comcast, or any of their subsidiaries or affiliates" in Comcast's putative Boston cluster.

(CAC, ¶ 31(b)). [5]

## The Alleged Cable System Transactions

The CAC alleges that Comcast has violated Sections 1 and 2 of the Sherman Act and Sections 4 and 5 of the Massachusetts Antitrust Act by "clustering" its cable system franchises in the so-called Boston cluster through two asset acquisitions undertaken by Comcast's predecessor, AT&T Broadband. (See generally CAC, ¶¶ 1-7, 11, 12) The two completed transactions which Plaintiffs challenge in the CAC (the "Cable System Transactions") are (i) a June 15, 2000 acquisition of MediaOne Group ("MediaOne") involving approximately 1,500,000 subscribers in the Boston area and New Hampshire and (ii) a January 8, 2001 swap agreement with Cablevision Systems Corp. (the "Cablevision Swap") involving approximately 362,000 subscribers in the Boston area. (CAC ¶¶ 52, 55-56)

Plaintiffs also allege -- inexplicably -- that a never consummated swap transaction between AT&T Broadband and Charter Communications ("Charter"), which was announced in December 1999, but was terminated without completion in July 2000, also allegedly deterred potential competitors from entering the Boston cluster and permitted Defendants to maintain or increase their prices to supra-competitive levels. (Id. ¶ 54, 55(a))

## The CAC's Conclusory Allegations That The Transacting Parties Were "Competitors"

Though the CAC baldly characterizes the counterparties to the Cable System Transactions and Charter as "competitors" (see generally id. ¶¶ 51, 54), the CAC does not allege

---

[5] Comcast will challenge the CAC's class definition, and class certification overall, consistent with the Scheduling Order entered by the Court, should the CAC survive this motion.

1409116

any facts showing that Comcast (or AT&T Broadband) actually competed against MediaOne, Cablevision, or Charter, either by providing cable service in the same franchise areas as those entities prior to the challenged transactions or otherwise (see id. ¶¶ 52-53, 55-59). Nor does the CAC set forth any facts, or even allege, that any of those counterparties applies for franchises or otherwise intended to compete with Comcast in the future.

**The CAC's Conclusory Allegations That Higher
Prices "Resulted From" The Cable System Transactions**

The CAC alleges that the complained-of transactions constitute "horizontal market allocations" that are violative of Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act, including as *per se* violations (see id. ¶¶ 11, 36(a), 72, 81) and give rise to monopolization and attempted monopolization claims under Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act (see id. ¶¶ 12, 36(b), 101). The CAC alleges that, as a "proximate result" of the Cable System Transactions, Plaintiffs and the putative class members "have paid more, and will continue to pay more for cable programming services than they would have otherwise paid." (Id. ¶ 74; see also id. ¶¶ 102, 107 (same)) The CAC posits this causal hypothesis without setting forth any fact-based allegations to support it.

**The Cable System Transactions Received Regulatory Scrutiny And Approval**

Each of the transactions complained of in the CAC was extensively scrutinized and approved by regulators and franchising authorities at the federal, state and local levels. (See Declaration of Alycia Regan Benenati ("Benenati Decl."), Exs. 1 and 2 (excerpts from regulatory filings and approvals pertaining to Cable System Transactions)).[6]

---

[6] In fact, the MediaOne deal was one of the most scrutinized deals in the history of the cable industry, requiring AT&T, in order to receive FCC and Department of Justice approval, to elect to a) divest MediaOne's 25.5% interest in Time Warner Entertainment, LP ("TWE"); (b) end involvement in TWE's video programming activities; or (c) divest ownership interests in other

7

1409116

**The CAC's Allegations of Injury To Persons Other Than Plaintiffs**

In addition to the allegations concerning the Cable System Transactions, Plaintiffs further allege, mostly "upon information and belief," that Defendants engaged in three types of anti-competitive conduct "excluding, preventing or interfering with competition in the relevant market." (CAC ¶¶ 82, 87-88, 90, 93)

First, Plaintiffs apparently fault the terms under which Comcast provides access to New England Cable News ("NECN"), of which Comcast is a joint owner. Plaintiffs allege that Comcast has "denied access to and carriage of NECN to unaffiliated cable companies directly competing with Comcast in the relevant geographic market, while allowing access to and carriage of NECN by unaffiliated cable companies in the New England area that do not directly compete with Comcast." (Id. ¶ 85) Significantly, Plaintiffs do not allege that Comcast was required to provide access to NECN, or that any overbuilder was prevented from entering or effectively competing in any market as a result of its inability to access NECN. Moreover, Plaintiffs do not specifically allege that they suffered any injury as a result of the terms on which NECN was or was not offered to alleged competitors.

Second, Plaintiffs allege that "Comcast has targeted marketing campaigns and deep price discounts to areas in which competitor cable companies operate in the relevant geographic market." (Id. ¶ 86) Plaintiffs do not allege that these discounted offers were below Comcast's costs, or that these "targeted" marketing efforts negatively impacted (much less prevented) any overbuilder's entry into or continued business in their respective markets.

Finally, Plaintiffs allege that Comcast has "disconnected cable lines entering various consumers' homes that are provided by competitor cable companies, as part of the competitors'

---

cable systems serving 11.8% of MVPD subscribers nationwide or more than 9.7 million subscribers. See Benenati Decl., Ex. 2.

provision of cable services to the consumers' homes, despite the fact that Comcast knows, or should know, that such cable lines belong to its competitors." (Id. ¶¶ 93-94)  Plaintiffs do not allege that any lines entering their homes have been disconnected, nor that this supposed conduct interfered with any overbuilder's entry into a market or ability to compete in that market.

## ARGUMENT

In the CAC, Plaintiffs purport to state claims against Comcast under Sections 1 and 2 of the Sherman Act and Sections 4 and 5 of the Massachusetts Antitrust Act[7] based on two types of conduct: (i) the acquisition, by merger or asset purchase, of cable systems in areas in which Comcast did not previously offer cable service; and (ii) alleged conduct by Comcast allegedly directed against other cable providers in certain Massachusetts communities.

**I.     THIS COURT NEED NOT ADOPT ALLEGATIONS
        IN THE CAC THAT ARE PURELY CONCLUSORY OR
        CONTRADICTED BY JUDICIALLY NOTICEABLE FACTS**

Although the Court must accept as true well-pled factual allegations in the CAC on a motion to dismiss, the Rule 8(a) standard is not a "toothless tiger," and the Court need not credit bald assertions or legal conclusions. See, e.g., Serpa Corp. v. McWane, Inc., 199 F.3d 6 (1st Cir. 1999); DM Research Inc. v. College of Am. Pathologists, 170 F.3d 53, 57 (1st Cir. 1999); Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir. 1996).  Moreover, "[i]nvocation of antitrust terms of art does not confer immunity from a motion to dismiss." Boston Scientific Corp. v. Schneider (Eur.) AG, 983 F. Supp. 245, 253 (D. Mass. 1997).  Accordingly, this Court need not credit

---

[7] The Massachusetts Antitrust Act provides that it "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes as far as practicable." See M.G.L. ch. 93 § 4.  "As a result, determining the merits of plaintiff's Sherman Act claims will also determine the merits of plaintiff's claims under M.G.L. ch. 93 § 4." Suzuki of W. Mass. Inc. d/b/a/ AllPower v. Outdoor Sports Expo Inc., 126 F. Supp. 2d 40, 46 n.3 (D. Mass. 2001).  As discussed infra, Plaintiffs have failed to state a claim under the Sherman Act.  Therefore, their state law claims under the Massachusetts Antitrust Act also must fail. See Egan v. Athol Memorial Hosp., 971 F. Supp. 37, 46 (D. Mass. 1997), aff'd, 134 F.3d 361 (1st Cir. 1998).

