# HEINS MILLS & OLSON, P.L.C.

**ATTORNEYS AT LAW**

3550 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MINNESOTA 55402
TEL (612) 338-4605 • FAX (612) 338-4692
WWW.HEINSMILLS.COM

*file*
*C F H*
*9- 7- 06*

DAVID R. WOODWARD
DIRECT DIAL: (612) 412-3555
DWOODWARD@HEINSMILLS.COM

September 5, 2006

## VIA FEDERAL EXPRESS

Honorable Edward F. Harrington
United States District Court for the
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Room #19, 7th Floor
Boston, Massachusetts 02210

> Re:    Martha Kristian v. Comcast Corporation, et al.
> Civil Action No. 03-CV-12466 EFH;
> Jack Rogers and Paul Pinella v. Comcast Corporation, et al.
> Civil Action No. 04-10142 EFH (consolidated)

Dear Judge Harrington:

Please find enclosed for your interest and for association with the files in the above consolidated actions a courtesy copy of the August 31, 2006, Memorandum and Order of the Honorable John R. Padova, United States District Court for the Eastern District of Pennsylvania, denying Comcast's motion to dismiss in Glaberson, et al. v. Comcast Corporation, et al. (E. D. Pa., No. 03-6604). The Glaberson case involves federal antitrust claims similar to the federal and state claims asserted in the above antitrust actions.

Thank you.

Respectfully submitted,

HEINS MILLS & OLSON, P.L.C.

*David Woodward*

David R. Woodward

DRW:dd
Enclosures
cc:    Michael S. Shuster, Esq. (w/o enc.)
Sheron Korpus, Esq. (w/o enc.)
Timothy Blank, Esq. (w/o enc.)
Barry C. Barnett, Esq. (w/o enc.)
John Peter Zavez, Esq. (w/o enc.)

57218

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLABERSON et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COMCAST CORPORATION et al. | : | NO. 03-6604 |

### MEMORANDUM

**Padova, J.**                                                                                 **August 31, 2006**

Plaintiffs, cable television services customers of Defendants in the Philadelphia and Chicago regions, have brought this antitrust action against Defendants for damages arising out of Defendants' alleged imposition of horizontal restraints in the relevant cable television markets and unlawful monopolization and attempted monopolization of those markets. Presently before the Court is Defendants' Motion to Dismiss the Third Amended Class Action Complaint (Docket No. 138), pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' Motion to Dismiss is denied.

I.    BACKGROUND

Plaintiffs, six non-basic cable television programming services customers of Defendants in the Philadelphia, Pennsylvania and Chicago, Illinois regions, have brought this antitrust suit on behalf of themselves and all those similarly situated, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, for violations of Sections 1 (Count One) and 2 (Counts Two and Three) of the Sherman Act, 15 U.S.C. §§ 1, 2. The Third Amended Complaint alleges that Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Communications Holdings, Inc., and Comcast Cable Holdings, LLC (collectively

"Comcast") acquired cable systems and cable subscribers from their competitors in the Philadelphia and Chicago cable markets until the number of competing cable providers in those markets was substantially reduced. (3d Am. Compl. ¶¶ 3, 49, 51-53.) The remaining competitors were primarily very large businesses who owned pockets of cable systems and cable subscribers throughout the country. (Id. ¶ 3.) Comcast then entered into agreements with those companies to avoid competition by allocating the nation's regional cable markets amongst themselves through swaps of their respective cable assets, including subscribers. (Id. ¶ 4.) Comcast received competitors' cable systems and cable subscribers in the Philadelphia and Chicago cable markets in exchange for Comcast's cable systems and cable subscribers in other parts of the country. (Id. ¶¶ 4, 10, 50, 54-56.) One swap agreement allocated markets and customers between Comcast and AT&T Broadband ("AT&T"); Comcast swapped its Chicago-area subscribers for AT&T's Philadelphia-area subscribers. (Id. ¶¶ 4, 56.) Then, as part of the November 18, 2002, merger between Comcast and AT&T, Comcast acquired AT&T's cable monopoly and cable subscribers in the Chicago area. (Id. ¶¶ 5, 57.) The result of all the swap agreements was that Comcast willfully obtained and maintained monopoly power in the relevant geographic markets, defined as Comcast's cable franchises located in Philadelphia and Chicago and geographically contiguous areas and areas in close geographic proximity to Philadelphia and Chicago in designated counties (hereinafter the Philadelphia and Chicago "clusters"). (Id. ¶¶ 6, 31.) The Third Amended Complaint alleges that Comcast currently controls ninety-four percent and ninety-two percent of the cable market in the Philadelphia and Chicago clusters, respectively, and that Comcast has used its monopoly power to raise cable prices in the Philadelphia and Chicago clusters to artificially high, supra-competitive levels. (Id. ¶¶ 7, 80-81, 99.)

2

Count One of the Third Amended Complaint maintains that Comcast has conspired with its competitors and engaged with them in a strategy of allocating markets through swap agreements that exchanged their respective cable assets, including subscribers, and that such horizontal market restraints constitute per se violations of § 1 of the Sherman Act.[1] (Id. ¶ 73.) Plaintiffs also maintain that Comcast's acquisitions of competing cable companies in the Philadelphia and Chicago clusters through asset purchases and mergers amount to contracts and conduct in restraint of trade in further violation of § 1. (Id. ¶ 74.) Count Two alleges that Comcast has monopolized, and Count Three alleges that Comcast has attempted to monopolize, the product market for multichannel video programming services ("MVPS") within the Philadelphia and Chicago clusters in violation of § 2 of the Sherman Act. (Id. ¶¶ 102, 107.) Comcast's anticompetitive conduct purportedly entails not only its swap agreements and acquisitions of competing cable companies, but also Comcast's refusal to provide Philadelphia-area competitor RCN Telecomm Services, Inc. ("RCN") with long-term, nondiscriminatory access to local sports programming controlled by Comcast ("Sportsnet"), which Plaintiffs contend RCN requires in order to compete effectively against Comcast. (Id. ¶¶ 11-12, 97.) In addition, Comcast has substantially interfered with RCN's access to the contractors needed to build competing cable systems in Comcast's Philadelphia franchise areas, and Comcast has engaged in pricing campaigns designed to prevent or destroy competition from RCN. (Id.) Plaintiffs contend that they have been injured by Comcast's activities because they have been forced to pay higher cable prices than they would have paid absent Comcast's unlawful conduct, and they seek treble damages, injunctive relief, and their costs of suit, including attorneys' fees. (Id. ¶¶ 11, 28, 67, 103,

---

[1]A horizontal restraint is defined as "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972).

