## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARTHA KRISTIAN, | ) |
| | ) Civil Action No. 03-CV- |
| Plaintiff | ) 12466-EFH |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| COMCAST CORPORATION, COMCAST | ) **DECLARATION OF** |
| HOLDINGS CORPORATION, COMCAST | ) **ALYCIA REGAN** |
| CABLE COMMUNICATIONS, INC., | ) **BENENATI** |
| COMCAST CABLE HOLDINGS, LLC, and | ) |
| COMCAST MO GROUP, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| JACK ROGERS and PAUL PINELLA, | ) Civil action No. 04-CV- |
| | ) 10142-EFH |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| COMCAST CORPORATION and AT&T | ) |
| BROADBAND | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Alycia Regan Benenati, an attorney duly admitted to practice before the courts of

the State of New York, declares as follows:

1.     I am an attorney with the law firm of Kasowitz, Benson, Torres &

Friedman LLP, counsel for defendants Comcast Corporation, Comcast Holdings

Corporation, Comcast Cable Communications, Inc., Comcast Cable Holdings, LLC,

Comcast MO Group, Inc. and AT&T Broadband (collectively "Comcast").

2.    This declaration is submitted in support of Comcast's motion for an order

dismissing the Consolidated Amended Class Action Complaint for Violations of the

Sherman Antitrust Act and the Massachusetts Antitrust Act (the "CAC").

3.    Attached hereto are true and accurate copies of the following documents:

Exhibit 1: Excerpts from regulatory approvals of transactions mentioned in the CAC:

| Exhibit | Cable System Transaction |
|---------|--------------------------|
| 1(A) | AT&T purchase of MediaOne (excerpts of FCC approval at Exhibit 3) |
| 1(B) | AT&T / Cablevision swap (FCC and local authorities) |

Exhibit 2: FCC Memorandum Opinion and Order, approving transfer of licenses between MediaOne and AT&T, adopted June 5, 2000.

Exhibit 3: Decision of U.S. District Court for the Eastern District of Pennsylvania in Glaberson v. Comcast Corp. (Civ. A. No. 03-604, Aug, 31, 2006) (slip op.).

Exhibit 4: Excerpt from Internet site of Commonwealth of Massachusetts, Department of Telecommunications and Energy, listing communities in Massachusetts that have granted licenses to more than one MVPD provider.[1]

Exhibit 5: Excerpts from the FCC's *Twelfth Annual Assessment of the Status of Competition in the Market for the Delivery of Video*, released March 3, 2006.

Exhibit 6: Excerpts from the Internet sites of Direct Broadcast Satellite (DBS) MVPD providers.

| Exhibit | DBS provider |
|---------|--------------|
| 6(A) | DirecTV[2] |
| 6(B) | Dish Network (Echostar Communications)[3] |

---

[1] See <http://www.mass.gov/dte/catv/license/2ndlicnse.htm>.

[2] See <http://www.directv.com/DTVAPP/global/contentPage.jsp?assetId=500008>.

[3] See <http://www.dishnetwork.com/content/faq/search/about/index.shtml>.

2

#1415164

Exhibit 7: FCC Memorandum Opinion and Order, approving transfer of licenses between Comcast and AT&T, adopted November 13, 2002.

Exhibit 8: Excerpts from the Asset Exchange Agreement between AT&T and Cablevision, entered into April 18, 2000.

Exhibit 9: Excerpt from Internet site of Commonwealth of Massachusetts, Department of Telecommunications and Energy, listing communities where a determination of adequate competition has been made by the FCC, or is pending.[4]

Exhibit 10: Excerpts from FCC determinations of effective competition.

| Exhibit | Community |
|---------|-----------|
| 10(A)   | Arlington and Newton |
| 10(B)   | Boston (July 20, 2001) |
| 10(C)   | Boston (March 13, 2002) |
| 10(D)   | Dedham and Needham |
| 10(E)   | Lexington |
| 10(F)   | Somerville |

Exhibit 11: Excerpts from applications made to FCC for a determination of adequate competition (listed as pending by the Commonwealth of Massachusetts, Exhibit 9).

| Exhibit | Community |
|---------|-----------|
| 11(A)   | Brookline |
| 11(B)   | Burlington, Natick, Waltham, Watertown |
| 11(C)   | Framingham |
| 11(D)   | Wakefield |

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated: September 7, 2006



_____ /s/ Alycia Regan Benenati _____ __

ALYCIA REGAN BENENATI

---

[4] See < http://www.mass.gov/dte/catv/effcompcom.htm>.

3

# EX. 1(A)

# Department of Justice

FOR IMMEDIATE RELEASE
THURSDAY, MAY 25, 2000
WWW.USDOJ.GOV

AT
(202) 202-514-2007
TDD (202) 514-1888

## JUSTICE DEPARTMENT REQUIRES AT&T TO DIVEST MEDIAONE'S INTEREST IN ROAD RUNNER BROADBAND INTERNET ACCESS SERVICE

WASHINGTON, D.C. - The Department of Justice today announced that AT&T Corp. has agreed to divest its interest in Road Runner, the second largest provider of broadband Internet access, in order to resolve the Department's antitrust concerns about AT&T Corp.'s proposed merger with MediaOne Group Inc. Broadband Internet access permits users to transmit and receive data at much greater speeds than are possible through "narrowband" access over ordinary telephone lines.

