IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLABERSON et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COMCAST CORPORATION et al. | : | NO. 03-6604 |

**ORDER**

**AND NOW,** this 31st day of August, 2006, upon consideration of Defendants' Motion to Dismiss Plaintiffs' Third Amended Class Action Complaint (Docket No. 138), and all submissions filed in connection therewith, **IT IS HEREBY ORDERED** that said Motion is **DENIED.**

BY THE COURT:

/s/ John R. Padova, J.
John R. Padova, J.

# EX. 4




September 6, 2006

# Cable Television Division

Return to Main Menu

## Communities that have granted a License to more than one Cable Operator

| Communities | Operators |
|---|---|
| Arlington | Comcast/RCN |
| Braintree | Comcast/Braintree Electric Light Department (BELD) |
| Brookline | Comcast/RCN |
| Burlington | Comcast/RCN/Verizon |
| Dedham | Comcast/RCN |
| Framingham | Comcast/RCN |
| Hamilton | Comcast/Verizon |
| Ipswich | Comcast/Verizon |
| Lexington | Comcast/RCN |
| Lynnfield | Comcast/Verizon |
| Marlborough | Comcast/RCN |
| Milton | Comcast/RCN |
| Natick | Comcast/RCN |
| Needham | Comcast/RCN |
| Newton | Comcast/RCN |
| North Reading | Comcast/Verizon |
| Norwood | Comcast/Norwood Light Department |
| Quincy | Comcast/RCN |
| Randolph | Comcast/RCN |
| Reading | Comcast/Verizon |
| Saugus | Comcast/RCN |
| Somerville | Comcast/RCN |
| Stoneham | Comcast/RCN/Verizon |
| Tewksbury | Comcast/Verizon |
| Wakefield | Comcast/RCN/Verizon |
| Wenham | Comcast/Verizon |
| Weymouth | Comcast/RCN |

| Winchester | Comcast/RCN/Verizon |
|---|---|
| Woburn | Comcast/RCN/Verizon |

**Massachusetts Department of Telecommunications and Energy**
**Cable Television Division**
**One South Station**
**Boston, MA 02110**
**Telephone: 617-305-3580**
**Toll-Free in Massachusetts: 1-888-622-2588**
**Facsimile: 617-478-2590**




**No Frames**

**Frames**

[ DTE Home ] [ Contact Us ] [ Help ]

**Privacy Policy**

# EX. 5

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Annual Assessment of the Status of Competition | ) | MB Docket No. 05-255 |
| in the Market for the Delivery of Video | ) | |
| Programming | ) | |

# TWELFTH ANNUAL REPORT

**Adopted: February 10, 2006** **Released: March 3, 2006**

**Comment Date: April 3, 2006**
**Reply Comment Date: April 18, 2006**

By the Commission: Chairman Martin, Commissioners Copps, Adelstein, and Tate issuing separate statements.

## TABLE OF CONTENTS

Heading Paragraph #


I. INTRODUCTION ..... 1
  A. Scope of this Report ..... 2
  B. Summary ..... 4
    1. The Current State of Competition: 2005 ..... 4
    2. General Findings ..... 6
    3. Specific Findings ..... 8
II. COMPETITORS IN THE MARKET FOR THE DELIVERY OF VIDEO PROGRAMMING ..... 27
  A. Cable Television Service ..... 27
    1. General Performance ..... 28
    2. Capital Acquisition and Disposition ..... 47
    3. Advanced and Other Services ..... 50
  B. Direct-to-Home Satellite Services ..... 70
    1. Direct Broadcast Satellite ..... 70
    2. Home Satellite or Large Dish Service ..... 79
    3. Satellite-Based Advanced Services ..... 83
  C. Broadband Service Providers ..... 87
  D. Broadcast Television Service ..... 92
    1. General Performance ..... 92
    2. Digital Television ..... 95
  E. Other Wireline Video Services ..... 121
    1. Local Exchange Carriers ..... 121
    2. Electric and Gas Utilities ..... 126
  F. Other Wireless Video Services ..... 129
    1. Private Cable Systems ..... 129
    2. Wireless Cable Systems ..... 131

3. Commercial Mobile Radio Service ..... 133
G. Other Entrants ..... 135
1. Internet Video ..... 135
2. Home Video Sales and Rentals ..... 140
III. MARKET STRUCTURE AND CONDITIONS AFFECTING COMPETITION ..... 143
A. Market Structure and Ownership Issues ..... 143
1. Competitive Issues in the Retail Market for the Distribution of Video Programming to Consumers ..... 144
2. Competitive Issues in the Program Supply Market ..... 151
B. Vertical Integration and Other Programming Issues ..... 156
1. Status of Vertical Integration ..... 156
2. Other Programming Issues ..... 168
C. Other Competitive Issues ..... 203
1. Competitive Developments in Small and Rural Markets ..... 203
2. Competitive Developments in the MDU Market ..... 207
IV. TECHNICAL ISSUES ..... 209
A. Navigation and Reception Devices ..... 210
B. Emerging Technologies ..... 219
V. FOREIGN MARKETS ..... 236
VI. ADMINISTRATIVE MATTERS ..... 243

APPENDICES:
Appendix A: List of Commenters
Appendix B: Market Structure Tables
Appendix C: Vertical Integration Tables

## I. INTRODUCTION

1. As required by Section 628(g) of the Communications Act of 1934, as amended, this is the Commission's twelfth annual report (*2005 Report*) to Congress on the status of competition in the market for the delivery of video programming.[1] Congress imposed this annual reporting requirement in the Cable Television Consumer Protection and Competition Act of 1992 (1992 Cable Act)[2] as a means of obtaining information on the competitive status of the market for the delivery of video programming.

### A. Scope of this Report

2. Consistent with the statutory purpose, we report on developments in the market for the delivery of video programming and on the factors that have facilitated or impeded changes in the competitive environment over the past year. We present information and analysis regarding changes in the market since the *2004 Report*, and we describe how those changes affect the current state of the market. The information and analysis provided in this *Report* are based on information submitted by

---

[1] The Commission's previous reports appear at: *Implementation of Section 19 of the 1992 Cable Act* (*Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*), *1994 Report*, 9 FCC Rcd 7442 (1994); *1995 Report*, 11 FCC Rcd 2060 (1996); *1996 Report*, 12 FCC Rcd 4358 (1997); *1997 Report*, 13 FCC Rcd 1034 (1998); *1998 Report*, 13 FCC Rcd 24284 (1998); *1999 Report*, 15 FCC Rcd 978 (2000); *2000 Report*, 16 FCC Rcd 6005 (2001); *2001 Report*, 17 FCC Rcd 1244 (2002); *2002 Report*, 17 FCC Rcd 26901 (2002); *2003 Report*, 19 FCC Rcd 1606 (2004); and *2004 Report*, 20 FCC Rcd 2755 (2005). *See* Communications Act of 1934 § 628(g), 47 U.S.C. § 548(g).

[2] Pub. L. No. 102-385, 106 Stat. 1460 (1992).

