

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(BOSTON)

| | |
|---|---|
| Martha Kristian, | ) Civil Action No. 03-CV-12466-EFH |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| Comcast Corporation, Comcast Holdings | ) |
| Corporation, Comcast Cable Communications, | ) |
| Inc., Comcast Cable Holdings, LLC, and | ) |
| Comcast MO Group, Inc., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) Civil Action No. 04-10142-EFH |
| Jack Rogers and Paul Pinella, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Comcast Corporation and AT&T Broadband, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................1

FACTS ...................................................................................................................1

JUDGE PADOVA'S DECISION DENYING DEFENDANTS' MOTION TO
DISMISS ...............................................................................................................6

ARGUMENT..........................................................................................................8

    I.        Legal Standard for a Motion to Dismiss. ............................................8

    II.      Plaintiffs Have Antitrust Standing. ....................................................9

           A.       Plaintiffs as Consumers Have Suffered Antitrust Injury by
Paying Supra-Competitive Prices As a Result of Defendants'
Antitrust Violations. ................................................................9

           B.       Plaintiffs Have Clearly Pled That Defendants' Antitrust
Violations Eliminated and Reduced Competition in the Boston
Cable Market.........................................................................11

           C.       Comcast's Cited Cases are Inapposite....................................16

           D.       Plaintiffs Have Standing to Assert Their Claims Under § 2 of
the Sherman Act and § 5 of the Massachusetts Antitrust Act
Based on Defendants' Anticompetitive Conduct That Also
Affects Competitors..............................................................18

                 1.       Plaintiffs Meet the First Circuit's Requirements for
Standing.....................................................................19

                 2.       The Fact That Anticompetitive Conduct May Also
Harm Competitors Does Not Deprive Plaintiffs, as
Injured Consumers, of Antitrust Standing....................23

    III.     Plaintiffs' Complaint Sets Forth a Valid Claim that Defendants' Swap
Agreements and Acquisitions Violate § 1 of the Sherman Act and § 4
of the Massachusetts Antitrust Act. ..................................................24

           A.       Plaintiffs' Market Allocation Claim Alleges a Paradigm *Per Se*
Horizontal Restraint of Trade.................................................25

           B.       Plaintiffs Allege That The *Per Se* Liability Rule Applies to
Defendants' Unlawful Market-Allocating Swap Conduct. ......28

i

57407.1

C.  Comcast's Argument that the Challenged Transactions
    Produced No Anticompetitive Effects is Wrong.......................................28

D.  Defendants' Arguments Concerning Agency Actions and
    Inactions Fail as a Matter of Law.............................................................32

E.  Plaintiffs' Complaint Sets Forth a Valid Claim that
    Defendants' Acquisitions of Cable Competitors Violate § 1 of
    the Sherman Act and § 4 of the Massachusetts Antitrust Act..................34

IV. Plaintiffs' Complaint Alleges Valid Unlawful Monopolization or
    Attempted Monopolization Claims....................................................................36

A.  Plaintiffs Have Properly Defined the Relevant Geographic
    Market........................................................................................................38

B.  Comcast's Anticompetitive Conduct Also Affecting
    Competitors Violates § 2 of the Sherman Act and § 5 of the
    Massachusetts Antitrust Act......................................................................43

    1.  Comcast's Restriction of Access to Essential
        Programming Was Designed to Prevent Competitors
        From Effectively Competing With Comcast................................43

    2.  Comcast's Additional Exclusionary Conduct Was
        Designed to Prevent Competitors From Effectively
        Competing With Comcast...........................................................47

V.  Plaintiffs Have Stated Valid Claims that Defendants' Anticompetitive
    Conduct Violates §§ 4 and 5 of the Massachusetts Antitrust Act. .......................52

CONCLUSION....................................................................................................................52

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Abraham v.  Intermountain Health Care Inc.*, --- F.3d ---, No. 05-4043, 2006 WL 2556357 (10th Cir. Sept. 6, 2006)................................................................37

*Addamax Corp. v. Open Software Foundation, Inc.*, 152 F.3d 48 (1st Cir. 1998)................25, 28

*Addyston Pipe & Steel Co. v. U.S.,* 175 U.S. 211 (1899)...........................................................26

*Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555 (5th Cir. 1984) (en banc), *cert. denied*, 474 U.S. 1053 (1986) ..............................................................................39

*Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.,* 267 F.3d 30 (1st Cir. 2001)............................................................................................................................8

*Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Group, Inc.*, No. 02-41010, 2004 WL 136091 (5th Cir. Jan. 27, 2004)....................................................................................44

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230 (3d Cir. 1975)..................................26

*Amtrol, Inc. v. Vent-Rite Valve Corp.*, 646 F.Supp. 1168 (D. Mass. 1986) ................................17

*Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268 (3d Cir. 1999)...........................................11

*Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56 (1st Cir. 2005).....................9, 10, 24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ................ 44, 46, 48, 51

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)................................................................................................................19

*AT&T v. IMR Capital Corp.*, 888 F. Supp. 221 (D. Mass. 1995).........................................46, 52

*Augusta News Co. v. Hudson News Co.*, 269 F.3d 41 (1st Cir. 2001)...................................25, 26

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994) ........................................................................30

*Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227 (1st Cir 1983) ...................................50

*Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) ..................................................................26

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) ........................................................passim

*Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307 (3d Cir. 1982) ...........................39

*Boston Scientific Corp. v. Schneider (Europe) AG,* 983 F.Supp. 245 (D. Mass 1997) ..........35, 37

*Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869 (3d Cir. 1995)................................................9, 11

*Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*, No. Civ. A. 03-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004).......................................................................17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977) ........................................10

*Cableamerica Corp. v. FTC*, 795 F. Supp. 1082 (D. Ala. 1992).................................................32

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182 (1st Cir. 1996) ................................................................................................ 36, 39, 43

*Coffee v. Healthtrust, Inc.,* 955 F.2d 1388 (10th Cir. 1992) ....................................30

*Conley v. Gibson,* 355 U.S. 41 (1957) ...............................................................8, 50

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.,* 715 F.2d 1115 (6th Cir. 1983) .........................................................................................................31

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690 (1962)....................52

*Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984).......................34

*Corey v. Look,* 641 F.2d 32 (1st Cir. 1981) ...........................................................50

*Coyne v. Somerville,* 972 F.2d 440 (1st Cir. 1992).....................................................8

*CSR Ltd. V. Fed. Ins. Co.,* 40 F.Supp.2d 559 (D.N.J. 1998) ...................................36

*CTC Comms. Corp. v. Bell Atl. Corp.,* 77 F. Supp. 2d 124 (D. Me. 1999)...................51

*Discon Inc. v. NYNEX Corp.,* 86 F. Supp. 2d 154 (W.D.N.Y. 2000) .........................41

*Eastern Food Services, Inc. v. Pontifical Catholic Univ. of Puerto Rico Serv. Ass'n., Inc.,* 357 F.3d 1 (1st Cir. 2004) ......................................................................38

*Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1 (1st Cir. 1979), *cert. denied,* 446 U.S. 983, *reh'g denied,* 449 U.S. 893 (1980)................................ 26, 28, 30

*First Del. Valley Citizens Tel., Inc. v. CBS, Inc.,* 398 F. Supp. 917 (E.D. Pa. 1975) ..................33

*Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir. 1986) ........................................30

*FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447 (1986).............................................38

*FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411 (1990)...............................38

*Glaberson v. Comcast Corp.,* No. 03-6604, 2006 WL 2559479 (E.D. Pa. Aug. 31, 2006) ...................................................................................................passim

*Goldwasser v. Ameritech Corp.,* 222 F.3d 390 (7th Cir. 2000)...................................23

*Greenville Publ'g Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391 (4th Cir. 1974) ....................30

*GTE News Media Servs., Inc. v. Ameritech Corp.,* 21 F.Supp.2d 27 (D.D.C. 1998) .................27

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481 (1968) ......................10

*Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C. Cir. 1977).......................................17

*Hewlett-Packard Co. v. Boston Scientific Corp.,* 77 F. Supp. 2d 189 (D. Mass. 1999) ...............48

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738 (1976)....................................8

*In re Flat Glass Antitrust Litig.,* 385 F.3d 350 (3rd Cir.  2004)....................................36

*In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144 (3d Cir. 1993), *cert. denied,* 510 U.S. 1091 (1994) ...........................................................................20

*In re Pharm. Indus. Average Wholesale Price Litig.,* 307 F.Supp.2d 196 (D. Mass. 2004)...........................................................................................................9

57407.1

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000)...........................................17

*Kinsella v. Wyman Charter Corp.*, 417 F.Supp.2d 159 (D. Mass. 2006) ......................................8

*Kling v. Fidelity Mgmt. Trust Co.,*  270 F.Supp.2d 121 (D. Mass. 2003)......................................8

*MCI Comms. Corp. v. Am. Tel. and Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) ............................44

*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) ...............................................29

*Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51 (1st Cir. 2003) ...........................................39

*N. Y. Jets, LLC v. Cablevision Sys. Corp.*, No. 05 Civ. 2875 (HB), 2005 WL 2649330
    (S.D.N.Y. Oct. 17, 2005) ....................................................................................................39

*NCAA v. Bd. of Regents*, 468 U.S. 85 (1984) .............................................................................38

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370 (7th Cir. 1986) .............46

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) ........................................................ 11, 26, 28, 29

*Poller v. Columbia Broad. Sys.*, 368 U.S. 464 (1962) ..................................................................8

*PSW, Inc. v. Visa USA, Inc.,*  No. C.A. 04-347T, 2006 WL 519670 (D.R.I. Feb. 28,
    2006) ...................................................................................................................................17

*Quaak v. Dexia, S.A.*, No. 03-11566-PBS, 2006 U.S. Dist. LEXIS 54740 (D. Mass.
    Aug. 8, 2006)........................................................................................................................8

*Quaker State Corp. v. Leavitt,* 839 F.Supp. 76 (D. Mass. 1993)..................................................52

*Recetas Por Menos, Inc. v. Five Development Corp.*, 368 F.Supp.2d 124 (D.P.R.
    2005) ....................................................................................................................................39

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979).............................................................................9

*SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39 (1st Cir. 1995)...............................................10, 37

*Serpa Corp. v. McWane, Inc.*, 199 F.3d 6 (1st Cir. 1999).............................................10, 24, 37

*Serv. Merch. Co., Inc. v. Boyd Corp.*, 722 F.2d 945, 950 (1st Cir. 1983)...................................25

*SMS Systems Maint. Servs., Inc. v. Digital Equip. Corp.* 188 F.3d 11 (1st Cir. 1999)................41

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)...........................................................37

*Storer Cable Comm., Inc. v. City of Montgomery*, 826 F. Supp. 1338 (M.D. Ala.
    1993), *vacated upon settlement*, 866 F.Supp. 1376 (M.D. Ala. Sep. 27, 1993) ...............40

*Sullivan v. Tagliabue*, 25 F.3d 43 (1st Cir. 1994)..................................................................10, 19

*Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F. Supp. 486 (S.D.N.Y. 1992) .............44

*Suzuki of W. Mass., Inc. v. Outdoor Sports Expo. Inc.,* 126 F.Supp.2d 40 (D. Mass.
    2001) ....................................................................................................................................52

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) ....................................................40

*Texaco Inc. v. Dahger*, 126 S.Ct. 1276 (2006) ..........................................................................34

*Town of Norwood v. New England Power Co.,* 202 F.3d 408 (1st Cir.2000)...............................48

v

*TV Signal Co. of Aberdeen v. Am. Tel. & Tel. Co.*, No. Civ. 70-6N, 1981 WL 2049 (D.S.D. Mar. 13, 1981) .................................................................................................39

*Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566 (2nd Cir 1990)...................45

*U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).................................................................29

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000) .............................................................26

*United States v. Brown Univ.*, 5 F.3d 658 (3d Cir. 1993) ...........................................................25

*United States v. First Nat'l Bank and Trust Co. of Lexington*, 376 U.S. 665, 668 (1964)........................................................................................................................................34

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................................................36

*United States v. Philadelphia Nat'l Bank,* 374 U.S. 321 (1963) .................................................33

*United States v. Radio Corp. of Am.*, 358 U.S. 334 (1959)....................................................26, 33

*United States v. Sealy, Inc.*, 388 U.S. 350 (1967).......................................................................26

*Verizon Comms. v. Trinko*, 540 U.S. 398 (2004)...................................................................22, 34

*Waterson v. Page*, 987 F.2d 1 (1st Cir. 1993) ..............................................................................8

*Winter Hill Frozen Foods and Servs., Inc. v. Haagen-Dazs Co.*, 691 F.Supp. 539 (D.Mass.1988).......................................................................................................................52

*Wojcieszek v. New England Tel. & Tel. Co.*, 997 F.Supp. 527 (D. Mass 1997)....................18, 37

*Yangtze Optical Fibre v. Ganda, LLC*, No. CA 04-474ML, 2006 WL 1666180, at *3 (D.R.I. June 9, 2006) ......................................................................................................11

*Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997) .....................51

## Statutes

§ 4 of the Sherman Act...................................................................................................................4

47 U.S.C. § 251..............................................................................................................................33

47 U.S.C. § 541..............................................................................................................................33

47 U.S.C.A. § 543(d) .....................................................................................................................49

Hart-Scott-Rodino Act, 15 U.S.C. §§ 18, 18a, 18a(i)(1)...............................................................33

M.G.L. ch. 93 § 4 ..........................................................................................................................52

## Other Authorities

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 335f (2d ed. 2002) ........................12

Cable Television Consumer Protection Act of 1992 .....................................................................33

Section 4 of the Clayton Act...........................................................................................................9

**Rules**

Fed.R.Civ.P. 8(a) ........................................................................................................50

Fed.R.Evid. Rule 1005 ...............................................................................................8

Fed.R.Evid. Rule 902(4)..............................................................................................8

Federal Rule of Civil Procedure 12(b)(6)....................................................................8

Rule 56 ........................................................................................................................8

57407.1

## INTRODUCTION

Plaintiffs, cable customers of Defendants (collectively, "Comcast"), filed this antitrust action seeking damages and injunctive relief for Defendants' imposition of horizontal market restraints and unlawful monopolization and attempted monopolization of the Boston cable market. In their Consolidated Amended Class Action Complaint ("Compl."), Plaintiffs plead a classic *per se* violation – the horizontal allocation of markets via "swap" agreements between competitors – as well as unlawful acquisitions further restraining trade in violation of § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act (Count I). Plaintiffs further plead unlawful monopolization (Count II) and attempted monopolization (Count III) by Defendants in violation of § 2 of the Sherman Act and § 5 of the Massachusetts Antitrust Act. Plaintiffs have suffered universally recognized antitrust injury: payment of higher cable prices caused by Defendants' antitrust violations. Each element of Plaintiffs' antitrust claims is set forth with specificity in the Complaint. Under established antitrust jurisprudence, Comcast's motion to dismiss must be denied.