Plaintiffs' conclusory references to "competitors" and "competition" in the absence of any facts supporting either of those characterizations. See infra at 11-15. Neither does the court need to accept the truth of allegations contradicted by judicially noticeable matters in the public record. See Howe v. Bank for Int'l Settlements Inc., 194 F. Supp. 2d 6, 11 (D. Mass. 2002); Am. Tel. & Tel. Co. v. IMR Capital Corp., 888 F. Supp. 221, 234 (D. Mass. 1995). See also City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998) (on motion to dismiss antitrust claims, district court properly considered extrinsic documents pertaining to the regulatory proceedings approving the challenged transaction). Therefore, this Court can (and should) consider the conclusions of the FCC and other regulatory authorities who extensively reviewed and approved the transactions challenged in the CAC, and who continue to monitor competition in the cable industry. See infra at 17, 23-25; Benenati Decl., Exs. 1, 2 & 5.

## II.    THE CAC FAILS TO STATE VIABLE ANTITRUST CLAIMS BASED ON COMCAST'S CABLE SYSTEM TRANSACTIONS

### A.    Plaintiffs Lack Antitrust Standing To Challenge The Cable System Transactions

In the CAC, Plaintiffs allege that they have suffered injury, in the form of higher cable prices, as a result of Comcast's Cable System Transactions. (See, e.g., CAC, ¶¶ 66, 107) Plaintiffs' right to seek damages and injunctive relief based on these allegations, however, is dependent upon their ability to demonstrate that they have "antitrust standing." See, e.g., Serpa Corp., 199 F.3d at 10 ("standing in an antitrust case is 'not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws'"). In determining whether Plaintiffs have satisfied this threshold requirement, the Court must examine the following factors:

> (1) the causal connection between the ... antitrust violation and [the] harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the [alleged injury is of the type for which]... the antitrust

10

laws were [intended to provide redress] ("antitrust injury"); (4) the directness
with which the alleged market restraint caused the [alleged] injury; (5) the
speculative nature of the damages; and (6) the risk of duplicative recovery or
complex apportionment of damages.

Sullivan v. Tagliabue, 25 F.3d 43, 46 (1st Cir. 1994) (citing Associated Gen. Contractors of Cal.,

Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 537-45 (1983)).  Causation and injury are

intimately related and together define what is commonly referred to as "antitrust injury," which

is a "central factor in the standing calculus," and one whose absence "weighs heavily against a

grant of standing." Sullivan, 25 F.3d at 47 & n. 9; RSA Media Inc. v. Media Group Inc., 260

F.3d 10, 14 (1st Cir. 2001) ("Even when a causal link has been established between the alleged

violation and the injury, the absence of 'antitrust injury' will generally defeat standing").

Applying these factors to the CAC, it is clear that Plaintiffs lack standing to assert antitrust

claims against Comcast based on the Cable System Transactions.

> **1.    Comcast And The Counterparties To The
> Cable System Transactions Were Not "Competitors"**

The transaction-based claims are predicated entirely on the allegation that antitrust injury

resulted because the Cable System Transactions were between Comcast and its "competitors."

However, though Plaintiffs baldly characterize MediaOne, Cablevision and Charter as

"competitors" (see CAC, ¶¶ 49-54, 69, 73, 80-81), the Court need not accept such conclusory

descriptions where the facts in the complaint suggest otherwise. See Dry v. Methodist Med. Ctr.

of Oak Ridge, Inc., 893 F.2d 1334 (table), 1990 WL 3489, at *3 (6th Cir. Jan. 19, 1990)

(disregarding plaintiff's conclusory characterization of himself as a "competitor" of defendant

where, on the face of the complaint, it was apparent that plaintiff and defendant actually

provided services in distinct, non-overlapping markets).  Absent any cognizable allegation that

the transacting parties were competitors, there is no basis for assuming that they were.

11

### 2.    Comcast And The Counterparties To The Cable System Transactions Served Different Franchise Areas

The CAC makes clear by implication that, prior to the Cable System Transactions, Comcast's predecessor, AT&T Broadband, provided cable service only in areas where it held a franchise and did not possess (and had never sought) franchise approval to provide cable service in the franchise areas served by the Cable System Transaction counterparties.  Thus, the CAC does <u>not</u> allege that AT&T Broadband provided cable service in any of the franchise areas serviced by the counterparties to the Cable System Transactions (or the aborted swap with Charter) prior to those transactions.  To the contrary, it is plain from the allegations in the CAC that the Cable System Transactions were the means by which AT&T Broadband <u>entered</u> those franchise areas in the first place by acquiring the incumbent franchised cable providers (and thereby acquiring the franchise rights entitling it to service those areas).[8]  The Cable System Transaction counterparties were <u>not</u> competitors of AT&T Broadband -- they were simply cable providers in separate franchise areas.  They <u>could not be competitors</u> of AT&T Broadband -- and this is undisputed and indisputable -- because a subscriber in AT&T Broadband's franchise area <u>could not</u> obtain cable service from those companies.  Similarly, customers of those companies could not obtain cable service from AT&T Broadband.

### 3.    Comcast And The Counterparties To The Cable System Transactions Were Not "Overbuilders"

Nor, significantly, do Plaintiffs allege that Comcast has a history of overbuilding rivals' systems (it does not), or that, but for the challenged transactions, Comcast would have overbuilt neighboring systems or was likely to do so.  See <u>Associated Gen. Contractors of Cal. v. Cal.</u>

---

[8] For example, Plaintiffs allege: (1) that Comcast has approximately 2 million subscribers in the Boston area (<u>see</u> CAC, ¶ 32)); and (2) that when Comcast merged with AT&T Broadband, it acquired all of AT&T's subscribers (approximately 13 million nationwide), including the approximately 1.8 million Boston-area subscribers AT&T had earlier obtained from its acquisition of MediaOne and the Cablevision Swap.  (<u>See</u> <u>id.</u> ¶¶ 52, 55, 57)

12

State Council of Carpenters, 459 U.S. 519, 526 (1983) ("It is not ... proper to assume that the [Plaintiffs] can prove facts that [they have] not alleged.").  To the contrary, as described in the CAC, it is clear that the challenged transactions were competition-neutral insofar as they simply resulted in the substitution of one incumbent cable provider (e.g., MediaOne, Cablevision, etc.) for another (AT&T Broadband and, subsequently, Comcast) in franchise areas where Comcast did not previously offer cable services and thus did not compete with the incumbent providers. (CAC ¶¶ 53)  Indeed, Plaintiffs would be hard pressed to posit a scenario under which a counterparty who chose to exit an area in which it was the incumbent provider would have any conceivable interest in reentering that same area as an overbuilder (an endeavor which would entail, inter alia, obtaining new franchise approvals, laying new cable, and competing to regain the very same customers which it previously served on an exclusive basis).[9]