3

108.) Comcast has moved to dismiss Plaintiffs' Third Amended Complaint in its entirety.

II.    LEGAL STANDARD

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may look only to the facts alleged in the complaint and its attachments. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). The court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985). The court, however, "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)). A Rule 12(b)(6) motion will be granted when a plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988). The dismissal standard is higher in antitrust cases than generally. Brotech Corp. v. White Eagle Int'l Tech. Grp., Inc., Civ. A. No. 03-232, 2004 WL 1427136, at *3 (E.D. Pa. June 21, 2004) (citation omitted); see also Lum v. Bank of Am., 361 F.3d 217, 228 (3d Cir. 2004) ("[I]n antitrust cases, . . . dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (quoting Hosp. Bldg. Co. v. Trustees of the Rex Hosp., 425 U.S. 738, 746 (1976))). Nonetheless, the facts underlying the elements of an antitrust claim must be pled with specificity. Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 528 n.17 (1983); Brotech Corp., 2004 WL 1427136, at *3 (citation omitted).

III.    DISCUSSION

Comcast argues that Plaintiffs' Third Amended Complaint should be dismissed because it

4

does not allege facts indicating that Plaintiffs have antitrust standing to challenge Comcast's transactions with other cable companies or Comcast's conduct towards RCN.[2] Comcast further asserts that Count One should be dismissed for failure to state a claim under § 1 of the Sherman Act, and that Counts Two and Three should be dismissed for failure to state a claim under § 2 of the Sherman Act. Comcast also contends that Plaintiffs' claims are time-barred to the extent that they depend on three acquisitions that occurred outside the Clayton Act's four-year statute of limitations for bringing private antitrust actions.

A.    Plaintiffs' Antitrust Standing

Whether a plaintiff has standing to raise antitrust claims is a threshold inquiry. City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998); Baglio v. Baska, 940 F. Supp. 819, 828 (W.D. Pa. 1996) (citing Associated Gen. Contractors, 459 U.S. at 519), aff'd, 116 F.3d 467 (3d Cir. 1997). The burden on a plaintiff in a private antitrust action to demonstrate that he has antitrust standing arises from § 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit under the antitrust laws in the district courts for treble damages. See 15 U.S.C. § 15. "[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine." Associated Gen. Contractors, 459 U.S. at 535 n.31. While "'[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact . . . [the doctrine of antitrust standing requires] the court [to] make a further determination [as to]

---

[2]While motions to dismiss that implicate constitutional standing principles are generally predicated on Federal Rule of Civil Procedure 12(b)(1), the United States Court of Appeals for the Third Circuit has considered motions to dismiss that raise issues of antitrust standing under Rule 12(b)(6). Maio v. Aetna, Inc., 221 F.3d 472, 481 n.7 (3d Cir. 2000).

whether the plaintiff is a proper party to bring a private antitrust action." Alberta Gas Chems. Ltd.

v. E.I. Du Pont De Nemours & Co., 826 F.2d 1235, 1239 (3d Cir. 1987) (quoting Associated Gen.

Contractors, 459 U.S. at 535 n.31); see also West Penn Power, 147 F.3d at 264.

The United States Court of Appeals for the Third Circuit uses the following five-factor

balancing test to evaluate antitrust standing:

> (1) the causal connection between the antitrust violation and the harm
> to the plaintiff and the intent by the defendant to cause that harm,
> with neither factor alone conferring standing; (2) whether the
> plaintiff's alleged injury is of the type for which the antitrust laws
> were intended to provide redress; (3) the directness of the injury,
> which addresses the concerns that liberal application of standing
> principles might produce speculative claims; (4) the existence of
> more direct victims of the alleged antitrust violations; and (5) the
> potential for duplicative recovery or complex apportionment of
> damages.

2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 740-41 (3d Cir. 2004)

(quoting Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir. 1997)).

The first step in determining whether a plaintiff has antitrust standing begins with the second factor

in the balancing test, commonly known as the antitrust injury requirement. West Penn Power, 147

F.3d at 264 n.14, 265. If there is no antitrust injury, that is the end of the inquiry, and the claim

should be dismissed. Id. at 265 (citing Barton & Pittinos, Inc., 118 F.3d at 182). An antitrust injury

is an "injury of 'the type the antitrust laws were intended to prevent and that flows from that which

makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the

violation or of anti-competitive acts made possible by the violation." Eichorn v. AT & T Corp., 248

F.3d 131, 140 (3d Cir. 2001) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477,

489 (1977)). The concept of antitrust injury overlaps with the first factor in the balancing test

6

because the injury must be causally related to the defendant's allegedly anticompetitive activity. See West Penn Power, 147 F.3d at 265.

Comcast argues that Count One of the Third Amended Complaint should be dismissed because Plaintiffs lack antitrust standing to challenge the swaps and acquisitions of cable systems in the Philadelphia and Chicago clusters that form the basis for Count One. Comcast also argues that Counts Two and Three should be dismissed to the extent that they depend upon those transactions. Comcast then contends that Counts Two and Three should be dismissed in their entirety because Plaintiffs do not have antitrust standing to challenge the remaining conduct underlying those claims, namely Comcast's treatment of RCN.

1.    The cable system transactions

Comcast asserts that Plaintiffs lack antitrust standing to challenge its swap agreements and acquisitions because Plaintiffs are unable to demonstrate a direct causal connection between those transactions and Plaintiffs' alleged injury of higher cable prices. According to Comcast, Plaintiffs have failed to allege any facts suggesting that there was actual or likely future competition between Comcast and the transacting cable companies in the relevant markets. Comcast contends that the Third Amended Complaint acknowledges that price competition for cable programming services only arises when an overbuilder operates in a given franchise area alongside the incumbent cable provider. Comcast argues that the Third Amended Complaint must, therefore, plead facts showing that the challenged transactions specifically removed overbuilders from Comcast's franchise areas or prohibited overbuilders from entering Comcast's franchise areas.[3]    Comcast maintains that the

_____

[3]Overbuilders are wireline cable providers that install cable systems along the same rights-of-way as the incumbent cable franchisee.