In its complaint, filed today in U.S. District Court in Washington, D.C., the Department said the combination of AT&T's interests in Excite@Home and MediaOne's interests in Road Runner would substantially lessen competition in the aggregation, promotion, and distribution of broadband content. At the same time, the Department filed a proposed consent decree that, if approved by the court, would address the Department's competitive concerns and resolve the lawsuit.

AT&T owns a controlling interest in Excite@Home, the largest provider of broadband Internet access which is also owned in part by Comcast Corp. and Cox. Road Runner is principally owned by MediaOne, Time Warner Inc., Microsoft, and Compaq. Most residential Internet users who have broadband Internet access today use either a cable modem service,

- 2 -

provided by their cable company, or a digital subscriber line (DSL) service provided by their local telephone company. Excite@Home currently has exclusive contract rights to provide broadband cable modem service over the cable facilities of AT&T, Comcast, Cox, and other cable system operators, while Road Runner has exclusive contract rights to provide broadband cable modem service over the cable facilities of MediaOne and Time Warner. Together, Excite@Home and Road Runner serve approximately 75 percent of the country's cable modem subscribers, and a majority of all residential broadband subscribers.

"The merger as proposed, would have had an anticompetitive impact on the emerging broadband market," said Joel I. Klein, Assistant Attorney General in charge of the Department's Antitrust Division. "The divestiture assures that AT&T will not acquire undue leverage in its dealings with broadband content providers, and American consumers will be the ultimate beneficiaries."

Under the terms of the proposed consent decree, AT&T is required to exit the Road Runner joint venture no later than December 31, 2001. The agreement requires AT&T to exit the joint venture prior to that date if other relevant owners of Road Runner agree to an earlier departure. AT&T will be permitted to retain Road Runner assets used exclusively to provide cable modem service and broadband service to MediaOne customers.

In addition, AT&T is required to obtain prior approval from the Department of Justice before entering into certain types of agreements with Time Warner or with AOL, which has a pending merger agreement with Time Warner. That requirement, which would remain in place for two years after AT&T exits Road Runner, would apply to any agreement that jointly proposes to provide a residential broadband service or, any agreement that would prevent either party from

- 3 -

offering a residential broadband service to customers in any geographic region. It would also apply to agreements that would prevent the inclusion of any content in a cable modem service offered by either party, or that would prevent either party from providing preferential treatment to content provided by others.

AT&T Corporation is headquartered in New York City. In 1999, it had revenues of approximately $61.5 billion .

MediaOne is headquartered in Engelwood, Colorado. In 1999, it had total revenues of approximately $2.7 billion.

As required by the Tunney Act, the proposed consent decree will be published in the Federal Register, together with the Department's competitive impact statement, which will be filed with the Court shortly. Any person may comment on the proposed decree by submitting comments to the Department. After a 60-day comment period, the United States will reply to any public comments and seek entry of the decree by the Court.

At the conclusion of the 60-day comment period, the court may enter the consent decree upon its finding that it serves the public interest.

# # #

00-297

# EX. 1(B)

## CABLE TELEVISION RELAY SERVICE (CARS)

File No..
20001030AKD8

CONSENT TO ASSIGNMENT

FROM. Cablevision of Boston, Inc

TO. MediaOne of New York, Inc.

Licensee/Permittee:
(for transfers only)

| CALL SIGN | STATION LOCATION | |
|-----------|------------------|---|
| WHZ-310 | BOSTON | MA |

Under authority of the Communications Act of 1934, as amended, the consent of the Federal Communications Commission is hereby granted to the transaction indicated above.

The Commission's consent to the above is based on the representations made by the applicants that the statements contained in, or made in connection with, the application are true and that the undertakings of the parties upon which this transaction is authorized will be carried out in good faith.

The actual consummation of voluntary transactions shall be completed within 60 days from the date hereof, and notice in letter form thereof, shall promptly be furnished the Commission by the buyer showing the date the act necessary to effect the transaction were completed. Upon furnishing the Commission with such written notice this transaction will be considered completed for all purposes related to the above described station(s).

ADDITIONAL REQUIREMENTS FOR ASSIGNMENTS ONLY:

Upon consummation the assignor must deliver the permit/license, including any modifications thereof to the assignee.

It is hereby directed that, upon consummation, a copy of this consent be posted with the station authorization(s) as required by the Commission's Rules and Regulations.

The assignee is not authorized to construct nor operate said station(s) unless and until notification of consummation in letter form has been forwarded to the Commission.

Dated: 12/05/2000



FEDERAL
COMMUNICATIONS
COMMISSION

## CABLE TELEVISION RELAY SERVICE (CARS)

File No..
20001030AD08

CONSENT TO ASSIGNMENT

FROM    Cablevision of Brookline L.P

TO      UACCMidwest, inc

Licensee/Permittee:
(for transfers only)

| CALL SIGN | STATION LOCATION | |
|-----------|------------------|---|
| WHZ-308   | BROOKLINE        | MA |

Under authority of the Communications Act of 1934, as amended, the consent of the Federal Communications Commission is hereby granted to the transaction indicated above.