5. Competition in the delivery of video programming services has provided consumers with increased choice, better picture quality, and greater technological innovation. In particular, the effect of DBS competition has resulted in the addition of networks to cable operators' channel line ups, although it has only lowered cable rates slightly.[8] We find that almost all consumers have the choice between over-the-air broadcast television, a cable service, and at least two DBS providers. In some areas, consumers also may have access to video programming delivered by emerging technologies, such as digital broadcast spectrum, fiber to the home, or video over the Internet. In addition, through the use of advanced set-top boxes and digital video recorders, and the introduction of new mobile video services, consumers are now able to maintain more control over what, when, and how they receive information. Further, MVPDs of all stripes are offering nonvideo services in tandem with their traditional video services.

### 2. General Findings

6. The MVPD market has continued to grow. While the largest MVPD remains a cable operator, cable subscribership declined slightly since the *2004 Report*. The second and third largest MVPDs now are DBS operators. In addition, other delivery technologies continue to serve small numbers of subscribers in limited areas. LECs, such as SBC[9] and Verizon, who continue to partner with DBS providers to offer video service, have spent the past year preparing to offer video in their operating areas and are building out their facilities to add video offerings.

7. Large numbers of consumers continue to subscribe to cable service, which commands approximately 69 percent of all MVPD households. Cable operators have responded to the growth of DBS and its competitive service offerings by, among other things, expanding their channel line ups and bundling video service with other service offerings, such as cable modem service or telephone service. The number of cable subscribers selecting digital tiers and advanced services not offered by DBS continues to grow. These competitive efforts are matched by DBS operators' offering of local broadcast channels, additional sports and international programming, and advanced set-top boxes with digital video recorder (DVR) capabilities. Similarly, broadband service providers continue to offer a triple play of video, voice and Internet access service, which is proving to be price competitive with cable. Among our findings in rural and small markets are that LECs are upgrading their traditional copper facilities to digital subscriber line (DSL) and fiber-based platforms to allow them to offer a suite of video, telephone, and data services.

### 3. Specific Findings

8. The number of TV households and the number of MVPD subscribers increased in the past year. As of June 2005, there were 109.6 million TV households, compared to 108.4 million in June 2004. Of that number, approximately 94.2 million TV households, or almost 86 percent of TV households subscribe to an MVPD service, as compared to 92.3 million, or 85.1 percent as of June 2004. Cable serves the largest percentage of MVPD subscribers, but cable's share of the MVPD market continued to decline. As of June 2005, 69.4 percent of MVPD subscribers received video programming from a franchised cable operator, as compared to 71.6 percent as of June 2004.[10] DBS subscribers

---

[8] *See* paras. 41 *infra*.

[9] Following its acquisition of AT&T Corp., SBC changed its name to AT&T Inc. We continue to refer to the company as SBC, the name under which it submitted its filings in this proceeding. *See* AT&T Inc., *New AT&T Launches* (press release), Nov. 18, 2005.

[10] This percentage is the result of adding together the number of subscribers to all MVPD services and calculating the percentage of this total represented by cable subscribers. *See* Appendix B, Table B-1. The 70/70 test, referred to in para. 12, *infra*, measures the share of cable subscribers to systems with 36 or more channels as a percent of homes to which cable systems with 36 or more channels are available.

# EX. 6(A)

DIRECTV - Compare DIRECTV




Across the country, cable companies are airing commercials containing false and misleading information about satellite TV. It's time to set the record straight.

| MYTH ··········> | REALITY |
|---|---|
| Weather frequently interrupts DIRECTV reception. | DIRECTV delivers a digital signal 99.96% of the time, rain or shine. |
| **MYTH ··········>** | **REALITY** |
| DIRECTV doesn't offer local channels. | DIRECTV offers local channels to nearly 94% of US households. |
| **MYTH ··········>** | **REALITY** |
| DIRECTV customers must install their own equipment. | DIRECTV provides professional installation, service and maintenance — and a 100% satisfaction guarantee. |
| **MYTH ··········>** | **REALITY** |
| DIRECTV offers limited high-definition (HD) programming and services. | DIRECTV offers 900 hours of HD programming each week. |
| **MYTH ··········>** | **REALITY** |
| Cable is available everywhere. | Cable is available in only 98% of US homes. DIRECTV is available in 100%. |
| **MYTH ··········>** | **REALITY** |
| Cable and DIRECTV offer similar picture quality. | DIRECTV provides 100% digital quality. All channels. All the time. |
| **MYTH ··········>** | **REALITY** |
| DIRECTV doesn't offer video on demand. | DIRECTV has exclusive on-demand partnerships, and only our customers can view FX series before they air. |

# EX. 6(B)







home | order online | locate a retailer | en español | about us | careers | advanced search

Get DISH | Programming | Products & Services | Customer Care | My Account

SEARCH



## CUSTOMER CARE

**FAQ's**

- General Information
  - **About DISH Network**
  - Self-Help Customer Tools
  - Commercial Business/Retailer
  - Live Chat & Tech Forum
- Billing
  - General Billing
  - Fees
  - Payment Methods
- Programming
  - Programming Selection
  - Local/Distant Networks
  - Locks
  - Blackouts
  - Pay-Per-View
  - DISH on Demand
- Sales & Equipment
  - Receivers & Accessories
  - Activating Your Account
  - Existing Customer Upgrades
  - HDTV
  - DVR
  - Internet Access
- Installation & Tech Support
  - General Technical Information
  - Installing Your System
  - Digital Home Protection Plan
  - Audio/Visual Questions
  - Dual-Tuner Receivers
  - Remote Control Help

## FAQ :: About DISH Network




**What is DISH Network / EchoStar Communications Corporation?**

EchoStar Communications Corporation (Nasdaq:DISH) serves more than 11.3 million satellite TV customers through DISH Network®, and is a leading U.S. provider of advanced digital television services. DISH Network's services include hundreds of video and audio channels, Interactive TV, Pay-Per-View, DISH On Demand , HDTV, sports and International programming, together with Standard Professional Installation and 24-hour customer service. EchoStar has been a leader for 25 years in satellite TV equipment sales and support worldwide. EchoStar is included in the Nasdaq-100 Index (NDX) and is a Fortune 500 company.

**Where is DISH Network offered?**

DISH Network service is offered all over the U.S. including Hawaii , Alaska and Puerto Rico . Areas outside the continental United States will usually need a larger dish to receive an adequate signal. The size of the dish may range from a 24-inch dish to a 1.5 meter dish depending on the location. Please click here to locate a retailer near you. The retailer will be able to determine the correct size dish needed in your area.

Please click here for a list of programming available in Hawaii, Alaska and Puerto Rico.

Unfortunately we are prohibited from distributing our programming services to anyone residing outside of the United States and its territories and possessions at this time.

We are currently working closely with ExpressVu in Canada to provide DBS service in your area. Please visit ExpressVu's web site or call the ExpressVu Hotline at 1-888-759-3474 for new and timely information on ExpressVu.

**How can I find a local retailer?**

We have many retailers that can assist you with all of your DISH Network needs.

Click here to find a local retailer in your area. You will need your ZIP code to begin the search. Please note, some of our retailers may not be listed online. For more retailers in your area, please check your local Yellow Pages under "Satellite."