## FACTS

This class action challenges Defendants' illegal conduct designed to eliminate and prevent competition in the cable industry in violation of federal and state antitrust laws. Compl. ¶ 1. Defendants have allocated the nation's regional cable markets among themselves through acquisitions of competitors and "swaps" of their cable customers in one geographic area for cable customers of their competitors in another. *Id.* By these actions, Defendants have acquired or maintained monopoly power in particular geographic regions, including the Boston, Massachusetts area. By moving out of competitors' clusters and arranging for the departure of competitors from their own regional markets, large cable companies, including Defendants, have

restrained trade and monopolized regional cable markets, including the Boston area cable market, now dominated by Comcast.  *Id.*

Defendants engaged in swaps of cable systems and subscribers in their respective monopoly markets in order to allocate and divide markets and customers and thereby maintain (and increase) their monopoly power, including in the Boston area cable market.  *Id.* ¶¶ 3, 53-55.  As part of the merger between Comcast and AT&T on November 18, 2002, Comcast acquired AT&T's cable subscribers and monopoly in the Boston area, furthering Defendants' willful acquisition and maintenance of monopoly power in the Boston area.  *Id.* ¶ 4.  In the merger, Comcast assumed, as a matter of law, AT&T's liability for its violations of antitrust laws, including AT&T's liability for such violations relating to the Boston area cable market and AT&T's allocation of cable subscribers.  *Id.* ¶ 4, 58, 59.  Defendants continue to acquire and swap cable customers with their competitors, again allocating cable customers with competitor cable companies and resulting in the further willful acquisition and/or maintenance of monopoly power in the Boston cable market.  *Id.* ¶ 5.  As a direct result of Defendants' antitrust violations, Plaintiffs allege, in each count and throughout their Complaint, that Defendants have charged Plaintiffs and members of the putative class supra-competitive cable prices in the Boston area cable market. *See, e.g.,* Compl. ¶¶  2, 6, 54, 62, 65-67, 91-92, 107.

## Violations of § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act (Count I).

In Count I, Plaintiffs allege Defendants violated § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act by restraining trade in the Boston cable market based on two grounds.  First, Defendants imposed horizontal market restraints by conspiring with and entering into agreements with competitors to eliminate actual and potential competition by "swapping" their respective cable television assets, including subscribers, with other cable companies.  These

57407.1

unlawful agreements included a swap between AT&T and Cablevision Systems Corp. ("Cablevision"), which closed on approximately January 8, 2001. *Id.* ¶55.b. Through this swap, AT&T obtained Cablevision and its 362,000 subscribers in and around Boston including 38 suburbs, and Cablevision received AT&T cable systems and subscribers in northern New York suburbs. *Id.* This swap agreement was contingent upon AT&T's completion of its acquisition of MediaOne, a large cable operator. *Id.* Defendants' market allocating swap agreement with Cablevision removed a competitor from Defendants' Boston market, making the competitor's return financially unattractive, if not wholly uneconomic, and further raised barriers to entry for other competitors. *Id.* ¶53.

Defendants' market allocating swap activity in the Boston cable market also included an attempted swap between AT&T and Charter Communications ("Charter"), announced December 1, 1999 and terminated July 6, 2000. *Id.* ¶ 55.a. Under this swap, AT&T was to obtain Charter cable subscribers including over 200,000 subscribers in and around Worcester, Massachusetts, and Charter was to receive AT&T cable systems and subscribers in other areas of the country. *Id.* In 2001, AT&T and Charter consummated a swap of different AT&T and Charter cable systems and subscribers located in other parts of the country. *Id.*[1]

Defendants conspired and entered into such market-allocating "swap" agreements for the purpose, and with the effect of, eliminating, suppressing and preventing actual and potential competition and unreasonably restraining trade in the Boston area cable market. *Id.* ¶¶ 11, 71.

Second, Plaintiffs allege that Defendants' acquisitions of competitor cable companies and subscribers in the Boston area cable market constitute contracts and conduct in restraint of trade

---

[1] Although the Boston AT&T-Charter swap was terminated approximately one and one-half years after its announcement, the understanding within the cable industry that the swap was pending and that Defendants would, through the swap, gain even greater market share in the Boston area had the effect of deterring potential competitors from entering the Boston area cable market and allowed Defendants to maintain their cable prices at, and increase their prices to, supra-competitive levels. Compl. ¶ 54.

57407.1

in further violation of §1 and §4 of the Sherman Act and the Massachusetts Antitrust Act, respectively. *Id.* ¶¶ 5, 51, 52, and 73. As an example, a significant acquisition by Defendants was AT&T's acquisition of MediaOne Group, Corp. ("MediaOne"), which closed on approximately June 15, 2000. *Id.* ¶ 52. Through this acquisition, AT&T obtained MediaOne's cable systems and subscribers, including about 1.5 million subscribers in and around Boston and neighboring parts of New Hampshire. *Id.* The swap agreement between AT&T and Cablevision, described above, was expressly contingent upon AT&T's completion of its acquisition of MediaOne. *Id.* ¶55.b. Through the interdependent MediaOne acquisition and the Cablevision swap, AT&T, which at that time was the largest cable provider in the country, gained approximately 2 million cable subscribers in the Boston area, making it AT&T's largest cluster. *Id.* ¶ 56. AT&T's president and CEO at the time, Daniel Summers, remarked to a *Boston Globe* reporter, "It's just neat to own Boston lock, stock and barrel." *Id.* ¶ 56. Further, as a result of the Comcast-AT&T merger on November 18, 2002, Comcast acquired AT&T's cable systems and subscribers in the Boston area market. *Id.*

As a result of Defendants' unlawful conduct, competition, including price competition, for cable services has been restrained, suppressed and/or eliminated; actual and potential competitors have been removed, and will continue to be restrained from entering Comcast's Boston cable market; entry barriers have been raised to actual and potential competition; and Defendants have increased prices for cable programming services to artificially high, supra-competitive levels. *Id.* ¶ 62, 98.

**Violations of § 2 of the Sherman Act & § 5 of the Massachusetts Antitrust Act (Count II).**

Plaintiffs allege that Defendants have engaged in unlawful monopolization in violation of § 2 of the Sherman Act and § 5 of the Massachusetts Antitrust Act. The relevant geographic

57407.1

market is Comcast's Boston cluster, defined as Comcast's cable franchises located in Boston, and geographically contiguous areas or areas in close geographic proximity in designated counties. *Id.* ¶¶ 12, 31.a(2). The relevant product market is multichannel video programming services. *Id.* ¶¶ 12, 76. Comcast possesses monopoly power in the relevant product and geographic markets. Plaintiffs allege that Comcast controls approximately 94.6% of the relevant product market within the relevant Boston area geographic market. *Id.* ¶ 77.

Plaintiffs further allege that Defendants have willfully obtained or maintained monopoly power through exclusionary anticompetitive conduct (Compl. ¶¶ 12, 78-96), including (1) Defendants' imposition of horizontal market allocations through "swap" agreements, unlawful as a *per se* violation of §1 of the Sherman Act and §4 of the Massachusetts Antitrust Act (*id.* ¶¶ 12, 79-81); (2) Defendants' acquisitions of competitor cable companies and their subscribers in the Boston area cable market, which Plaintiffs challenge as unreasonable restraints of trade under a rule of reason analysis (*id.* ¶¶ 12, 73, 81); (3) Comcast's refusal to provide competitors access to essential video programming controlled by Comcast and needed by competitors to compete in the relevant geographic market, including Comcast's denial of access to New England Cable News ("NECN") to unaffiliated cable companies that directly compete with Comcast in the Boston cable market, while allowing access to unaffiliated cable companies in the New England area that do not directly compete with Comcast (*id.* ¶¶83-85); (4) engaging in discriminatory, non-uniform, highly discounted pricing practices aimed at areas in which competitor cable companies operate (*id.* ¶¶12, 86-92); and (5) disconnecting cable lines entering consumers' homes that are provided by competitor cable companies (*id.* ¶¶ 12, 93-94).

Through such anticompetitive, exclusionary conduct, Defendants have excluded actual and potential competitors from the relevant geographic market, Comcast has acquired and

57407.1

maintained monopoly power in the relevant markets, and Plaintiffs and class members have been compelled to pay higher cable prices than they would have paid absent Defendants' alleged unlawful conduct. *Id.* ¶¶ 13, 81, 82, 85, 89, 90, 91, 92, 97, 98, 99 and 102.

## Attempted Monopolization (Count III).[2]

Plaintiffs allege that Defendants engaged in the alleged anticompetitive conduct with the specific intent to monopolize the Boston cable market. Defendants' conduct demonstrates a dangerous probability of achieving monopoly power in the relevant markets. Defendants' attempt to monopolize violates §2 of the Sherman Act and §5 of the Massachusetts Antitrust Act. Plaintiffs have been injured in their business or property by Defendants' attempted monopolization by paying higher cable prices as a result of Defendants' unlawful conduct. *Id.* ¶¶12, 13, 103-107.

## JUDGE PADOVA'S DECISION DENYING DEFENDANTS' MOTION TO DISMISS

In a mirror image of this case, the Honorable John R. Padova has denied in its entirety Comcast's similar motion to dismiss. *Glaberson v. Comcast Corp.*, No. 03-6604, 2006 WL 2559479 (E.D. Pa. Aug. 31, 2006). There, like here, plaintiff cable subscribers of Comcast, also represented by the undersigned counsel, brought an antitrust action for damages and injunctive relief arising from Defendants' alleged restraints of trade in Comcast's Philadelphia and Chicago area cable markets, through unlawful market allocating swap agreements and acquisitions, and the unlawful monopolization and attempted monopolization of those cable markets.[3] Judge Padova rejected each of the arguments Defendants advance here.

---

[2] Count III is inadvertently styled as "Count IV" in the Complaint.
[3] Attached to the Declaration of Jessica N. Servais as Ex. 1 is a copy of the Third Amended Class Action Complaint filed in the *Glaberson* action, alleging similar facts and challenging similar conduct by Defendants based upon the same legal theories set forth in this action.

57407.1

In *Glaberson*, as here, Defendants argued that plaintiffs lacked antitrust standing. Judge Padova rejected Comcast's position, finding that plaintiffs had established antitrust standing under Supreme Court precedent. *Glaberson* at *5-6. There, as here, Defendants argued that plaintiffs failed to show a casual connection between the challenged conduct and plaintiffs' injury of paying higher cable prices, because plaintiffs purportedly failed to plead adverse competitive impact. Judge Padova disagreed, finding that the complaint "pleads a reduction of actual and prospective competition . . . that was the intended result of the challenged swap agreements and acquisitions." *Id.* at *5. There, as here, Comcast argued that plaintiffs lacked antitrust standing with respect to Comcast's conduct toward a competitor (there, RCN), because the competitor was supposedly the more direct victim. Again, Judge Padova rejected Comcast's argument, finding that "[t]he fact that Comcast's conduct harmed RCN and potentially RCN's customers, as well as Plaintiffs, does not deprive Plaintiffs of their antitrust standing." *Id.* at *7 (citations omitted). There, as here, Comcast argued that the court should not accept plaintiffs' "bald, conclusory" allegations and characterization of the swap agreements as horizontal market allocations. Judge Padova was unpersuaded, holding that plaintiffs sufficiently alleged "that the swap agreements are horizontal market allocations subject to the per se rule" and that their complaint "states a claim under §1 of the Sherman Act." *Id.* at * 10. There, as here, Comcast argued that plaintiffs failed to properly plead relevant geographic markets and valid monopolization and attempted monopolization claims. Again, Judge Padova rejected Comcast's position, finding plaintiffs' complaint set forth valid claims under § 2 of the Sherman Act. *Id.* at *12.

57407.1

Judge Padova's thorough, well-reasoned opinion provides a road map to aid the Court's analysis here. Unless long recognized antitrust principles are to be ignored, the same destination – denial of Defendants' motion to dismiss –should be reached here.

## ARGUMENT

### I.    Legal Standard for a Motion to Dismiss.

In considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true the factual allegations in the Complaint and draw all reasonable inferences in Plaintiffs' favor.[4] *Coyne v. Somerville*, 972 F.2d 440, 442-43 (1st Cir. 1992); *Quaak v. Dexia, S.A.*, No. 03-11566-PBS, 2006 U.S. Dist. LEXIS 54740, at *7 (D. Mass. Aug. 8, 2006). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The dismissal standard is even higher in antitrust cases. The Supreme Court has instructed that dismissals prior to discovery should be granted "very sparingly" in antitrust cases, particularly where, as here, the relevant proof is in the hands of the defendant. *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976); *Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962) ("summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."). "In antitrust cases . . ., dismissals prior to

---

[4] "Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56." *Waterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *Kling v. Fidelity Mgmt. Trust Co.*, 270 F.Supp.2d 121, 127 (D. Mass. 2003). Additionally, to be considered official public records within one of the narrow exceptions to the general rule, documents must be authenticated (*see Kinsella v. Wyman Charter Corp.*, 417 F.Supp.2d 159 (D. Mass. 2006)), which requires that they be certified (*see* Fed.R.Evid. Rule 902(4) and 1005 ). Defendants' exhibits are neither authenticated, certified or complete documents, nor are they relevant at this motion to dismiss stage. As Judge Padova noted, "[w]hen deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may look only to the facts alleged in the complaint and its attachments." (citation omitted). *Glaberson* at *2. Plaintiffs therefore object to Comcast's improper submission of documents outside of the pleadings. *See* Decl. of Alycia Regan Benanati and attached exhibits submitted with Defendants' motion to dismiss.

giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F.Supp.2d 196, 212-13 (D. Mass. 2004) (citation omitted).  Additionally, "the existence of 'antitrust injury' is not typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995). As the First Circuit has explained:

> At the Rule 12(b)(6) stage, we cannot conclude that the alleged antitrust activities could not be proven to be a but-for cause of the harm the consumers allegedly suffered. . . .  Such causation issues are often decided at summary judgment, not on the pleadings, precisely because they depend on some factual development.

*Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 73 (1st Cir. 2005).

**II.**      **Plaintiffs Have Antitrust Standing.**

Contrary to Defendants' contention, Defs.' Mem. at 10-11, 13-16, 28-29, Plaintiffs have set forth the paradigm example of antitrust standing – higher prices paid by Plaintiffs as cable subscribers as a result of Defendants' antitrust violations.