### 4.    Because The Cable System Transactions Were Competition-Neutral, Plaintiffs Lack Standing To Assert An Antitrust Claim

Courts have repeatedly held that private plaintiffs do not suffer antitrust injury as a result of -- and thus lack antitrust standing to challenge -- conduct that leaves the competitive landscape unchanged from the point of view of consumers.  See, e.g., West Penn, 147 F.3d at 266-67 (finding lack of antitrust injury sufficient to confer antitrust standing where plaintiff did not "directly aver that there had ever been competition between [the utilities] in the relevant area." because "[w]ithout demonstrating that there was competition, a plaintiff cannot show that the defendants' actions have had or will have anticompetitive effects.").  Similarly, in Balaklaw v. Lovell, 14 F.3d 793, 798-99 (2d Cir. 1994), the court found no antitrust injury where the

---

[9] In seeking to determine why so few franchise areas are served by overbuilders, Congress formally found that becoming an overbuilder involves "extraordinary expense."  Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, § 2(a)(2), 106 Stat. 1460.  The CAC itself acknowledges that "only approximately 1.3% of cable consumers [nationwide] are served by an overbuilder." (CAC ¶ 44)

challenged conduct simply resulted in the substitution of one competitor for another because, "[f]rom the consumers' point of view, nothing about the market has changed". See also Bocobo v. Radiology Consultants of S. Jersey, 305 F. Supp. 2d 422, 426-27 (D. N.J. 2004) (substitution of one exclusive contractor for another does not constitute sufficient antitrust injury to give rise to antitrust standing). Mere conclusory allegations that a company might have been a potential competitor are insufficient. See Hecht v. Pro-Football, Inc., 570 F.2d 982, 994 (D.C. Cir. 1977) (potential competitor must demonstrate, not just intention, but preparedness to enter industry through such indicia as entering into contracts and procuring equipment); Brotech Corp. v. White Eagle Int'l Tech. Grp., Inc., No. Civ. A. 03-232, 2004 WL 1427136, at *5 (E.D. Pa. June 21, 2004) (plaintiff must plead facts demonstrating "both [the potential competitors'] intention to enter the market and its preparedness to do so."); Amtrol, Inc. v. Vent-Rite Valve Corp., Civ. A. No. 85-0681-Y, 1986 U.S. Dist. LEXIS 25337, at *26 (D. Mass. May 19, 1986) (standing inquiry requires a showing that the company is a "serious potential competitor, distinguishable from the great horde of opportunists who 'would've, could've or might've.'").

Plaintiffs would like the Court to presume that the alleged lack of price competition in the "cluster" is the obvious and inevitable result of the Cable System Transactions. However, courts must not "presume antitrust injury wherever there is an agreement or merger that [allegedly] results in harm," but must instead "look back from the vantagepoint of the injury to test the nature of the cause." West Penn, 147 F.3d at 266

Plaintiffs will likely argue that, based on the recent decision in Glaberson v. Comcast Corp., Civ. A. No. 03-6604 (E.D. Pa. Aug. 31, 2006) (Benenati Decl., Ex. 3), this Court need not consider the issue of anticompetitive market effect in its standing analysis. In Glaberson, which involves similar claims concerning Comcast's acquisitions in the Philadelphia and Chicago areas, the court erroneously held that it "need not consider" whether Comcast's actions should be

14

1409116

considered competition-neutral for purposes of the Court's standing analysis. (Benenati Decl., Ex. 3 at 8) The court's holding in <u>Glaberson</u> is entirely inconsistent with other Third Circuit cases which have clearly held that a showing of injury to *competition* is critical to the antitrust standing inquiry, including the <u>Glaberson</u> court's own prior decision in <u>Brotech</u>.[10] See <u>Eichorn v. AT&T Corp.</u>, 248 F.3d 131, 140 (3d Cir. 2001) (court has "consistently held" that antitrust injury requires a showing of the challenged activity's "anti-competitive effect on the competitive market"); <u>West Penn</u>, 147 F.3d at 267 ("Without demonstrating that there was competition, a plaintiff cannot show that the defendants' actions have had or will have anticompetitive effects"); <u>Brotech Corp.</u>, 2004 WL 1427136 at *7 ("[A]n antitrust plaintiff must show that the allegedly anticompetitive conduct harmed 'the competitive landscape.'").

Courts in this Circuit have similarly required that a complaint demonstrate injury <u>to competition</u> in order to survive a motion to dismiss. See <u>PSW, Inc. v. Visa USA, Inc.</u>, No. C.A. 04-347T, 2006 WL 519670, at *7 (D. R.I. Feb. 28, 2006) (holding that "PSW's failure to allege an *injury to competition* is fatal to its antitrust claim. The injury to competition requirement is at the heart of the determination of whether there is antitrust injury and antitrust standing.") (emphasis added); <u>Wojcieszek v. New England Tel. & Tel. Co.</u>, 997 F. Supp. 527, 535 (D. Mass. 1997) (granting motion to dismiss because "[e]ven if the complaint actually alleged that plaintiffs were competitors, it would still fail to sustain a viable claim. The term "anti-

---

[10] The <u>Glaberson</u> court also misconstrued <u>West Penn</u> in concluding that the holding in that case was dependent upon the "quirk" of a regulatory scheme that authorized a territorial monopoly. See Benenati Decl., Ex. 3 at 10 n.4. The critical fact in <u>West Penn</u> was not the presence of a regulatory scheme, but rather the fact that any injury to plaintiff was purely speculative, due to the absence of competition among the parties. See <u>West Penn</u>, 147 F.3d at 265-67. Similarly, any injury to plaintiffs here is purely speculative, and therefore insufficient to confer standing, where Plaintiffs' entire theory of injury is based on the absence of competitive overbuilders in the putative cluster, and Plaintiffs have pleaded no facts to show that any of the parties to the challenged transactions ever were, or planned to be, overbuilders. See <u>Bristol-Myers Squibb v. Copley</u>, 144 F. Supp. 2d 21, 23 (D. Mass. 2000) (finding speculative argument insufficient to confer antitrust standing).

competitive" "refers not to actions that merely injure individuals" but rather "to actions that *harm the competitive process*.") (emphasis added).

For the foregoing reasons, Plaintiffs lack antitrust standing to seek damages or injunctive relief in connection with Comcast's Cable System Transactions.

**B.    The CAC Fails To State A Claim Under Section 1 Of The Sherman Act Or Section 4 of the Massachusetts Antitrust Act**

**1.    The CAC Fails To Allege A *Per Se* Violation**

Plaintiffs contend that the Cable System Transactions in general, and the Cablevision swap in particular, amounted to horizontal allocations of customers and markets "including as *per se* violations" of Section 1 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act. (See, e.g., CAC ¶¶ 11, 72, 81) This characterization is incorrect as a matter of law. *Per se* treatment is reserved for a small "category of agreements or practices which, because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289 (1985); see also Texaco Inc.v. Dagher, 126 S. Ct. 1276, 1279 (2006) ("*Per se* liability is reserved for only those agreements that are so plainly anticompetitive that no elaborative study of the industry is needed to establish their illegality.") (internal quotations omitted). The types of conduct which courts have "deemed to be unlawful in and of themselves include price fixing, division of markets, [certain] group boycotts, and tying arrangements." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 4 (1958) (internal citations omitted). Plaintiffs cannot show that the Cable System Transactions fall into any of these categories.