7

Third Amended Complaint instead makes clear that all that the challenged transactions accomplished was the substitution of Comcast as the exclusive provider of cable services in a given franchise area for another exclusive provider. Comcast asserts that the challenged transactions were, therefore, "competition-neutral," and that Plaintiffs cannot show that Comcast's actions had anticompetitive effects that could give rise to an antitrust injury.

We need not consider whether Comcast's actions should be considered "competition-neutral" absent allegations specifically concerning the elimination of overbuilders since, for the purposes of assessing antitrust standing, we assume as true the statements in the Third Amended Complaint that Comcast's conduct threatened competition in the relevant markets. See Angelico, M.D. v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 275 n.2 (3d Cir. 1999) (noting that the district court "erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section one of the Sherman Act, 15 U.S.C. § 1, which prohibits 'contracts, combinations or conspiracies in restraint of trade'" (quoting 15 U.S.C. § 1)). As a leading treatise explains:

> "[T]he antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition . . . may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government — which enjoys automatic standing — must be dismissed. . . . To test standing in a private suit, therefore, the court should assume the existence of a violation and then ask whether the [standing elements] are shown."

2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 335f (2d ed. 2002). It would thus be improper for us, as part of our standing analysis, to conclude that the challenged swap agreements

and acquisitions cannot constitute antitrust violations because the Third Amended Complaint does not specifically allege that the cable companies transacting with Comcast were overbuilders. See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 925 n.7 (3d Cir. 1999) ("While we do not decide whether an agreement among competitors to withhold a new product from a market would constitute an antitrust violation, we assume for the sake of assessing plaintiffs' antitrust standing that the conduct in which defendants allegedly engaged would constitute such a violation.").

We find that the Third Amended Complaint pleads a reduction of actual and prospective competition in the Philadelphia and Chicago clusters that was the intended result of the challenged swap agreements and acquisitions. (3d Am. Compl. ¶¶ 3-4, 10-12, 25, 61, 99(b).) The Third Amended Complaint provides examples of how the transactions were structured to achieve the removal of competitors from the relevant markets. (Id. ¶¶ 50-57.) It alleges, for instance, that in a swap agreement between Comcast and Adelphia Communications Corp. ("Adelphia"), which closed on or about January 1, 2001, Comcast obtained Adelphia's cable systems and cable subscribers located in Philadelphia and adjacent New Jersey areas in exchange for Comcast's cable systems and cable subscribers in and around Palm Beach, Florida and Los Angeles, California and that this agreement eliminated competition from Adelphia in the Philadelphia market. (Id. ¶ 55(b).) We also find that Plaintiffs' alleged injury, "an increase in price resulting from the dampening of competitive market forces[,] is assuredly one type of injury for which § 4 [of the Clayton Act] potentially offers redress." Blue Shield of Va. v. McCready, 457 U.S. 465, 482-83 (1982). The injury is one that flows from the challenged swap agreements and acquisitions, in that Comcast's ability to raise its cable prices stemmed from the purported deliberate lessening of competition achieved through those

9

transactions. Accordingly, with respect to the challenged swap agreements and acquisitions, the

Third Amended Complaint sufficiently pleads the antitrust injury and causal connection/defendant

intent elements required to satisfy factors one and two of the five-factor balancing test governing

antitrust standing.[4]

   In addition, we hold that the Third Amended Complaint adequately pleads antitrust standing

---

[4]The authority upon which Comcast relies is inapposite. Comcast, for example, cites West Penn Power, 147 F.3d at 265, for the proposition that where a private plaintiff alleges it has suffered injury due to the suppression or elimination of competition via horizontal transactions but fails to plead facts establishing the existence of actual or likely future competition between the transacting parties in the relevant market, the plaintiff's claims should be dismissed for lack of antitrust standing. In West Penn Power, the plaintiff, the City of Pittsburgh, brought suit against two electric companies seeking damages and an injunction precluding the merger of the companies, claiming that the merger would void the possibility of lower-priced electric service charged to city residents. The Third Circuit held that the plaintiff's claim did not meet standing requirements because of the absence of antitrust injury and a lack of causal connection between the plaintiff's injuries and the alleged harm. Id. The Third Circuit agreed with the district court's conclusion that there was no antitrust injury, as the proposed merger had not "brought about the lessening of competition in a 'marketplace' where there was no competition." Id. at 266-67. West Penn Power is distinguishable from the instant case. As the Third Circuit has explained, it arrived at the conclusion in West Penn Power because

> an intervening regulatory scheme precluded the companies from competing, i.e., the merger was not the cause of the injury. No significant antitrust injury inquiry was required to reach this conclusion and none was undertaken. We can reasonably posit, however, that if not for this regulatory quirk, the City would have been entitled to . . . relief because the proposed merger would have eradicated competition, a result prohibited under the Clayton Act, and detrimental to the City's electrical customers.

In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 401 (3d Cir. 2000). Unlike West Penn Power, the instant case does not involve a regulatory scheme that authorizes territorial monopolies and hence, the "quirk" that justified the denial of antitrust standing in West Penn Power is not present here. Comcast also relies upon Mathews v. Lancaster Gen. Hosp., 883 F. Supp. 1016 (E.D. Pa. 1995), aff'd, 87 F.3d 624 (3d Cir. 1996), a case in which the court held that defendants were entitled to summary judgment based on the plaintiff's lack of antitrust standing where "[f]rom the standpoint of the consumer, there has been no meaningful change in the market" as a result of the defendants' conduct. Id. at 1045. Mathews is distinguishable because the plaintiff in that case only alleged harm to himself, as a provider of orthopedic services whose privileges had been restricted at hospitals, and not harm to competition. Id. In Mathews, the "undisputed evidence show[ed] that orthopedic services are still readily available from a large and ever-increasing number of providers." Id.

requirements three through five. Plaintiffs' injury of higher cable prices is allegedly directly traceable to Comcast's success in dampening competitive market forces for the provision of cable services. Plaintiffs are direct victims because they purchased cable services straight from Comcast at the inflated prices generated through Comcast's purported antitrust violations. There is little likelihood of duplicative recovery because Plaintiffs are not seeking to recover damages passed onto them by other entities and complex apportionment of damages is not an issue because each Plaintiff suffered overcharges that are separate and distinct. We conclude that, regarding the challenged swap agreements and acquisitions that form the basis for Count One and parts of Counts Two and Three, the Third Amended Complaint satisfactorily alleges the elements of antitrust standing.