The Commission's consent to the above is based on the representations made by the applicants that the statements contained in, or made in connection with, the application are true and that the undertakings of the parties upon which this transaction is authorized will be carried out in good faith

The actual consummation of voluntary transactions shall be completed within 60 days from the date hereof, and notice in letter form thereof, shall promptly be furnished the Commission by the buyer showing the date the act necessary to effect the transaction were completed. Upon furnishing the Commission with such written notice this transaction will be considered completed for all purposes related to the above described station(s).

ADDITIONAL REQUIREMENTS FOR ASSIGNMENTS ONLY:

Upon consummation the assignor must deliver the permit/license, including any modifications thereof to the assignee.

It is hereby directed that, upon consummation, a copy of this consent be posted with the station authorization(s) as required by the Commission's Rules and Regulations.

The assignee is not authorized to construct nor operate said station(s) unless and until notification of consummation in letter form has been forwarded to the Commission.

Dated.    12/05/2000



FEDERAL
COMMUNICATIONS
COMMISSION

## CABLE TELEVISION RELAY SERVICE (CARS)

File No.:
20001030AI08

### CONSENT TO ASSIGNMENT

FROM: Cablevision of Boston, Inc

TO: MediaOne of New York, Inc.

License/Permittee:
(for transfers only)

| CALL SIGN | STATION LOCATION | |
|-----------|------------------|---|
| WHZ-307 | ROSLINDALE | MA |

Under authority of the Communications Act of 1934, as amended, the consent of the Federal Communications Commission is hereby granted to the transaction indicated above.

The Commission's consent to the above is based on the representations made by the applicants that the statements contained in, or made in connection with, the application are true and that the undertakings of the parties upon which this transaction is authorized will be carried out in good faith.

The actual consummation of voluntary transactions shall be completed within 60 days from the date hereof, and notice in letter form thereof, shall promptly be furnished the Commission by the buyer showing the date the act necessary to effect the transaction were completed. Upon furnishing the Commission with such written notice this transaction will be considered completed for all purposes related to the above described station(s).

ADDITIONAL REQUIREMENTS FOR ASSIGNMENTS ONLY:

Upon consummation the assignor must deliver the permit/license, including any modifications thereof to the assignee.

It is hereby directed that, upon consummation, a copy of this consent be posted with the station authorization(s) as required by the Commission's Rules and Regulations.

The assignee is not authorized to construct nor operate said station(s) unless and until notification of consummation in letter form has been forwarded to the Commission.

Dated: 12/05/2000



**FEDERAL COMMUNICATIONS COMMISSION**

## CABLE TELEVISION RELAY SERVICE (CARS)

File No..
20001030AJ08

CONSENT TO ASSIGNMENT

FROM: Cablevision of Boston, Inc.

TO. MediaOne of New York, Inc.

Licensee/Permittee:
(for transfers only)

| CALL SIGN | STATION LOCATION | |
|-----------|-------------------|---|
| WHZ-309 | ROXBURY | MA |

Under authority of the Communications Act of 1934, as amended, the consent of the Federal Communications Commission is hereby granted to the transaction indicated above.

The Commission's consent to the above is based on the representations made by the applicants that the statements contained in, or made in connection with, the application are true and that the undertakings of the parties upon which this transaction is authorized will be carried out in good faith.

The actual consummation of voluntary transactions shall be completed within 60 days from the date hereof, and notice in letter form thereof, shall promptly be furnished the Commission by the buyer showing the date the act necessary to effect the transaction were completed. Upon furnishing the Commission with such written notice this transaction will be considered completed for all purposes related to the above described station(s).

ADDITIONAL REQUIREMENTS FOR ASSIGNMENTS ONLY:

Upon consummation the assignor must deliver the permit/license, including any modifications thereof to the assignee.

It is hereby directed that, upon consummation, a copy of this consent be posted with the station authorization(s) as required by the Commission's Rules and Regulations.

The assignee is not authorized to construct nor operate said station(s) unless and until notification of consummation in letter form has been forwarded to the Commission.

Dated: 12/05/2000



FEDERAL
COMMUNICATIONS
COMMISSION



CITY OF BOSTON · MASSACHUSETTS

OFFICE OF THE MAYOR
THOMAS M. MENINO

October 5, 2000

Mr. Daniel Somers
President & CEO
AT&T Broadband
32 Avenue of the Americas
New York, New York 10013

Re:    "Transfer of the Cable License" from Cablevision to AT&T Corp.

Dear Mr. Somers:

Please be advised that I approve the Transfer of the City of Boston Cable License
from Cablevision of Boston, Inc. to MediaOne of New York, Inc., a wholly owned
subsidiary of AT&T Corporation.

As the Issuing Authority for the City of Boston, I make this decision since we
have found that AT&T meets the four criteria of legal, financial, technical and
managerial capacity to assume the obligations of the cable license.