**I found an error on your website. Who should I notify?**





Our web site is constantly under construction to provide our customers with the most up-to-date information available. If you discover a problem with our web site, please notify our Webmaster by clicking here and entering Webmaster as the category.

**How do I disconnect my account?**

We understand that situations arise which force our customers to disconnect their services. In order to process this request we ask that the account holder please contact DISH Network or local retailer as soon as possible at 1-888-284-7116. Our toll-free customer service line is open 24-hours-a-day, 7-days-a-week including all holidays.

**Residential Agreement | Site Map | Web Privacy | Subscriber Privacy Notice**

© Copyright 2006, EchoStar Satellite L.L.C. All rights reserved.

Enter your email address to receive the latest promotions and updates:





# EX. 7

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the matter of | ) | |
| | ) | |
| Applications for Consent to the Transfer of Control of Licenses from Comcast Corporation and AT&T Corp., Transferors, to AT&T Comcast Corporation, Transferee | ) | MB Docket No. 02-70 |
| | ) | |
| | ) | |
| | ) | |

# MEMORANDUM OPINION AND ORDER

**Adopted: November 13, 2002** **Released: November 14, 2002**

By the Commission: Chairman Powell issuing a statement; Commissioner Copps dissenting and issuing a statement.

## Table of Contents


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 11

A. The Applicants .......... 11
1. AT&T .......... 11
2. Comcast .......... 17

B. The Merger Transaction and the Application to Transfer Licenses .......... 24

III. STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK .......... 26

IV. POTENTIAL PUBLIC INTEREST HARMS .......... 29

A. Video Programming Services .......... 29
1. Background .......... 33
2. Potential Harms to the Production and Packaging of Video Programming .......... 41
3. Potential Harms in the Distribution of Video Programming .......... 89

B. Internet-Related Effects .......... 127
1. Background .......... 128
2. Unaffiliated ISP Access to AT&T Comcast Cable Modem Platform .......... 130
3. Quantity, Quality, and Diversity of Internet Content .......... 140
4. Other Effects on Competing Broadband Platforms. .......... 146
5. Conclusion .......... 151

C. Telecommunications Services ..... 152

D. Set-Top Box Issues ..... 154

E. Interactive Television ..... 159

F. Cross-Ownership Rules ..... 166
1. Cable/SMATV Cross-Ownership ..... 166
2. Section 652 - Cable-Telco Buyout Prohibition ..... 168

G. Other Potential Public Interest Harms ..... 169

V. ANALYSIS OF POTENTIAL PUBLIC INTEREST BENEFITS ..... 173

A. Accelerated Deployment of Broadband Services ..... 175

B. Accelerated Deployment of Cable Telephony ..... 186

C. Increase in Supply of Local and Regional Programming ..... 200

D. Ability to Compete in the Local, Regional, and National Advertising Market ..... 204

VI. QUALIFICATIONS AND CHARACTER ISSUES ..... 207

VII. BALANCING PUBLIC INTEREST HARMS AND BENEFITS ..... 215

VIII. PROCEDURAL MATTERS ..... 219

IX. ADMINISTRATIVE MATTER ..... 221

X. CONCLUSION ..... 222

XI. ORDERING CLAUSES ..... 223

APPENDICES:
Appendix A – List of Commenters
Appendix B – Merger Conditions
Appendix C – Confidential Appendix
Appendix D – List of Licensees and Authorizations

## I. INTRODUCTION

1. In this Order, we consider the joint application ("Application")[1] filed by Comcast Corporation ("Comcast") and AT&T Corp. ("AT&T") (collectively, "Applicants") for approval to transfer control of certain licenses and authorizations to AT&T Comcast Corporation, a newly created company, pursuant to sections 214(a) and 310(d) of the Communications Act of 1934, as amended

[1] Applications for Consent to the Transfer of Control of Licenses from Comcast Corporation and AT&T Corp. to AT&T Comcast Corporation, MB Docket No. 02-70 (filed Feb. 28, 2002).

("Communications Act").[2] To obtain Commission approval, Applicants must demonstrate that their proposed transaction will serve the public interest, convenience, and necessity.[3] In this regard, we have traditionally weighed the potential public interest harms of the proposed merger against the potential public interest benefits to ensure that Applicants have shown that, on balance, the benefits outweigh the harms.[4]

2. We consider this merger against the backdrop of litigation that resulted in judicial remand of the Commission's cable horizontal ownership limit, which prohibits any cable operator from owning attributable interests in systems serving more than 30% of the nation's multichannel video programming distributor ("MVPD") subscribers. AT&T's acquisition of MediaOne in 2000 violated this limit as a result of MediaOne's attributable interest in Time Warner Entertainment, L.P. ("TWE"). The Commission conditioned its approval of the associated license transfer on AT&T's divestiture of TWE. Shortly before the compliance deadline, the U.S. Court of Appeals for the District of Columbia Circuit held the Commission had failed to justify its ownership cap and remanded the matter to the Commission. The Commission subsequently initiated a rulemaking proceeding to consider the ownership rule in light of the remand. That rulemaking is pending.

3. The proposed merger would combine the nation's largest cable operator, AT&T, with the nation's third largest cable operator, Comcast, to create a new entity, AT&T Comcast, which would serve approximately 27.02 million subscribers, or 28.9% of all U.S. MVPD subscribers.[5] In addition, upon closing of the merger, AT&T Comcast would acquire AT&T's 27.64% interest in the nation's second largest cable operator, TWE.[6] The TWE cable systems serve approximately 12.8 million subscribers.[7] Including the subscribers served by TWE, the merged firm would have attributable ownership interests in cable systems serving approximately 38.34 million subscribers, or 41% of all nationwide MVPD subscribers.[8]

---

[2] 47 U.S.C. §§ 214(a), 310(d).

[3] *Id. See also Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from MediaOne Group, Inc., Transferor, to AT&T Corp., Transferee*, 15 FCC Rcd 9816, 9817 ¶ 1 (2000) ("*AT&T-MediaOne Order*"); *Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from Tele-Communications, Inc., Transferor, to AT&T Corp., Transferee*, 14 FCC Rcd 3160, 3168 ¶ 13 (1999) ("*AT&T-TCI Order*").

[4] *AT&T-MediaOne Order*, 15 FCC Rcd at 9817 ¶ 1.

[5] As of June 30, 2002, AT&T had approximately 18.51 million total subscribers and Comcast had approximately 8.51 million total subscribers. *See* Letter from Betsy J. Brady, AT&T Corp., and James R. Coltharp, Comcast Corporation, to Marlene H. Dortch, Secretary, FCC (Sept. 20, 2002) ("Applicants' Sept. 20, 2002, Ex Parte").

[6] Some of TWE's cable systems are managed by Time Warner Cable, Inc. ("TWI"). For ease of reference, TWE and TWI will be jointly referred to herein as TWE.

[7] This figure includes the 1.48 million subscribers served by Texas Cable Partners and Kansas City Cable Partners, systems that are owned jointly by AT&T and TWE. *See* note 14, *infra*. In order to avoid double-counting when combining the total subscribers of AT&T and TWE, we include the 1.48 million subscribers in AT&T's total subscriber count of 18.51 million subscribers, but we subtract them from TWE's total subscriber count of 12.8 million.