**A.**      **Plaintiffs as Consumers Have Suffered Antitrust Injury by Paying Supra-Competitive Prices As a Result of Defendants' Antitrust Violations.**

Section 4 of the Clayton Act provides:  "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore. . . ." *Id.*  In *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), a hearing aid consumer alleged that hearing aid manufacturers violated §§ 1 and 2 by, *inter alia*, restricting the territories, customers and brands of hearing aids offered by their retail dealers.   The consumer had antitrust standing "because the price of a hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct." *Id.* at 342.   Similarly, in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), plaintiff, a health plan subscriber, brought an antitrust class action against a health insurer and an association of psychiatrists.  Plaintiff alleged that defendants refused to reimburse subscribers for psychotherapy performed by a psychologist, while providing reimbursement for

57407.1

treatment from a psychiatrist.  The Court rejected defendants' argument that because plaintiff

alleged a conspiracy directed at psychologists and not at health plan subscribers, only

psychologists could sue.  The Court made clear that the treble damages remedy is not limited to

competitors, but extends to consumers, *id*. at 479, and held that the consumer's unreimbursed

payment for services conferred antitrust standing:

> McCready charges Blue Shield with a purposefully anticompetitive scheme.  She
> seeks to recover as damages the sums lost to her as the consequence of Blue
> Shield's attempt to pursue that scheme.…Although McCready was not a
> competitor of the conspirators, the injury she suffered was inextricably
> intertwined with the injury the conspirators sought to inflict on psychologists and
> the psychotherapy market.  In light of the conspiracy here alleged we think that
> McCready's injury 'flows from that which makes defendants' acts unlawful'
> within the meaning of *Brunswick*, and falls squarely within the area of
> congressional concern.

*Id.* at 483-84.   The First Circuit has followed the Supreme Court's standing analysis in

*McCready.  See Sullivan v. Tagliabue*, 25 F.3d 43, 48 (1st Cir. 1994).

"Antitrust injury" is "injury of the type the antitrust laws were intended to prevent and

that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-

O-Mat, Inc.,* 429 U.S. 477, 489 (1977).  Higher prices paid as a result of antitrust violations

constitute antitrust injury.  *See, e.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S.

481, 491 (1968) (stating "the general principle that the victim of an overcharge is damaged

within the meaning of § 4 to the extent of that overcharge").  Indeed, the body of law recognizing

that consumers have antitrust standing is overwhelming.[5]  Higher prices paid by consumers as a

---

[5] *See, e.g., Arroyo-Melecio*, 398 F.3d at 72 ("plaintiffs here are consumers and as such are presumptively favored as appropriate plaintiffs to assert antitrust injury."); *SAS of P.R., Inc. v. P.R. Tel. Co.,* 48 F.3d 39, 44 (1st Cir. 1995) ("the presumptively proper plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market.") (internal citation omitted); *Serpa Corp. v. McWane, Inc.,* 199 F.3d 6, 10 (1st Cir. 1999) ("[c]ompetitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."); *N. Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 811 (S.D.N.Y. 1986) (holding cable television subscribers' association alleging overcharges had antitrust standing, since "consumers have standing when they are injured as a result of a defendants' improper exclusion of competitors from the market." (citation omitted)).

57407.1

result of an agreement among firms to divide markets is a well-recognized example of antitrust

injury. *See, e.g., Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) (concluding that horizontal

allocation of market resulting in price increase violated § 1).

The Complaint alleges exactly this textbook example of antitrust injury. As a direct

result of Comcast's unlawful conduct, Plaintiffs and members of the class have paid supra-

competitive cable prices in the Boston area cable market. Compl. ¶¶ 2, 6, 13, 54, 60, 62 c., 65-

67, 74, 91, 92, 98.c., 102, 107.

**B.      Plaintiffs Have Clearly Pled That Defendants' Antitrust Violations
          Eliminated and Reduced Competition in the Boston Cable Market.**

Comcast's core argument against Plaintiffs' antitrust standing rests on the mistaken

assertion, contradicted by the facts actually pled, that Plaintiffs have not properly alleged

competition between the parties to the challenged transactions, or an adverse effect upon

competition. Defs.' Mem. at 1, 2, 11-16. Defendants are wrong as a matter of law and fact. The

issue of anticompetitive market effect plays no part in analyzing a plaintiff's antitrust standing:

> It is important to distinguish here between the antitrust injury a plaintiff must
> allege to successfully establish antitrust standing and the anti-competitive market
> effect element of a Sherman Act claim, which is also frequently referred to as
> antitrust injury. . . . [F]or purposes of a standing inquiry, the proper question is not
> whether the complaining party has alleged the elements of a per se, rule of reason,
> or other antitrust claim, but rather, whether that party has alleged an injury to
> itself that is a matter of antitrust concern.

*Yangtze Optical Fibre v. Ganda, LLC*, No. CA 04-474ML, 2006 WL 1666180, at *3 (D.R.I. June

9, 2006) (citing *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 n.2 (3d Cir. 1999)); *see

also McCready*, 457 U.S. at 482 (finding that plaintiff was not required to allege anticompetitive

market effect to establish antitrust injury). Moreover, "the existence of 'antitrust injury' is not

typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869,

876 (3d Cir. 1995). As Judge Padova stated, for purposes of a motion to dismiss, "we assume as

11

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

true the statements in the [complaint] that Comcast's conduct threatened competition in the

relevant markets." *Glaberson* at *4. "'To test standing in a private suit, therefore, the court

should assume the existence of a violation and then ask whether the [standing elements] are

shown.'" *Id.* (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 335f (2d ed.

2002)).

While anticompetitive market effect is irrelevant to standing, Plaintiffs have nevertheless

repeatedly alleged that the parties to the swap agreements and unlawful acquisitions were

horizontal competitors and that the challenged transactions removed actual and potential

competitors from the Boston cable market.[6]  Unable to ignore these specific allegations of prior

competition, and the elimination of competition via Defendants' swaps and acquisitions,

Comcast weaves of whole cloth the notion that Plaintiffs have no antitrust standing because they

do not allege "that AT&T Broadband provided cable service in any of the franchise areas

serviced by the counterparties to the Cable System Transactions (or the aborted swap with

Charter) prior to those transactions." Defs.' Mem. at 12 (emphasis added).  In short, Defendants'

unsustainable position is that standing here requires a showing that Defendants competed in the

same franchise areas where AT&T or Comcast acquired systems through a swap or acquisition.

*Id.*

---

[6] For example, the Complaint alleges that Defendants acquired and/or swapped cable customers through purchases or swaps of cable systems and subscribers from "their competitors" (Compl. ¶ 5); Defendants imposed horizontal market restraints by conspiring with and entering into agreements "with competitors to eliminate actual and potential competition from them and other competitors by exchanging or 'swapping' their respective cable television assets, including subscribers." (*id.* ¶ 11); "[t]hrough the imposition of such horizontal market restraints, Defendants have been able to avoid and have restrained and suppressed meaningful competition . . . ." (*id.* ¶ 11); before combining, "AT&T and Comcast were two separate, independent owners and operators of multiple cable systems, operating and competing with one another at the same level of competition in the cable industry." (*id.* ¶ 25); "[t]hrough these swap agreements, Defendants' sought to obtain and obtained competitors' cable systems and cable subscribers in Comcast's Boston cluster. . . . (*id.* ¶ 53); and that the swaps "physically removed actual and potential competitors from the Comcast Boston cluster, making the competitors' return to those areas financially unattractive if not wholly uneconomic, and further raised barriers to entry for other competitors" (*id.* ¶ 53).

57407.1

For several reasons, Defendants' argument must be rejected.  First, as discussed, *supra,* the issue of anticompetitive market effect is irrelevant and simply not a part of antitrust standing analysis.  Second, Defendants' own conduct defeats their argument.  AT&T's swap agreement with Cablevision was subject to a noncompete agreement restricting competition between AT&T and Cablevision.  Compl. ¶64.  Why in the world would AT&T bargain for and pay value for a noncompetition provision if it did not view Cablevision as a competitor?  In light of AT&T's own view then of Cablevision as a competitor, Defendants' argument now that Cablevision was somehow not a competitor if the two companies did not share any overlapping franchises defies common sense and self-destructs upon its making.

Third, Comcast's view of competition is far too narrow.  Adoption of Comcast's argument would insulate from liability Comcast and other large cable operators who willfully acquire or maintain monopoly power within a franchise in which the monopolist has successfully excluded or prevented competitors from entry.  Under its view, Comcast would be free to conspire with and allocate markets through swap agreements with competitors, provided that their pre-existing franchise areas did not overlap.  There is no basis in law or logic for Comcast's position.

Fourth, Comcast's argument is directly contradicted by the allegations in Plaintiffs' Complaint establishing that Comcast's market-allocating swap agreements in the Boston cable market removed or attempted to remove competition and further raised barriers to entry by potential competitors.

Fifth, Comcast's untenable position ignores the marketplace consequences of Defendants' alleged antitrust violations.  The challenged swap and acquisitions removed competitors or potential competitors from the Boston area cable market.  The removal of

57407.1

competition removed a check on Defendants' ability to raise their cable prices. The implemented market-allocating swap agreement (with Cablevision) and attempted swap (with Charter), by obtaining or seeking to obtain a competitor's sole means of competing (including its subscriber base, franchises, transmission facilities, employees and intellectual property), inevitably eliminated or sought to eliminate the competitor from the Boston area market. The unlawful swaps and acquisitions further suppressed competition and restrained trade by increasing the already high barriers to entry by competitors. Compl. ¶¶ 60-62. As a result, Defendants' conduct, actual and potential competitors were removed from, and Defendants were able to raise prices within, the Boston area cable market. *Id.*

Sixth, Plaintiffs allege a universally recognized form of antitrust injury – payment of supra-competitive prices as a result of Defendants' antitrust violations. Comcast's argument would lead to the absurd result that neither Plaintiffs, nor any Comcast cable customer, could ever challenge such supra-competitive prices, directly flowing from antitrust violations, unless Comcast (or its predecessor, AT&T) previously competed exactly within another cable company's franchise area. Adoption of Comcast's argument would jettison established antitrust standing jurisprudence.

Seventh and definitively, Comcast cannot demonstrate why an allegation of actual past competition between it and a competitor involved in an unlawful swap or acquisition is necessary. It is not. *McCready*, 457 U.S. at 482 ("[A] § 4 plaintiff need not 'prove an actual lessening of competition in order to recover'" (quoting *Brunswick*)). Indeed, it is the very nature of a horizontal market allocation agreement to avoid competition, to foreclose it – and to never have to actually compete directly. *See, e.g., United States v. Topco Assocs., Inc.*, 405 U.S. 596

14

(1972) (finding *per se* violation of § 1 where defendants had never competed in the same market, but had simply agreed to allocate markets).

Defendants' further argue that the Complaint alleges that "a second cable company can only compete with the incumbent by becoming an overbuilder" and that Comcast and other parties to the challenged swaps and acquisitions were not overbuilders. Defs.' Mem. at 3, 12-13. Defendants' argument mischaracterizes Plaintiffs' Complaint, makes no economic sense and is frivolous. Nowhere in their Complaint do Plaintiffs allege that only overbuilders are competitors. In none of the many paragraphs of the Complaint alleging a reduction in **competition** and **competitors** do Plaintiffs pin their antitrust claims on the presence or absence of overbuilders. In fact, the Complaint specifically alleges that Defendants' unlawful conduct "raised entry barriers to actual and potential competition, including from overbuilder competitors and from former competitors that ceased or reduced cable operations and sold or abandoned infrastructure necessary to effective competition in the Boston cluster." Compl. ¶¶ 62.b, 98.b. The Complaint repeatedly alleges that actual and potential **competitors** (not overbuilders) were removed from the Boston cluster as a result of Defendants' violative swap and acquisition conduct. *See, e.g.,* Compl. ¶¶ 1, 3, 5, 11, 13, 51, 55-56, 60, 62-63, 69, 73, 98.

Moreover, each of the competitors eliminated by Comcast's alleged antitrust violations were clearly horizontal competitors. Through such competition-reducing conduct, a monopolist is able to achieve its goals by excluding competitors and increasing its prices to levels higher than those that could be achieved in a competitive market:

> [B]asic economic theory predicts that the artificial absence of competition leads to less competitive prices. A firm creates barriers to market entry, such as exclusion of a competitor from a territory, in order to secure market power and charge prices above the prevailing market price under competitive conditions. This is one of the primary reasons that market allocation, like price-fixing, is considered a *per se* Sherman Act violation.

15

*In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 90 (E.D. Pa. 2003) (citations omitted).   Additionally, as Judge Padova concluded, "[w]e need not consider whether Comcast's actions should be considered 'competition neutral' absent allegations specifically concerning the elimination of overbuilders since, for the purposes of assessing antitrust standing, we assume as true the statements in the [complaint] that Comcast's conduct threatened competition in the relevant markets." *Glaberson* at \*4.

Plaintiffs, as subscribers who have paid higher cable prices as a result of Defendants' antitrust violations, have alleged traditional antitrust injury.

### C.    Comcast's Cited Cases are Inapposite.

Comcast challenges Plaintiffs' plain statement of antitrust injury by invoking inapplicable cases.  In *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998), the Third Circuit found that the restrictions on competition mandated by the applicable regulatory scheme broke any causal link between the defendants' conduct and the plaintiff's alleged injury. *West Penn's* facts are polar opposite to those before the Court.  Unlike the present case, the regulatory scheme in *West Penn* authorized territorial monopolies.  *Id.* at 260.  Additionally, the utilities' rates were subject to regulatory (PUC) approval.  *Id.*  Further, the *West Penn* court noted that "the comprehensive regulatory framework significantly restricts the nature of the competition which is permitted" and that "[w]e cannot know whether these two utilities will ever be permitted to compete for retail customers in a particular geographic region."  *Id.* at 263, 264.

The regulatory scheme for cable companies is entirely different.  The Cable Television Consumer Protection and Competition Act of 1992 and the Telecommunications Act of 1996 were enacted for the express purpose of promoting competition.  Compl.  ¶¶ 38, 39.  Far from granting territorial monopolies, the law specifically prohibits exclusive cable franchises.  47 U.S.C. §541(a)(1).  Other cable companies had franchises and were, in fact, present and

16

competing in the Boston cable market before they were either acquired by Defendants, or removed and excluded by Defendants' swap agreements. Compl. ¶¶ 51-59 (identifying the presence of MediaOne, Cablevision, and AT&T (prior to merging with Comcast in 2002)). Additionally, the FCC does not regulate the rates charged for non-basic cable services, which are determined by the cable companies themselves. Compl. ¶ 40. The Third Circuit has refused to apply *West Penn* where the regulatory scheme did not resemble the state-mandated monopoly in *West Penn*. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000). Judge Padova also distinguished *West Penn* for the same reasons. *Glaberson* at *5 n.4.

Comcast's reliance on *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 994 (D.C. Cir. 1977); *Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*, No. Civ. A. 03-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004); and *Amtrol, Inc. v. Vent-Rite Valve Corp.*, 646 F.Supp. 1168, 1177 (D. Mass. 1986), is equally misplaced. Those cases, in which the plaintiffs were purported competitors, are inapposite. Plaintiffs are not competitors, nor potential competitors but rather subscribers. For these reasons, Judge Padova properly rejected Defendants' same argument. *Glaberson* at *7 n.5.