Though Plaintiffs summarily characterize the two acquisitions that constitute the Cable

16

System Transactions as *per se* unlawful "horizontal allocations," the Court need not—and should not—accept Plaintiffs' characterization.  See, e.g., Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc., 441 U.S. 1, 1556 (1979) (recognizing that with respect to alleged per se violations, "easy labels do not always supply ready answers"); Betkerur v. Aultman Hosp. Assoc., 78 F.3d 1079, 1092 (6th Cir. 1996) (refusing to apply per se treatment to an exclusive referral agreement between two groups of doctors despite Plaintiffs' "attempts to label the referral agreement as a 'group boycott,' a 'price-fixing agreement,' or a 'horizontal restraint'"); Jetro Cash & Carry Enter., Inc. v. Food Distrib. Ctr., 569 F. Supp. 1404, 1414 (E.D. Pa. 1983) ("[Plaintiff] labels the actions of [defendant] as a horizontal restraint and advocates the applicability of the *per se* rule.... However, talismanic invocation of the word 'horizontal' does not automatically mandate application of the fatal *per se* rule.") (emphasis in original).

The Supreme Court has held that corporate combinations such as those alleged in the CAC are not subject to *per se* treatment.  See Texaco Inc. v. Dagher, 126 S. Ct. at 1280 ("Had respondents challenged [the joint venture] itself, they would have been required to show that its creation was anticompetitive under the rule of reason"); Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984) ("[C]ombinations, such as mergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively.  Accordingly, such combinations are judged under a rule of reason [analysis], an inquiry into market power and market structure designed to assess the combination's actual effect."); see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487 (1977) ("Every merger of two existing entities into one ... has the potential for producing economic readjustments that adversely affect some persons.  But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects.").  Plaintiffs cannot end-run the applicable (and more rigorous) rule of

17

reason analysis so easily.  Research has not uncovered a single instance where a merger or asset

acquisition of the type alleged in the complaint (or of any type, for that matter) has been treated

as a per se violation of Section 1 of the Sherman Act.  Given the frequency with which business

combinations are challenged under the antitrust laws (and as Section 1 violations in particular),

this dearth of authority is telling.[11]  Accordingly, to the extent that the CAC purports to state a

per se claim based on the Cable System Transactions, that claim must be dismissed.[12]

### 2.    The CAC Fails To State A Section 1 Claim Under The Rule Of Reason

#### a.    Plaintiffs Fail To Plead A Relevant Market

"To state a Sherman Act claim under [Section 1], a plaintiff must identify the relevant

product and geographic markets and allege that the defendant exercises market power within

those markets."  Eastern Food Serv., Inc. v. Pontifical Catholic Univ. of Puerto Rico Serv. Ass'n,

222 F. Supp. 2d 131, 136 (D. P.R. 2002), aff'd, 357 F.3d 1 (1st Cir. 2004) (citing Queen City

Pizza, Inc. v. Domino's Pizza, Inc., 922 F. Supp. 1055, 1060 (E.D. Pa. 1996), aff'd, 124 F.3d 430

(3d Cir. 1997)).  The burden is on the plaintiff, and where the plaintiff "fails to [define its

proposed] relevant market ... a motion to dismiss may be granted."  Id. (affirming Rule 12(b)(6)

dismissal of Sherman Act claims for failure to allege a relevant market).

---

[11] Indeed, if mergers and asset acquisitions among potential horizontal competitors did fall within the category of agreements that are per se illegal under Section 1, then other more specific provisions of the antitrust laws (such as Section 7 of the Clayton Act) as well as the regulatory structure created to monitor such combinations would be totally superfluous. Similarly, if such combinations were per se invalid, then DOJ's mandate to investigate mergers for compliance with the antitrust laws and to prosecute violations thereof would be meaningless.

[12] The court in Glaberson erroneously held that the plaintiffs in that case had adequately pleaded a per se violation with respect to the swap agreements at issue in that case.  (Benenati Decl., Ex. 3 at 18)  This holding is at odds with the Supreme Court's holdings in Copperweld and Dagher. See supra at 17.  In addition, the CAC challenges only two transactions – one outright acquisition and one swap involving a few hundred thousand customers in the Boston area..  (CAC ¶¶ 52-56) By contrast, the Glaberson complaint involved ten transactions pursuant to which Comcast gradually acquired smaller cable providers in the Philadelphia and Chicago areas.

1409116

Plaintiffs allege that "the relevant geographic market is Comcast's Boston cluster." (CAC, ¶ 9)  This cluster, in turn, is defined as "those areas covered by Comcast's cable franchises" in various counties in Massachusetts and New Hampshire.  (Id. ¶¶ 31(a)(2), (3))  Plaintiffs' proposed geographic market is facially deficient for two reasons:  (i) it fails to correspond to the commercial reality of the MVPD industry and (ii) it is artificially limited to Comcast's service area.

### 1.    Plaintiffs' Market Definition Does Not Correspond To The Area In Which Comcast Faces Competition

First, as the First Circuit has recognized, "the relevant geographic market consists of 'the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product.'"  Coastal Fuels Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 & n.11 (1st Cir. 1996).  The geographic market must correspond to the commercial reality of the industry and represent an economically significant trade area.  See Brown Shoe Co. v. United States, 370 U.S. 294, 336-37 (1962); see also Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 208 F.3d 655, 662 (8th Cir. 2000) (the geographic market describes where consumers *could* practicably go, *not* where they actually go).  Here, Plaintiffs' proposed geographic market -- Comcast's putative Boston cluster -- is facially (and fatally) deficient.

The CAC insists that Comcast has unlawfully squelched or avoided potential competition from overbuilders (i.e., cable providers competing directly within a given franchise zone) or from other large cable companies in neighboring regions who could theoretically choose to become overbuilders in Comcast's franchise areas (a highly unlikely event, see supra at 13).  With respect to actual competition from overbuilders, the proposed geographic definition (which includes hundreds of communities in nine counties in Massachusetts and five counties in New

Hampshire) is patently excessive, given that publicly available statistics maintained by the State

of Massachusetts establish that an overbuilder is licensed in only 29 communities located in three

counties in Massachusetts. (Benenati Decl., Ex. 4)  Moreover, the CAC contains allegations

concerning only <u>two</u> overbuilders operating in four communities in Massachusetts -- none of

which includes the communities where the named Plaintiffs reside.  (<u>See</u> CAC ¶¶ 88-90)

Similarly, with respect to <u>potential</u> competition from overbuilders or <u>actual competition</u> from

DBS providers and telephone operators, then the proposed market is patently too small, given

that Comcast could <u>potentially</u> face competition from overbuilders <u>anywhere</u> it operates and in

fact <u>does</u> face competition from DBS providers virtually <u>everywhere</u> it operates.[13]

Plaintiffs' failure to account for DBS in defining their market is particularly inexplicable

(and unjustifiable) given that they expressly define the relevant product market as "multichannel

video programming services ['MVPD'], which are distributed by ... cable television operators,

such as [Comcast], overbuilders[,] and <u>direct broadcast satellite operators</u>." (CAC ¶ 10)  It is

also surprising that Plaintiffs ignore the competitive impact of DBS, given that Direct TV and

DishNetwork (a wholly-owned subsidiary of EchoStar Communications Corp.) are now,

respectively, the second and third largest MVPD service providers in the nation (Comcast is the

first), and DBS's share of the national MVPD service market has reached **27.7%.**  (<u>See</u> Benenati

Decl., Ex. 5 (2006 FCC Report) ¶¶ 72-73)  Cable operators also face growing competition from

local exchange carriers like Verizon (<u>see id.</u> ¶¶ 122, 123) and local utilities.  (<u>See id.</u> at ¶¶ 126-

28)  Because it fails to even acknowledge competition from these sources, Plaintiffs' proposed

---

[13] DBS service is available virtually anywhere in the continental United States where a
subscriber has an unobstructed view of the southern sky.  (<u>See, e.g.,</u> Benenati Decl., Ex. 5 (FCC
Twelfth Annual MVPD Competition Report), ¶ 5 (noting that "almost all consumers have
[access to] at least two DBS providers"); <u>see also id.,</u> Ex. 6 (printouts from Direct TV and
DishNetwork websites indicating that their services are available everywhere in the United
States)).