2.    Conduct affecting RCN

Comcast argues that Plaintiffs lack antitrust standing to challenge Comcast's conduct towards RCN, and that the portions of Counts Two and Three that depend on such conduct should be dismissed. As discussed above, Counts Two and Three allege that Comcast deprived RCN of a long-term contract for Sportsnet, denied RCN access to the key contractors in the Philadelphia area, and made RCN the target of pricing schemes. (3d Am. Compl. ¶¶ 85-90, 105.) Comcast asserts that Plaintiffs' theory of injury — that Comcast was able to charge supra-competitive cable prices as a result of its suppression of competition from RCN — founders on paragraphs ninety and ninety-three of the Third Amended Complaint, which, Comcast contends, serve as an acknowledgment that RCN was able to enter and compete with Comcast in the Philadelphia cluster. Paragraph ninety states that RCN obtained short-term access to Sportsnet programming in Philadelphia, and paragraph ninety-three states that, in the summer of 2000, RCN began offering cable service in Delaware County, Pennsylvania communities served by Comcast. Comcast maintains that its alleged ability to charge

11

Plaintiffs inflated cable prices cannot be attributed to the purported exclusion of RCN from the Philadelphia cluster, and that Counts Two and Three fail to plead facts showing a direct causal connection between Comcast's treatment of RCN and Plaintiffs' claimed injury.  Comcast also argues that Plaintiffs lack antitrust standing because RCN is a more direct victim of the alleged antitrust violations.  See Associated Gen. Contractors, 459 U.S. at 542 (stating that "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general").

We find that Counts Two and Three adequately plead the first and second factors, i.e., the causal connection/defendant intent element and the antitrust injury element, of the antitrust standing analysis with respect to Comcast's treatment of RCN.  Counts Two and Three allege that Comcast deliberately acted with anticompetitive intent towards RCN by suppressing competition from RCN in the portion of the Philadelphia cluster in which RCN offered services and by preventing competition from RCN in the portions of the cluster it might have entered.  (3d Am. Compl. ¶¶ 82, 86.)  Counts Two and Three further allege that Comcast's success in reducing competition from RCN enabled it to charge the inflated prices that injured Plaintiffs.  (Id. ¶¶ 92, 94.)  As discussed, supra Part III.A.1, such prices are the type of injury for which the antitrust laws were intended to provide redress.  McCready, 457 U.S. at 482-83.  Counts Two and Three need not contend that Comcast completely eliminated all competition from RCN in order to demonstrate a link between Comcast's treatment of RCN and Plaintiffs' injury.  Under § 2 of the Sherman Act, "it is not necessary that all competition be removed from the market.  The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's

ambit." United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005) (citation omitted).

We additionally find that Counts Two and Three sufficiently plead the three remaining elements of antitrust standing with respect to Comcast's conduct towards RCN. Plaintiffs' own cable bills were higher because Comcast acted to restrain RCN, and Plaintiffs' injury is thus directly traceable to Comcast's anticompetitive behavior.[5] The fact that Comcast's conduct harmed RCN and potentially RCN's customers, as well as Plaintiffs, does not deprive Plaintiffs of their antitrust standing. "[O]ther direct victims exist, but their presence does not diminish the directness of the [Plaintiffs'] injury." In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1168-70 (3d Cir. 1993) (finding that plaintiff steel companies had antitrust standing to recover inflated dock handling charges resulting from defendant railroads' conspiracy preventing plaintiffs from using private docks and that the presence of dock companies as another direct victim did not dilute the causal connection between the inflated charges paid by plaintiffs and defendants' conspiracy); see also U.S. Horticultural Supply, Inc. v. Scotts Co., Civ. A. No. 03-733, 2004 WL 1529185, at *6 (E.D. Pa. Feb. 18, 2004) (noting that there may be more than one proper plaintiff of an alleged antitrust violation). Permitting Plaintiffs to proceed in this case does not pose the risk of duplicative damages even if RCN litigates its rights; Plaintiffs' injuries, which consist of overcharges, are

---

[5]Defendants argue in the alternative that Plaintiffs do not have antitrust standing with respect to Comcast's RCN-related conduct because they do not live in the counties where RCN operates, and they do not specifically allege that RCN ever competed in their counties or applied or intended to apply for franchise licenses covering their counties. Comcast relies upon Brotech Corp, 2004 WL 1427136, a case in which this Court noted that a competitor who seeks entry to a market can state an antitrust injury stemming from the defendant's violation of antitrust laws only if that prospective competitor can demonstrate "'both its intention to enter the market and its preparedness to do so.'" Id. at *5 (quoting Andrx Pharm., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 806 (D.C. Cir. 2001)). Plaintiffs are not competitors of Comcast and the standards that courts impose on competitors to ensure that their injury is not speculative are not applicable to the determination of Plaintiffs' antitrust standing.

13

distinct from RCN's injuries, which likely consist of lost profits. See McCready, 457 U.S. at 469 n.4, 474-75 (allowing a purchaser of health insurance to challenge a boycott by the insurer and psychiatrists directed at psychologists even though the psychologists had maintained their own successful suit, where the psychologists suffered one kind of injury – lost profits in selling their services – and plaintiff suffered another kind of injury – reduced coverage on her health insurance policy). Nor is there a risk of complex apportionment of damages since Comcast overcharged each Plaintiff through separate monthly bills and Comcast's billing records are easily recoverable.

RCN is not the more direct or "superior" plaintiff to vindicate the public interest. In general, "[t]he antitrust laws . . . were enacted for the protection of competition, not competitors" and "basic economic theory teaches us that the chief benefit of competition is lower prices to consumers." Brunswick Corp., 429 U.S. at 488 (quotation omitted); Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 109 (3d Cir. 1992). Comcast allegedly acted to restrain competition from RCN in order to gain the ability to charge consumers inflated prices. Plaintiffs were, therefore, the ultimate target of Comcast's anticompetitive conduct towards RCN. As the Supreme Court found in McCready, where the injury to the consumer is "inextricably intertwined" with the injury the defendant sought to inflict on the relevant market, standing under § 4 of the Clayton Act is present. McCready, 457 U.S. at 479, 483-84 (holding that plaintiff's injury was not rendered remote merely because the alleged goal of the defendant was to halt encroachment by competitors and noting that the § 4 "remedy cannot reasonably be restricted to those competitors whom [defendants] hoped to eliminate from the market"); see also Goldwasser v. Ameritech Corp., 222 F.3d 390 (7th Cir. 2000) (finding that consumers had antitrust standing to claim defendant had engaged in practices leading to anticompetitively high prices where those practices were aimed at preventing competitors from

14

entering local markets);[6] N.Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc., 651 F.