Sincerely,

Thomas M. Menino
Mayor of Boston

Cc:    Alicia Matthews, Director, Mass. DTE Cable Division,
One South Station, Boston, MA 02110

Printed on recycled paper

cc: Duncan / Reilly / Ricker / Sofio / Urban

# TOWN OF BROOKLINE,

# MASSACHUSETTS

## CABLE TELEVISION TRANSFER REPORT

## APPROVAL OF THE REQUEST FOR TRANSFER OF CONTROL
## OF THE CABLE TELEVISION RENEWAL LICENSE

### THE BOARD OF SELECTMEN

### TOWN OF BROOKLINE
### TOWN HALL
### BROOKLINE, MASSACHUSETTS

OCTOBER 10, 2000

## CABLE TELEVISION TRANSFER REPORT

### TOWN OF BROOKLINE, MASSACHUSETTS

WHEREAS, the current cable television licensee in the Town of Brookline (the "Town") is Cablevision of Brookline, L.P. ("Cablevision"); and

WHEREAS, Cablevision is subject to the terms and conditions contained in the Cable Television Renewal License (the "Renewal License"), dated August 5, 1997, which remains in full force and effect; and

WHEREAS, UACC Midwest, Inc., a wholly-owned subsidiary of AT&T Corp. ("AT&T") submitted an FCC Form 394 transfer request (the "Transfer Request") to the Board of Selectmen, dated June 16, 2000, and received by the Town on June 19, 2000, requesting approval of a transfer of control of the cable television system in the Town from Cablevision to AT&T; and

WHEREAS, the Board of Selectmen, as Issuing Authority, convened a public hearing on the Transfer Request on August 8, 2000, at the Brookline Town Hall, at which time Town representatives questioned Cablevision & AT&T officials on a number of transfer-related issues; and

WHEREAS, on August 10, 2000, outside counsel for the Town forwarded written follow-up questions to Adelphia regarding the Transfer Request, which questions are incorporated by reference herein and made a part hereof; and

WHEREAS, on August 22, 2000, AT&T submitted written responses to questions asked in said August 10th letter, which responses are incorporated by reference herein and made a part hereof; and

WHEREAS, AT&T has stated and assured the Town that there will be no increase in subscriber rates as a result of AT&T's acquisition of Cablevision and the transfer; and

WHEREAS, representatives of AT&T have agreed, verbally at said public hearings and in writing, to comply, in all respects, with all of the terms and conditions contained in the Renewal License; and

WHEREAS, the Brookline Cable Television Monitoring Committee filed a report with the Board of Selectmen, attached hereto as *Exhibit 1*, which report (i) recommended that the Board of Selectmen approve the Transfer Request, and (ii) advised the Board of Selectmen of a number of Renewal License violations; and

WHEREAS, Cablevision and AT&T representatives have met with representatives of the Town regarding a number of Town buildings that have not been connected to the Institutional Network (the "I-Net"); and

Cable Television Transfer Report
Town of Brookline
Page Two

WHEREAS, Cablevision and AT&T will connect the Town buildings, referenced in *Exhibit 2*, attached hereto, to the I-Net, as required by the Renewal License; and

WHEREAS, the Issuing Authority has received representations and assurances from AT&T that it possesses the financial, managerial, legal, and technical qualifications to assume all current cable television Renewal License obligations and responsibilities.

NOW THEREFORE, in light of the foregoing, and based upon the information provided to the Town by AT&T and based upon the benefits which AT&T has represented will inure to the benefit of the Town and its cable subscribers as a result of the transfer and based upon (i) AT&T complying with all of the Renewal License-related matters identified in *Exhibit 1* and (ii) AT&T completing the connections to the I-Net as outlined in *Exhibit 2*, the Issuing Authority hereby grants approval of the Transfer Request.

The Brookline Board of Selectmen

Joseph Geller
Chairman

Donna R. Kalikow
Donna Kalikow

Gilbert Hoy

Deborah Goldberg

Robert Allen

Dated: October 10, 2000

# EX. 2

## Before the
## Federal Communications Commission
## Washington, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Applications for Consent to the | ) |
| Transfer of Control of Licenses and | )    CS Docket No.99-251 |
| Section 214 Authorizations from | ) |
| | ) |
| MediaOne Group, Inc., | ) |
|   Transferor, | ) |
| | ) |
| To | ) |
| | ) |
| AT&T Corp. | ) |
|   Transferee | ) |
| | ) |

### MEMORANDUM OPINION AND ORDER

**Adopted: June 5, 2000**                    **Released:  June 6, 2000**

By the Commission:    Chairman Kennard issuing a statement; Commissioner Furchtgott-Roth
concurring in part, dissenting in part and issuing a statement; Commissioner
Powell concurring and issuing a statement; and Commissioner Tristani
concurring and issuing a statement.