[8] The cable ownership attribution rules, 47 C.F.R. § 76.503 n.2, determine whether the size or type of an entity's ownership interest in a cable system is such that it confers on the entity the ability to influence or control the operations of the cable system or creates economic incentives to take actions that concern the Commission. *See Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 14 FCC Rcd 19014, 19016 ¶ 1 (1999) ("*Attribution Order*"). As noted above, to avoid double-counting of subscribers served by AT&T's two partnerships with TWE, these subscribers are subtracted from TWE's total subscriber count for purposes of calculating the combined subscriber reach of AT&T Comcast and TWE.

47. Applicants reply that foreclosure of unaffiliated programmers "can be competitively significant only if the integrated firm is sufficiently large that its upstream competitors' inability to sell to the firm's downstream division precludes the upstream competitors from covering their costs."[110] Applicants state that the Commission has ruled that a cable MSO that accounts for less than 30% of MVPD purchases is not sufficiently large to pose a serious threat of anticompetitive foreclosure.[111] Applicants also state that the merged firm will own very little programming that could benefit from a foreclosure attempt, and will own many cable systems that would be harmed by a reduction in their supply of quality unaffiliated programming.[112]

48. *Discussion.* Section 613(f)(2)(A) of the Communications Act directs the Commission to set a horizontal ownership limit which ensures that no cable operator can unfairly impede the flow of video programming from the programmer to the consumer. Our 30% horizontal ownership rule is currently under review as part of a rulemaking proceeding commenced in September 2001, in response to the court's remand of the rule in *Time Warner.*[113] Despite the pendency of our horizontal ownership proceeding, Applicants have noted that their combined subscriber totals, excluding the TWE and TWI subscribers to be divested, are 27.02 million, which is 28.9% of the nation's 93.4 million MVPD subscribers.[114] Applicants therefore urge that the proposed merger will not violate our remanded horizontal ownership rule.[115] Applicants further assert that they will "take all steps necessary to comply with any new cable horizontal ownership limit that may be adopted in connection with the pending Horizontal Ownership FNPRM proceeding."[116]

49. Although our horizontal ownership cap has been reversed and remanded, and we have not yet determined what rules will best effectuate Congress' intent in enacting section 613(f) of the Communications Act, we remain obligated to ensure that the merged firm's national subscriber reach does not result in the harms to competition and consumers that the horizontal cap is intended to prevent (*i.e.,* ensuring that no cable operator can unfairly impede the flow of video programming from the programmer to the consumer). Further, while the *Time Warner* court vacated one of the two bases upon which we attributed TWE to AT&T in the *AT&T-MediaOne Order*, the remaining basis for attribution of TWE to AT&T—our prohibition on the sharing or appointment of officers and directors—remains intact.[117] But for Applicants' proposal to insulate and divest TWE, AT&T's right to appoint directors to the TWE Board of Representatives, which will inure to AT&T Comcast upon closing of the merger, means that TWE would remain attributable to AT&T Comcast absent a waiver of the officers/directors rule. Because Applicants have proposed to insulate the TWE Interest upon the merger's closing and to divest it thereafter, we evaluate the potential harms arising from increased subscriber reach without reference to TWE.

---

110 Applicants' Reply Comments at 44, citing Ordover Decl. ¶ 52.

111 *Id.* (citing *Horizontal Ownership Order* ¶¶ 5, 53).

112 *See id.*

113 *See generally Further Notice.*

114 *See* Applicants Sept. 20, 2002, Ex Parte. As noted above, AT&T has 18.51 million total subscribers and Comcast has 8.51 million total subscribers. As of July 31, 2002, there were 93.4 million total MVPD subscribers nationwide. *See Kagan Media Money,* Aug. 27, 2002, at 7. The percentage of nationwide MVPD subscribers the merged firm would serve is calculated as follows: 27.02 million divided by 93.4 million, equaling 28.9%.

115 Application at 50.

116 *Id.* at 49.

117 47 C.F.R. § 76.503 n.2(c). See para. 84, *infra* (discussing basis of attribution of TWE in the *AT&T-MediaOne Order*).

terrestrial delivery.[284] Moreover, there is no evidence in the record that Applicants intend to pursue such a strategy with existing programming or that they have the incentive to pursue such a strategy with respect to as-yet-uncreated programming.[285] Thus, the merger is not likely to enable AT&T Comcast to enter exclusive contracts with affiliated programmers that would prevent MVPD competitors from distributing such programming. We therefore conclude that the merger will not harm the public interest with respect to distribution of affiliated, satellite-delivered local or regional programming. Accordingly, we decline to impose conditions restricting the use of exclusive contracts between AT&T Comcast and affiliated programmers.

103. To the extent that clustering raises concerns about a cable operator's ability to secure exclusive distribution rights for certain programming, such concerns would apply industry-wide.[286] Further, we conclude above that the merger does not present a public interest harm in this regard. The appropriate forum for the consideration of this issue, therefore, is a rulemaking of general applicability. We have initiated a rulemaking proceeding to establish limits on cable operators' horizontal reach pursuant to section 613 of the Communications Act, which directs the Commission to establish such limits to prevent cable operators, because of their subscriber reach, from unfairly impeding the flow of programming to consumers.[287] Because the issue of regional clustering is an industry-wide phenomenon, we will consider in our pending rulemaking proceeding the relative harms and benefits of clustering as it may affect the flow of local and regional programming to consumers.

104. We also dismiss Minority TV's petition to deny the transfer of control. Minority TV fails to meet the standard for petitions to deny as expressed in our rules. Its argument consists of an account of third party testimony alleging that AT&T colluded with partners to violate the program access rules. Minority TV makes no attempt to relate this allegation to the specific transaction at hand, or to substantiate any of the allegations with further factual material.[288] Disputes of this nature should be

---

[284] In three regions the merger will increase concentration by 3% or less. In the Southeast post-merger concentration will not exceed 25%. *See* para. 61, *supra*. In addition, AT&T's local news affiliate, New England Cable News, already is delivered terrestrially, as is AT&T3. *See* BELD Comments, Exhibit 2; Letter from Michael H. Hammer, Willkie Farr & Gallagher, to Marlene H. Dortch, Secretary, FCC, (Oct. 25, 2002) at 1. Comcast SportsNet (Philadelphia) also is delivered terrestrially. Applicants' Nov. 4, 2002, Ex Parte at 3.

[285] The merger would enhance Applicants' ability and incentive to harm MVPD rivals by creating and withholding new terrestrially delivered programming only to the extent such programming has wide consumer appeal, such that rivals' failure to carry the programming would shift sufficient subscriber-related revenues from the rival to AT&T. For a new programming service to have such competitive significance, it must feature marquee programming, such as popular sports events. Because such programming is generally delivered over a large region due to the cost of acquiring it, the feasibility of terrestrial delivery will depend largely on the size of the regional footprint and the concentration of affiliated cable systems within that footprint. *See* Applicants' Nov. 4 Ex Parte at 4 n.7. For this reason, most regional sports programming today is delivered via satellite. Applicants' Nov. 4 Ex Parte at 2-4. We have found above that the merger is not likely to increase regional concentration to a material extent. In addition, we find below in evaluating the potential public interest benefits of the merger that the merger is not necessary to enable Applicants to create new local or regional programming.