Comcast also asserts that Plaintiffs must demonstrate injury to competition. Defs.' Mem. at 15-16. Defendants' cited cases actually reinforce Plaintiffs' antitrust standing. In *PSW, Inc. v. Visa USA, Inc.¸* No. C.A. 04-347T, 2006 WL 519670, at *7 (D.R.I. Feb. 28, 2006), the court stated that "[t]he antitrust injury requirement merely requires an allegation of loss or damage of the type the antitrust laws are intended to prevent and that flows from the allegedly unlawful acts." Judge Padova found that this is exactly what plaintiffs alleged:

> We also find that Plaintiffs' alleged injury, 'an increase in price resulting from the dampening from the competitive market forces[,] is assuredly one type of injury for which §4 [of the Clayton Act] potentially offers redress.' *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-483 (1982). The injury is one that flows from the

57407.1

challenged swap agreements and acquisitions, in that Comcast's ability to raise its cable prices stemmed from the purported deliberate lessening of competition achieved through these transactions.

*Glaberson* at *5. In *Wojcieszek v. New England Tel. & Tel. Co*., 997 F.Supp. 527, 535 (D. Mass 1997), the court stated that a complaint must allege actions that "harm the competitive process" and that if that is "alleged" or is "fairly inferable from the complaint," a viable antitrust claim is established. Plaintiffs have alleged harm to the competitive process. *See, e.g.,* Compl. ¶¶ 60-63. As Judge Padova correctly found, plaintiffs' complaint "pleads a reduction of actual and prospective competition . . . that was the intended result of the challenged swap agreements and acquisitions." *Glaberson* at *5.

      **D.**     **Plaintiffs Have Standing to Assert Their Claims Under § 2 of the Sherman Act and § 5 of the Massachusetts Antitrust Act Based on Defendants' Anticompetitive Conduct That Also Affects Competitors.**

Defendants also attack Plaintiffs' standing on grounds that Plaintiffs, as cable subscribers, cannot challenge conduct that also affects competitors.[7] Defs.' Mem. at 28-29. Defendants' argument is based on the misguided notion that Plaintiffs seek to recover damages **competitors** suffered as a result of Defendants' antitrust violations. They do not. Plaintiffs seek to recover damages **they** suffered. Defendants used this same argument in *Glaberson* to no avail. Judge Padova found that "RCN is not the more direct or 'superior' plaintiff to vindicate the public interest," and "Plaintiffs are direct victims because they purchased cable services straight from Comcast at the inflated prices generated through Comcast's purported antitrust

---

[7] In their monopolization and attempted monopolization claims under federal and state antitrust laws, Plaintiffs allege five independent anticompetitive practices of Defendants: (1) allocating territories, markets and customers via "swap" agreements with competitor cable companies; (2) acquiring competitor cable companies; (3) refusing to provide competitors access to essential video programming controlled by Comcast and needed by competitors to compete; (4) engaging in discriminatory, highly discounted, non-uniform pricing practices aimed at areas in which competitor cable companies operate; and (5) disconnecting competitors' cable lines. Plaintiffs allege that such conduct was designed to foreclose, eliminate and suppress competition and allowed Defendants to acquire or maintain monopoly power and exact supra-competitive cable prices from Plaintiffs and members of the putative class. Compl. ¶¶ 12, 13, 82-97.

violations." *Glaberson* at *5.  Plaintiffs have standing to challenge Defendants' anticompetitive

conduct relating to competitors because they have paid higher prices for Defendants' cable

service as a result of such conduct.

1.       **Plaintiffs Meet the First Circuit's Requirements for Standing.**

The following six-factors are relevant to antitrust standing:

(1) the causal connection between the alleged antitrust violation and harm to the
plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury
and whether the injury was of a type that Congress sought to redress with the
antitrust laws ("antitrust injury"); (4) the directness with which the alleged market
restraint caused the asserted injury; (5) the speculative nature of the damages; and
(6) the risk of duplicative recovery or complex apportionment of damages.

*Sullivan v. Tagliabue*, 25 F.3d 43, 46 (1st Cir. 1994) (quoting *Assoc. Gen. Contractors of Cal.,*

*Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529-35 (1983)).   Judge Padova carefully

analyzed the Third Circuit's similar five-factor test and concluded that plaintiffs established

antitrust standing.  *Glaberson* at *3-7.  Plaintiffs clearly have antitrust standing under the First

Circuit's test.

(a)       Defendants' Anticompetitive Conduct Proximately Caused
Plaintiffs to Pay Supra-Competitive Cable Prices.

An injury is the proximate and foreseeable result of an antitrust violation when the

challenged conduct causes the injury and that injury is the reasonably foreseeable result of such

conduct.  *McCready*, 457 U.S. at 479.  Plaintiffs meet the proximate causation requirement

where, as here, "the injury alleged [inflated cable prices] is so integral an aspect of the

conspiracy alleged [restraining trade in and monopolizing the Boston area market], that there can

be no question but that the loss was precisely the type of loss that the claimed violations . . .

would be likely to cause." *Id.*  (internal quotations omitted).  Plaintiffs meet the foreseeability

requirement because Comcast's anticompetitive conduct affecting competitors such as BELD

and RCN was part of "the very means by which it is alleged that [Defendants] sought to achieve

19

its illegal ends. The harm to [plaintiff] and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.*

      (b)      <u>Defendants Had an Improper Motive.</u>

The Complaint easily satisfies the improper motive component. Plaintiffs allege that Defendants' anticompetitive, exclusionary practices were for the purpose of "excluding, preventing or interfering with competition in the relevant market." Compl. ¶ 82.[8]

      (c)      <u>Plaintiffs' Injury is Precisely the Type that Congress Sought to Redress with Antitrust Laws.</u>

An injury reflects the anticompetitive effect of the challenged conduct when a plaintiff "seeks to recover as damages the sums lost to her as the consequence of [defendant's] attempt to pursue that [anticompetitive] scheme." *McCready*, 457 U.S. at 483. For example, "an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 potentially offers redress." *Id.* at 482-83. That is precisely the injury for which Plaintiffs seek damages. Indeed, Judge Padova recognized that Plaintiffs' injury (payment of inflated cable prices) is the type of injury traditionally protected by antitrust laws and flows from the challenged swap and acquisition conduct of Defendants. *Glaberson* at *5, 6.

      (d)      <u>Plaintiffs' Injury is Directly Traceable to Comcast's Anticompetitive Behavior.</u>

The directness of injury inquiry is "whether the injury resulting from excessive payment of . . . charges is directly traceable to the [defendant's] anticompetitive behavior." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167, 1168 (3d Cir. 1993), *cert. denied*, 510 U.S. 1091 (1994) (finding the requisite directness of injury and standing for the plaintiff steel

---

[8] For example, Plaintiffs allege that Defendants refused to provide competitors access to essential video programming needed by competitors in order to compete effectively "[i]n order to foreclose, eliminate and/or suppress competition." Compl. ¶¶ 83-85. Plaintiffs assert that Comcast's non-uniform, deep price discounts targeted to areas in which competitor cable companies operated were designed to "restrain, eliminate, preclude or suppress competition" and "prevent or destroy competition," and allowed Comcast to maintain its monopoly power and impose supra-competitive cable prices. Compl. ¶ 91.

companies where the ultimate end users (the steel companies) were forced to pay higher

transportation prices because the antitrust violators (the railroad companies) acted to close the

market to competitors). *Id.* at 1168. The *Glaberson* court found that "Plaintiffs' own cable bills

were higher because Comcast acted to restrain RCN, and Plaintiffs' injury is thus directly

traceable to Comcast's anticompetitive behavior." *Id.* at *7. As Judge Padova further reasoned,

"other direct victims exist, but their presence does not diminish the directness of the [Plaintiffs']

injury." *Id.* Precisely the same circumstances exist here. The ultimate end users of cable

television services (Plaintiffs) have been forced to pay higher cable prices because the antitrust

violator (Comcast) has acted to restrain competition from competitors (e.g., BELD and RCN).

Judge Padova's analysis is sound:

> RCN is not the more direct or "superior" plaintiff to vindicate the public
> interest. . . . Comcast allegedly acted to restrain competition from RCN in order
> to gain the ability to charge consumers inflated prices. Plaintiffs were, therefore,
> the ultimate target of Comcast's anticompetitive conduct towards RCN. As the
> Supreme Court found in <u>McCready</u>, where the injury to the consumer is
> "inextricably intertwined" with the injury the defendant sought to inflict on the
> relevant market, standing under § 4 of the Clayton Act is present. <u>McCready</u>, 457
> U.S. at 479, 483-84 (holding that plaintiffs' injury was not rendered remote
> merely because the alleged goal of the defendant was to halt encroachment by
> competitors and noting that the §4 "remedy cannot reasonably be restricted to
> those competitors whom [defendants] hoped to eliminate from the market.").

*Glaberson* at *7.

(e)    <u>Plaintiffs' Damages are Not Speculative.</u>

This is an overcharge case. Plaintiffs' damages will be measured by the amount of their

overpayment. In their pending motion for class certification in *Glaberson*, the plaintiffs have

provided expert testimony from John C. Beyer, Ph.D., demonstrating that two recognized,

accepted methodologies exist to quantify damages resulting from defendants' antitrust violations:

(1) the supra-competitive overcharge, which involves calculating the supra-competitive

21

57407.1

overcharge defendants' subscribers have paid because of the absence of effective competition; and (2) the supra-competitive rate of price increase, which compares the difference between the rate of cable price increases during the class period in the relevant geographic market with the rate of cable price increases during the same period by other cable companies outside of the relevant geographic market. Plaintiffs anticipate providing the Court with similar expert testimony at the appropriate time in this case. The fact that Plaintiffs claim economic injuries that are readily capable of calculation on a class-wide basis through established methodologies disposes of any contention that damages are speculative.

(f)     There is No Likelihood of Duplicative Recovery or Complex Apportionment of Damages Because Plaintiffs' Injuries Are Not Derivative of Those Suffered by Competitors.

Duplicative recoveries occur in the antitrust context only when either (1) an entity seeks to recover damages on behalf of other entities for which those other entities could recover themselves, *McCready*, 457 U.S. at 473-74, or (2) both direct and indirect purchasers are allowed to recover for the same violation. *Id.* Plaintiffs seek damages only for losses they, not competitors, have suffered. Unlike in *Verizon Comms. v. Trinko*, 540 U.S. 398 (2004), Plaintiffs are neither direct nor indirect purchasers of anything from the third-party competitor. As Judge Padova recognized, there is simply no risk of duplicative damages, precisely because Plaintiffs' injuries consist of overcharges directly paid to Defendants:

> Permitting Plaintiffs to proceed in this case does not pose the risk of duplicative damages even if RCN litigates its rights; Plaintiffs' injuries, which consist of overcharges, are distinct from RCN's injuries, which likely consist of lost profits. See McCready, 457 U.S. at 469 n.4, 474-75. Nor is there a risk of complex apportionment of damages since Comcast overcharged each Plaintiff through separate monthly bills and Comcast's billing records are easily recoverable.

*Glaberson* at *7.

2.    **The Fact That Anticompetitive Conduct May Also Harm Competitors Does Not Deprive Plaintiffs, as Injured Consumers, of Antitrust Standing**.

Simply because Comcast's unlawful conduct harms competitors, as well as consumers, does not deprive Plaintiffs of their antitrust standing.  In *N.Y. Citizens Comm.*, 651 F. Supp. at 812, plaintiff cable subscribers' association had antitrust standing based on its members having to pay higher cable prices, despite the fact that competitors excluded by the defendants' anticompetitive conduct could also challenge the alleged antitrust violations:

> Here, since the [plaintiffs] represent the ultimate consumers of the excluded product, who have perhaps the most to lose from higher prices, it is not necessary to wait for the programmers to bring suit.  The advantages of competition are ultimately to the benefit of the consumer, who should be able to bring such a suit to vindicate the purposes of the antitrust laws.

*Id.*  Likewise, in *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 398-99 (7th Cir. 2000), although the defendant's conduct also affected competitors, consumers, as direct purchasers of telephone services, had standing to challenge defendant's monopoly prices:

> [W]e think Ameritech is wrong to claim that the plaintiffs lack standing because they are attempting to raise third-party rights – the rights of the competitors ….  These plaintiffs want lower prices and more choice, and they claim that Ameritech (a monopolist) is doing things to prevent that from happening.  Their theory is a classic exclusionary acts theory, and in all such cases, the monopolist's alleged sin is the exclusion of other competitors from the market….The….plaintiffs do not care in principle which competitors enter their market; they just want a competitively structured local telephone market that will prevent Ameritech from inflicting antitrust injury on them.  We are satisfied that they are asserting their own rights, and thus have standing.

Judge Padova, invoking both *N.Y. Citizens Comm. On Cable TV* and *Goldwasser,* concluded that plaintiffs "sufficiently allege the elements of antitrust standing with respect to Plaintiffs' injuries stemming from Comcast's conduct towards RCN" and denied defendants' motion to dismiss "to the extent the motion disputes Plaintiffs' antitrust standing."  *Glaberson* at *7.  As the First Circuit has noted, "Plaintiffs here are consumers and as such are presumptively

23

favored as appropriate plaintiffs to assert antitrust injury." *Arroyo-Melecio*, 398 F.3d at 72; *see also Serpa*, 199 F.3d at 10-11 (same). Plaintiffs have suffered antitrust injury by paying higher cable prices as a result of Comcast's antitrust violations. Their injuries are precisely those that the antitrust laws were intended to redress. Clearly, they have antitrust standing.

### III.    Plaintiffs' Complaint Sets Forth a Valid Claim that Defendants' Swap Agreements and Acquisitions Violate § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act.

Plaintiffs' detailed Complaint alleges that Defendants' market allocating "swap" agreements with competitors, including AT&T's swap with Cablevision, violate § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act under a straightforward application of the *per se* rule long used by the judiciary in condemning such horizontal restraints of trade. Additionally, the Complaint pleads each and every element of a valid claim that Defendants' acquisitions (AT&T's acquisition of MediaOne and Comcast's acquisition by merger of AT&T's Boston area cable systems and subscribers) violate § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act under a rule of reason analysis.

Comcast nevertheless argues that Plaintiffs fail to state a § 1 claim because: (1) Plaintiffs have not demonstrated that Defendants' conduct falls within antitrust categories afforded *per se* treatment; (2) antitrust challenges to acquisitions are analyzed under the rule of reason; (3) Plaintiffs purportedly fail to define a relevant market;[9]  (4) Plaintiffs have not shown that Defendants' conduct was anticompetitive; and (5) the challenged transactions were approved or not challenged by government agencies.

---

[9] Defendants also challenge Plaintiffs' geographic market definitions for purposes of Plaintiffs' § 2 claims. For the Court's convenience, Plaintiffs address both of these unsound challenges in section IV.A., *infra*.