1409116

market definition is hopelessly deficient.

### 2.    Plaintiffs' Market Definition Is Improperly Limited To Comcast's Service Area

Plaintiffs also improperly attempt to delineate the relevant geographic markets solely by reference to the places where Comcast has subscribers.  In Discon Inc. v. Nynex Corp., 86 F. Supp. 2d 154 (W.D.N.Y. 2000), for example, the plaintiff provider of telecom equipment removal services challenged an exclusive agreement between defendant NYNEX (the consumer of plaintiff's services) and a rival removal services provider as an unlawful attempt to monopolize the market for such services.  See id. at 156-157.  In its complaint, plaintiff "define[d] the geographic boundaries of the relevant market ... as the reach of [defendant's] service area, i.e. most of New York State, excluding Rochester, Jamestown, and Middletown, and including a small area in Connecticut adjoining New York State."  Id. at 162 (internal quotations omitted).  The court held that this market was "far too narrowly drawn" and dismissed plaintiff's claims.  Id. at 163.  Noting that "political boundaries, such as state and municipal boundaries, cannot be used artificially to circumscribe a relevant market," the court found that plaintiff had gone "one step further" down the forbidden path by "proposing a geographic market definition artificially gerrymandered to include all areas of New York (and even portions of Connecticut) where NYNEX provided service, but carefully excluding adjoining communities in both states served by other phone companies."  Id. at 163.  For the same reason, Plaintiffs' attempt here to gerrymander geographic markets in which Comcast is the only cable provider is arbitrary, artificial, and thus insufficient as a matter of law.  (See, e.g., CAC, ¶¶ 9)  Moreover, Plaintiffs have not simply defined their market in terms of those areas in which Comcast offers service.  Indeed, not only does Plaintiffs' proposed market area not include Comcast's other

service areas regionally or nationally,[14] but it fails to include even all of Comcast's service areas in Massachusetts and New Hampshire (i.e., the states in which the putative "clusters" are located). In sum, because Plaintiffs have failed to define a plausible (or even a rational) geographic market for their Section 1 claim (and corresponding state law claim) based on the Cable System Transactions, those claims must be dismissed.

> **b.     Plaintiffs Fail To Plead Facts Showing That The Cable System Transactions Produced Any Anticompetitive Effect**

To state a rule of reason claim under Section 1 of the Sherman Act or Section 4 of the Massachusetts Antitrust Act, a plaintiff must allege: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997); Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield, 373 F.3d 57, 61 (1st Cir. 2004). Here, it is clear that Plaintiffs' allegations with respect to the Cable System Transactions fail to establish the second, third, and fourth of these elements.

First, Plaintiffs have failed to allege that the Cable System Transactions produced anticompetitive effects in any actual (or hypothetical) market. As discussed supra, even drawing every favorable inference in Plaintiffs' favor, the CAC pleads, at best, that the Cable System Transactions resulted in the substitution of one franchised cable provider for another. Courts

---

[14] Though unarticulated, the reason Plaintiffs have not alleged a larger, national market is obvious: wireline cable operators such as Comcast operate under a *de facto* regulatory cap which prohibits them from serving more than 30% of cable subscribers nationally. (Cf. Benenati Decl., Ex. 7 (FCC Memorandum Opinion and Order approving transfer of licenses between Comcast and AT&T, ¶ 48) This threshold is significant, because courts have consistently found that market share of 30% or less does not constitute monopoly market power. See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 27 (1984) (30% market share is insufficient to establish market power); United States v. Eastman Kodak Co., 63 F.3d 95, 100 (2d Cir. 1995) (36% market share not sufficient to establish market power).

have repeatedly held that such conduct is competition-neutral as a matter of law and cannot support a Section 1 rule of reason claim. See supra at 13-14 (citing cases); see also Coffey v. Healthtrust, Inc., 955 F.2d 1388, 1393 (10th Cir. 1992) (where radiology services were provided to hospital on an exclusive basis both before and after challenged agreement, "it is clear that what occurred ... was only a reshuffling of competitors [which] had no detrimental effect on competition"); Cont'l Cablevision of Ohio v. American Elec. Power Co., 715 F.2d 1115, 1119-20 (6th Cir. 1983) ("[T]he exchange of price information [between defendants] had no anticompetitive effect.... [T]here is no concrete evidence of any competition among defendants to be restrained. Since each operating company has a monopoly within its service area, defendants have no need to compete with other utilities for cable attachment rentals.").

Second, Plaintiffs' Section 1 claim must fail because the Cable System Transactions were plainly not illegal; to the contrary, each of these transactions was examined and approved by authorities at the federal, state, and local levels. (See Benenati Decl., Exs. 1& 2 (excerpts from regulatory approvals received in connection with the Cable System Transactions); see also supra, pp. 4, 7) The existence of such approvals is persuasive evidence of the Cable System Transactions' legality. See, e.g., Texaco, Inc. v. Dagher, 126 S. Ct. at 1280 n.1 (presuming that a joint venture between competitors was lawful where "[i]ts formation has been approved by federal and state regulators" and "the economic justifications for creating the joint venture[]" were reflected in a "voluminous record" below). Significantly, the CAC does not allege that the Cable System Transactions were not validly approved.[15]

The Supreme Court's recent decision in Verizon Communications v. Law Offices of

---

[15] Although Plaintiffs have singled out Comcast in the CAC, they do not allege that Comcast has conducted its business differently from any other large national cable provider. Plaintiffs are not simply challenging the legality of the Cable System Transactions; rather, they are seeking to challenge federal telecommunications policy, which has allowed large regional cable clusters to develop with the express approval of federal, state, and local authorities.

1409116

Curtis V. Trinko, LLP, 540 U.S. 398, 412 (2004) ("Trinko") further demonstrates why this Court

should decline Plaintiffs' invitation to assume the role of regulator in this already highly

regulated industry. In that case, a customer of AT&T's local telephone services sued Verizon

alleging that it had intentionally refused to provide competitors, including AT&T, with adequate

access to certain technical elements of local network a required under the Telecommunications

Act of 1996. Trinko, 540 U.S. at 402-04. Plaintiffs contended that Verizon had engaged in this

conduct, in violation of Section 2 of the Sherman Act, "as part of an anticompetitive scheme to

discourage customers from becoming or remaining customers of competit[ors], thus impeding

the competit[ors'] ability to enter and compete in the market for local telephone service." Id. at

404.