Supp. 802, 811 (S.D.N.Y. 1986) ("Consumers have standing when they are injured as a result of a

defendant's improper exclusion of competitors from the market." (citing McCready, 457 U.S. at

465)). We hold that Counts Two and Three of the Third Amended Complaint sufficiently allege the

elements of antitrust standing with respect to Plaintiffs' injuries stemming from Comcast's conduct

towards RCN. We deny the instant Motion to Dismiss to the extent the Motion disputes Plaintiffs'

antitrust standing.

## B.   Plaintiffs' Claim Under Section One of the Sherman Act

In Count One of the Third Amended Complaint, Plaintiffs assert that Comcast has violated

§ 1 of the Sherman Act. Section 1 provides: "Every contract, combination in the form of trust or

otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign

---

[6]The United States Court of Appeals for the Seventh Circuit in Goldwasser explained:
[W]e think [the defendant] is wrong to claim that the plaintiffs lack
standing because they are attempting to raise third-party rights — the
rights of the competitors. It is true that the reason the plaintiffs have
been injured (allegedly, of course) implicates the rights of the
competitors not to be excluded from the local markets through
anticompetitive actions of [the defendant], but that does not make this
a *jus tertii* case. These plaintiffs want lower prices and more choice,
and they claim that [the defendant] (a monopolist) is doing things to
prevent that from happening. Their theory is a classic exclusionary
acts theory, and in all such cases, the monopolist's alleged sin is the
exclusion of other competitors from the market. One assumes that
those other competitors are grateful for the help from the consumer
litigation, but that is incidental. The [plaintiffs] do not care in
principle which competitors enter their markets; they just want a
competitively structured local telephone market that will prevent [the
defendant] from inflicting antitrust injury on them. We are satisfied
that they are asserting their own rights, and thus that they have
standing.

Goldwasser, 222 F.3d at 398-99.

nations, is hereby declared to be illegal." 15 U.S.C. § 1.  Courts have long recognized that § 1 only prohibits unreasonable restraints of trade.  Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988).  Certain restraints of trade are per se unreasonable, while others require more rigorous analysis under the "rule of reason."  In re Flat Glass Antitrust Litig., 385 F.3d 350, 356 (3d Cir. 2004) (citing InterVest Inc. v. Bloomberg, L.P., 340 F.3d 144, 158-59 (3d Cir. 2003)).

Generally, to establish a § 1 violation, a plaintiff must prove: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action."  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997) (citations omitted); Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991).  However, when a per se violation of § 1 is alleged, a plaintiff need only prove concerted action that was the proximate cause of the plaintiff's injuries.  See Flat Glass, 385 F.3d at 356.  Per se treatment is reserved for a small category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."  Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289 (1985) (quotation omitted); see also Texaco Inc. v. Dagher, – U.S. –, 126 S. Ct. 1276, 1279 (2006) ("Per se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." (quotation omitted)).  Accordingly, courts "have expressed reluctance to adopt per se rules . . . 'where the economic impact of certain practices is not immediately obvious.'"  Texaco, 126 S. Ct. at 1279 (quoting State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)).  "For those activities not within the

16

per se invalidity category, courts employ the rule of reason test." Eichorn, 248 F.3d at 138. "Under this test, plaintiffs have the burden of establishing that, under all the circumstances, 'the challenged acts are unreasonably restrictive of competitive conditions' in the relevant market." Id. (quoting Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 28 (1911)). Comcast argues that Count One of the Third Amended Complaint does not allege a per se violation of § 1 of the Sherman Act, and that Plaintiffs must proceed under the rule of reason and plead additional facts, which, if true, could demonstrate an anticompetitive effect within the relevant markets.

Count One alleges that Comcast engaged in the horizontal division of cable markets by entering into swap agreements with its competitors and that those agreements prevented competitors from entering or reentering the Philadelphia and Chicago clusters to challenge Comcast. (3d Am. Compl. ¶¶ 63-65, 70-74.) Comcast acknowledges that the agreed upon division of markets between competitors in order to suppress competition is the type of conduct courts have traditionally afforded per se treatment. See Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49 (1990) ("'One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. . . . This Court has reiterated time and time again that [h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling competition.'" (quoting United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972))).

Comcast contends, however, that we should not accept Count One's characterization of the swap agreements as horizontal market allocations.[7]  Comcast invokes Jetro Cash & Carry Enters.,

---

[7]Comcast emphasizes that the conduct Plaintiffs challenge under § 1 of the Sherman Act includes Comcast's acquisitions. Count One only alleges that Comcast's swap agreements with horizontal competitors constitute per se violations of § 1. (3d Am. Compl. ¶ 73.) Count One

Inc. v. Food Distrib. Ctr., 569 F. Supp 1404 (E.D. Pa. 1983), for the proposition that the "talismanic invocation of the word 'horizontal' does not automatically mandate application of the fatal per se rule." Id. at 1414. In Jetro, the court did not have to accept as true all well-pleaded allegations in the complaint because the court was not considering a motion to dismiss; rather, the court had conducted a bench trial and was making findings of fact and law. Id. at 1406. While courts should not credit "bald allegations" even at the motion to dismiss stage, Cal. Pub. Employees' Ret. Sys, 394 F.3d at 143, we find that Count One's allegations that the swap agreements constitute horizontal market allocations are buttressed by descriptions in the Third Amended Complaint of the parties to the swap agreements, when the agreements were completed, and how the terms of the agreements served to eliminate competitors from the Philadelphia and Chicago clusters and effectively preclude opportunities for entry and reentry.[8]  (3d Am. Compl. ¶¶ 10, 54-56, 63-64.)

_____

separately alleges that Comcast's acquisitions of competing cable companies and their cable subscribers in the Philadelphia and Chicago clusters constitute contracts and conduct in restraint of trade in violation of § 1 under the applicable rule of reason analysis. (Id. ¶ 74.) Thus, Comcast's assertions that acquisitions hold the promise of increasing a firm's efficiency, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984), and, thus, are not manifestly anticompetitive business practices are irrelevant to the assessment of whether Count One has alleged per se violations of § 1.