### Table of Contents

                                                                              Paragraph
Before the ............................................................................................................................................................1

Federal Communications Commission...........................................................................................................1

Washington, D.C. 20554 ..................................................................................................................................1

MEMORANDUM OPINION AND ORDER.....................................................................................................1

I. ........................................................................................................................................... Introduction        3

II. .............................................................................................................PUBLIC INTEREST FRAMEWORK        5

III. .................................................................................................................................BACKGROUND        8

    A.    The Applicants ....................................................................................................................8

    B.    The Merger Transaction and the Application to Transfer Licenses ..................................17

IV..............................................................ANALYSIS OF POTENTIAL PUBLIC INTEREST HARMS        19

1

A.   Video Programming .......................................................................................................19

1.   Diversity and Competition in Video Program Purchasing...................................20
2.   Program Access Issues .........................................................................................37
3.   Channel Occupancy Limits ..................................................................................40
4.   Arguments That the Cable Rules Apply to Internet Access Services..................40
5.   Electronic Programming Guides ..........................................................................41
6.   MVPD Competition .............................................................................................43

B.   Cable Equipment ........................................................................................................44

C.   Broadband Internet Services ......................................................................................46

1.   Background ...........................................................................................................46
2.   Discussion ............................................................................................................49
3.   Findings. ...............................................................................................................51

D.   Local Exchange and Exchange Access Service ........................................................58

E.   Mobile Telephone Service .........................................................................................61

F.   Bundling .....................................................................................................................62

G.   Universal Service/Deployment .................................................................................64

V. ................................................................ANALYSIS OF POTENTIAL PUBLIC INTEREST BENEFITS            68

A.   MediaOne ...................................................................................................................71

B.   AT&T ..........................................................................................................................73

C.   Joint Venture and Other Contractual Arrangements..................................................74

D.   Applicants' Deployment Projections .........................................................................76

VI. .....................................................................................................PROCEDURAL MATTERS            77

VII. ................................................................................................................CONCLUSION            79

VIII. ..........................................................................................ORDERING CLAUSES            80

APPENDIX B...................................................................................................................83

II. ....................................................................................................................SAFEGUARDS            84

Merger Conditions.............................................................................................................91

Protecting and Promoting Competition and Diversity ......................................................92

An Open Access Commitment ...........................................................................................92

FCC's Merger Review Framework ....................................................................................92

Statement of Commissioner Harold W. Furchtgott-Roth,...........................................................................95

Concurring In Part and Dissenting In Part ...............................................................................................95

CONCURRING STATEMENT OF............................................................................................................97

CONCURRING STATEMENT OF COMMISSIONER GLORIA TRISTANI .........................................99

Appendix A – List of Commenters
Appendix B – Safeguards Relating to Video Programming

## I.    INTRODUCTION

1.      In this Order, we consider the joint application ("Application") filed by MediaOne Group, Inc. ("MediaOne") and AT&T Corp. ("AT&T") (collectively the "Applicants" or "AT&T-MediaOne")[1] for approval to transfer control to AT&T of certain licenses and authorizations controlled by MediaOne and its affiliates and subsidiaries, pursuant to Sections 214(a) and 310(d) of the Communications Act of 1934, as amended ("Communications Act").[2]  To obtain Commission approval of their Application, the Applicants must demonstrate that their proposed transaction will serve the public interest, convenience, and necessity.[3]  In this regard, we must weigh the potential public interest harms of the proposed merger against the potential public interest benefits to ensure that the Applicants have shown that, on balance, the benefits outweigh the harms.[4]

2.      We review this merger in the context of an unprecedented convergence of communications services, including a trend toward consolidation in communications industries generally and the cable industry in particular.  Cable companies are upgrading their systems to provide a full range of video, data, and voice services.  In this proceeding, the Applicants contend that the proposed merger will allow them to provide local telephony and new services more quickly and effectively in order to compete directly with incumbent local telephone exchange carriers ("ILECs").  In contrast, many commenters argue that the merger would create a web of relationships that will allow the Applicants to dominate communications conduits through their cable infrastructure and dominate media content through their vertical integration with content providers.  In the proposed merger, the nation's largest cable operator, AT&T, would acquire the nation's fourth largest cable operator, MediaOne, which holds

---

[1] Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from MediaOne to AT&T, CS Docket No. 99-251 (filed July 7 and 15, 1999) ("Application").

[2] 47 U.S.C. §§ 214(a), 310(d).

[3] *See* 47 U.S.C. §§ 214(a), 310(d).  *See also Applications of Ameritech Corp., Transferor, and SBC Communications Inc., Transferee, for Consent To Transfer Control of Corporations Holding Commission Licenses and Lines Pursuant to Sections 214 and 310(d) of the Communications Act and Parts 5, 22, 24, 25, 63, 90, 95, and 101 of the Commission's Rules,* CC Docket No. 98-141, Memorandum Opinion and Order ("*SBC-Ameritech Order*"), 14 FCC Rcd 14712, 14736 ¶ 46 (1999); *Application of WorldCom, Inc. and MCI Communications Corporation for Transfer of Control of MCI Communications Corporation to WorldCom, Inc.,* CC Docket No. 97-211, Memorandum Opinion and Order ("*WorldCom-MCI Order*"), 13 FCC Rcd 18025, 18026-27, 18030-32 ¶¶ 1, 8-10 (1998); *Applications of NYNEX Corp. Transferor, and Bell Atlantic Corp. Transferee, for Consent to Transfer Control of NYNEX Corp. and Its Subsidiaries,* File No. NSD-L-96-10, Memorandum Opinion and Order ("*Bell Atlantic-NYNEX Order*"), 12 FCC Rcd 19985, 19987, 20000-04 ¶¶ 2, 29-32 (1997).