[286] Congress opted not to include terrestrially delivered and unaffiliated programming within the scope of the program access rules. For example, the Senate version of the program access provisions was drafted to apply to all "national and regional cable programmers who are affiliated with cable operators. . . ." Conf. Rep. 102-862 at 91. The House version of the provisions applied only to "satellite cable programming vendor[s] affiliated with a cable operator. . . ." *Id.* at 92. The Conference Report adopted the House version with amendments. *Id.* At 93. The Conference Agreement amended the House version to apply also to "satellite broadcast programming vendors." *Id.*

[287] *See generally Further Notice*, 16 FCC Rcd 19074 (2001); 47 USC § 613(f)(2). Under 47 USC § 613(f)(2), when adopting rules to implement 47 USC § 613(f)(1), the Commission is required to, among other things, ensure that cable operators affiliated with video programmers do not unreasonably restrict the flow of the video programming of such programmers to other video distributors.

[288] 47 U.S.C. § 309(d).

# EX. 8

ASSET EXCHANGE AGREEMENT

This Asset Exchange Agreement (this "Agreement") is made and entered into as of April 18, 2000, by and among CSC Holdings, Inc., a Delaware corporation ("Holdings"), Cablevision of Brookline, L.P., a Delaware limited partnership ("CSC Brookline"), Cablevision of Boston, Inc., a Delaware corporation ("CSC Boston" and, together with CSC Brookline, the "Cablevision Sellers" and, together with CSC Brookline and Holdings, the "Cablevision Entities"), and AT&T Corp., a New York corporation ("AT&T").

RECITALS

WHEREAS, upon consummation of the AT&T/MediaOne Merger, MediaOne of New York, Inc., a New York corporation ("AT&T Sub I" ), and MediaOne of Greater New York, Inc., a Rhode Island corporation ("AT&T Sub II" and, together with AT&T Sub I, the "AT&T Sellers" and, together with AT&T Sub I and AT&T, the "AT&T Entities"), will be indirect wholly owned subsidiaries of AT&T and will own and operate cable television systems serving the communities described in Exhibit A (the "AT&T CATV Systems").

WHEREAS, CSC Brookline and CSC Boston are subsidiaries of Holdings and own and operate cable television systems serving the communities described in Exhibit B (the "Cablevision CATV Systems").

WHEREAS, the boards of directors of Holdings, CSC Brookline, CSC Boston and AT&T have approved, and deem it advisable and in the best interests of their respective shareholders to consummate, the transactions contemplated hereby.

WHEREAS, this Agreement sets forth the terms and conditions on which the Cablevision Sellers will convey to the AT&T Sellers or the other AT&T Subsidiary designated by AT&T (the "AT&T Designated Subsidiary" and, collectively with the AT&T Entities, the "AT&T Parties") substantially all of the assets of the Cablevision CATV Systems and AT&T will cause the AT&T Sellers to convey to the Cablevision Sellers substantially all of the assets of the AT&T CATV Systems and AT&T will cause the AT&T Sellers or qualified intermediaries acting on behalf of the AT&T Sellers or the AT&T Designated Subsidiary to deliver to the Cablevision Sellers the Exchange 1 Cash Consideration and the Cablevision Sellers will deliver to the AT&T Sellers or the AT&T Designated Subsidiary the Exchange 2 Cash Consideration, in transactions intended to qualify, to the extent reasonably possible, as tax-free exchanges of like-kind assets under Section 1031 of the Code (collectively, the "Exchange Transaction").

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows, each intending to be legally bound as and to the extent herein provided.

operation and cash flows of the Cablevision CATV Business or the AT&T CATV Business (as the case may be) for any period prior to the Closing. As used in this Section 9.04, the right of inspection includes the right to make copies at the requesting party's expense for reasonable business purposes.

9.05 Subscriber Billing Services and Call Center Services.

(a) Holdings will provide or cause to be provided to AT&T, upon request, customer billing services, at a cost to AT&T equal to Holdings' cost, and otherwise on terms and conditions reasonably satisfactory to each party, and access to and the right to use its billing system computers, software and related fixed assets in connection with the Cablevision CATV Systems acquired by AT&T for a period of up to 120 days following the Closing to allow for conversion of existing billing arrangements. AT&T will notify Holdings at least 30 days prior to the expected Closing Date as to whether it desires such transitional billing services from Holdings.

(b) AT&T will provide or cause to be provided to Holdings, upon request, customer billing services and call center services, at a cost to Holdings equal to AT&T's cost, and otherwise on terms and conditions reasonably satisfactory to each party, and access to and the right to use its billing system and call center computers, software, systems and related fixed assets in connection with the AT&T CATV Systems acquired by Holdings for a period of up to 120 days following the Closing to allow for conversion of existing billing and call center arrangements. Holdings will notify AT&T at least 30 days prior to the expected Closing Date as to whether it desires such transitional billing and call center services from AT&T.

9.06 Covenant Not to Compete.

(a) Holdings covenants and agrees that for a period of three years after Closing (or, if the maximum period permitted by law is less than three years, such shorter maximum period), Holdings will not, and will cause its Subsidiaries, Cablevision Parent and all Subsidiaries of Cablevision Parent not to directly or indirectly, acquire, manage, operate or control, any terrestrial video cable television system, multichannel multipoint distribution system ("MMDS"), satellite master antenna system ("SMATV") or local multipoint distribution system ("LMDS") within the Cablevision Systems Area (or, if the maximum area by law is smaller than the Cablevision Systems Area, such smaller maximum area). Notwithstanding anything contained herein, (i) the ownership of securities of any company that is "publicly held" and that do not constitute more than 5% of the voting rights or equity interests of such entity shall not constitute a violation of this covenant, and (ii) this Section 9.06(a) shall not be construed to restrict ownership acquisition, management, operation or control of entities with respect to the direct broadcast satellite business or wireless services business or ownership, acquisition, management, operation or control of licenses relating to the foregoing, regardless of the services provided by such entities or the spectrum utilized by them.

In no way limiting the scope of the carve out in the immediately preceding 9.06(a)(ii), but merely as a single example, Holdings or its Subsidiaries would be free to

provide wireless local loop services that could include any distance voice and data services (including without limitation, video services via the Internet).

(b) AT&T covenants and agrees that for a period of three years after Closing (or, if the maximum period permitted by law is less than three years, such shorter maximum period), AT&T will not, and will cause its Subsidiaries not to, directly or indirectly, acquire, manage, operate or control, any terrestrial video cable television system, MMDS, SMATV or LMDS within the AT&T Systems Area (or, if the maximum area by law is smaller than the AT&T Systems Area, such smaller maximum area). Notwithstanding anything contained herein, (i) the ownership of securities of any company that is "publicly held" and that do not constitute more than five percent (5%) of the voting rights or equity interests of such entity shall not constitute a violation of this covenant and (ii) this Section 9.06(b) shall not be construed to restrict ownership, acquisition, management, operation or control of entities with respect to the direct broadcast satellite business or wireless services business or ownership, acquisition, management, operation or control of licenses relating to the foregoing, regardless of the services provided by such entities or the spectrum utilized by them.