57407.1

A.    **Plaintiffs' Market Allocation Claim Alleges a Paradigm *Per Se* Horizontal Restraint of Trade.**

Comcast argues that Plaintiffs have not shown that Defendants' conduct falls within any *per se* unlawful categories.  Defs.' Mem. at 16-18.  On the contrary, Plaintiffs properly invoke the long established *per se* rule applied to market-allocating agreements among horizontal competitors.  Plaintiffs allege that Defendants' imposition of horizontal market restraints, by conspiring with and entering into "swap" agreements with competitors (including AT&T's "swap" agreement with Cablevision) violates § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act, including pursuant to the *per se* violation doctrine.  Compl. ¶¶ 11, 69-72.  The *per se* standard is applied to "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993); *Serv. Merch. Co., Inc. v. Boyd Corp.*, 722 F.2d 945, 950 (1st Cir. 1983); *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001) ("The classic cases are agreements to set prices, fix output or engage in horizontal market division.").  In fact, "where a plaintiff proves conduct that falls within a per se category, nothing more is needed for liability; the defendants' power, illicit purpose and anticompetitive effect are all said to be irrelevant." *Addamax Corp. v. Open Software Foundation, Inc.*, 152 F.3d 48, 51 (1st Cir. 1998) (citation omitted).

Horizontal agreements between competitors to allocate markets are classic *per se* § 1 violations:

> One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.  …This Court has reiterated time and time again that '[h]orizontal territorial limitations…are naked restraints of trade with no purpose

except stifling competition.' Such limitations are per se violations of the Sherman Act.

*United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (citations omitted); *see also Addyston Pipe & Steel Co. v. U.S.,* 175 U.S. 211 (1899); *United States v. Sealy, Inc.*, 388 U.S. 350 (1967); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) (per curiam) (reaffirming *Topco*); *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir 2001). As discussed, Defendants' argument that their swap agreements were not with competitors is wrong both factually and as a matter of law. Regardless, federal courts have repeatedly found horizontal non-price restraints, such as market allocations, illegal *per se*, whether between existing competitors or potential competitors. *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 11 (1st Cir. 1979), *cert. denied*, 446 U.S. 983, *reh'g denied*, 449 U.S. 893 (1980) (holding "agreement entered into between the two potential competitors constituted a territorial allocation of markets such as to bring it within the ambit of per se prohibition."). [10] Further, through their citation to *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1 (1958), Defs.' Mem. at 16, Defendants concede that the "division of markets" is within the types of conduct traditionally afforded *per se* treatment. [11]

---

[10] *See In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 86 (E.D. Pa. 2003) ("[M]arket allocation – the geographic division of markets among competitors—is a *per se* violation of the Sherman Act."); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1242 (3d Cir. 1975) (stating that by permitting franchisees to determine potential competitors in a given market, defendant's conduct "constitute[d] a horizontal market allocation" that was a *per se* violation of the Sherman Act); *United States v. Andreas*, 216 F.3d 645, 666-67 (7th Cir. 2000) (holding that market allocation among five competitors was a *per se* violation of the Sherman Act, despite the "clever characteristics that the conspirators hoped would help them avoid detection"); *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (finding agreement "to limit advertising to different geographical regions was intended to be, and sufficiently approximates an agreement to allocate markets so that the *per se* rule of illegality applies").

[11] Comcast's description of the challenged swap transactions as exchanges of assets is a label without significance. Defs.' Mem. at 3, 18. Asset exchanges can constitute illegal restraints of trade under § 1. *United States v. Radio Corp. of Am.*, 358 U.S. 334 (1959) (finding civil antitrust action challenging exchange of television stations was maintainable under the Sherman Act). Plaintiffs clearly allege and demonstrate that the swap agreement between AT&T and Cablevision constituted and effected the division of markets, territories and customers – the very conduct courts have historically treated as *per se* § 1 violations. *See e.g.,* Compl. ¶¶ 1, 3, 5, 7, 11, 53-55.

For example, applying the *per se* rule to a market allocation claim in the telecommunications industry, the court in *GTE News Media Servs., Inc. v. Ameritech Corp.*, 21 F.Supp.2d 27, 44 (D.D.C. 1998), upheld a claim that five regional Bell telephone companies allocated the Internet yellow pages market.   In *GTE*, the plaintiff telecommunications company alleged that the regional telephone companies, who were exclusive Internet yellow pages providers in their particular regions, agreed to allocate the Internet yellow pages market according to the regions in which each defendant provided telecommunication services.  *Id.* at 34.  Plaintiff's allegations were held sufficient to characterize the restraint as a horizontal agreement subject to the *per se* rule:  "Simply put, the challenged restraint involves competitors at the same level of distribution agreeing to allocate geographic territories and customers" (citation omitted)).  *Id.*

Defendants argue here, as they did in *Glaberson*, that the Court should not accept Plaintiffs' allegation that the swap agreements are horizontal market allocations.  Judge Padova disagreed:

> While courts should not credit 'bald allegations' even at the motion to dismiss stage . . . , we find that Count One's allegations that the swap agreements constitute horizontal market allocations are buttressed by descriptions in the Third Amended Complaint of the parties to the swap agreements, when the agreements were completed, and how the terms of the agreement serve to eliminate competitors from the Philadelphia and Chicago clusters and effectively preclude opportunities for entry and reentry.

*Glaberson* at *9.  Judge Padova determined that plaintiffs' complaint "sufficiently alleges that the swap agreements are horizontal market allocations subject to the *per se* rule" and that "Count One states a claim under § 1 of the Sherman Act."  *Id.* at *10.  Likewise, here, Plaintiffs allege that Defendants' "imposed horizontal market restraints by conspiring with and entering into and implementing agreements with competitors to eliminate actual and potential competition from

27

them and other competitors by exchanging or 'swapping' their respective cable television assets, including subscribers." Compl. ¶ 11; *see also* ¶¶ 3, 50, 53-55, 68-72 and 74. Plaintiffs' Complaint amply pleads a valid *per se* restraint of trade claim under established antitrust law.

 **B.** **Plaintiffs Allege That The *Per Se* Liability Rule Applies to Defendants' Unlawful Market-Allocating Swap Conduct.**

   Defendants' argument that the rule of reason should apply to acquisitions challenged as antitrust violations (Defs.' Mem. at 17-18) is unremarkable and provides no basis for its motion to dismiss.  Plaintiffs allege that Defendants' market-allocating swap conduct constitutes violations, including *per se* violations, of § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act. Compl. ¶¶ 11, 72. Plaintiffs separately allege that Defendants' acquisitions of competitor cable companies' subscribers in the Boston area cable market constitute contracts and conduct in restraint of trade in violation of § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act. *Id.* ¶¶ 11 and 73.  Judge Padova correctly read plaintiffs' complaint in *Glaberson*, which mirrors Plaintiffs' Complaint here, and rejected the same argument. *Glaberson* at *9.[12]

 **C.** **Comcast's Argument that the Challenged Transactions Produced No Anticompetitive Effects is Wrong.**

   Defendants improperly invoke a rule of reason analysis as to their challenged swap conduct and argue that Plaintiffs have failed to demonstrate anticompetitive effects.  The law on this point could not be more clear.  Since Plaintiffs have alleged a per se violation of § 1, the Court does not need to consider the alleged anticompetitive effects. *Addamax*, 152 F.3d at, 51

---

[12] Defendants claim that their acquisition and swap conduct constitute the kind of "corporate combinations" that are not subject to *per se* treatment. Defs.' Mem. at 17.  However, the form of the agreement to allocate markets is not determinative.  An agreement between competitors allocating markets remains a *per se* violation. *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 11 (1st Cir. 1979) ("joint ventures which partake of behavior identified as inherently pernicious to competition such as  price fixing or territorial allocations will be judged under the per se rule rather than under the rule of reason. The talisman of 'joint venture' cannot save an agreement otherwise inherently illegal."); *see also Palmer*, 498 U.S. at 48 (upholding *per se* treatment of a joint venture that was formed for the purpose and effect of raising prices).  Nevertheless, as demonstrated below (part III.E., *infra*), Plaintiffs state valid claims that Defendants' acquisition conduct unreasonably restrains trade under the rule of reason analysis.

(1st Cir. 1998); *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).  The swap agreements are

inherently anticompetitive.  Each swap transaction, consummated or not, allocated markets

between Comcast and a competitor and removed a competitor from Comcast's Boston area

market, or further illustrated Comcast's intent to allocate markets horizontally and monopolize

particular markets.  *See e.g. Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)

(§ 1 combination and conspiracy predicated on a "conscious commitment to a common scheme

designed to achieve an unlawful objective").  Unsurprisingly, Judge Padova held that similar

allegations against Comcast for the same type of horizontal market allocations were sufficient to

state a § 1 claim and that the court "need not consider Comcast's arguments that Count One fails

to plead an anticompetitive effect in a relevant product or geographic market under the rule of

reason." *Glaberson* at *10.

Nonetheless, Plaintiffs do allege that Defendants were able to increase cable prices in the

Boston cable market as a result of the swap agreements.  Compl. ¶¶ 2, 6, 11, 13, 54, 62, 65, 66,

67.  *See also Palmer v. BRG of Ga., Inc.*, 498 U.S. at 47 (noting that after competing firm left the

market, remaining firm's prices increased by 200 percent).  The Complaint alleges that the swap

agreements had a decidedly anticompetitive effect at the Plaintiffs' expense.  Further, Plaintiffs

repeatedly allege that the cable operators engaged in the swaps were Comcast's competitors.  *See*

*e.g.,* Compl. ¶¶ 1, 2, 5, 11, 36.a., 50, 51. 53.

Regardless, the Supreme Court has rejected the notion that illegal market allocations can

only occur where the two parties had previously competed in the same territory.  In *Palmer*, 498

U.S. at 49, the Court held that the lower courts "erred when they assumed that an allocation of

markets or submarkets by competitors is not unlawful unless the market in which the two

previously competed is divided between them." *Id*.  After noting that the "defendants in *Topco*

29

57407.1

had never competed in the same market, but had simply agreed to allocate markets," the Court

held that "[s]uch agreements are anticompetitive regardless of whether the parties split a market

within which both do business or whether they merely reserve one market for one and another

for the other."  *Id.* at 49-50.  *See also Engine Specialties, Inc.,* 605 F.2d at 11 (holding agreement

to allocate markets between potential competitors within ambit of *per se* prohibition).

Defendants also claim that the challenged transactions were "competition-neutral" in that

they "simply resulted in the substitution of one incumbent cable provider . . . for another" in

franchise areas in which Comcast had not previously competed with the incumbent cable

company.  Defs.' Mem. at 13.  On the contrary, Defendants' antitrust violations were anything

but competition-neutral.  As alleged, Cablevision was removed from the Boston area as a result

of AT&T's market allocating swap with Cablevision.  Compl. ¶¶ 53, 55.b., 56.  Therefore, that

swap agreement was not simply an exchange of one competitor with another.[13]  Indeed, if such a

"substitution" was so insignificant and "competition-neutral" as Defendants contend, why would

Comcast's predecessor in interest (AT&T's then President and CEO) have described the

combined result of the swap transaction and AT&T's acquisition of MediaOne as AT&T

"own[ing] Boston lock, stock and barrel."  Compl. ¶ 56.[14]

---

[13] Even if the swap agreements (Compl. ¶¶ 53-56) were improperly viewed as exchanges of one competitor for another competitor, the courts have categorically denied this defense to antitrust challenges.  *See, e.g., Fishman v. Estate of Wirtz,* 807 F.2d 520, 533-35 (7th Cir. 1986) (rejecting defendants' argument that substituting competitors does not injure competition); *see also Greenville Publ'g Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 397 (4th Cir. 1974) ("[T]he antitrust laws need not tolerate exclusionary conduct whenever it appears that only one competitor can survive the preliminary bout.")

[14] Comcast again relies on inapplicable cases.  In *Balaklaw v. Lovell,* 14 F.3d 793 (2d Cir. 1994), the plaintiff did not have antitrust standing because his claimed injury was based on "losing out in the competition for an exclusive anesthesiology contract . . . and nothing more."  *Id.* at 798.  The market had not changed, because anesthesiology services were exclusive before and after the agreement awarding exclusive services to an alternative provider.  The same fact pattern, involving a radiologist who previously had an exclusive relationship with a hospital but lost out when the hospital awarded the exclusive contract to another provider, was involved in *Coffee v. Healthtrust, Inc.,* 955 F.2d 1388 (10th Cir. 1992) (Defs.' Mem. at 23).  In contrast, here competitors have not simply been reshuffled as Comcast contends.  Plaintiffs allege Defendants' unlawful conduct eliminated effective competition in the Boston cable market and transformed it into a market now dominated by Comcast, whose antitrust violations reduced competition from actual and potential competitors and resulted in increased cable prices for Plaintiffs and members

30

The competition-reducing effect of Defendants' antitrust violations is further demonstrated by the obvious consequence that Cablevision, like other competitors removed from Comcast's regional markets through swap agreements, has not reentered or competed against Defendants in the Boston area cable market. Compl. ¶ 63. Plaintiffs allege that the swap agreements constitute unlawful horizontal restraints of trade and agreements to divide and allocate markets irrespective of express terms restricting reentry. However, AT&T's swap with Cablevision was subject to an express noncompete agreement or other provisions restricting competition between AT&T and Cablevision in the Boston cable services market. Compl. ¶ 64. Such agreements plainly do not, as Defendants argue, merely substitute one cable company for another. On the contrary, and as alleged, they expressly bar re-entry by the departing competitor (Cablevision), and indicate not only that Comcast considered the other cable provider (Cablevision) a competitor, but that explicitly precluding it from competing in the Boston area market was of significant value to Comcast.[15]

Judge Padova rejected Comcast's same argument, holding that the "allegations that the swap agreements constitute horizontal market allocations are buttressed by descriptions in the Third Amended Complaint of the parties to the swap agreements, when the agreements were

---

of the proposed class. Similarly, in *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115 (6th Cir. 1983), cited at Defs.' Mem. at 23, the court determined that the defendant utilities' exchange of rate information did not offend §1 or have an anticompetitive effect where the "parties stipulated that no competition exists among them." *Id.* at 1119. Here, by contrast, Plaintiffs repeatedly allege that competition in the Boston cluster was eliminated and suppressed by Defendants' antitrust violations.

[15] Comcast's argument that the noncompete provision contained in the swap agreement is purportedly reasonable in terms (Defs.' Mem. at 25) misses the point. Plaintiffs point to the non-compete provision as one indicia of Defendants' anticompetitive intent in entering into the Cablevision swap and of the swap's anticompetitive, competition-reducing effect. Further, Comcast's submission of an excerpt of the Cablevision swap agreement containing a noncompete provision and its attempt to interpret the terms of that provision are inappropriate at the motion to dismiss stage and, regardless, "not sufficient for [the court] to draw conclusions as a matter of law, even with respect to Comcast's arrangements with [the swapping parties]. . . ." *Glaberson* at * 9 n.10. Moreover, as the court in *Glaberson* concluded, "Count One [plaintiffs' §1 claim] does not necessarily depend upon the presence, or absence, of express covenants not to compete." *Id.* Indeed, the swap agreement between AT&T and Cablevision constitutes an unlawful horizontal restraint of trade and an agreement to divide and allocate markets independent of the existence of a noncompete provision.

31

57407.1

completed and how the terms of the agreements served to eliminated competitors . . . and effectively preclude opportunities for entry and reentry." *Glaberson* at *9. The same result should follow here.