        In support of its determination that Verizon's alleged conduct did not constitute a

wrongful "refusal to deal" under the antitrust laws, the Trinko court noted the "particular

importance [of] the existence of a regulatory structure [under the 1996 Act] designed to deter and

remedy anticompetitive harm." Id. at 412. Specifically, the Court found that the "likelihood of

major antitrust harm" was "significantly diminishe[d]" by the comprehensive regulatory

framework in which Verizon conducted its business, including continuing oversight by the FCC.

Id. Here, as in Trinko, the industry in which Comcast operates is highly regulated and is

similarly subject to continuing oversight by the FCC and applicable franchising authorities.

(Benenati Decl., Exs. 1, 2 & 5) As the Supreme Court noted, where, as here, a comprehensive

"regulatory structure designed to deter and remedy anticompetitive harm exists ... the additional

benefit provided by [judicial] antitrust enforcement will tend to be small, and it will be less

plausible that the antitrust laws contemplate such additional scrutiny." Id. at 412. Moreover,

judicial forbearance is all the more appropriate where, as here, the consequences of "mistaken

[judicial] inferences and ... false condemnations" would not just impose liability with respect to

24

one competitor but would undermine an entire industry; in such cases, the high "cost of false

positives counsels against an undue expansion of ... liability." Id. at 414.

Finally, Plaintiffs' Section 1 claim (and corresponding state law claim) must be dismissed

because the CAC fails to allege a causal link between the Cable System Transactions and the

injury Plaintiffs pretend to have suffered. (See supra, pp. 10-15) Nor, moreover, can a showing

of anticompetitive effect be based upon Plaintiffs' misleading assertion that the Cablevision

Swap Agreement contained a non-compete clause. (CAC ¶ 64) The noncompete agreement was

reasonable both in time (3 years) and geographic scope (the affected franchise areas only).

(Benenati Decl., Ex. 8) Courts have repeatedly held such limited agreements accompanying the

sale of a business to be reasonable ancillary restraints. See, e.g., Wells v. Wells, 400 N.E.2d

1317, 1321 (Mass. App. Ct. 1980) (upholding 52-month non-compete agreement covering

existing areas of business and areas in which acquiring party wanted to expand business).

Perhaps most significantly, the non-compete agreement entered into between Comcast and

Cablevision would not have had any impact on the ability of third party overbuilders to enter or

compete in the affected franchise areas.[16]

### C.    Plaintiffs' Acquisition-Related Allegations Fail To State A Claim Under Section 2 Of The Sherman Act Or Section 5 Of The Massachusetts Antitrust Act

#### 1.    Plaintiffs Fail To Plead A Relevant Geographic Market

To allege a claim for monopolization under the Sherman Act or the Massachusetts

Antitrust Act, a plaintiff must plead two elements: "(1) the possession of monopoly power in the

relevant market; and (2) the willful acquisition or maintenance of that power through *anti-

competitive* means, 'as distinguished from growth or development as a consequence of a superior

---

[16] Moreover, as noted above, Plaintiffs have pled no facts showing that Cablevision was engaged in the business of overbuilding or that, but for this ancillary non-compete agreement, it would have undertaken the substantial investment and risk of overbuilding.

1409116

product, business acumen, or historic accident.'" Wojcieszek v. New England Tel. and Tel. Co., 977 F. Supp. 527 (D. Mass. 1997) (quoting Ocean State Physicians Health Plan Inc. v. Blue Cross & Blue Shield of R.I., 83 F.2d 1101, 1110 (1st Cir. 1987)).

As with their Section 1 claim, Plaintiffs bear the burden of establishing the product and geographic markets relevant to their claims for monopolization and attempted monopolization under Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act. See, e.g., Benjamin v. Aroostook Med. Ctr., 937 F. Supp. 957, 967 n.6 (D. Me. 1996) (dismissing complaint which failed to sufficiently identify either the product or the geographic market), aff'd, 113 F.3d 1 (1st Cir. 1997). Here, for the reasons discussed supra at pp. 18-22, Plaintiffs' market definition is patently deficient.

### 2.      The Cable System Transactions Were Not The Type Of Predatory Or Anticompetitive Conduct Required To State A Section 2 Claim

In the CAC, Plaintiffs contend that Comcast is a monopolist in the putative Boston cluster and charges supra-competitive prices to its customers there.  (See, e.g., CAC, ¶¶ 49 et seq., 91, 97)  As the Supreme Court has recently made clear, however, the "mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free market system." Trinko, 540 U.S. at 407.  Accordingly, the acquisition (actual or attempted) of monopoly power "will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." Id. (emphasis in original). See also Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922, 927 (1st Cir. 1984) (A monopolist "is free to exploit whatever market power it may possess when that exploitation takes the form of charging uncompetitive prices."); Berkey Photo Inc. v. Eastman Kodak Co., 603 F.2d 263, 297 (2d Cir. 1979) ("[M]ore than monopoly power is necessary to make the charging of a noncompetitive price unlawful.").

26

1409116

Here, Plaintiffs cannot show that the Cable System Transactions were improper or negatively impacted competition.  Plaintiffs cannot deny that the transactions were vetted and approved by regulators (see supra, pp. 4, 7), and have pled no facts showing (i) that any transacting cable provider would have competed with Comcast but for the transactions, or (ii) that any overbuilder who had the intention and preparedness to enter those areas was prevented from doing so as a result of the challenged transactions.  (See supra, pp. 12-13)  Thus, because it appears on the face of the CAC that the Cable System Transactions were competition-neutral, Plaintiffs' Section 2 claim (and corresponding state law claim) with respect to those transactions must be dismissed.[17]

## III.    THE CAC FAILS TO STATE A CLAIM BASED ON COMCAST'S ALLEGED CONDUCT TOWARD COMPETITORS

### A.    Plaintiffs Lack Antitrust Standing To Challenge Comcast's Alleged Conduct Vis-À-Vis Competitors

For their second attempt to state a claim under Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act, Plaintiffs allege that Comcast directed conduct toward competitors in the putative Boston cluster that constituted unlawful monopolization or attempted monopolization.  Specifically, Plaintiffs contend that Comcast (i) denied unaffiliated cable companies directly competing with Comcast access to New England Cable News ("NECN"); (ii) offered price discounts to Comcast subscribers who threatened to switch to a competitor cable company, and to existing customers of BELD ( the Braintree Electric Light Department, an

---

[17] Plaintiffs' Section 2 claims with respect to the Cable System Transactions must be dismissed for the additional reason that, having failed to define a valid geographic market, Plaintiffs cannot demonstrate that Comcast has (with respect to Plaintiffs' monopolization claim) or has a dangerous probability of acquiring (with respect to their attempted monopolization claim) monopoly power.  See, e.g., Gianna Enter. v. Miss World (Jersey) Ltd., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) ("The absence of an adequate market definition makes it impossible to even approximate the market effect of defendants' allegedly anticompetitive agreement.").