[8]Comcast has submitted excerpts from its swap agreements with AT&T and Adelphia to argue that, irrespective of the specificity of Count One's allegations, we should find as a matter of law that none of the swap agreements amount to horizontal market allocations. (James T. Cain Decl. Ex. A(7), A(8).) According to Comcast, the excerpts demonstrate that the swap agreements did not impose restrictions on the ability of any counterparty to reenter or compete directly in the affected markets. We decline to consider these excerpts on a motion to dismiss, as they go beyond the facts alleged in the Third Amended Complaint and do not warrant the exceptions made for documents that are "integral to or explicitly relied upon in the complaint" or "undisputedly authentic" and the basis for plaintiffs' claims. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (quotation omitted); Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, the excerpts are not sufficient for us to draw conclusions as a matter of law, even with respect to Comcast's arrangements with AT&T and Adelphia, because Count One does not necessarily depend upon the presence, or absence, of express covenants-not-to-compete.

18

Comcast further argues that Plaintiffs cannot show that Comcast engaged in conduct that was

per se unlawful because the transactions challenged in Count One were approved by government

authorities at the federal, state, and local levels. Comcast relies upon Verizon Communications Inc.

v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004), in which the Supreme Court,

considering the dismissal of antitrust claims, noted that "[o]ne factor of particular importance is the

existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such

a structure exists, the additional benefit to competition provided by antitrust enforcement will tend

to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny."

Id. at 412.

The mere fact that regulatory and law enforcement agencies may have reviewed and approved

the challenged transactions is not ground for dismissal of Plaintiffs' claims. See Otter Tail Power

Co. v. United States, 410 U.S. 366, 372 (1973) (explaining that "[a]ctivities which come under the

jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws");

Cableamerica Corp. v. Fed. Trade Comm'n, 795 F. Supp. 1082, 1092 (N.D. Ala. 1992) (stating that

"'[a]ntitrust immunity is not conferred by the bare fact that defendants' activities might be controlled

by an agency having broad powers over their conduct'" and that "'[t]here is no general presumption

that Congress intends the antitrust laws to be displaced whenever it gives an agency regulatory

authority over an industry'" (quoting Phonetele, Inc. v. Am. Tel. & Tel. Co., 664 F.2d 716, 729 (9th

Cir. 1981))).  "Only where there is a 'plain repugnancy between the antitrust and regulatory

provisions' will repeal [of the antitrust provisions] be implied." Gordon v. New York Stock Exch.,

Inc., 422 U.S. 659, 682 (1975) (citing United States v. Phila. Nat'l Bank, 374 U.S. 321, 350-351

(1963)). Comcast does not contend that the antitrust laws and the regulatory provisions under which

19

the challenged transactions were approved are repugnant to each other, but simply argues that we should refrain from "substitut[ing] [our] judgment for that of the countless federal, state, and local authorities who approved the Cable System Transactions as being in the public interest." (Def. Rep. Mem. at 22.)

Trinko, 540 U.S. 398, the case upon which Comcast primarily relies, does not support the proposition that Comcast's conduct should be shielded from antitrust scrutiny. In Trinko, the Supreme Court analyzed the 1996 Telecommunications Act and found that it expressly preserves claims that satisfy existing antitrust standards. Id. at 407. The Court's focus on the telephone industry's regulatory regime was in the context of deciding whether to recognize an expansion of the contours of § 2 of the Sherman Act to create additional exceptions to the established proposition that there is no duty to aid competitors. Id. at 412. Trinko does not provide a basis for insulating claims based on well-established examples of anticompetitive conduct, such as horizontal market allocations, from judicial review.

We conclude that Count One of the Third Amended Complaint sufficiently alleges that the swap agreements are horizontal market allocations subject to the per se rule. Count One further alleges that the swap agreements were the result of concerted action and a proximate cause of Plaintiffs' injuries. (3d Am. Compl. ¶¶ 10, 75.) Accordingly, we find that Count One states a claim under § 1 of the Sherman Act. Comcast's Motion to Dismiss is denied to the extent that it asserts otherwise. We need not consider Comcast's arguments that Count One fails to plead an anticompetitive effect in a relevant product or geographic market under the rule of reason. See Flat Glass, 385 F.3d at 356; see also CSR Ltd. v. Fed. Ins. Co., 40 F.Supp.2d 559, 564 (D.N.J. 1998) ("At this early [motion to dismiss] stage of the proceeding, the court does not find it necessary to

20

determine which mode of analysis [per se or rule of reason] it will ultimately employ in evaluating the defendants' activities."); Swarthmore Radiation Oncology, Inc. v. Lapes, 812 F. Supp. 517, 520 (E.D. Pa.1992) ("[The court] need not decide, at this stage of the proceedings, whether a per se rule or a 'rule of reason' applies.").

### C.    Plaintiffs' Claim Under Section Two of the Sherman Act

In Counts Two and Three of the Third Amended Complaint, Plaintiffs assert that Comcast has violated § 2 of the Sherman Act by monopolizing and attempting to monopolize the market for MVPS in the Philadelphia and Chicago clusters. Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations" is guilty of an offense and subject to penalties. 15 U.S.C. § 2. In order to state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must plead facts indicating "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 412-13 (3d Cir. 1997) (quoting Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 197 (3d Cir. 1992)). The possession of monopoly power "will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." Trinko, 540 U.S. at 407 (emphasis deleted). In order to state a claim for attempted monopolization, a plaintiff must allege that the defendant has "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.'" Queen City Pizza, 124 F.3d at 442 (quotations omitted). To determine whether there exists a viable claim of

21

monopolization or attempted monopolization, "a court must inquire 'into the relevant product and geographic market.'" Id. (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993)); Syncsort Inc. v. Sequential Software, Inc., 50 F. Supp. 2d 318, 327 (D.N.J. 1999) (citation omitted).