[4] *SBC-Ameritech Order,* 14 FCC Rcd at 14736 ¶ 46 (1999); *WorldCom-MCI Order,* 13 FCC Rcd at 18031-32 ¶ 10.

a 25.5% interest in the nation's second largest cable operator, Time Warner Entertainment, LP ("TWE").[5]

3.      The merged firm's attributable ownership interests in cable systems serving approximately 51.3% of the nation's cable subscribers and a significant number of video programming networks, raises concerns that the merged company will be able to exercise excessive market power in the purchase of video programming.[6]  Commenters opposing the merger argue that the merged entity will have the power to determine which video programming networks are successful, thereby limiting the diversity of programming available to viewers.  In addition, commenters argue that the merged entity will be able to command excessively large discounts or exclusive contracts from programming networks, thereby hindering competition from alternative providers of multichannel video service.  We find that the proposed merger violates the Commission's cable horizontal ownership rules,[7] which are designed to address threats to diversity and competition in the video programming marketplace.

4.      Accordingly, as a non-severable condition to our grant of the Application, we will give the Applicants a period of 12 months from the effective date of the horizontal ownership rules, May 19, 2000 to (a) divest their interests in TWE, (b) terminate their involvement in TWE's video programming activities (pursuant to the limited partnership exemption and the officers/directors attribution waiver provisions of the cable ownership attribution rules), or (c) divest their interests in other cable systems, such that they will have attributable ownership interests in cable systems serving no more than 30% of MVPD subscribers nationwide.  We also will require the merged firm to file with the Cable Services Bureau, within six months from the closing of the merger, a written document specifying which of the foregoing three compliance options it has elected to pursue.  If the merged firm is not in compliance by the May 19, 2001 deadline, then we will require it to place into an irrevocable trust for the purpose of sale the assets that it must divest pursuant to the compliance option that it elected in the foregoing filing to come into compliance with the 30% limit.  We also will adopt the Applicants' proposal that, 60 days before the expiration of the 12-month period, May 19, 2001, the Applicants shall file with the Cable Services Bureau a written document (a) stating that it will be in compliance by the May 19, 2001 deadline, or (b) stating that it will not be in compliance and describing the irrevocable trust arrangement that it will establish by the May 19, 2001 deadline for the sale of any assets that it must be divest in order to effectuate the compliance option it had elected.  In addition to the above conditions, we will mitigate the potential harm to the diversity of programming and competition during the compliance period by imposing interim conditions on the merged entity.  The merged firm must abide by the interim conditions

---

[5] Counting owned and operated systems alone, MediaOne is the nation's fourth largest cable operator.  Under the cable ownership attribution rules, MediaOne is the nation's second largest cable operator because TWE's subscribers are attributable to MediaOne by virtue of MediaOne's 25.5% ownership interest in TWE.  *See* 47 C.F.R. § 76.503 n.2.  Thus, this merger in fact links the top three cable operators, AT&T, MediaOne, and TWE.

The cable ownership attribution rules, 47 C.F.R. § 76.503 n.2, determine whether the size or type of an entity's ownership interest in a cable system is such that it confers on the entity the ability to influence or control the operations of the cable system or creates economic incentives to take actions that concern the Commission.  *See In re Implementation of the Cable Television Consumer Protection and Competition Act of 1992; Implementation of Cable Reform Act Provisions of the Telecommunications Act of 1996: Review of the Commission's Cable Attribution Rules*, CS Docket Nos. 98-82, 96-85, Report and Order ("*Attribution Order*"), 14 FCC Rcd 19014, 19014 ¶ 1 (1999).  Thus, the cable ownership attribution rules identify ownership interests that raise issues of concern to the Commission.  *See id.*

[6] *See* Section III.B, *infra.*

[7] 47 C.F.R. § 76.503.

and their enforcement mechanisms, attached hereto as Appendix B, until such time as it has taken the foregoing compliance action.