In no way limiting the scope of the carve out in the immediately preceding 9.06(b)(ii), but merely as a single example, AT&T or its Subsidiaries would be free to provide wireless local loop services that could include any distance voice and data services (including without limitation, video services via the Internet).

(c) For the avoidance of doubt, notwithstanding anything in Section 9.06(b), none of AT&T or any of its Subsidiaries or Affiliates shall be required to propose, negotiate, commit to or effect the sale, divestiture or disposition of, or any limitation or restriction with respect to, any property, business, assets, licenses, franchises or other rights of any current or future member of the Liberty Media Group in order to comply with Section 9.06(b).

(d) None of AT&T or any AT&T Subsidiary shall act through any current or future member of the Liberty Media Group in order to in any way change, limit, circumvent or avoid any of its obligations under Section 9.06(b).

(e) The parties hereto each acknowledge that in view of the uniqueness of the subject matter of this Section 9.06, a breach of the provisions of this Section 9.06 may result in irreparable injury and the parties would not have an adequate remedy at law for money damages in the event that this Section 9.06 were not performed in accordance with its terms. Therefore the parties hereto agree that each party shall be entitled to specific enforcement of the terms of this Section 9.06 in addition to any other remedy to which a party may be entitled at law or in equity.

9.07 <u>Remaining Franchises</u>.

(a) In the event that a Closing under this Agreement occurs without the receipt of all consents and approvals to transfer all franchises included in the Cablevision CATV Business, the AT&T Parties and the Cablevision Entities covenant and agree to act in

# EX. 9

new_bar.gif (19013 bytes)

September 6, 2006

# Cable Television Division

Return to Main Menu

## Communities that are deemed by the FCC to have effective competition

| Communities | Operators | FCC Order |
|---|---|---|
| Arlington | Comcast/RCN | DA 99-1686 |
| Boston | Comcast/RCN | DA 01-1731<br>FCC 02-70 |
| Brookline | Comcast/RCN | Pending<br>(Filed May 31, 2006) |
| Burlington | Comcast/RCN | Pending<br>(Filed May 31, 2006) |
| Dedham | Comcast/RCN | DA-03-28A1 |
| Framingham | Comcast/RCN | Pending<br>(Filed May 31, 2006) |
| Lexington | Comcast/RCN | DA-02-3376A1 |
| Natick | Comcast/RCN | Pending<br>(Filed May 31, 2006) |
| Needham | Comcast/RCN | DA-03-28A1 |
| Newton | Comcast/RCN | DA 99-1686 |
| Somerville | Comcast/RCN | DA 99-285 |
| Wakefield | Comcast/RCN | Pending<br>(Filed May 31, 2006) |
| Waltham | Comcast/RCN | Pending<br>(Filed May 31, 2006) |
| Watertown | Comcast/RCN | Pending<br>(Filed May 31, 2006) |

**Massachusetts Department of Telecommunications and Energy**
**Cable Television Division**
**One South Station**
**Boston, MA 02110**
**Telephone: 617-305-3580**
**Toll-Free in Massachusetts: 1-888-622-2588**
**Facsimile: 617-478-2590**



No Frames

Frames

[ DTE Home ] [ Contact Us ] [ Help ] [ Search ]

**Privacy Policy**

# EX. 10(A)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of: | ) | CSR 5395-E |
| | ) | |
| MediaOne of Massachusetts | ) | Arlington, MA MA0115 |
| | ) | Newton, MA MA0117 |
| Petition for Effective Competition | ) | |

## MEMORANDUM OPINION AND ORDER

**Adopted: August 19, 1999** **Released: August 24, 1999**

By the Deputy Chief, Cable Services Bureau:

## I. INTRODUCTION

1. MediaOne of Massachusetts ("MediaOne") filed a petition asserting that it is subject to effective competition in the Cities of Arlington and Newton, Massachusetts (the "Cities") from RCN-BecoCom, L.L.C. ("RCN"), an affiliate of a local exchange carrier ("LEC")[1] that is offering cable service in the Cities. No oppositions to MediaOne's petition were filed.

2. Section 623(a)(4) of the Communications Act of 1934, as amended ("Communications Act") allows franchising authorities to become certified to regulate basic cable service rates of cable operators which are not subject to effective competition.[2] For purposes of the initial request for certification, local franchising authorities may rely on a presumption that cable operators within their jurisdiction are not subject to effective competition unless they have actual knowledge to the contrary.[3] Certification becomes effective 30 days from the date of filing unless the Commission finds that the authority does not meet the statutory certification requirements.[4] In *Implementation of Cable Act Reform Provisions of the Telecommunications Act of 1996* ("*Cable Reform Final Order*"),[5] the Commission instructed cable operators believing themselves subject to LEC effective competition under Section

---

[1]The Communications Act defines the term "local exchange carrier" as:

> any person that is engaged in the provision of telephone exchange service or exchange access. Such term does not include a person insofar as such person is engaged in the provision of a commercial mobile service under Section 332(c), except to the extent that the Commission finds that such service should be included in the definition of such term.

Communications Act § 3(26), 47 U.S.C. § 153(26).

[2]Communications Act § 623(a)(4), 47 U.S.C. § 543(a)(4).

[3]47 C.F.R. §§ 76.906, 76.910(b)(4).

[4]47 C.F.R. § 76.910(e); 47 C.F.R. § 76.910(b); *see also* Communications Act § 623(a)(4), 47 U.S.C. § 543(a)(4).

[5]*Implementation of the Cable Act Reform Provisions of the Telecommunications Act of 1996*, CS Docket No. 96-85, FCC 99-57 (rel. March 29, 1999) (1999 WL 169592) ("Cable Reform Final Order").

623(l)(1)(D) of the Communications Act to file a petition for determination of effective competition pursuant to Section 76.7 and 76.907 of the Commission's rules.[6] Section 623(l)(1)(D) of the Communications Act provides that a cable operator is subject to effective competition where:

> a local exchange carrier or its affiliate (or any multichannel video programming distributor using the facilities of such carrier or its affiliate) offers video programming services directly to subscribers by any means (other than direct-to-home satellite services) in the franchise area of an unaffiliated cable operator which is providing cable service in that franchise area, but only if the video programming services so offered in that area are comparable to the video programming services provided by the unaffiliated cable operator in that area.[7]

## II. THE PLEADINGS

3. MediaOne argues that it faces LEC effective competition in its Arlington and Newton, Massachusetts franchise areas from RCN, a LEC-affiliated franchised cable operator. With regard to the LEC affiliation requirement, MediaOne contends that RCN currently markets both telephone and cable television service to Arlington and Newton residents.[8] MediaOne explains that RCN is a joint venture between RCN Telecom Services, Inc. ("RCNTS") and Boston Edison Company. MediaOne states that RCNTS is a wholly-owned subsidiary of C-TEC,[9] a local exchange carrier, and that RCNTS, itself, is engaged in the provision of local exchange service.[10] MediaOne additionally asserts that RCN is affiliated with MFS Communications Company, Inc. ("MFS"), another local exchange carrier.[11]

4. With regard to the requirement that the LEC competitor offer video programming service in the unaffiliated cable operator's franchise area, MediaOne asserts that RCN is physically able to deliver service to potential subscribers in Arlington and Newton.[12] MediaOne states that on February 27, 1997, the Commission granted RCN's application for OVS certification covering 48 service areas in and around Boston, Massachusetts, including Arlington and Newton.[13] According to MediaOne, RCN entered into

[6]47 C.F.R. §§ 76.7 and 76.907.