> **D.**   **Defendants' Arguments Concerning Agency Actions and Inactions Fail as a Matter of Law.**

Defendants argue that Plaintiffs' § 1 claims should fail because the challenged transactions were allegedly approved "by authorities at the federal, state, and local levels." Defs.' Mem. at 23, 7.[16]  Defendants' argument is unavailing in the face of established law that a plaintiff has a right of action to pursue antitrust claims notwithstanding agency review and approval of the disputed transactions. *Otter Tail Power Co. v. U.S.,* 410 U.S. 366, 373 (1973) (holding that "a regulatory agency's approval of a merger or acquisition is no bar to an antitrust suit, even where the impact on competition is relevant to the agency's determination"); *Cableamerica Corp. v. FTC*, 795 F. Supp. 1082 (D. Ala. 1992) (holding that "[a]ntitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct" (citations omitted)).  There is no implied immunity from the antitrust laws even where an agency is directed by statute to consider competitive factors before approving mergers. *United States v. Philadelphia Nat'l Bank,* 374

---

[16] Comcast fails to cite any order or authority demonstrating that the FCC actually approved, for example, the challenged AT&T-Cablevision swap agreement.  Comcast purports to include in its exhibits "[e]xcerpts from regulatory approvals of transactions mentioned in the CAC," including FCC approvals of the AT&T /Cablevision swap.  Decl. of Alycia Regan Benanati at ¶ 3.  However, Comcast's exhibits regarding Cablevision are merely "Cable Television Relay Service" forms issuing consents to assignment of certain station locations between Cablevision and MediaOne of NewYork, Inc. and UACCMidwest, Inc., respectively.  Benanati Decl., Ex. 1(b). Contrary to Comcast's misrepresentation, Ex. 1(b) of the Benanati Declaration does not contain excerpts from an FCC regulatory approval of the actual AT&T-Cablevision swap transaction.  Additionally, the transfer of control of licenses between AT&T and Comcast in connection with the AT&T-Comcast merger in November 2002 is obviously not tantamount to an approval of the swap agreements.  *In the Matter of Applications for Consent to the Transfer of Control of Licenses from Comcast Corporation and AT&T Corp., Transferors, to AT&T Comcast Corporation, Transferee*, MB Docket No. 02-70, Memorandum Opinion and Order, released November 14, 2002 at ¶ 28.  Therefore, the fact that the FCC reviewed and approved the cable licenses transfer is irrelevant to Plaintiffs' allegations that Comcast violated federal and state antitrust laws via Defendants' swap and acquisition activities.

57407.1

U.S. 321, 350-51 (1963) ("Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored. . . .").

The FCC's order in connection with the AT&T/Comcast merger allowing the transfer of licenses in connection with the AT&T/Comcast merger, the DOJ's closure of its merger investigation, and purported scrutiny by federal agencies regarding the "MediaOne deal" (Defs.' Mem. at 7 n.6) have no legal significance to Plaintiffs' claims.  As a matter of law, neither the FCC's nor the DOJ's decisions have any effect on future claims of private antitrust plaintiffs.[17] Likewise, the DOJ did not "bless" the AT&T/Comcast merger, as Comcast suggests; rather, it simply closed its investigation under the Hart-Scott-Rodino Act, 15 U.S.C. §§ 18, 18a.  As the HSR Act makes clear, any decision by the DOJ or the FTC to close an investigation of a proposed merger or acquisition is not a substantive decision that the transaction complies with the Clayton Act or Sherman Act.[18]

Likewise, Defendants' assertion that the cable industry is "heavily regulated," Defs.' Mem. at 4, is puzzling given the undisputable fact that Congress has deregulated the industry. *See* Cable Television Consumer Protection Act of 1992, 47 U.S.C. § 541; Telecommunications Act of 1996, 47 U.S.C. § 251; Compl. ¶¶ 38-41.  Under the 1996 Act, and effective March 31, 1999, the FCC's authority to regulate rates for non-basic cable services terminated and cable rates are not regulated but are set by Defendants alone.  Compl. ¶ 40.

---

[17] While the FCC may consider issues of competition in its public interest determination, it is not an antitrust court, and its decisions have long been held to have no impact on later antitrust actions.  *See United States v. Radio Corp. of Am.*, 358 U.S. 334 (1959) (holding that United States was not precluded from bringing a civil antitrust action against RCA for swapping television stations even after the transaction had been approved by the FCC).  The Court held that while the FCC may consider antitrust policy in its determination of "the public interest, convenience and necessity," *id.* at 351, it "was not given the power to decide antitrust issues as such, and … Commission action was not intended to prevent enforcement of the antitrust laws in federal court."  *Id.* at 346; *see also First Del. Valley Citizens Tel., Inc. v. CBS, Inc.*, 398 F. Supp. 917 (E.D. Pa. 1975) (denying motion to dismiss complaint alleging that CBS's failure to lease a transmitter site was a *per se* violation of the Sherman Act, even though the FCC had determined that the refusal did not violate FCC rules).

[18]  A DOJ or FTC decision closing an investigation does not preclude any party from later challenging the transaction under the antitrust laws. 15 U.S.C. §18a(i)(1)

Comcast's argument that the presence of a regulatory scheme trumps the application of the antitrust laws to Comcast's conduct ignores the Supreme Court's contrary determination in *Verizon Comms. v. Trinko*, 540 U.S. 398 (2004), that the Telecommunications Act of 1996 expressly preserves the applicability of antitrust laws:

> Section 601(b)(1) of the 1996 Act is an antitrust-specific saving clause providing that 'nothing in this Act….shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.' This bars a finding of implied immunity. As the FCC has put the point, the saving clause preserves those 'claims that satisfy established antitrust standards.'

*Id.* at 406 (citations omitted).[19]  Judge Padova rightly concluded that "<u>Trinko</u> does not provide a basis for insulating claims based on well-established examples of anticompetitive conduct, such as horizontal market allocations, from judicial review" and that "[t]he mere fact that regulatory and law enforcement agencies may have reviewed and approved the challenged transactions is not ground for dismissal of Plaintiffs' claims." *Glaberson* at *10.

**E.  Plaintiffs' Complaint Sets Forth a Valid Claim that Defendants' Acquisitions of Cable Competitors Violate § 1 of the Sherman Act and § 4 of the Massachusetts Antitrust Act.**

As recognized by the Supreme Court, "it has long been clear that a pattern of acquisitions may itself create a combination illegal under § 1…." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *United States v. First Nat'l Bank and Trust Co. of Lexington*, 376 U.S. 665, 668 (1964) (concluding that the merger of two banks would result in "the elimination of significant competition" and "constitutes an unreasonable restraint of trade in violation of § 1 of the Sherman Act.")  *See also* Defs.' Mem. at 18 (noting the frequency with

---

[19]  Comcast's citation to *Texaco Inc. v. Dahger*, 126 S.Ct. 1276, 1280 (2006), Defs.' Mem. at 23,  is also unpersuasive.  Comcast cites footnote 1 of the *Dahger* opinion for the proposition that a joint venture is presumed lawful when it has been approved by federal or state regulators.  An examination of the entire footnote, however, makes clear that "there is no contention here that it [defendants' joint venture] is a sham."  *Id.* n.1.  In other words, the plaintiffs in *Dahger* never challenged the lawfulness of the joint venture in that case.  Plaintiffs here, of course, do challenge Defendants' unlawful swap and acquisition conduct.

57407.1

which "business combinations are challenged under the antitrust laws (and as Section 1 violations in particular)").

To establish a § 1 claim under the rule of reason, a plaintiff must prove: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. *Boston Scientific Corp. v. Schneider (Europe) AG,* 983 F.Supp. 245, 268-269 (D. Mass 1997). Plaintiffs have succinctly alleged a rule of reason claim as to Defendants' conduct unreasonably restraining trade by acquiring competitor cable companies in the Boston cable market, specifically including AT&T's acquisition of MediaOne in June 2000, and Comcast's acquisition through merger of AT&T's cable subscribers in the Boston area.  Compl. ¶¶ 49, 51, 52, 56, 57. Defendants concede that Plaintiffs have established the first element.  *See* Defs.' Mem. at  22. Plaintiffs have also established the three remaining elements.  Plaintiffs allege that the challenged conduct resulted in adverse, anticompetitive effects by Defendants acquiring competitor cable systems and subscribers, and raising barriers to competition, within the Boston market (Compl. ¶¶ 49, 51, 56, 57, 62); that the acquisitions were entered into for the specific purpose of restraining trade and creating unlawful monopolies (Compl. ¶¶ 4, 5, 49, 51, 73, 98); and Plaintiffs were forced to pay higher prices for cable services because of Defendants' concerted action than if effective competition existed.  *See, e.g.,* Compl. ¶¶ 6, 11, 61, 62, 65-67, 74.

Although Plaintiffs have obviously met their burden of pleading a § 1 rule of reason claim, such a showing is unnecessary on a motion to dismiss.  As Judge Padova held, because the

57407.1

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

*Glaberson* plaintiffs alleged the swap agreements were the result of concerted action and a proximate cause of their injuries, they had adequately alleged "horizontal market allocations subject to the per se rule." Therefore, "[w]e need not consider Comcast's arguments that Count One fails to plead an anticompetitive effect in a relevant product or geographic market under the rule of reason." *Glaberson* at *20-21 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3rd Cir. 2004), and *CSR Ltd. V. Fed. Ins. Co.,* 40 F.Supp.2d 559, 564 (D.N.J. 1998) ("At this early [motion to dismiss] stage of the proceeding, the court does not find it necessary to determine which mode of analysis [per se or rule of reason] it will ultimately employ in evaluating the defendants' activities.").)

## IV.     Plaintiffs' Complaint Alleges Valid Unlawful Monopolization or Attempted Monopolization Claims.

To state a monopolization claim under § 2, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp*., 384 U.S. 563, 570 (1966); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 195-96 (1st Cir. 1996). Plaintiffs' Complaint fully satisfies each element of a monopolization claim. The Complaint defines the relevant product market (multichannel video programming services), ¶ 10, and the relevant geographic market (Comcast's Boston cluster), ¶ 31.a(2), and alleges that Comcast possesses monopoly power, ¶¶ 76-77, and has willfully obtained or maintained its monopoly through numerous anticompetitive practices, ¶¶ 12, 78-94.[20]

To state an attempted monopolization claim, a plaintiff must establish "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to

---

[20] Defendants' anticompetitive conduct is summarized *supra,* n.8.

monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993); *Boston Scientific Corp. v. Schneider,* 983 F.Supp. 245, 268 (D.Mass.1997).  In Count III, Plaintiffs allege each of the elements of an attempted monopolization claim.  Compl. ¶¶ 103-107.

Defendants' argument that Plaintiffs lack standing to assert their attempted monopolization claim because they are consumers rather than competitors of Defendants is without merit.  The First Circuit has explicitly held in evaluating attempted monopolization claims that, "[c]ompetitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *Serpa Corp. v. McWane, Inc.,* 199 F.3d 6, 9-10, 12 (1st Cir. 1999) (concluding plaintiff lacked standing to assert attempted monopolization because it did not "bring its claim as either a competitor or a consumer but as a distributor."); *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.,* 48 F.3d 39, 44-45 (1st Cir. 1995) (holding with regard to supplier plaintiff's monopolization and attempted monopolization claims that "the presumptively 'proper' plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market."); *see also Abraham v. Intermountain Health Care Inc.,* --- F.3d ---, No. 05-4043, 2006 WL 2556357, at *13 (10th Cir. Sept. 6, 2006) (holding that optometrist plaintiff lacked standing to assert attempted monopolization claim against surgical facility since, competitors "and consumers of surgical facilities . . would be more directly harmed by [defendant's] alleged attempt to monopolize the market for surgical facilities.").  Consequently, the holdings in Comcast's cited cases are either inconsistent with, or superseded by, First Circuit law.[21]  Plaintiffs, as consumers, have standing to assert their attempted monopolization claim.

---

[21] Nonetheless, even under the reasoning stated in *Wojcieszek v. New England Tel. and Tel. Co.,* 977 F.Supp. 527 (D. Mass. 1997) (cited in Defs.' Mem. at 33), that "a consumer cannot obtain damages without showing that he

**A.    Plaintiffs Have Properly Defined the Relevant Geographic Market.**

Comcast contends that Plaintiffs have not properly pled geographic markets for their § 1 and § 2 claims.  Defs.' Mem. at 18-21, 26.  Plaintiffs alleging a *per se* violation of § 1 generally need not define a relevant geographic or product market.  *See, e.g., FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 432-36 (1990); *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958).  As they establish in section III.A., above, Plaintiffs assert a classic *per se* § 1 violation – horizontal  "swap" agreements that allocate or attempt to allocate customers and territories with competitors.  Although the relevant market properly pled in the Complaint applies to each of their claims, Plaintiffs have no obligation to specify the relevant market in order to state a § 1 claim.[22]  Where the conduct at issue plainly exerts anticompetitive effects on consumers without offsetting competitive benefits, plaintiffs may prevail without pleading and proving the relevant market.  *See, e.g., FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-61 (1986); *NCAA v. Bd. of Regents*, 468 U.S. 85, 110 (1984).  In this case, the customer and market allocations that Defendants achieved or attempted through agreements with competitors on their face restrict competition for cable subscribers in the Boston area market, afford no plausible benefits to consumers and, in fact, have resulted in higher prices for consumers.

Nonetheless, Comcast improperly attempts to argue the facts and merits of the relevant market inquiry, prematurely discussing limited overbuilding activity in Massachusetts

---

actually paid more than the competitive level" (*id*. at 535 (quotation omitted)), Plaintiffs have standing.  Plaintiffs explicitly plead as part of their attempted monopolization claim that they have paid, and continue to pay, supra-competitive prices due to Comcast's monopolizing conduct.  Compl. ¶ 107.

[22] *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055 (E.D. Pa. 1996), *aff'd*, 124 F.3d 430 (3rd Cir. 1997) (cited at Defs.' Mem. at 18), involved a tying claim, which does require definition of a relevant market in which the defendant holds market power.  There, franchisees accused Domino's of forcing them to buy pizza ingredients and supplies only from Domino's.  The tying claim failed "because the products within the proposed market [of Domino's franchisees] are interchangeable with products outside the proposed market." *Queen City*, 124 F.3d at 442.  *Queen City* provides no support for Comcast's argument that a non-tying, *per se* claim under § 1 requires plaintiffs to plead the relevant market.  *Eastern Food Services, Inc. v. Pontifical Catholic Univ. of Puerto Rico Serv. Ass'n., Inc.*, 357 F.3d 1 (1st Cir. 2004), is completely inopposite.  There, the First Circuit upheld dismissal of "essentially a contract dispute with possible attendant tort claim" and "not a plausible antitrust case." *Id*. at 3.  Nothing could be further from the case now before this Court.

communities, direct broadcast satellite operations and other competition issues in its motion to dismiss and asks the Court to resolve the relevant market question as a matter of law.  Defs.' Mem. at 19-20.  In antitrust cases, "market definition is a question of fact."  *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996); *see also Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003) (reversing district court's grant of motion to dismiss § 1 claim on market definition grounds, holding that market definition "cannot be resolved on the face of the complaint").  Indeed, "to survive a motion to dismiss, a plaintiff need only allege a 'plausible' market."  *N. Y. Jets, LLC v. Cablevision Sys. Corp.*, No. 05 Civ. 2875 (HB), 2005 WL 2649330, at *5 (S.D.N.Y. Oct. 17, 2005) (citation omitted).  The Third Circuit has also held "[t]he definition of the relevant geographic market . . . is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration."  *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311 (3d Cir. 1982).