1409116

overbuilder in Braintree, Massachusetts) and RCN (an overbuilder in Burlington, Waltham and Dedham, Massachusetts), who agreed to switch to Comcast for a certain period of time; and (iii) allegedly disconnected cable lines entering certain consumer homes that are provided by competitor cable companies. (CAC ¶¶ 88-94) Plaintiffs claim that, as a result of such actions (collectively the "Competitor-Related Conduct"), Comcast "prevented or destroyed effective competition [and was thereby] able to maintain its monopoly power and its supra-competitive prices." (CAC, ¶ 91; see also id. ¶¶ 92, 98, 102) For the reasons discussed below, Plaintiffs lack antitrust standing to assert a claim based on these allegations.

First, Plaintiffs cannot show that they have suffered antitrust injury—the *sina qua non* of antitrust standing—because they have failed to plead facts showing a direct causal connection between challenged conduct and claimed injury. None of the Plaintiffs resides in any of the communities where Comcast allegedly targeted BELD or RCN customers. (CAC ¶¶ 89, 90) See Marco Island Cable, Inc. v. Comcast Cablevision of the South, Inc., No. 2:04-cv-26-FtM-29DNF, 2006 U.S. Dist. LEXIS 45116, at * 8 (M.D. Fl. July 3, 2006) (rejecting plaintiff's standing to assert antitrust claim with respect to areas where it did not operate). Plaintiffs' conclusory allegation that they have been required to "subsidize," through the payment of higher prices, the discounted cable prices Comcast allegedly made available to certain consumers (CAC ¶ 92) is entirely speculative and insufficient to confer standing. See Bristol-Myers Squibb Co., 144 F. Supp. at 23 (finding speculative argument insufficient to confer antitrust standing).[18] Moreover, Plaintiffs cannot show that the discounts offered were in any way improper or non-competitive. See infra at 31-34. Plaintiffs' theory of injury, if accepted, would lead to the illogical conclusion that, for example, existing subscribers of a newspaper could sue the paper

---

[18] The Glaberson court improperly ignored the requirement that all antitrust plaintiffs must demonstrate non-speculative injury by concluding that the standards courts impose on competitors do not apply to consumers. See Benenati Decl., Ex. 3 at 13 n.5.

for being forced to "subsidize" new subscriber discounts.

Second and more fundamentally, assuming <u>arguendo</u> that the Competitor-Related Conduct could be viewed as conduct proscribed by Section 2 of the Sherman Act (it is not—<u>see infra</u>, pp. 30-35), Plaintiffs lack standing to challenge this conduct because BELD or RCN -- not Plaintiffs -- are the "more direct victim[s]" who would be better situated "to perform the office of a private attorney general." <u>Associated Gen.</u>, 459 U.S. at 542; <u>Howe v. Bank for Int'l Settlements Inc.</u>, 194 F. Supp. 2d 6, 17 (D. Mass. 2002) (finding plaintiffs lacked standing where there were "alternative and more appropriate plaintiffs" who were more directly injured than the plaintiff by the scheme alleged). According to the CAC, both BELD and RCN were the targets of predatory pricing schemes in Braintree, Burlington, Waltham and Dedham, Massachusetts. Where, as here, there is "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," there is little "justification for allowing a more remote party ... to perform the office of a private attorney general." <u>Associated Gen.</u>, 459 U.S. at 542. BELD and RCN, therefore, "as the direct victim[s] of [Comcast's] alleged misconduct, [are] in a far better position than [Plaintiffs] to vindicate the public interest in enforcement of the antitrust laws." <u>Trinko</u>, 540 U.S. at 417 (Stevens, J. concurring). Similarly, those companies whose lines were allegedly disconnected by Comcast (or their customers) are the direct victims of that alleged conduct and far better situated to bring suit. The <u>Glaberson</u> court improperly ignored Justice Stevens' concurrence in <u>Trinko</u> in concluding that the plaintiffs in that case were as well situated as the targeted overbuilder (in that case, RCN) to bring an antitrust claim. (Benenati Decl., Ex. 3 at 13-15)

For these reasons, Plaintiffs' Section 2 claims based on Comcast's alleged conduct vis-à-vis competitors should be dismissed for lack of antitrust standing.

1409116

**B.    Plaintiffs Fail To Allege A Relevant Geographic Market**

As noted above, Plaintiffs define the geographic markets for their monopolization and attempted monopolization claims as being "Comcast's Boston cluster."  (CAC, ¶ 9)  To the extent that Plaintiffs purport to base these claims on the alleged Competitor-Related Conduct, their market definition is deficient as a matter of law.    See supra at 18-22.

**C.    The Competitor-Related Conduct Alleged In The CAC Cannot Support Claims For Monopolization Or Attempted Monopolization**

Plaintiffs allege that Comcast violated Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act by engaging in three types of conduct vis-à-vis Competitors.  See supra at p. 8-9.  Plaintiffs are wrong—as discussed below, these allegations fail to state a claim as a matter of law.

**1.    NECN**

Plaintiffs first contend that Comcast violated Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act when it "denied access to and carriage of NECN to unaffiliated cable companies directly competing with Comcast in the relevant geographic market, while allowing access to and carriage of NECN by unaffiliated cable companies in the New England area that do not directly compete with Comcast."  (CAC ¶ 85)  This allegation is unavailing.

It is well-settled that the antitrust laws do not generally require a business to provide assistance to its competitors.  See, e.g., Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990) ("Antitrust law, however, does not require one competitor to give another a break just because failing to do so offends notions of fair play."); Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370, 375 (7th Cir. 1986) ("[A] firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price

umbrella over their heads or by otherwise pulling its competitive punches"). <u>AT&T v. IMR Capital Corp.</u>, 888 F. Supp. 221, 247 (D. Mass. 1995) ("There appears to be no general duty of a monopolist to assist those in competition with it.").[19]  Here, moreover, Comcast's default right to refuse to deal with competitors is reinforced by statute.  NECN is delivered <u>terrestrially</u> and is therefore not subject to statutory program access rules which would require Comcast to make <u>satellite-delivered</u> cable programming available to competitors.  (Benenati Decl., Ex. 7 at 42 n.284)  Thus, even if Comcast has refused to provide competitors with access NECN, Comcast would have been well within its rights to do so.

### 2.  Price Discounts

While most of the CAC complains that Plaintiffs were forced to pay "supra-competitive prices" due to the absence of overbuilders, Plaintiffs ironically also complain about *lower* prices offered by Comcast in areas where overbuilders were actually present.  Plaintiffs allege that Comcast violated federal and state antitrust laws by offering "anticompetitive nonuniform targeted price discounts" to Comcast customers who sought to switch providers and to BELD and RCN customers in Braintree, Burlington, Waltham and Dedham, Massachusetts.  (CAC, ¶¶ 86-92)  As the Supreme Court has recognized, "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition [and thus] cannot give rise to antitrust injury."  <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 340 (1990); <u>Virgin Atl. Airways Ltd. v. British Airways PLC</u>, 257

---

[19] While the right to refuse to deal is not absolute, the restrictions on that right are extremely narrow.  <u>See</u> <u>Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u> 472 U.S. 585 (1985) (right to refuse to deal did not extend to defendant's refusal to reestablish pre-existing voluntary (and profitable) joint program with plaintiff, where defendant's refusal to reestablish the program was not supported by any valid business justification and appeared instead to reflect a willingness to forego highly lucrative short-term benefits in order to harm plaintiff's business over the long term); <u>see</u> <u>also</u> <u>Trinko</u>, 540 U.S. at 409 (holding that the <u>Aspen Skiing</u> case is "at or near the outer boundary" of § 2 [refusal to deal] liability").