Counts Two and Three propose that the relevant geographic market is Comcast's Philadelphia and Chicago clusters, i.e., "those areas covered by Comcast's cable franchises or any of its subsidiaries or affiliates, located in Philadelphia, Pennsylvania [and Chicago, Illinois] and geographically contiguous areas, or areas in close geographic proximity to Philadelphia, Pennsylvania [and Chicago, Illinois]" in designated counties. (3d Am. Compl. ¶¶ 31, 78, 107.) Comcast argues that Counts Two and Three must be dismissed because they do not adequately plead a relevant geographic market. Comcast contends that Plaintiffs' geographic market definition is carefully but artificially gerrymandered to include Comcast's franchise areas and leave out neighboring areas covered by rival cable providers. Comcast asserts that Plaintiffs' attempt to delineate the relevant geographic market solely by reference to the places where Comcast has subscribers is improper as a matter of law. See Eichorn, 248 F.3d at 147 ("By defining the market so narrowly that it only includes the defendants, plaintiffs' proffered geographic and product markets are unrealistic.").

The viability of claims of monopolization and attempted monopolization under § 2 of the Sherman Act is dependent upon "demonstration by a plaintiff of why a proposed market is the relevant market." Syncsort, 50 F. Supp. 2d at 330 (citing Schuylkill Energy Res., 113 F.3d at 415). "'The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks[.]'" Tunis Bros., 952 F.2d at 726 (alteration in original) (quoting Pa. Dental Ass'n v. Medical Serv. Ass'n of Pa., 745 F.2d 248, 260 (3d Cir. 1984)). "Consequently,

22

the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." Id. "The definition of the relevant geographic market, therefore, is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration." Borough of Lansdale v. Phila. Elec. Co., 692 F.2d 307, 311 (3d Cir. 1982); see also Brown Shoe Co. v. United States, 370 U.S. 294, 336-37 (1962); but cf. Queen City Pizza, 124 F.3d at 436 (noting that there is no per se prohibition against dismissal of antitrust claims for failure to plead a relevant market.) The relevant geographic market may be local, regional, national, or international in origin. See Brown Shoe, 370 U.S. at 337. However, "[t]he mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market." Tunis Bros., 952 F.2d at 727; see also Gordon v. Lewistown Hosp., 272 F. Supp. 2d 393, 432 (M.D. Pa. 2003) ("There is voluminous case law holding that a firm's service area, alone, does not equate to a market's geographic scope.").[9]

"To survive a Rule 12(b)(6) motion to dismiss," Plaintiffs' alleged market must be

_____

[9]Comcast asserts that "Plaintiffs' proposed geographic market (a miscellany of 30 counties spread across five states) is an arbitrary construct which cannot be explained or justified by reference to (i) the areas in which Plaintiffs allege that Comcast faces actual competition from RCN (i.e., Delaware County, Pennsylvania), or (ii) the areas in which Comcast faces actual competition for the relevant product (i.e., everywhere in the United States that Comcast offers MVPS)." (Def. Rep. Mem. at 31.) While numerous cases say that for the purposes of § 2 of the Sherman Act, the relevant geographic market is the "area of effective competition," see e.g., Jetro, 569 F. Supp at 1412, what is meant is the area where the buyer can practicably and feasibly turn to make its purchases. Id.; Tunis Bros., 952 F.2d at 726. Plaintiffs need not define the relevant market based upon where Comcast competes. See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir. 1991) ("[A] company may compete in many markets or in only part of a market. Where it competes does not define the market.").

23

"plausible." Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001) (discussing product markets) (quotation omitted); cf. Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 479 n.12 (3rd Cir. 1992). Counts Two and Three of the Third Amended Complaint not only identify the geographic areas that constitute the proposed relevant geographic market but also allege that subscribers living within the Philadelphia and Chicago clusters cannot look beyond Comcast for their cable services. (3d Am. Compl. ¶¶ 31, 41-42, 78, 107.) As Defense Counsel acknowledged at Oral Argument, the commercial realities of the cable market mean that it is particularly local in nature and that consumers chose their cable providers based on the options available to them at their residences. (08/07/06 Tr. at 64.) We find that deciding whether Plaintiffs' proposed relevant geographic market appropriately tracks Comcast's franchise territories requires a fact-intensive inquiry not appropriately conducted on a motion to dismiss, and that the geographic market pled in Counts Two and Three of the Third Amended Complaint is sufficient to set forth valid claims under § 2 of the Sherman Act. Accordingly, we conclude that Comcast's Motion to Dismiss is denied to the extent that it asserts that Counts Two and Three fail to state a claim under § 2 of the Sherman Act.[10]

_____

[10]Comcast also argues that Plaintiffs cannot show that its conduct produced anticompetitive effects in the relevant markets as required to maintain a § 2 claim. We have found, supra Part III.B, that Count One states a claim under § 1 of the Sherman Act with respect to Comcast's alleged horizontal market allocations. That same manifestly anticompetitive conduct also underlies Plaintiffs' § 2 claims in Counts Two and Three. Comcast maintains that we should nonetheless dismiss Counts Two and Three to the extent that they rely on Comcast's other conduct, namely Comcast's acquisitions of competing cable companies and Comcast's treatment of RCN. We will not, at this stage, take such a piecemeal approach to Counts Two and Three. See LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of [defendant's] exclusionary practices considered together."). Moreover, Comcast's contention that its acquisitions cannot be considered anticompetitive unless they involved overbuilders clearly implicates questions of fact regarding, for example, the sources of competition in the relevant product market.

24

### D.   Statute of Limitations

Comcast argues that Counts One through Three are time-barred under the applicable statute of limitations to the extent that they depend on transactions which were consummated more than four years before Plaintiffs filed their original Complaint in this action on December 8, 2003. The Third Amended Complaint alleges three such transactions: an acquisition of Marcus Cable Communication's ("MCC") cable systems and approximately 27,000 cable subscribers in Harrington, Delaware that closed on April 1, 1998 (3d Am. Compl. ¶ 52(a)); an acquisition of Greater Philadelphia Cablevision, Inc's ("GPC") cable systems and approximately 79,000 cable subscribers in Philadelphia, Pennsylvania that closed in June 1999 (Id. ¶ 52(b)); and an acquisition of Tele-Communications, Inc.'s ("TCI") 1.6 million cable subscribers in and around Chicago, Illinois that closed on March 9, 1999 (Id. ¶ 53(a)).[11]