5.    In the broadband arena, the merged firm will be able to provide high-speed Internet access over a vast cable infrastructure. The merged firm also would have major ownership interests in the nation's two largest cable broadband Internet service providers ("ISPs"), Excite@Home and Road Runner. Excite@Home and Road Runner are the exclusive ISPs serving broadband subscribers over the cable systems of AT&T, MediaOne, TWE, Cox Communications, Inc., and Comcast Corporation, among others. Commenters raise concerns that the Applicants, through their cable infrastructure and ownership of Excite@Home and Road Runner, will dominate the provision of broadband Internet services and threaten the openness and diversity of broadband Internet content, software applications, and network architecture. We note that the Department of Justice has entered a proposed consent decree with the Applicants, pursuant to which the merged entity will divest its interests in Road Runner.[8] Given the nascency of broadband Internet services, we find in this Order that growing competition from alternative broadband access providers, the Applicants' commitment to give unaffiliated ISPs direct access to the Applicants' cable systems, and the terms of Applicants' proposed consent decree with the Department of Justice requiring the divestiture of Road Runner make it unlikely that the merged firm would be able to dominate and threaten the openness and diversity of the Internet. Accordingly, we decline to impose conditions in this regard. Nevertheless, we will scrutinize broadband developments closely and review our policies if competition fails to grow as expected, especially if the merged firm fails to fulfill its commitment to open its cable systems or otherwise threatens the openness and diversity of the Internet.

6.    In this Order, we also consider whether the proposed merger would result in the violation of any other Commission rules or federal communications policies. In this regard, the Applicants have adjusted the programming services of four cable systems in order to avoid potential violation of the Commission's channel occupancy rules,[9] and MediaOne has reduced its ownership in Time Warner Telecom ("TWT") in order to avoid a potential violation of Section 652(b) of the Communications Act.[10]

7.    After reviewing the record in this proceeding and the arguments of the Applicants and commenters,[11] we conclude that the potential public interest benefits, on balance, outweigh the potential public interest harms of the merger. We find that the merger is likely to benefit consumers by enhancing the merged entity's ability to compete more effectively with incumbent local exchange companies ("LECs") in providing facilities-based local telephony and other new services to residential customers. Accordingly, subject to the conditions discussed herein to mitigate the potential public interest harms, we conclude that approval of the Application to transfer control of Commission licenses and authorizations from MediaOne to AT&T will serve the public interest, convenience, and necessity.

## II.    PUBLIC INTEREST FRAMEWORK

8.    Before the Commission can approve the transfer of control of authorizations and licenses connected with the proposed merger under Sections 214(a) and 310(d) of the Communications Act,[12] we

---

[8] *See United States v. AT&T Corp. and MediaOne Group, Inc.,* Case No. 1:00CV01176, Complaint and Proposed Final Judgment (D.D.C., filed May 25, 2000).

[9] 47 C.F.R. § 76.504.

[10] 47 U.S.C. § 572(b).

[11] *See* Appendix A for a list of commenters in this proceeding.

[12] 47 U.S.C. §§ 214(a), 310(d).

# EX. 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| GLABERSON et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COMCAST CORPORATION et al. | : | NO. 03-6604 |

## MEMORANDUM

**Padova, J.**                                                         **August 31, 2006**

Plaintiffs, cable television services customers of Defendants in the Philadelphia and Chicago
regions, have brought this antitrust action against Defendants for damages arising out of Defendants'
alleged imposition of horizontal restraints in the relevant cable television markets and unlawful
monopolization and attempted monopolization of those markets. Presently before the Court is
Defendants' Motion to Dismiss the Third Amended Class Action Complaint (Docket No. 138),
pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants'
Motion to Dismiss is denied.

I.     BACKGROUND

Plaintiffs, six non-basic cable television programming services customers of Defendants in
the Philadelphia, Pennsylvania and Chicago, Illinois regions, have brought this antitrust suit on
behalf of themselves and all those similarly situated, pursuant to Sections 4 and 16 of the Clayton
Act, 15 U.S.C. §§ 15, 26, for violations of Sections 1 (Count One) and 2 (Counts Two and Three)
of the Sherman Act, 15 U.S.C. §§ 1, 2. The Third Amended Complaint alleges that Defendants
Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc.,
Comcast Cable Communications Holdings, Inc., and Comcast Cable Holdings, LLC (collectively

"Comcast") acquired cable systems and cable subscribers from their competitors in the Philadelphia and Chicago cable markets until the number of competing cable providers in those markets was substantially reduced. (3d Am. Compl. ¶¶ 3, 49, 51-53.) The remaining competitors were primarily very large businesses who owned pockets of cable systems and cable subscribers throughout the country. (Id. ¶ 3.) Comcast then entered into agreements with those companies to avoid competition by allocating the nation's regional cable markets amongst themselves through swaps of their respective cable assets, including subscribers. (Id. ¶ 4.) Comcast received competitors' cable systems and cable subscribers in the Philadelphia and Chicago cable markets in exchange for Comcast's cable systems and cable subscribers in other parts of the country. (Id. ¶¶ 4, 10, 50, 54-56.) One swap agreement allocated markets and customers between Comcast and AT&T Broadband ("AT&T"); Comcast swapped its Chicago-area subscribers for AT&T's Philadelphia-area subscribers. (Id. ¶¶ 4, 56.) Then, as part of the November 18, 2002, merger between Comcast and AT&T, Comcast acquired AT&T's cable monopoly and cable subscribers in the Chicago area. (Id. ¶¶ 5, 57.) The result of all the swap agreements was that Comcast willfully obtained and maintained monopoly power in the relevant geographic markets, defined as Comcast's cable franchises located in Philadelphia and Chicago and geographically contiguous areas and areas in close geographic proximity to Philadelphia and Chicago in designated counties (hereinafter the Philadelphia and Chicago "clusters"). (Id. ¶¶ 6, 31.) The Third Amended Complaint alleges that Comcast currently controls ninety-four percent and ninety-two percent of the cable market in the Philadelphia and Chicago clusters, respectively, and that Comcast has used its monopoly power to raise cable prices in the Philadelphia and Chicago clusters to artificially high, supra-competitive levels. (Id. ¶¶ 7, 80-81, 99.)