[7]Communications Act § 623(l)(1)(D), 47 U.S.C. § 543(l)(1)(D).

[8]MediaOne Petition at 2.

[9]C-TEC is a holding company with wholly and majority-owned subsidiaries engaged in the provision of competitive local exchange services and cable television. C-TEC operates as a local exchange carrier in Pennsylvania, offering service to a 19-county, 5067 square mile service territory in the state. *See* C-TEC Corporation SEC Form 10-K, filed with the Securities and Exchange Commission on March 31, 1997.

[10]MediaOne notes that C-TEC's SEC Form 10-K states that RCNTS is a provider of "local and long distance telephone service, video programming and internet access to households located in New York City and Boston." *See* MediaOne Petition at 5.

[11]MediaOne Petition at 6.

[12]*Id.*

[13]*Id.* at 7 *citing RCN-BETG, L.L.C., Memorandum Opinion and Order*, 12 FCC Rcd 2480 (1997).

individual OVS agreements with the Cities of Arlington and Newton in August and October, 1997, respectively.[14] MediaOne states that these OVS agreements require RCN to make service available to every residential dwelling and business in the Cities of Arlington and Newton, and to complete construction of the OVS system within 10 months of the date of the agreements (specifically, June 25, 1998 in Arlington and August 22, 1998 in Newton.)[15] MediaOne adds that RCN has been competing for cable television customers in Arlington since November, 1998 and began selling service to Newton in February, 1999.[16] MediaOne asserts that there are no regulatory, technical, or other impediments to households taking RCN's service and that RCN has launched an "aggressive" $10 million mass media advertising campaign (radio, newspaper, and direct mail) to create awareness of its voice, data, and video offerings.[17]

5. MediaOne also asserts that RCN offers programming comparable to that offered by MediaOne in Arlington and Newton.[18] MediaOne provides RCN's channel line-ups which demonstrates that RCN offers 100 channels of video programming, several of which are local television broadcast signals.[19] MediaOne also includes its own channel line-ups which indicate that it offers almost 100 channels of video programming in Arlington and Newton.[20]

6. MediaOne states that RCN's OVS agreements require RCN to provide performance bonds to the Cities ($350,000 in Newton and $250,000 in Arlington) and that RCN is also required to provide two PEG access channels.[21] Furthermore, RCN must pay to the Cities a percentage of its gross annual revenues from the provision of OVS services. According to MediaOne, RCN is clearly making an investment in its OVS operations throughout Arlington and Newton of the type the Commission believes is characteristic of an effective competitor.[22]

## III. ANALYSIS

7. In the absence of a demonstration to the contrary, cable systems are presumed not to be subject to effective competition.[23] The cable operator bears the burden of rebutting the presumption that effective competition does not exist with evidence that effective competition, as defined by Section 76.905

---

[14] *Id.* Copies of the agreements are attached to MediaOne's Petition at Exhibit B.

[15] *Id.*

[16] *Id.* at 8.

[17] *Id.* at 10.

[18] *Id.*

[19] *Id.* at 12.

[20] *Id.* at Exhibit F.

[21] *Id.* at 9.

[22] *Id.*

[23] 47 C.F.R. § 76.906.

of the Commission's rules, is present within the franchise area.[24] MediaOne has met this burden.

8. With regard to the first part of the LEC effective competition test, which requires that the alleged competitive service be provided by a LEC or its affiliate (or any multi-channel video programming distributor using the facilities of such LEC or its affiliate), we find that MediaOne has provided sufficient evidence, through SEC documents and other material, demonstrating that RCN is LEC-affiliated under the Commission's rules.[25] Therefore, we find that MediaOne satisfies the affiliation prong of the LEC effective competition test. In addition, we note that MediaOne is unaffiliated with RCN or any of RCN's partners.

9. We also find that MediaOne has submitted sufficient evidence showing that RCN's program service offering is comparable to MediaOne's channel line-ups in Arlington and Newton. Under the Commission's rules, in order to offer comparable programming as that term is used, a competing multichannel video programming distributor must offer at least 12 channels of video programming, including at least one channel of nonbroadcast service programming.[26] The channel information for RCN submitted by MediaOne establishes that RCN offers 100 channels of programming, including 15 local broadcast channels and numerous nonbroadcast channels, in satisfaction of the programming comparability criterion.

10. The LEC effective competition test requires that competitive service be offered directly to subscribers in the franchise area of an unaffiliated cable operator which is providing cable service in that franchise area. In enacting the LEC effective competition test, Congress indicated that the Commission should apply its preexisting definition of the term "offer" to the LEC effective competition test.[27] This definition provides that service is offered:

(1) When the multichannel video programming distributor is physically able to deliver service to potential subscribers, with the addition of no or only minimal additional investment by the distributor, in order for an individual subscriber to receive service; and (2) When no regulatory, technical or other impediments to households taking service exist, and potential subscribers in the franchise area are reasonably aware that they may purchase the services of the multichannel video programming distributor.[28]

11. We conclude that, based on the information before us, RCN is offering service in Arlington and Newton sufficient to demonstrate the presence of effective competition. In order to support a finding of effective competition under the LEC test, the LEC's service must substantially overlap the incumbent cable

---

[24] 47 C.F.R. § 76.905 and § 76.907. The note to Section 76.907 states that the criteria for determining effective competition pursuant to Section 76.905(b)(4) are described in the *Cable Reform Final Order*.

[25] 47 C.F.R. §76.905(b)(4).

[26] 47 C.F.R. §76.905(g).

[27] *Cable Reform Final Order*, at ¶ 7, citing H.R. Rep. No. 458, 104th Cong., 2d Sess. 170 (1996) ("Conference Report").

[28] 47 C.F.R. §76.905(e); *see Cable Reform Final Order*, at ¶ 7.

operator's service in the franchise area.[29] RCN has constructed its video distribution facilities throughout Arlington and Newton and is actively signing up and serving customers. We further find it relevant that RCN's posting of performance bonds, establishment of PEG channels, and payment of a percentage fee of gross revenues, demonstrates RCN's commitment to provide video programming service to Arlington and Newton residents now and in the future.[30]

12. We note that RCN's extensive marketing efforts throughout the Cities and the wide press coverage of RCN's construction activities in the local media ensure that potential subscribers are reasonably aware of the availability of RCN's service. In addition, we find that subscribers are able to receive RCN's cable service for only a minimal additional investment and without encountering regulatory or technical obstacles.

13. We find that MediaOne has submitted sufficient evidence demonstrating that its cable systems serving Arlington and Newton, Massachusetts are subject to LEC effective competition from RCN. MediaOne's petition is hereby granted and the certifications of the Cities of Arlington and Newton are revoked.