    In any event, courts have routinely approved geographic market definitions that track a provider's service and/or franchise territory.  *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 369 (1973) (defining geographic market as "aggregate of towns in service area" of public utility); *TV Signal Co. of Aberdeen v. Am. Tel. & Tel. Co.*, No. Civ. 70-6N, 1981 WL 2049, at *1 (D.S.D. Mar. 13, 1981) ("In this case the Court finds that the city of Aberdeen constitutes the geographic area of most effective competition between TV Signal Company and Defendants."); *Recetas Por Menos, Inc. v. Five Development Corp.*, 368 F.Supp.2d 124, 132 (D.P.R. 2005) ("The geographic market can be defined as 'the market area in which the seller operates.'") (citation omitted).  In *Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555 (5th Cir. 1984) (en banc), *cert. denied*, 474 U.S. 1053 (1986), the Fifth Circuit upheld a jury finding that cable

operators conspired to exclude Affiliated Capital from competition for a cable franchise within

the City of Houston.  As in this case, the agreement to eliminate competition for any franchise

area within a specific territory in itself violated the Sherman Act.

Another court likewise defined a cable operator's franchise area as the relevant

geographic market under §§ 1 and 2 in *N.Y. Citizens Comm. on Cable TV v. Manhattan Cable*

*TV, Inc*., 651 F. Supp. 802 (S.D.N.Y. 1986).   There, plaintiff alleged that the incumbent cable

operator in lower Manhattan, MCTV, refused to grant Showtime and other providers access to

the incumbent's cable system within its franchise area.  Defendants moved to dismiss, arguing

that the plaintiff failed to allege relevant product and geographic markets.  The court denied the

motion, holding that MCTV's franchise territory defined "the geographic area where competition

occurs."  *Id.* at 807 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)).  The

court observed:

> The alleged refusal to deal eliminates all competition between programmers for
> consumers' dollars in lower Manhattan, whether or not HBO and Showtime
> compete effectively in other markets.  Within the area of the franchise, it is
> impossible for competing programmers, given the alleged violation, to enter the
> market and prevent HBO from charging noncompetitive prices to MCTV that
> may be indirectly passed on to consumers.  The very nature of the alleged
> violation defines the geographic market.

*Id.* at 807-08 (footnote omitted).  The same conclusion applies here.  The very nature of

Comcast's anticompetitive conduct – elimination of actual and potential competitors from its

franchise cluster in Boston– defines the relevant geographic market.[23]

---

[23] The court reached a similar result in *Storer Cable Comm., Inc. v. City of Montgomery*, 826 F. Supp. 1338 (M.D. Ala. 1993), *vacated upon settlement by* 866 F.Supp. 1376 (M.D. Ala. Sep. 27, 1993).  Montgomery Cablevision alleged that Storer Cable, the incumbent operator, had monopolized and conspired to monopolize "the retail cable television sales market in the Montgomery area" by inducing suppliers of cable programming – including ESPN and Turner Network – to refuse to deal with Montgomery Cablevision.  *Id.* at 1355.  Because Storer held a monopoly in the relevant product market, the court denied the defendants' motion to dismiss Montgomery Cablevision's §§ 1 and 2 counterclaims.  *Id.* at 1360.  Indeed, the defendants in *Storer Cable* did not "put forward any serious dispute" over the relevant geographic market.  *Id.* at 1354.

In this case, the relevant geographic market depends on where cable subscribers can realistically look for alternative cable services and where Comcast would effectively compete for cable subscribers in the absence of its monopolizing conduct. A subscriber who lives within the Comcast franchise footprint generally cannot obtain cable service from any other operator. Whether the Comcast subscribers have alternative sources of supply depends in part on the economic feasibility of rivals providing alternative cable service within Comcast's Boston cluster. Such inquiries present questions of fact, not a legal issue that a court may resolve on a motion to dismiss.

The purpose of defining a relevant market is to assist in determining whether a firm has market power. *SMS Systems Maint. Servs., Inc. v. Digital Equip. Corp.* 188 F.3d 11, 16 (1st Cir. 1999). The case on which Comcast primarily relies, *Discon Inc. v. NYNEX Corp*., 86 F. Supp. 2d 154 (W.D.N.Y. 2000), illustrates this purpose and does <u>not</u> help Comcast's effort to muddle the question of market definition. In *Discon* the plaintiff, Discon, claimed that NYNEX, violated §§ 1 and 2 by choosing an alternative supplier of "removal services," the dismantling and hauling away of telephone switching equipment. *Id*. at 156. Discon defined the relevant geographic market as NYNEX's service area and the relevant product market as removal services for NYNEX. The court rejected both definitions as ignoring the economic reality that Discon could and did sell removal services to other customers and that therefore NYNEX represented a fraction of demand for removal services within the area of effective competition. *Id*. at 162-63. NYNEX's service area in *Discon* simply was not a limiting factor in the relevant market for telecom removal services because Discon had other options outside the proposed geographic definition of that market for their service. In this case, by contrast, the geography of Comcast's service area, encompassing Plaintiffs' homes as within Comcast's Boston market,

41

does in fact limit Plaintiffs' options for the service at issue.  Comcast does not face meaningful

competition for cable subscribers within its franchise territories.  And, as Plaintiffs detail in their

Complaint, Comcast took as its very purpose, the tightening of its stranglehold on the Boston

market through swapping agreements (both consummated and aborted) and other anticompetitive

conduct.

Comcast further argues that Plaintiffs' geographic market definition is flawed because it

does not include other areas in the nation in which Comcast provides cable services, and does not

"account for" the presence of other competitors.  Defs.' Mem. at 19-20.  Comcast's position is

untenable.  The cable services market is particularly local in nature.  It does not matter in the

least to a Boston cable subscriber that Comcast, the monopolist cable company in the Boston

area market, also provides cable services in, say, Minnesota.  As even the FCC recognizes:

> Consistent with past practice, we will also treat the relevant geographic
> market, for purposes of evaluating possible horizontal effects, as local.
> Consumers make decisions based on the MVPD choices available to them
> at their residences . . .. We thus conclude that the relevant geographic
> market is the franchise area of a local cable operator.

*In the Matter of Applications for Consent to the Transfer of Control of Licenses from Comcast

Corporation and AT&T Corp., Transferors, to AT&T Comcast Corporation, Transferee,*  MB

Docket No. 07-70 ¶ 90 at 37.  Additionally, Comcast's argument that Plaintiffs' geographic

market definition fails somehow to "account for" competitors such as satellite cable providers,

telephone companies or municipal cable providers, is wrong.  Plaintiffs' proper geographic

market definition – Comcast's franchise areas located in Boston and geographically contiguous

areas, or areas in close geographic proximity to Boston, in designated counties –  has no such

effect.  Comcast will remain free, at the appropriate stage of the litigation, to attempt to show

whether effective competition exists in the relevant geographic market and that it does not, as

57407.1

Plaintiffs allege and Comcast has yet to deny, possess monopoly power in that market. But this is for another day, a later stage of these proceedings. *Coastal Fuels of Puerto Rico, Inc.*, 79 F.3d 187, 196 (1st Cir. 1996) ("Market definition is a question of fact.").

As Judge Padova held, "We find that deciding whether Plaintiffs' proposed relevant geographic market appropriately tracks Comcast's franchise territories requires a fact-intensive inquiry not appropriately conducted on a motion to dismiss and that the geographic market pled in Counts Two and Three of the Third Amended Complaint is sufficient to set forth valid claims under § 2 of the Sherman Act." *Glaberson* at *12. Thus, Plaintiffs, while not required to do so for purposes of their § 1 claims, have adequately defined proper geographic markets for both their §§ 1 and 2 antitrust claims. Defendants' request for a ruling on those definitions as a matter of law at this preliminary stage is inappropriate.

### B.    Comcast's Anticompetitive Conduct Also Affecting Competitors Violates § 2 of the Sherman Act and § 5 of the Massachusetts Antitrust Act.

Independent of and in addition to Defendants' anticompetitive conduct in entering into actual and attempted market allocation agreements and unlawfully restraining trade through acquisitions of competitor cable companies, Plaintiffs further allege that Comcast acquired and maintained monopoly power through additional anticompetitive acts that also affected competitors.[24]  Comcast maintains that such conduct does not violate § 2. Comcast, again, is wrong.

### 1.    Comcast's Restriction of Access to Essential Programming Was Designed to Prevent Competitors From Effectively Competing With Comcast.

As alleged, Comcast is a joint owner of the New England Cable News ("NECN"), one of the largest cable news networks in the country, serving over 2.7 million households in more than

---

[24]  *See supra*, n.8.

57407.1

850 communities located throughout New England. NECN offers a significant competitive marketing advantage that Comcast has publicly recognized by advertising that NECN is available only on Comcast. As Plaintiffs further allege, Comcast forecloses, eliminates and/or suppresses competition by denying access to NECN to unaffiliated cable companies directly competing with Comcast in the relevant geographic market, while allowing access to NECN by cable companies in the New England area that do not directly compete with Comcast. Compl. ¶¶ 83-85.

Comcast argues that antitrust laws do not "generally require" it to assist its competitors. Defs.' Mem. at 30. However, "the absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985). The Court in *Aspen* held that exercising the right to refuse to deal with other firms as a means of monopolization and without legitimate business justification violates § 2. *Id.* at 601-602. *See also Otter Tail Power*, 410 U.S. at 378 (holding defendant's refusal to sell power at wholesale and transfer power to the municipalities along the only power lines available constituted actionable refusal to deal); *LePage's v. 3M*, 324 F.3d at 153-54 (concluding conduct without a legitimate business purpose that makes sense only because it eliminates competition is anticompetitive).[25]  As alleged, as a means of maintaining its monopoly power Comcast

---

[25]  *See also MCI Comms. Corp. v. Am. Tel. and Tee. Co.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983) (AT&T's refusal to provide competitors with requested interconnections constituted an act of monopolization under § 2 where no legitimate business or technical reason was shown); *Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F. Supp. 486, 497-98 (S.D.N.Y. 1992) (upholding § 2 claim that defendant failed to cooperate with plaintiff in establishing a two-way roaming agreement on commercially reasonable and nondiscriminatory terms on the basis that defendant's refusal to deal was "motivated by anticompetitive animus."); *Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Group, Inc.*, No. 02-41010, 2004 WL 136091, at *10 (5th Cir. Jan. 27, 2004) (finding conduct was exclusionary because there was no valid business justification for defendant refusing to grant plaintiff a new contract for additional gas volume).

selectively allows other cable companies access to NECN only if they do not compete with it within the relevant geographic area.  Compl. ¶ 85.

Comcast's argument that it is not technically required to share programming which is offered terrestrially as opposed to via satellite, Defs.' Mem. at 31, is unavailing.  The Complaint alleges that Comcast withheld NECN to create and maintain its monopoly in the Boston cable market.  Compl. ¶ 85.  That Comcast denies access to NECN only to competitors within its Boston area market indicates that it is doing so to maintain its monopoly power.  Allowing it to continue to engage in such anticompetitive conduct simply because it is not *required* by the 1992 Act would permit Comcast to continue to foreclose competition and prevent competitors from obtaining essential programming demanded by cable subscribers.  Moreover, denying competitors access to such essential programming is a deliberate effort by Comcast, a monopolist, to discourage its customers from switching cable providers.  As such, Plaintiffs have properly alleged that Comcast's practices regarding access constitutes anticompetitive conduct in violation of § 2 of the Sherman Act and § 5 of the Massachusetts Antitrust Act.

Comcast's reliance on *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2nd Cir. 1990), for the proposition that it has no duty to assist its competitors  (Defs.' Mem. at 30), is misplaced.  In *Twin Laboratories*, the court rejected plaintiff's § 2 "essential facilities" claim and attempted monopolization claim, finding that defendant "at best had 25% of the relevant market and probably much closer to 10%." *Id*. at  570.  Here, Plaintiffs do not allege an "essential facilities" claim, but do allege that Comcast has monopoly power (approximately a 94.6% share of the relevant product market within the Boston area geographic market), Compl. ¶ 77, and that Comcast has acquired or maintained its monopoly power via anticompetitive means,

45

including discriminatory denials of access to programming that Comcast itself acknowledges provides a competitive advantage (*id.* ¶ 84).

Similarly, Comcast's citation to *Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 375 (7th Cir. 1986), Defs.' Mem. at 30, fails to support its position.[26] In *Olympia,* plaintiff, a Telex terminal equipment lessor, sued Western Union for liquidating its Telex terminal equipment business and exiting the market. The court found that defendant had not abused monopoly power, but rather had acted in a pro-competitive manner by first opening up the Telex equipment market to competition and then exiting it voluntarily. *Id.* at 374-75. Under such radically different facts, Judge Posner found no factual support for deviating from the general rule that a monopolist need not help its competitors. However, Judge Posner acknowledged that certain monopolistic refusals to deal, including those in which a monopoly supplier discriminates because a customer competes with it, do constitute exceptions to the general rule. *Id.* at 376-77. Additionally, Judge Posner stated that if the Supreme Court's decision in *Aspen Skiing*, recognizing an exception to the general rule, "stands for any principle that goes beyond its unusual facts, it is that a monopolist may be guilty of monopolization if it refuses to cooperate with a competitor in circumstances where some cooperation is indispensable to effective competition." *Id.* at 379. That is precisely what Plaintiffs allege here. Comcast's conduct of discriminatorily denying competitors needed access to NECN for the purpose of maintaining its monopoly power is clearly anticompetitive under § 2.

---

[26] Comcast's citation to *AT&T v. IMR Capital Corp.*, 888 F. Supp. 221, 247 (D. Mass. 1995), is itself a citation to *Olympia*, and was not included in the antitrust context but as part of a discussion of duty for a negligence claim. In contrast, here Plaintiffs have alleged that Comcast does abuse its monopoly power, competition is being harmed and Comcast is engaged in anticompetitive behavior.

2.    **Comcast's Additional Exclusionary Conduct Was Designed to Prevent Competitors From Effectively Competing With Comcast.**

Plaintiffs also allege that Comcast engaged in additional exclusionary conduct designed to keep competitors, such as RCN and BELD, out of certain areas where they were attempting to compete by (a) engaging in non-uniform pricing campaigns including deep price discounts aimed only at competitors' customers or Comcast customers considering switching to a competitor; and (b) disconnecting cable lines entering consumers' homes serviced by competitor cable companies.  Compl. ¶¶ 86-94.  Such exclusionary and anticompetitive conduct violates § 2 of the Sherman Act and § 5 of the Massachusetts Antitrust Act.