31

F.3d 256, 269 (2d Cir. 2001) ("We must be mindful that low prices are a positive aspect of a competitive marketplace and are encouraged by the antitrust laws.").  To state a claim for predatory pricing, a plaintiff must show (1) that the defendant's prices are set below its own costs, and (2) that the defendant has a "dangerous probability[] of recouping its investment in [those] below-cost prices" by eliminating competition and raising prices to supra-competitive levels.  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993) "The requisites for proving predatory pricing are demanding, because the conditions under which it is plausible are not common, and because it can easily be confused with merely low prices which benefit consumers." Tri-State Rubbish Inc. v. Waste Mgmt, Inc., 998 F.2d 1073, 1080 (1st Cir. 1993); Virgin Atl. Airways Ltd., 257 F.3d at 266 ("[T]he Supreme Court has expressed deep skepticism regarding the viability of proving a predatory pricing scheme.").

Plaintiffs do not allege that the discounted rates Comcast allegedly offered to certain of its customers, or to BELD and RCN's customers, were below its costs.  On that basis alone, dismissal is warranted.  Moreover, even if Comcast's discounted price had been "below market price, or even below [BELD or RCN's] costs" (which is not alleged here), as a matter of law that discount was "not activity forbidden by the antitrust laws." Atlantic Richfield, 495 U.S. at 340; Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 231 (1st Cir. 1983) ("a legal precedent or rule of law that prevents a firm from unilaterally cutting its prices risk interference with one of the Sherman Act's most basic objectives: the low price levels that one would find in well-functioning competitive markets."); Americana Indus. Inc. v. Wometco de Puerto Rico Inc., 556 F.2d 625, 628 (1st Cir. 1977) (rejecting predatory pricing claim where "[t]here is nothing from which a court could conclude that the complained-of-activity was part of a persistent course of action with the purpose of putting Americana out of business, nor are there facts stated to suggest that Wometco's prices were in any way abnormal.  That Wometco P.R.'s prices were lower than

32

Americana's and that Americana lost customers and was obliged to lower its prices to meet Wometco's competition would not, standing alone, reflect persistent, below-cost pricing. These facts reflect no more than the sort of healthy competition which the antitrust laws are designed to foster."). Indeed, the First Circuit expressed concern in <u>Monahan's Marine, Inc. v. Boston Whaler Inc.</u>, 866 F.2d 525, 527 (1st Cir. 1989) that "judicial efforts to prevent firms from charging low, nonpredatory prices, despite an occasional beneficial result, would more often significantly interfere with the achievement of the Sherman Act's basic and important low price objectives." <u>See id.</u> at 527 (recognizing that "a 'dominant firm' can lawfully charge a low, nonpredatory price, even though it could use an 'above cost' price cut to drive out competition, and then later raise prices to levels higher than they otherwise would be.'").

Moreover, Plaintiffs' efforts to state an attempted monopolization claim based on their discounted pricing allegations would still fail as a matter of law because, even if Comcast's pricing could somehow be viewed as "predatory," such a claim would belong to Comcast's <u>competitors</u>, not its customers. <u>See, e.g., Wojcieszek</u>, 977 F. Supp. at 535 (citing <u>In re Air Passenger Computer Reservation Sys.</u>, 727 F. Supp. 564, 568-69 (C.D. Cal. 1989) ("[W]hen defendants engage in predatory pricing and other anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market [as opposed to consumers] is the party with standing."); <u>Hahn v. Rifkin/Narragansett S. Fla. CATV Ltd. P'ship</u>, 941 F. Supp. 1196 (S.D. Fla. 1996) (cable television subscribers lacked standing to bring action against operator for attempted monopolization alleging predatory pricing and actions by operator with respect to apartment complex in which subscribers did not reside); <u>Davis v. S. Bell Tel. & Tel. Co.</u>, No. 89-2839-CIV-NESBITT, 1994 WL 912242, at *16 (S.D. Fla. Feb. 1, 1994) (dismissing attempted monopolization claim based on alleged predatory pricing because "consumers do not have standing to bring claims for attempted monopolization").

33

Finally, Plaintiffs' claim that Comcast's pricing had an "anticompetitive effect" in the relevant geographic market is further belied by the fact that the FCC has determined that one of the Massachusetts communities where Comcast alleged engaged in predatory pricing against RCN -- Dedham -- faces "effective competition."[20]  (See Benenati Decl., Exs. 9, 10(D))  The FCC has also found that  6 other communities in Massachusetts, including the City of Boston and Arlington (where one of the named Plaintiffs resides) have "effective competition."  (Id., Exs. 9, 10)  Similar findings for the other two communities in which Plaintiffs claim that Comcast engaged in improper pricing tactics against RCN -- Burlington and Waltham -- are pending, as well as for five other Massachusetts communities.  (Id., Exs. 9, 11)

### 3.    Alleged Disconnection of Competitor Lines

For their final attempt to state a viable Section 2 claim, Plaintiffs allege that Comcast "disconnected cable lines entering various consumers' homes that are provided by competitor cable companies, as part of the competitors' provision of cable services to the consumers' homes, despite the fact that Comcast knows, or should know, that such cable lines belong to its competitors."  (CAC ¶¶ 94)  These allegations are deficient for several reasons.

First, Plaintiffs' bare assertion that Comcast  disconnected cable lines fails to meet even the minimal pleading requirements of Rule 8(a).  See, e.g., Serpa Corp., 199 F.3d at 9 ("We do not ... accept a plaintiff's unsupported conclusions or interpretations of law.")  Plaintiffs fail to identify where wires were cut, when they were cut, to whom they belonged, or whether they were active or inactive.  Second, Plaintiffs do not plead that any of their cable lines have been disconnected, or that disconnection of lines has any way interfered with any overbuilder's entry

---

[20] "Effective competition" is defined by statute as a situation where (i) fewer than 30% of households subscribe to a cable system; (ii) at least two MVPDs offer programming to at least 50% of households and at least 15% of households subscribe to an MVPD other than the largest one; (iii) an MVPD operated by the local franchising authority offers programming to at least 50% of households; or (iv) a local LEC offers video programming.

34

into or continuance of business.

For all of these reasons, the allegations in the CAC concerning the Competitor-Related

Conduct cannot state a claim under Section 2 of the Sherman Act or Section 5 of the

Massachusetts Antitrust Act.

## **CONCLUSION**

For the foregoing reasons, Comcast respectfully requests that the CAC be dismissed in its

entirety, with prejudice and without leave to replead.

Dated: September 7, 2006

/s/ Timothy C. Blank
Timothy C. Blank (BBO #548670)
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Telephone: (617) 728-7100
Facsimile: (617) 426-6567

Michael S. Shuster
Sheron Korpus
Alycia Regan Benenati
KASOWITZ, BENSON, TORRES &
   FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Attorneys for Defendants Comcast
Corp., Comcast Holdings Corp., Comcast
Cable Communications, Inc., Comcast
Cable Holdings, LLC, Comcast MO
Group, Inc. and AT&T Broadband

### **CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to
the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non-registered participants on September 7, 2006.

_____/s/ Timothy C. Blank_____

35