The statute of limitations is an affirmative defense, and the burden of establishing its applicability to a particular claim rests with the defendant. Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 487 (3d Cir. 1985) (citation omitted). When considering a motion to dismiss pursuant to Rule 12(b)(6) on statute of limitations grounds, courts "'must determine whether the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" Davis v. Grusemeyer, 996 F.2d 617, 623 (3d Cir. 1993) (quoting Cito v. Bridgewater Twp. Police Dept., 892 F.2d 23, 25 (3d Cir. 1989)). The defendant bears a heavy burden in seeking to establish that the challenged claims are barred as a matter of law. Davis, 996 F.2d at 623 n.10 (citing Van Buskirk, 760 F.2d at 498). The Clayton Act provides that "[a]ny action

_____

[11]The TCI acquisition was made by AT&T. The Third Amended Complaint alleges that, as part of the merger between AT&T and Comcast, Comcast assumed liability for AT&T's violations of antitrust law. (3d Am. Compl. ¶ 5.)

to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Generally, a cause of action accrues, and the statute begins to run, when the defendant commits an act that injures the plaintiff. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971). Plaintiffs, who limit their claims for damages to the four years preceding the filing of their original complaint, do not dispute the applicability of the Clayton Act's four-year statute of limitations. Plaintiffs argue, however, that their claims may be based on conduct occurring prior to the four-year period under the continuing violation exception to the accrual rule.

"The Supreme Court has considered and rejected the argument that, in the context of a defendant's continuing violation of the Sherman Act, the statute of limitations runs from the violation's earliest impact on a plaintiff." Lower Lake Erie Iron Ore, 998 F.2d at 1171 (citing Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968)). The four-year statute of limitations does not bar later recovery for private antitrust actions if the defendant's conduct "constituted a continuing violation of the Sherman Act and . . . inflicted continuing and accumulating harm." Hanover Shoe, 392 U.S. at 502 n.15. Antitrust law provides that, in the case of a continuing antitrust violation, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again." Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) (quotation omitted). Plaintiffs contend that the continuing violation exception should be applied to the MCC, GPC, and TCI acquisitions because the Third Amended Complaint alleges that those transactions are part of an ongoing program of acquisitions, which furthered Comcast's unlawful restraints on trade and monopolization and which extended into the limitations period. (3d Am. Compl. ¶ 68.) See Areeda, supra, ¶ 320c4 ("When the monopolist creates its monopoly by a

26

series of repeated or re-asserted acts designed to maintain its monopoly, the statute of limitation is restarted, provided that the subsequent acts fall within the definition of independent predicate acts . . . ."). Plaintiffs further contend that, since the Third Amended Complaint alleges that the MCC, GPC, and TCI acquisitions resulted in continuing and accumulating harm to them within the limitations period in the form of overcharges, they are not barred by the statute of limitations from making claims based on those acquisitions. (3d Am. Compl. ¶¶ 51-53, 62.) See In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) ("[I]f a party commits an initial unlawful act that allows it to maintain market control and overcharge customers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings."); Meijer, Inc. v. 3M, Civ. A. No. 04-5871, 2005 WL 1660188, at *4 (E.D. Pa. July 13, 2005).

Comcast argues that Plaintiffs' injuries accrued from the MCC, GPC, and TCI acquisitions on the dates that the acquisitions closed and beyond the applicable statute of limitations. Comcast maintains that acquisitions are single, discrete acts and that they cannot be appraised collectively as part of a continuing acquisitions program. Cf. Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1050 (8th Cir. 2000) (stating that the statute of limitations on a merger or acquisition of another company's assets being challenged under § 7 of the Clayton Act, 15 U.S.C. § 7, presumptively begins to run at the time the merger or acquisition occurs). Comcast further maintains that making post-acquisition charges the basis for a continuing violation exception would effectively abolish the statute of limitation for acquisitions because combined corporations would necessarily be exposed to damages each time they made a sale. See Areeda, supra, ¶ 320c5 ("[A]ny 'continuing violation' rule to the effect that each sale by the post-merger firm restarts the statute of limitations

27

would leave mergers open to perpetual challenge. Clearly, Congress did not intend to exempt mergers from the antitrust statute of limitation. . . . Limiting merger challenges to four years following acquisition would thus seem to be a foregone conclusion . . . .").

We find that the conceptualization of the MCC, GPC, and TCI acquisitions for statute of limitations purposes implicates questions of fact -- such as whether the acquisitions were part of a continuing course of conduct or whether they were discrete transactions — which are not properly considered on this Motion to Dismiss. Moreover, we note that Counts One through Three of the Third Amended Complaint are based primarily upon conduct occurring within the statute of limitations period. For example, all of the challenged swap agreements, four of the challenged acquisitions, and the merger between AT&T and Comcast occurred within the four-year period preceding the filing of the initial Complaint, as did the pricing campaign allegedly designed to prevent competition from RCN. (Compl. ¶¶ 52-53, 55-57, 93.) The MCC, GPC, and TCI acquisitions are merely alleged to have contributed to the damages associated with limitations period acts. Comcast is thus asking us to dismiss portions of Plaintiffs' § 1 and § 2 claims. "Such a piecemeal approach to an antitrust claim is improper." Del. & Hudson Ry. Co. v. Consol. Rail Corp., 654 F.Supp. 1195, 1204 (N.D.N.Y. 1987) (refusing to dismiss portions of defendant's antitrust claim on statute of limitations grounds) (citation omitted); see also LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003) ("As the Supreme Court recognized in Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."). Accordingly, we hold that Comcast's Motion to Dismiss is denied to the extent that it is based on the statute of limitations.

28

IV.    CONCLUSION

We conclude that Comcast has not demonstrated that Plaintiffs cannot prove any set of facts, consistent with the Third Amended Complaint, which would entitle them to relief. The Third Amended Complaint alleges the elements of antitrust standing and Comcast's arguments that Count One has not timely stated a claim under § 1 of the Sherman Act and that Counts Two and Three have not timely stated claims under § 2 of the Sherman Act are unavailing. Accordingly, Comcast's Motion to Dismiss is denied. An appropriate order follows.

29

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| GLABERSON et al. | : | CIVIL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| COMCAST CORPORATION et al. | : | NO. 03-6604 |

## O R D E R

**AND NOW,** this 31st day of August, 2006, upon consideration of Defendants' Motion to

Dismiss Plaintiffs' Third Amended Class Action Complaint (Docket No. 138), and all submissions

filed in connection therewith, **IT IS HEREBY ORDERED** that said Motion is **DENIED**.

BY THE COURT:

/s/ John R. Padova, J.
John R. Padova, J.