2

Count One of the Third Amended Complaint maintains that Comcast has conspired with its competitors and engaged with them in a strategy of allocating markets through swap agreements that exchanged their respective cable assets, including subscribers, and that such horizontal market restraints constitute per se violations of § 1 of the Sherman Act.[1] (Id. ¶ 73.) Plaintiffs also maintain that Comcast's acquisitions of competing cable companies in the Philadelphia and Chicago clusters through asset purchases and mergers amount to contracts and conduct in restraint of trade in further violation of § 1. (Id. ¶ 74.) Count Two alleges that Comcast has monopolized, and Count Three alleges that Comcast has attempted to monopolize, the product market for multichannel video programming services ("MVPS") within the Philadelphia and Chicago clusters in violation of § 2 of the Sherman Act. (Id. ¶¶ 102, 107.) Comcast's anticompetitive conduct purportedly entails not only its swap agreements and acquisitions of competing cable companies, but also Comcast's refusal to provide Philadelphia-area competitor RCN Telecomm Services, Inc. ("RCN") with long-term, nondiscriminatory access to local sports programming controlled by Comcast ("Sportsnet"), which Plaintiffs contend RCN requires in order to compete effectively against Comcast. (Id. ¶¶ 11-12, 97.) In addition, Comcast has substantially interfered with RCN's access to the contractors needed to build competing cable systems in Comcast's Philadelphia franchise areas, and Comcast has engaged in pricing campaigns designed to prevent or destroy competition from RCN. (Id.) Plaintiffs contend that they have been injured by Comcast's activities because they have been forced to pay higher cable prices than they would have paid absent Comcast's unlawful conduct, and they seek treble damages, injunctive relief, and their costs of suit, including attorneys' fees. (Id. ¶¶ 11, 28, 67, 103,

---

[1]A horizontal restraint is defined as "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972).

3

108.) Comcast has moved to dismiss Plaintiffs' Third Amended Complaint in its entirety.

## II.    LEGAL STANDARD

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may look only to the facts alleged in the complaint and its attachments. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). The court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985). The court, however, "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)). A Rule 12(b)(6) motion will be granted when a plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988). The dismissal standard is higher in antitrust cases than generally. Brotech Corp. v. White Eagle Int'l Tech. Grp., Inc., Civ. A. No. 03-232, 2004 WL 1427136, at *3 (E.D. Pa. June 21, 2004) (citation omitted); see also Lum v. Bank of Am., 361 F.3d 217, 228 (3d Cir. 2004) ("[I]n antitrust cases, . . . dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (quoting Hosp. Bldg. Co. v. Trustees of the Rex Hosp., 425 U.S. 738, 746 (1976))). Nonetheless, the facts underlying the elements of an antitrust claim must be pled with specificity. Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 528 n.17 (1983); Brotech Corp., 2004 WL 1427136, at *3 (citation omitted).

## III.    DISCUSSION

Comcast argues that Plaintiffs' Third Amended Complaint should be dismissed because it

4

does not allege facts indicating that Plaintiffs have antitrust standing to challenge Comcast's transactions with other cable companies or Comcast's conduct towards RCN.[2] Comcast further asserts that Count One should be dismissed for failure to state a claim under § 1 of the Sherman Act, and that Counts Two and Three should be dismissed for failure to state a claim under § 2 of the Sherman Act. Comcast also contends that Plaintiffs' claims are time-barred to the extent that they depend on three acquisitions that occurred outside the Clayton Act's four-year statute of limitations for bringing private antitrust actions.

A.    Plaintiffs' Antitrust Standing

Whether a plaintiff has standing to raise antitrust claims is a threshold inquiry. City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998); Baglio v. Baska, 940 F. Supp. 819, 828 (W.D. Pa. 1996) (citing Associated Gen. Contractors, 459 U.S. at 519), aff'd, 116 F.3d 467 (3d Cir. 1997). The burden on a plaintiff in a private antitrust action to demonstrate that he has antitrust standing arises from § 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit under the antitrust laws in the district courts for treble damages. See 15 U.S.C. § 15. "[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine." Associated Gen. Contractors, 459 U.S. at 535 n.31. While "'[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact . . . [the doctrine of antitrust standing requires] the court [to] make a further determination [as to]

---

[2]While motions to dismiss that implicate constitutional standing principles are generally predicated on Federal Rule of Civil Procedure 12(b)(1), the United States Court of Appeals for the Third Circuit has considered motions to dismiss that raise issues of antitrust standing under Rule 12(b)(6). Maio v. Aetna, Inc., 221 F.3d 472, 481 n.7 (3d Cir. 2000).