## IV. ORDERING CLAUSES

14. Accordingly, **IT IS ORDERED** that the Petition for Determination of Effective Competition filed by MediaOne challenging the certifications of the Cities of Arlington and Newton, Massachusetts **IS GRANTED**.

15. **IT IS FURTHER ORDERED** that the certifications of the Cities of Arlington and Newton, Massachusetts to regulate the basic cable rates of MediaOne in Arlington and Newton, Massachusetts **IS REVOKED**.

16. This action is taken pursuant to delegated authority under Section 0.321 of the Commission's rules, as amended.[31]

[29] *See Cable Reform Final Order* at ¶ 10.

[30] *See Cable Reform Final Order* at ¶ 13 ("If the LEC plans an open video system, the showing must establish the LEC's intent regarding the proposed area.")

[31] 47 C.F.R § 0.321.

FEDERAL COMMUNICATIONS COMMISSION

William H. Johnson
Deputy Chief, Cable Services Bureau

# EX. 10(B)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of: | ) | CSR 5048-E |
| | ) | |
| Cablevision of Boston, Inc. | ) | Boston, MA |
| | ) | CUID No. MA0182 |
| Petition for Determination of | ) | |
| Effective Competition | ) | |

**MEMORANDUM OPINION AND ORDER**

**Adopted: July 18, 2001** **Released: July 20, 2001**

By the Chief, Cable Services Bureau:

## I. INTRODUCTION

1. Cablevision of Boston, Inc. ("Cablevision")[1] has filed a petition for determination of effective competition asserting that it is subject to effective competition in Boston, Massachusetts because of the presence of Residential Communications Network of Massachusetts, Incorporated's ("RCN") cable operations in that franchise area. The City of Boston ("Boston") filed comments opposing Cablevision's request to which Cablevision filed a reply. Both Cablevision and Boston filed supplements to update the record.

2. In the absence of a demonstration to the contrary, cable systems are presumed not to be subject to effective competition,[2] as that term is defined by Section 76.905 of the Commission's rules.[3] The cable operator bears the burden of rebutting the presumption that effective competition does not exist with evidence that effective competition is present within the relevant franchise area.[4] Section 623(l)(1)(D) of the Act provides that a cable operator is subject to effective competition, and therefore exempt from cable rate regulation, if a LEC or its affiliate offers video programming services directly to subscribers by any means (other than direct-to-home satellite services) in the franchise area of an unaffiliated cable operator which is providing cable service in that franchise area, provided the video programming services thus offered are comparable to the video programming services provided by the unaffiliated cable operator in that area.[5]

---

[1] Cablevision recently transferred its Boston cable franchise to AT&T Broadband. Nevertheless, we refer to Cablevision in this Order because it filed the original petition.

[2] 47 C.F.R. § 76.906.

[3] 47 C.F.R. § 76.905.

[4] *See* 47 C.F.R. §§ 76.906 & 907.

[5] Communications Act, § 623(1)(1)(D), 47 U.S.C. § 543(1)(1)(D); *see also* 47 C.F.R. § 76.905(b)(4). This fourth statutory effective competition test within Section 632(l) is often called the "LEC" effective competition test.

17. Insofar as the City of Boston's belief that a finding of effective competition would be "premature," we disagree. As discussed above, Cablevision has provided evidence sufficient to satisfy all parts of the LEC effective competition test. In particular, we note the aggressive buildout requirement and liquidated damage provisions of the franchise indicating that our finding is not premature.[40] We also note that the Mayor of Boston, Thomas Menino, has recognized RCN as a viable competitor to Cablevision when RCN's franchise agreement was signed: "Today, Boston residents, as customers, will reap the benefits of the real choice that comes from deregulation of the cable industry. . . .We have a new company that gives subscribers the right to choose based on product, costs, and consumer service."[41] As Cablevision has submitted sufficient evidence demonstrating that its cable system serving Boston, Massachusetts is subject to LEC effective competition from RCN, its petition is granted, and the certification of the City of Boston is revoked.

## IV. ORDERING CLAUSES

18. Accordingly, **IT IS ORDERED** that the Petition for Determination of Effective Competition filed by Cablevision of Boston, Inc. challenging the certification of the City of Boston, in Boston, Massachusetts **IS GRANTED.**

19. **IT IS FURTHER ORDERED** that the certification of the City of Boston, Massachusetts to regulate the basic cable rates of Cablevision in Boston, Massachusetts **IS REVOKED.**

20. This action is taken pursuant to delegated authority under Section 0.321 of the Commission's rules, as amended.[42]

FEDERAL COMMUNICATIONS COMMISSION

W. Kenneth Ferree
Chief, Cable Services Bureau

[40] *See Time Warner-St. Petersburg*, 12 FCC Rcd 20964 (1997); *Time Warner-Pinellas County*, 12 FCC 3143 (1997); and *Time Warner-Clearwater*, 11 FCC Rcd 20909 (1996) (all finding LEC effective competition when only a portion of the franchise area was built out by the competitor at the time when the Cable Services Bureau rendered its decisions.)

[41] *See* RCN's press release, July 27, 1999.

[42] 47 C.F.R § 0.321.

# EX. 10(C)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of: | ) | CSR 5048-E |
| | ) | |
| Cablevision of Boston, Inc. | ) | |
| | ) | CUID No. MA0182 |
| Petition for Determination of Effective Competition | ) | |
| | ) | |
| Application for Review | ) | |

## MEMORANDUM OPINION AND ORDER

**Adopted: March 7, 2002** **Released: March 13, 2002**

By the Commission:

## I. INTRODUCTION

1. Before the Commission is an Application filed by the City of Boston ("City" or "Boston")[1] seeking review of a Memorandum Opinion and Order ("*Order*") adopted by the Cable Services Bureau ("Bureau"),[2] granting Cablevision's Petition seeking a determination that it is subject to local exchange carrier ("LEC") effective competition in the Boston franchise area. AT&T Broadband ("AT&T"), to which Cablevision had transferred its Boston cable franchise, filed an Opposition to Boston's Application to which the City filed a Reply.[3] As discussed below, the Application for Review is denied.

## II. BACKGROUND

2. Section 623(a)(4) of the Communications Act of 1934, as amended, ("Act") allows franchising authorities to become certified to regulate basic cable service rates of cable operators that are not subject to effective competition.[4] In the absence of a demonstration to the contrary, cable systems

---

[1] The City of Boston concurrently filed a Petition to Stay the Determination of Effective Competition with its Application for Review. Because we address the merits of the Application in this *Order*, we need not address the arguments raised in the Petition for Stay.

[2] *Cablevision of Boston, Inc.*, 16 FCC Rcd 14056 (CSB July 20, 2001).

[3] The Commonwealth of Massachusetts' Department of Telecommunications & Energy ("DTE") supports the City's request for review. DTE states that it is interested in the final determination of this matter because "the decision will impact the outcome of matters pending before our cable division." *See* Boston Reply at Exhibit A.

[4] 47 U.S.C. § 543(a)(4).

(continued...)