As alleged, Comcast did not provide notice of or publicly offer deeply discounted rates to new cable subscribers or any of its customers who did not attempt to change cable providers. Compl. ¶ 86.  Further, the Complaint alleges that Comcast engaged in a practice of offering its subscribers who contacted it to switch their cable service to a competitor a significant price discount if the customer agreed to stay with Comcast, and that such discounts were not offered, nor disclosed by Comcast, to other Comcast customers.   Compl. ¶ 87.  As one example, Comcast engaged in door-to-door visits to customers of competitor BELD in Braintree Massachusetts, offering unpublished, deeply discounted rates for a period of 16 months to BELD customers who switched to Comcast, but did not offer comparable rates to anyone else, and Comcast instructed its sales force not to leave copies of the written offer with BELD customers. After BELD complained to the Massachusetts Attorney General, the Massachusetts Department of Telecommunications and Energy and local franchising authority officials about Comcast's anticompetitive, non-uniform pricing practices, Comcast discontinued the offer. Compl. at ¶¶ 88-89.  Plaintiffs further allege that Comcast engaged in similar tactics to drive competitor RCN out of the Burlington, Waltham and Dedham Massachusetts areas with price offers discounted over

PDF Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

40%.  Compl. ¶ 90.  Plaintiffs also allege that Comcast has engaged in a practice during field audits of disconnecting competitors' cable lines entering the homes of competitor customers despite knowing that such cable lines belonged to the competitors and were clearly marked as such. Compl. ¶ 93.  Plaintiffs allege that these practices injured and caused Plaintiffs and class members to pay supra-competitive prices by allowing Comcast to maintain its monopoly power over the Boston area market. Compl. ¶ 91.

Exclusionary conduct is the creation or maintenance of a monopoly by means other than competition on the merits as stated in *Grinnell*.  *See Aspen Skiing*, 472 U.S. at 596 (attempting to exclude competition on grounds other than efficiency); *Town of Norwood v. New England Power Co.,* 202 F.3d 408, 420-21 (1st Cir.2000) ("The usual section 2 claim requires monopoly or near monopoly power in some market, and a wrongful exclusionary act designed to enhance such power in that market or to achieve an improper advantage in another market.").  "Conduct is exclusionary if it exceeds the needs of ordinary business dealings and unnecessarily excludes competition from the relevant market."  *Hewlett-Packard Co. v. Boston Scientific Corp*., 77 F. Supp. 2d 189, 197 (D. Mass. 1999) (holding allegations of an unreasonable refusal to cooperate were sufficient to support an inference of exclusionary conduct).  An important factor in determining if conduct is exclusionary is the proffered business justification for the act.  *See Aspen Skiing*, 472 U.S. at 608 (finding failure to offer persuasive business justification "most significant").  If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported.  *Id.*  Moreover, the existence of valid business reasons motivating a monopolist's conduct is ordinarily a question of fact not appropriate for determination on a motion to dismiss.  *See Apt. Source of Pa., L.P. v. Philadelphia Newspapers,*  No. 98-5472, 1999 WL 191649, at *10 (E.D. Pa. 1999).

Here, Comcast has offered no legitimate business reasons for its anticompetitive conduct which adversely affected the ability of competitors, such as RCN and BELD, to compete effectively in the Boston market.  Nor can Comcast explain why it would only offer these unpublished, highly discounted rates to  competitors' customers and not the general public.

In *LePage's v. 3M*, the Third Circuit found that 3M sought to meet the competition that LePage's threatened by "exclusionary conduct that consisted of rebate programs and exclusive dealing arrangements designed to drive LePage's and any other viable competitor from the transparent tape market."  *LePage's,* 324 F.3d at 154.  The exclusive dealing arrangements included contracts between 3M and certain of its retailers that effectively required exclusive dealing with 3M.  *Id.* at 157-58.  The court found that "the jury could reasonably find that 3M's exclusionary conduct violated § 2."  *Id.* at 159.  The Third Circuit stated that exclusive dealing arrangements can be anticompetitive if designed to induce business away from or foreclose an opportunity of a competitor.  *Id.*

Here, Comcast's ability to offer deep discounts in certain areas highlights the fact that it keeps prices artificially high in areas where it faces no competition. Comcast's targeted discounts amount to a form of price discrimination against its cluster subscribers outside the areas where such price discounts are not offered.  That this practice is anticompetitive and pursued to maintain and further Comcast's monopoly is clear.  Indeed, Congress has specifically prohibited the secret, discriminatory, non-uniform rates Comcast has implemented through its targeted discounts available only to customers within areas where Comcast may face competition.  *See* 47 U.S.C.A. § 543(d) ("A cable operator shall have a rate structure, for the provision of cable service, that is uniform throughout the geographic area in which cable service is provided over its cable system.")  Here, Comcast competes not on the merits but by flaunting a direct

49

Congressional prohibition designed to promote fair competition and protect cable customers from the very non-uniform rates Comcast's uses to further its monopoly. This is not competition on the merits.[27]

Comcast mischaracterizes Plaintiffs' allegations as a predatory pricing claim. Comcast argues that Plaintiffs' claims should be dismissed for failure to allege below cost prices. Defs.' Mem. at 32. The flaw in this argument is that Plaintiffs have alleged exclusionary conduct, not a predatory pricing scheme. Comcast engaged in non-uniform, targeted price discounts (subsidized by supra-competitive prices charged to other customers) and secretive anticompetitive pricing policies aimed only at certain areas where Comcast faced competition in an attempt to further monopolize the relevant market and prevent and destroy competition. Compl. ¶¶ 90-91. While the First Circuit generally requires that one must prove prices were below total costs to succeed on the merits of a predatory pricing claim (*Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 231 (1st Cir. 1983), Plaintiffs here are not alleging an antitrust violation based solely on Comcast's pricing. Rather, they allege that the manner in which those prices were selectively and secretly utilized, in violation of statute, to drive out competitors, while Comcast concurrently maintained supra-competitive prices through the exercise of its monopoly power in other parts of the Boston Cluster, was exclusionary.

Use of monopoly power to squeeze out the competition can be anticompetitive under § 2 as Plaintiffs have alleged here. *See LePage's*, 324 F.3d at 157 (finding defendant's bundled rebate program was anticompetitive since it was used to squeeze plaintiff out of the transparent

---

[27] Similarly, Defendants' conduct of cutting the cable lines of competitors is patently anticompetitive under the *Grinnell* standard. Defendants contend that these allegations are not sufficiently pled. Defs.' Mem. at 34. To the contrary, Plaintiffs' allegations (Compl. ¶¶ 93, 94) fully satisfy the requirement of Fed.R.Civ.P. 8(a), which simply requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Federal pleading rules "do not require a claimant to set out in detail the facts upon which he bases his claim," but only require Plaintiffs to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "'There is no special rule requiring more factual specificity in antitrust pleadings.'" *Corey v. Look*, 641 F.2d 32, n.10 (1st Cir. 1981) (citation omitted).

tape market); *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 643-44 (E.D. Pa.

1997) (finding exclusionary practices designed to unfairly exclude or destroy competition

violated § 2).[28]    The Court in *Yeager's Fuel* considered whether defendant's conduct "impaired

competition in an unnecessarily restrictive way." *Yeager's Fuel*, 953 F. Supp. at 643 (quoting

*Aspen Skiing*, 472 U.S. at 605).[29]    In denying defendant's motion for summary judgment on

plaintiff's claim of attempted monopolization, the court held that defendant's conduct, which

included persuading builders and developers to exclude competitors through aggressive

marketing strategies that involved cash incentives, discount agreements, and advertising

promotions, could constitute exclusionary or anticompetitive conduct in violation of § 2.  *Id.* at

643-44.

Similarly, Comcast's exclusionary practices in areas where Comcast faced competition

constitute anticompetitive conduct.  Enforcing antitrust liability for conduct designed to keep

competitors out while monopoly profits are reaped elsewhere in a market is entirely consistent

with the underlying purpose of the antitrust laws.  Comcast's non-uniform, targeted price

discounts and targeted marketing campaigns were designed to lessen competition, and constitute

---

[28] *See also CTC Comms. Corp. v. Bell Atl. Corp.*, 77 F. Supp. 2d 124, 144-45 (D. Me. 1999) (concluding that refusal to deal combined with exclusionary practices such as the imposition of termination penalties on customers who wished to assign their long term contracts constituted a pattern of anticompetitive conduct that warranted denial of defendant's motion for summary judgment on § 2 claim).
[29] The Court in *Aspen Skiing* condemned behavior which discourages a customer from switching to a smaller rival. *Aspen Skiing*, 472 U.S. at 610.  In *Aspen Skiing*, the Court stated, ". . . the record in this case comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." *Id.* at 610 (quoting *Lorain Journal*, 342 U.S. at 149 (citation omitted)).

anticompetitive or exclusionary conduct under § 2, especially when considered together with Defendants' other violations.[30]

## V.    Plaintiffs Have Stated Valid Claims that Defendants' Anticompetitive Conduct Violates §§ 4 and 5 of the Massachusetts Antitrust Act.

The Massachusetts Antitrust Act provides that "it shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes as far as practicable."  M.G.L. ch. 93 § 4. As a result, the determination of the merits of Plaintiffs' Sherman Act claims will also determine the merits of Plaintiffs' claims under M.G.L. ch. 93 § 4.[31]  Because Plaintiffs have successfully pled claims for violations of §§ 1 and 2 of the Sherman Act, they have therefore successfully pled violations of §§ 4 and 5 of the Massachusetts Antitrust Act as well.

## CONCLUSION

In condemning horizontal agreements between competitors to allocate markets as *per se* violations of § 1, the Supreme Court described the Sherman Act as "the Magna Carta of free enterprise."   *Topco*, 405 U.S. at 610.  Far from asking this Court to "assume the role of regulator," Plaintiffs simply respectfully request that the Court exercise its historic, quintessential judicial function by allowing Plaintiffs' valid federal and state antitrust claims to

---

[30] The anticompetitive effects of Comcast's exclusionary practices should be considered as a whole. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("'[I]n a case like the one before us [alleging §1 and §2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it.'" (citation omitted)).  *See also LePage's*, 324 F.3d at 162 ("The effect of 3M's conduct in strengthening its monopoly position by destroying competition by LePage's in second-tier tape is most apparent when 3M's various activities are considered as a whole. The anticompetitive effect of 3M's exclusive dealing arrangements, whether explicit or inferred, cannot be separated from the effect of its bundled rebates."); *United States v. Microsoft*, 87 F. Supp. 2d 30, 33 (D.D.C. 2000), *rev'd on other grounds*, 253 F.3d 34 (D.C.Cir. 2001) ("[O]nly when the separate categories of conduct are viewed, as they should be, as a single, well-coordinated course of action does the full extent of the violence that Microsoft has done to the competitive process reveal itself.").

[31] *Suzuki of W. Mass., Inc. v. Outdoor Sports Expo. Inc.*, 126 F.Supp.2d 40, 46 n.3. (D. Mass. 2001); *Winter Hill Frozen Foods and Servs., Inc. v. Haagen-Dazs Co.*, 691 F.Supp. 539, 543 n. 5 (D.Mass.1988) (§ 4 "is construed in harmony with Section 1 of the Sherman Act, and the same principles and analysis under the federal claim apply to this particular state law claim."); *Quaker State Corp. v. Leavitt*, 839 F.Supp. 76 (D. Mass. 1993) (analysis of territorial restraints under Massachusetts Antitrust Act is same as that under Sherman Antitrust Act); *American Tel. & Tel. Co. v. IMR Capital Corp.*, 888 F.Supp. 221 (D. Mass. 1995) (requirements for restraint of trade or monopolization claim under Massachusetts Antitrust Act are identical to requirements for such claim under Sherman Antitrust Act, i.e., that plaintiff must either show that defendant committed one of limited category of *per se* antitrust violations or prove its case under rule of reason.)

52

57407.1

proceed, just as Judge Padova did in *Glaberson*, thereby furthering the important public interest

purposes of the Sherman Act and the Massachusetts Antitrust Act.  Under the broad standards

governing a motion to dismiss, and for all the above reasons, Defendants' motion to dismiss

should be denied in its entirety.

Dated:  October 9, 2006

/s/ David Woodward
Samuel D. Heins
Stacey L. Mills
David Woodward
Jessica N. Servais
HEINS MILLS & OLSON, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Tel:  (612) 338-4605
Fax:  (612) 338-4692


 /s/ Joshua H. Grabar
Anthony J. Bolognese (#36937)
Joshua H. Grabar (JHG 1707) (#82525)
BOLOGNESE & ASSOCIATES, LLC
1617 JFK Blvd., Suite 650
Philadelphia, PA  19103
Tel:  (215) 814-6750
Fax:  (215) 814-6764


Barry Barnett
John Turner
Jason Fulton
SUSMAN GODFREY LLP
901 Main Street, Suite 5100
Dallas, TX  75202
Tel:  (214) 754-1900
Fax:  (214) 754-1933


Marc H. Edelson (#51834)
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA  18901
Tel:  (215) 230-8043
Fax:  (215) 230-8735

57407.1

53

Robert N. Kaplan
Gregory K. Arenson
Christine M. Fox
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY  10022
Tel:  (212) 687-1980
Fax:  (212) 687-7714

Gary L. Specks
KAPLAN FOX & KILSHEIMER LLP
423 Sumac Road
Highland Park, IL  60035
Tel:  (847) 831-1585
Fax:  (847) 831-1580

Lynn Lincoln Sarko
Mark A. Griffin
John H. Bright
Raymond J. Farrow
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Tel:  (206) 623-1900
Fax:  (206) 623-3384

Michael Hausfeld
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699

Stewart Weltman
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
39 S. LaSalle Street, Suite 1100
Chicago, IL  60603
Tel:  (312) 357-0370
Fax:  (312) 357-0369

57407.1

Ann D. White
LAW OFFICES OF ANN D. WHITE, P.C.
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA  19046
Tel: (215) 481-0274
Fax: (215) 481-0271

Jayne Goldstein
MAGER & GOLDSTEIN, LLP
Liberty Place, 21st Floor
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 640 -3280
Fax: (215) 640 -3281

John Peter Zavez (#555721)
Noah Rosmarin (#630632)
ADKINS KELSTON & ZAVEZ, P.C.
90 Canal Street
Boston, MA  02114
Tel: (617) 367-1040
Fax: (617) 742-8280

Ted Donner
DONNER & COMPANY
LAW OFFICES LLC
203 North LaSalle Street, Suite 2100
Chicago, IL  60601
Tel:  (312) 805-2100
Fax:  (312) 556-1369

**Counsel for Plaintiffs**

**CERTIFICATE OF SERVICE**

I certify that on 9, October 2006, I caused a true copy of the foregoing document to be

served electronically via the Court's electronic filing system on counsel of Record.


/s/  *David Woodward*
David Woodward

57407.1