IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Caroline Behrend, Stanford Glaberson<br>Michael Kellman, Lawrence Rudman,<br>Joan Evanchuk-Kind and Eric Brislawn, | ) | No. 03-6604<br>The Honorable John R. Padova |
| | ) | |
| Plaintiffs, | ) | **THIRD AMENDED CLASS ACTION<br>COMPLAINT FOR VIOLATIONS<br>OF THE SHERMAN ANTITRUST ACT** |
| v. | ) | |
| | ) | |
| Comcast Corporation, Comcast Holdings<br>Corporation, Comcast Cable<br>Communications, Inc., Comcast Cable<br>Communications Holdings, Inc., and<br>Comcast Cable Holdings, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs, on their own behalf and on behalf of the Classes of those similarly situated,

bring this action for treble damages under the antitrust laws of the United States against

Defendants, including Defendant Comcast Corporation and its subsidiaries, affiliates and

predecessors and its predecessors' subsidiaries and affiliates (collectively referred to as

"Comcast"). "Defendants" includes both Comcast, and AT&T Corporation's cable businesses

("AT&T") which are now merged with Comcast.

## INTRODUCTION

1.      This class action challenges illegal conduct by the Defendants designed to

eliminate and prevent competition in the cable industry, in violation of Sections 1 and 2 of the

Sherman Act.  Deregulation of the cable markets in the 1990s by Congress was intended to end

exclusive cable franchises and bring about competition in the cable industry.  But Defendants

and other large cable companies have avoided competing with one another by allocating the

nation's regional markets among themselves.  Defendants and other cable companies have

56326

accomplished this division of markets through a series of transactions in which they have acquired competitors and then "swapped" customers in one geographic area for customers in another, thereby "clustering" their cable systems in particular regions. These actions have allowed them to acquire or maintain monopoly power in particular geographic clusters, including the Philadelphia, Pennsylvania and Chicago, Illinois clusters. Having moved out of the clusters of competitors, and arranged for the departure of competitors from their own clusters, the cable companies are freed from the threat of actual or potential competition from other cable providers in those markets. The result is that regional markets remain dominated by a single cable provider, with no effective competition.

2.      This conduct has allowed cable companies, including Defendants, to acquire or maintain monopoly power in regional markets, engage in anticompetitive conduct, charge supra-competitive prices, and limit choice for cable consumers to effectively the only game in town – the cable services of the "cluster" monopoly cable company. This lawsuit challenges the horizontal allocation of markets and the willful acquisition and maintenance of monopoly power by the Defendants in the Philadelphia and Chicago regional cable markets.

3.      Even before the Class Period began and continuing during the Class Period, Defendants, including Comcast and AT&T, made massive purchases of cable systems and cable subscribers from their competitors, resulting in the willful acquisition and maintenance of monopoly power in the Philadelphia and Chicago cable markets, respectively. After such purchases, the number of cable providers in Philadelphia and Chicago was substantially reduced. The remaining cable providers were primarily very large cable businesses heavily concentrated in different parts of the country, including Comcast in Philadelphia and AT&T in Chicago.

4.    These remaining cable providers then engaged in a series of swaps of cable systems and cable subscribers in their respective monopoly markets, or clusters, to allocate among them customers of cable services and thereby maintain (and increase) their monopoly power in their respective clusters, including Philadelphia and Chicago.  These swaps included the allocation of customers between AT&T and Comcast whereby AT&T swapped its Philadelphia area subscribers for Comcast's Chicago area subscribers.

5.    Thereafter, as part of a merger between Comcast and AT&T, Comcast acquired AT&T's cable subscribers and monopoly in the Chicago area, furthering the willful acquisition and/or maintenance of monopoly power by Defendants in those markets.  As part of the merger, Comcast assumed the liability of AT&T for its violations of antitrust law, including AT&T's liability for such violations relating to the Chicago area cable market and AT&T's allocation of cable subscribers.

6.    Defendants continue to acquire from, and/or swap cable customers with their competitors, again allocating cable customers with their competitors and resulting in the willful acquisition and/or maintenance of monopoly power in the Philadelphia and Chicago clusters.  Defendants' past and continuing conduct violates both Sections 1 and 2 of the Sherman Act.

7.    Beginning before the Class Period and continuing to the present, Defendants have maintained cable prices at, and further increased prices to, supra-competitive levels in the Philadelphia and Chicago clusters as a direct result of Defendants' antitrust violations.

8.    Plaintiffs and members of the Classes seek an injunction, treble damages and other relief against Defendants for their violations of Section 1 of the Sherman Act, including Defendants' imposition of horizontal market restraints by conspiring with and entering into and implementing agreements with competitors to "swap" their respective cable customers (and thus

56326                                3

to eliminate themselves as actual and potential competitors and further raise barriers to entry by other potential competitors); and for Defendants' unlawful acquisition or maintenance of monopoly power, or their attempted monopolization of the relevant markets, in Defendants' "clusters" in the Philadelphia, Pennsylvania and Chicago, Illinois areas, in violation of Section 2 of the Sherman Act.

## NATURE OF THE ACTION

9.      Plaintiffs bring this action against Defendants, the owners and operators of multiple cable television systems, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

10.      Defendants have imposed horizontal market restraints by conspiring with and entering into and implementing agreements with competitors to eliminate actual and potential competition from them and other competitors by exchanging or "swapping" their respective cable television assets, including subscribers.  Through the imposition of such horizontal market restraints, Defendants have been able to avoid meaningful competition and Defendants' cable subscribers in the Philadelphia, Pennsylvania and Chicago, Illinois "clusters" have paid higher prices for cable television services than they would have absent Defendants' unlawful conduct. Defendants' conduct in entering into and implementing agreements allocating markets, territories and customers for cable television services constitutes a *per se* violation of Section 1 of the Sherman Act.

11.      Defendants also have engaged in conduct constituting unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Defendants have willfully acquired or maintained monopoly power in the relevant product market (multichannel video programming services) within the relevant geographic markets (Comcast's Philadelphia and Chicago clusters,

56326                                      4

as defined below).  Defendants' willful acquisition or maintenance of monopoly power is the result of exclusionary, anticompetitive conduct, including without limitation: 1) conspiring with and entering into and implementing illegal agreements with competitors to allocate territories, markets and customers in connection with the "swapping" of cable television subscribers; 2) acquiring competitor cable companies and their cable subscribers in the Philadelphia and Chicago clusters; 3) Comcast's refusal for years to provide a competitor reasonable, long-term, nondiscriminatory access to essential local sports programming controlled by Comcast and needed by the competitor to compete against Comcast (Comcast has only recently provided a competitor with longer-term access to such sports programming); 4) substantially interfering with a competitor's access to contractors needed by the competitor to build competing cable television facilities and systems; and 5) engaging in anticompetitive targeted pricing and sales practices aimed at areas in which Comcast may face potential competition.  Through such unlawful conduct, Defendants have excluded actual and potential competitors from the relevant geographic markets and Plaintiffs and members of the Classes, as a result of Defendants' unlawful conduct, have been forced to pay higher prices for cable television in the relevant geographic markets than they would have paid in the absence of Defendants' unlawful conduct.

12.    Through such unlawful conduct, Defendants have attempted to monopolize the relevant geographic markets.  Defendants have engaged in such conduct with the specific intent to monopolize and, through such conduct, have demonstrated a dangerous probability of achieving monopoly power in the relevant geographic markets.  Defendants' attempt to monopolize the relevant geographic markets also violates Section 2 of the Sherman Act.

## PARTIES

### PLAINTIFFS

13.    Plaintiff Caroline Behrend (formerly Caroline Cutler) resides in Newtown,
Pennsylvania. During the time period covered by this Complaint, Plaintiff Behrend has been and
continues to be a subscriber of non-basic cable programming services provided by Comcast.

14.    Plaintiff Stanford Glaberson is an individual who resides in Montgomery County,
Pennsylvania. During the time period covered by this Complaint, Plaintiff Glaberson has been
and continues to be a subscriber of non-basic cable programming services provided by Comcast.

15.    Plaintiff Michael Kellman is an individual who resides in Lake Zurich, Illinois.
During the time period covered by this Complaint, Plaintiff Kellman has been a subscriber of
non-basic cable programming services provided by Comcast.

16.    Plaintiff Lawrence Rudman is an individual who resides in Chicago, Illinois.
During the time period covered by this Complaint, Plaintiff Rudman has been and continues to
be a subscriber of non-basic cable programming services provided by Comcast.

17.    Plaintiff Joan Evanchuk-Kind is an individual who resides in Downers Grove,
Illinois. During the time period covered by this Complaint, Plaintiff Evanchuk-Kind has been
and continues to be a subscriber of non-basic cable programming services provided by Comcast.

18.    Plaintiff Eric Brislawn is an individual who resides in Buffalo Grove, Illinois.
During the time period covered by this Complaint, Plaintiff Brislawn has been a subscriber of
non-basic cable programming services provided by Comcast.

### DEFENDANTS

19.    Defendant Comcast Corporation, formerly known as AT&T Comcast
Corporation, is a Pennsylvania corporation with its principal place of business at 1500 Market
Street, Philadelphia, Pennsylvania 19102. Comcast Corporation was formed through a merger

56326                                    6

on November 18, 2002 with AT&T. The merger occurred in several steps. First, AT&T transferred to Comcast Cable Communications Holdings the assets, liabilities and businesses represented by AT&T Broadband Group, which was the broadband business of AT&T. Next, AT&T spun-off Comcast Cable Communications Holdings to its shareholders. Then, Comcast Holdings and Comcast Cable Communications Holdings each merged with a different, wholly-owned subsidiary of Comcast, and Comcast Holdings and AT&T shareholders received Comcast shares. Through these transactions, Comcast and AT&T combined to form the new Comcast Corporation (formerly AT&T Comcast Corporation). The merger resulted, as a matter of law and pursuant to the merger agreement between AT&T and Comcast, in Comcast's assumption of AT&T's liability for the antitrust violations alleged in this Complaint.

20.    Defendant Comcast Holdings Corporation, formerly Comcast Corporation and predecessor to Defendant Comcast Corporation, is a Pennsylvania Corporation with its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania 19102, and is a wholly-owned subsidiary of Comcast.

21.    Defendant Comcast Cable Communications Holdings, Inc., formerly AT&T Broadband Corp., is a Delaware Corporation with its principal place of business at 296 North Maple Avenue, Basking Ridge, New Jersey 07920, and is a wholly-owned subsidiary of Comcast.

22.    Defendant Comcast Cable Holdings, LLC, formerly known as AT&T Broadband, LLC, is a Delaware limited liability company with its principal place of business at 5619 DTC Parkway, Englewood, Colorado 80001, and is a wholly-owned subsidiary of Comcast Cable Communications Holdings, Inc.

23.    Defendant Comcast Cable Communications, Inc. is a Delaware corporation with its principal place of business at 1201 Market Street, Suite 2201, Wilmington, Delaware 19801, is an indirect wholly-owned subsidiary of Comcast.

24.    Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications Holdings, Inc., Comcast Cable Communications, Inc., and Comcast Cable Holdings, LLC are collectively included within "Comcast" as used in this Complaint.

25.    Before combining, AT&T and Comcast were separate, independent owners and operators of multiple cable systems, operating and competing with one another at the same level of competition in the cable industry. At the time of the transactions described in paragraph 19, Comcast was the third largest multiple system cable operator in the United States, and AT&T was the largest multiple system cable operator in the United States. Upon acquiring AT&T through a merger on November 18, 2002, Comcast became the largest cable company in the country. Comcast serves over twenty-one million cable subscribers in the United States.

26.    During the Class Period, Defendants have provided and continue to provide cable television services in the United States by means of interstate commerce.

27.    Defendants' business activities as described in this Complaint were within the flow of and substantially affected interstate trade and commerce.

## JURISDICTION AND VENUE

28.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief, treble damages, and Plaintiffs' costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and other similarly situated Class members by reason of Defendants' violations of Sections 1 and 2 of the Sherman Act.

29.    Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and

16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

30.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15, 22, and 26, and 28

U.S.C. § 1391(b) and (c), because Comcast transacts business, maintains offices, or otherwise is

found within this District.

## CLASS ALLEGATIONS

31.    a.    As used in this paragraph and Complaint:

(1)    "Basic cable services" means the separately available basic

tier of video programming services to which subscription is required for

access to other tiers of cable service offered by Defendants and which

includes the retransmission of local television broadcast signals and public,

educational and governmental access channels.

(2)    "Comcast's Philadelphia cluster" means those areas

covered by Comcast's cable franchises or any of its subsidiaries or

affiliates, located in Philadelphia, Pennsylvania and geographically

contiguous areas, or areas in close geographic proximity to Philadelphia,

Pennsylvania, which is comprised of the areas covered by Comcast's cable

franchises, or any of its subsidiaries or affiliates, located in the following

counties: Berks, Bucks, Chester, Delaware, Montgomery and Philadelphia,

Pennsylvania; Kent and New Castle, Delaware; and Atlantic, Burlington,

Camden, Cape May, Cumberland, Gloucester, Mercer and Salem, New

Jersey.

(3)    "Comcast's Chicago cluster" means those areas covered by

Comcast's cable franchises or any of its subsidiaries or affiliates, located in

56326                                    9

Chicago, Illinois and geographically contiguous areas, or areas in close

geographic proximity to Chicago, Illinois, which is comprised of the areas

covered by Comcast's cable franchises or any of its subsidiaries or

affiliates, located in the following counties:  Cook, DeKalb, DuPage,

Grundy, Kane, Kankakee, Kendall, Lake, La Salle, McHenry and Will,

Illinois; Jasper, Lake, LaPorte and Porter, Indiana.

b.     Plaintiffs bring this class action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) on behalf of the following Classes:

(1)     All cable television customers who subscribe or subscribed at any
time since December 1, 1999, to the present to video programming
services (other than solely to basic cable services) from Comcast, or
any of its subsidiaries or affiliates in Comcast's Philadelphia
cluster.  The class excludes governmental entities, Defendants,
Defendants' subsidiaries and affiliates and this Court.

(2)     All cable television customers who subscribe or subscribed at any
time since December 1, 1999, to the present to video programming
services (other than solely to basic cable services) from AT&T
and/or Comcast, or any of their subsidiaries or affiliates in
Comcast's Chicago cluster.  The class excludes governmental
entities, Defendants, Defendants' subsidiaries and affiliates and this
Court.

32.     Plaintiffs do not yet know the exact size of the Classes and such information is in

the exclusive control of Defendants.  However, based on the nature of the trade and commerce

involved, Plaintiffs believe that the total number of members in the Philadelphia Class exceeds

two million persons, who are located throughout the Philadelphia, Pennsylvania and surrounding

area, and that the total number of members in the Chicago Class is at least 1,700,000 cable

subscribers, who are located throughout the Chicago, Illinois and surrounding area.  In its 2005

Annual Report, Comcast estimates that the number of cable subscribers in Comcast's Chicago

and Philadelphia markets is 1.6 million and 1.8 million, respectively.  Consequently, joinder of

all members of each Class would be impracticable.

33.    Plaintiffs will fairly and adequately protect the interests of all Class members, and have engaged counsel experienced and competent in antitrust and class action litigation. Plaintiffs have no interests antagonistic to those of the other members of the Classes.

34.    Plaintiffs' claims are typical of the claims of the respective Classes in that each paid for non-basic or cable programming services and were injured by the same wrongful conduct of Defendants alleged in this Complaint. The violations of the antitrust laws, the effects of such violations and the relief sought are common to Plaintiffs and the members of the Classes.

35.    The rights of Plaintiffs and members of the Classes involve common questions of law and fact that would predominate over questions affecting only individual members of the Classes. Whatever difficulties may exist in the management of the Classes are generally outweighed by the advantage of that procedure, including but not limited to providing claimants with a method for redress of claims that might otherwise not warrant individual litigation.

36.    The questions of law and fact common within the Classes include, but are not limited to:

    a.    whether Defendants' conduct in conspiring with and entering into and implementing agreements with competitors allocating markets, territories and customers for cable television services constitutes a *per se* violation of Section 1 of the Sherman Act;

    b.    whether Defendants' conduct in possessing and willfully acquiring or maintaining monopoly power in, or attempting to monopolize, the relevant markets and engaging in the acts and practices alleged in this Complaint constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2;

    c.    whether Defendants' acts caused prices for cable television services in the relevant markets to be artificially high and not competitive;

56326                             11.

      d.      whether Plaintiffs and the members of the Classes were injured by Defendants' acts;

      e.      the measure of damages by which Defendants' conduct injured all members of the Classes; and

      f.      whether members of the Classes are entitled to injunctive relief as a result of Defendants' continuing conduct.

37.      Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy, because it permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence and effort. Class treatment will also permit the adjudication of claims by individual consumer class members, who could not afford to individually litigate antitrust claims against the large corporate defendants. Without class treatment, Plaintiffs and members of the proposed Classes will be unable to vindicate their statutory antitrust claims.

## GENERAL ALLEGATIONS

## DEREGULATION OF CABLE INDUSTRY

38.      In 1992, to protect the public against the increasing market power and dominance of cable operators and promote competition among cable operators, Congress passed the Cable Television Consumer Protection Act of 1992. To further and encourage competition in local markets as a matter of national policy, Congress prohibited local jurisdictions from awarding exclusive franchises for cable systems for a particular geographic area so that cable companies would directly compete against each other. 47 U.S.C. § 541(a)(1).

39.      In 1996, Congress deregulated cable television and passed the Telecommunications Act of 1996, 47 U.S.C. § 251 (the "1996 Act"), to encourage competition, including competition among cable television providers. Through the 1996 Act, Congress

sought to "provide for a pro-competitive, de-regulatory national policy framework designed to

rapidly accelerate private sector deployment of advanced telecommunications and information

technologies and services to all Americans by opening all telecommunications markets to

competition." H.R. Cong. Rep. 104-458, 1996 WL 46795, at 1 (1996), U.S. Code Cong. &

Admin. News 1996, at 124.

40.     Pursuant to the 1996 Act, 47 U.S.C. § 543, the FCC's authority to regulate the

rates charged for non-basic, or cable programming services (those channels that are not on a

cable system's basic tier and for which there is no per-channel or per-program charge) was

terminated for services provided after March 31, 1999. Therefore, the rates charged for such

cable services are determined by the cable companies themselves. Neither the FCC nor any state

or local entity has the authority to review rates for such cable services or to investigate

allegations that such rates are excessive.

41.     Despite passage of the 1992 and 1996 Congressional legislation, large cable

companies, including Defendants, have violated federal antitrust law and carved out their own

respective areas of operation to the exclusion of competition from other cable companies.

## CABLE INDUSTRY: INCREASED CONSOLIDATION, SKYROCKETING PRICES AND LIMITED CONSUMER CHOICES

42.     Despite Congress' intention of promoting competition in the cable industry to

benefit the public, the cable industry has become increasingly consolidated, consumers' choices

among cable operators have been eliminated or substantially narrowed, and in monopoly

"clusters" created by large cable companies, including Defendants, cable prices have increased

significantly more than in areas where competition exists.

43.     In its 2002 report on competition in the cable market, the FCC found that cable

companies continue to dominate the market for multichannel video services. As of June 2002,

56326                                           13

the FCC determined that cable operators provided video programming to more than three-quarters (76.5%) of all multichannel video subscribers nationwide. *In the Matter of Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming, Ninth Annual Report*, MB Docket No. 02-145, released December 31, 2002, ("Ninth Video Competition Report") ¶4. As a result of increased consolidation within the cable industry, as cable operators acquired and traded cable systems and subscribers, the ten largest cable operators serve approximately 85% of all cable subscribers. *Id.* ¶14. In 1995, prior to passage of the Telecommunications Act of 1996, the top ten cable companies served approximately 73.22% of all cable subscribers. *In the Matter of Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming, Second Annual Report*, App. G at Table 2 (1995). In its 2002 report on video competition, the FCC concluded, "The market for the delivery of video programming to households continues to be highly concentrated." *Ninth Video Competition Report* ¶113.

44.    The FCC has determined that only approximately 2% of all cable consumers reside in areas with effective competition and only approximately 1.3% of cable consumers are served by an overbuilder (a competing cable system operator).

45.    Studies confirm that competition from another cable company is essential to restrain the prices of a dominant cable provider. For example, in its October 2002 report, the United States General Accounting Office (GAO) determined that "the presence of a second cable franchise (known as an overbuilder) does appear to restrain cable prices" and that "in franchise areas with a second cable provider, cable prices are approximately 17 percent lower than in comparable areas without a second cable provider." GAO, *Report to the Subcommittee on Antitrust, Competition, and Business and Consumer Rights, Committee on the Judiciary, U.S.*

*Senate: Telecommunications, Issues in Providing Cable and Satellite Television Service (2002)* (*GAO's 2002 Cable Report*) at 9. In its October 2003 report, the GAO found that competition from a wire-based cable provider (a competitor using a wire technology, such as a second cable company) is limited to very few (about 2% of) markets; however, in markets where such competition from a second wireline cable company exists, cable rates are significantly lower— by approximately 15% —than cable rates in markets without competition from a second wireline cable operator. GAO, *Report to the Chairman, Committee on Commerce, Science, and Transportation, U.S. Senate: Telecommunications, Issues Related to Competition and Subscriber Rates in the Cable Television Industry* ("*GAO's 2003 Cable Report*") at 3, 9 and 10. In its February 2004 report – involving a study comparing six cities with a second wire-based cable provider (a broadband service provider, or BSP, offering a bundle of cable television, Internet and local telephone services) with six cities without such a second cable competitor – the GAO found that expanded basic cable telephone rates were 15% to 41% lower in 5 of the 6 studied markets with a second cable competitor (BSP) compared to their matched markets without such a competitor. GAO, *Report to the Subcommittee on Antitrust, Competition Policy and Consumer Rights, Committee on the Judiciary, U.S. Senate: Telecommunications, Wire-Based Competition Benefited Consumers in Selected Markets* (2004) at 15. The GAO found that "[t]he ultimate result of the BSP operations, along with incumbent's response, is substantially lower prices for consumers." *Id.* at 12.

46.    The FCC has also found that the prices charged by large cable companies are restrained by the presence of an overbuilder in the market. In its 2001 annual report on cable prices, the FCC determined, solely based on information provided by cable operators that the FCC does not audit, that cable prices on average were 6.3% lower in areas where the incumbent

cable operator faced effective competition from overbuilders. *In the Matter of Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Rates for Basic Service, Cable Programming Service, and Equipment* (2001) ("*2001 Report on Cable Prices*") ¶8. In its 2002 report on cable prices, the FCC determined, again solely based on information provided by cable operators that is not audited by the FCC, that cable prices were on average 6.4% lower in areas where the incumbent cable operator encounters effective competition from an overbuilder. *In the Matter of Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Rates for Basic Service, Cable Programming Services, and Equipment* ("*2002 Report on Cable Prices*") ¶28.

47.    By contrast, the presence of competition from a direct broadcast system ("DBS") provider does not restrain, or restrains only slightly, the prices of cable services provided by large cable companies. The FCC has determined that in areas where DBS has achieved a degree of market presence, there is no significant effect on prices for cable service. *FCC's 2002 Report on Cable Prices* ¶45. In its October 2002 report, the GAO also found that the presence of DBS companies has not led to lower cable prices. *GAO's 2002 Cable Report* at 9. In its October 2003 report, the GAO determined that DBS competition is associated with only a slight reduction in cable rates. *GAO's 2003 Cable Report* at 11.

48.    In its 2004 report on the cable market, the FCC indicated that between year-end 1993 and the end of June 2003, cable prices rose 53.1%, while prices generally, as measured by the Consumer Price Index, increased 25.5%. *In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming Services*, Tenth Annual Report (2004) at 56.

56326                                        16

## DEFENDANTS' MONOPOLY AND ANTICOMPETITIVE PRACTICES

49.    Before the Class Period began (December 1, 1999) and continuing thereafter, Comcast and AT&T, including their respective subsidiaries and affiliates, willfully acquired and maintained monopolies and unreasonably restrained trade in the Philadelphia and Chicago clusters, respectively, through a series of acquisitions of competitor cable companies.

50.    Defendants further willfully maintained, acquired and exercised monopoly power and unreasonably restrained trade in the Philadelphia and Chicago clusters by engaging in a series of horizontal market allocations in the form of "swap" agreements between Defendants and other cable companies, specifically including swaps between Comcast and AT&T, who were competitors in the Philadelphia and Chicago clusters prior to the market allocating swap agreements between themselves in those markets.

### Defendants' Clustering Scheme – Acquisitions

51.    Defendants perpetrated their clustering scheme, in part, by acquiring cable systems and cable subscribers from competitor cable companies in Comcast's Philadelphia or Chicago clusters.

52.    Examples of Comcast's acquisitions resulting in the addition of cable subscribers in its Philadelphia cluster include:

a.    An acquisition of Marcus Cable cable systems which was announced on or about December 5, 1997 and closed on or about April 1, 1998. As a result of this acquisition, Comcast obtained Marcus Cable cable systems and approximately 27,000 cable subscribers in Harrington, Delaware.

b.    An acquisition of Greater Philadelphia Cablevision, Inc., a subsidiary of Greater Media, Inc., which was announced on or about February 18, 1999 and closed on or about

56326                              17

June 1999. As a result of this acquisition, Comcast obtained Greater Philadelphia Cablevision's cable systems and approximately 79,000 cable subscribers in Philadelphia, Pennsylvania.

        c.      An acquisition of Lenfest Communications, Inc. ("Lenfest"), including its wholly owned subsidiary, Suburban Cable, which was announced on or about November 16, 1999 and closed on or about January 18, 2000. As a result of this acquisition, Comcast obtained Lenfest Communications' cable systems and cable subscribers in Berks, Bucks, Chester, Delaware and Montgomery counties of Pennsylvania, as well as in New Castle County, Delaware. Through this acquisition, Comcast obtained more than 1.1 million cable subscribers in southeastern and central Pennsylvania, southern New Jersey and northern Delaware. At the time of the acquisition, Lenfest was jointly owned by AT&T and the Lenfest Family. The acquisition agreement between Comcast and Lenfest superseded a prior agreement under which AT&T was to acquire the Lenfest Family's interest in Lenfest. The acquisition agreement also included a provision allowing AT&T to purchase cable systems serving 1.25 million subscribers from Comcast in the event that AT&T's planned acquisition of MediaOne Group, Inc., referenced in paragraph 53.c., fell through.

        d.      An acquisition of Garden State Cablevision L.P. ("Garden State Cable"), in conjunction with Comcast's acquisition of Lenfest Communications, Inc., which was announced on or about November 16, 1999 and closed on or about January 18, 2000. As a result of this acquisition, Comcast obtained Garden State Cable's cable systems and cable subscribers in Atlantic, Burlington, Camden, Cape May, Cumberland, Glouster, Mercer and Salem counties of New Jersey.

        53.      Examples of acquisitions resulting in the addition of cable subscribers by Comcast and/or AT&T in Comcast's Chicago cluster include the following:

     a.     An acquisition by AT&T of Tele-Communications, Inc. ("TCI") which was announced on or about June 24, 1998 and closed on or about March 9, 1999. As a result of this acquisition, AT&T gained approximately 1.6 million cable subscribers in and around Chicago, Illinois.

     b.     An acquisition by Comcast of Prime Communications LLC ("Prime Cable") which was announced on or about December 11, 1998 and closed on or about August 1, 2000. As a result of this acquisition, Comcast obtained Prime Cable's cable systems and approximately 140,000 cable subscribers in and around Chicago, Illinois.

     c.     An acquisition by AT&T of MediaOne Group, Inc., which was announced on or about May 6, 1999 and closed on or about June 15, 2000. As a result of this acquisition, AT&T obtained MediaOne Group's cable systems and cable subscribers including cable systems and cable subscribers in the Chicago, Illinois area.

**Defendants' Clustering Scheme – Swap Agreements**

     54.     Defendants have perpetrated their clustering scheme, in part, by conspiring with and entering into and implementing agreements with competitors to exchange or "swap" cable systems, including cable customers ("swap agreements" or "swaps"). Through these swap agreements, Comcast obtained competitors' cable systems and cable subscribers in Comcast's Philadelphia or Chicago clusters in exchange for Comcast's cable systems and cable subscribers in another part of the country, including swaps between AT&T and Comcast whereby AT&T was given pre-existing Comcast subscribers in the Chicago cluster and Comcast was given pre-existing AT&T subscribers in the Philadelphia cluster. The "swaps" and clustering physically removed actual and potential competitors from the Comcast clusters in Philadelphia and

Chicago, making the competitors' return to those areas financially unattractive if not wholly

uneconomic, and further raised barriers to entry for other competitors.

55.    Examples of Comcast's swaps resulting in the addition of cable subscribers in its

Philadelphia cluster include:

a.    A swap agreement between Comcast and AT&T, which was announced

on or about May 4, 1999 and closed on or about December 31, 2000.  Through this swap

agreement, Comcast obtained  AT&T cable systems and approximately 770,000 cable

subscribers including subscribers in Eastern Pennsylvania (Bucks and Berks Counties) and New

Jersey.  In exchange, AT&T received approximately 700,000 Comcast subscribers in Chicago,

Illinois, and parts of California, Colorado, Florida, Georgia and Pennsylvania.  Comcast and

AT&T previously negotiated the swap as part of a settlement allowing AT&T to acquire the

large cable company, MediaOne Group, Inc., as referenced in paragraph 53.c., instead of

Comcast.

b.    A swap agreement between Comcast and Adelphia Communications Corp.

("Adelphia"), which was announced on or about May 26, 1999 and closed on or about January 1,

2001.  As a result of this swap agreement, Comcast obtained Adelphia's cable systems and cable

subscribers located mainly in the Philadelphia, Pennsylvania and adjacent New Jersey areas.  In

exchange, Adelphia received Comcast's cable systems and cable subscribers in and around Palm

Beach, Florida and Los Angeles, California.

c.    A swap agreement between Comcast and AT&T which was announced on

or about May 4, 1999 and closed on or about April 30, 2001.  Through this exchange, Comcast

acquired multiple AT&T cable systems and approximately 595,000 AT&T cable subscribers,

including subscribers in Pennsylvania and New Jersey. Upon information and belief, this exchange was related to the swap referenced in paragraph 55.a.

56.     Examples of swap agreements entered into by Defendants resulting in the addition of cable subscribers in the Chicago cluster include a swap agreement between Comcast and AT&T which was announced on or about May 4, 1999 and closed on or about December 31, 2000. As a result of this swap agreement, AT&T received approximately 700,000 Comcast cable subscribers, including subscribers in the Chicago, Illinois area. Comcast, in exchange, received approximately 770,000 AT&T cable subscribers, including cable subscribers in the Philadelphia, Pennsylvania area. Through the swap agreement, Comcast transferred its Prime Cable properties, referenced in paragraph 53.b., to AT&T. AT&T engaged in this exchange in an effort to increase its market share in the Chicago cluster and to prevent 21st Century TV Cable, Inc. (purchased by RCN Telecom Services in 2000) from entering the cable services market in the Chicago, Illinois area. Comcast and AT&T previously negotiated the swap as part of a settlement allowing AT&T to acquire the large cable company, MediaOne Group, Inc., as referenced in paragraph 53.c., instead of Comcast.

**THE AT&T/COMCAST MERGER**

57.     On or about December 19, 2001, AT&T and Comcast announced that AT&T's cable business would merge into Comcast. The merger closed on or about November 18, 2002. As a result of the merger, Comcast acquired AT&T's cable systems and more than 13 million AT&T cable subscribers, including the acquisition of AT&T's cable subscribers in the Chicago, Illinois area.

56326                                          21

58.     The merger between AT&T and Comcast and the creation of Defendant Comcast Corporation resulted, as a matter of law, in Comcast's assumption of AT&T's liabilities for the antitrust violations alleged in this Complaint.

59.     In accordance with the merger, Comcast acquired the assets and agreed to assume the liabilities of AT&T.  Specifically, pursuant to the merger, including the Agreement and Plan of Merger dated December 19, 2001 By and Among AT&T Corp., AT&T Broadband Corp., Comcast Corporation, AT&T Broadband Acquisition Corp., Comcast Acquisition Corp. and AT&T Comcast Corporation, implementing the merger, AT&T Comcast Corporation (the parent corporation created under the merger agreement), acquired the assets and assumed the liabilities of the AT&T Broadband Group (AT&T's cable businesses).   Pursuant to the merger, AT&T Comcast Corporation became Defendant Comcast Corporation.

60.     As a result of the unlawful swap agreements and transactions described in this Complaint, Defendants' actual and potential competitors were removed from the Philadelphia and Chicago clusters and Defendants were able to exclude actual and potential competitors from, and raise prices within, the Philadelphia and Chicago clusters.

61.     The purpose and effect of Defendants' conduct in entering into and implementing such unlawful swap agreements and transactions were to unreasonably restrain, suppress and eliminate competition for cable television service in the Philadelphia and Chicago clusters and to maintain the respective pre-existing monopolies of Defendants in those clusters.

62.     Defendants' conduct set forth in this Complaint, including the imposition of horizontal territory, market and customer allocations, has had the following effects, among others:

a.   Competition, including price competition, for cable television service has been, and will continue to be restrained, suppressed, and/or eliminated.

b.   Competitors have been, and will continue to be, restrained from entering into the areas subject to the allocation agreements and Defendants' unlawful conduct has raised entry barriers to actual and potential competition, including from overbuilder competitors and from former competitors that ceased or reduced cable operations and sold or abandoned infrastructure necessary to effective competition in the Philadelphia and Chicago clusters.

c.   Defendants have increased prices for cable programming services to artificially high, supra-competitive levels and, unless enjoined, will continue to maintain and increase prices at such levels.

d.   Cable subscribers have been, and will continue to be, deprived of the benefits of free and open competition, including lower prices for Comcast's cable services in both the Philadelphia and Chicago clusters that would result from effective competition.

e.   Prices for Comcast's cable services in the Philadelphia and Chicago clusters would be lower in the absence of Comcast's violations of the Sherman Act as set forth in this Complaint.

63.   In connection with the swap agreements and transactions described in this Complaint, Defendants have not competed in the cable television markets in which they exchanged subscribers in the swap agreements and otherwise acquired subscribers in the transactions, and the other cable operators involved in such swap agreements or transactions

56326                                23

have not re-entered or competed against Defendants in their clusters in and around Philadelphia, Pennsylvania and Chicago, Illinois.

64.     Defendants' conduct in entering into and implementing the illustrative swap agreements and other transactions identified in this Complaint constitute unlawful horizontal restraints on competition and agreements to divide and allocate markets and to maintain the respective pre-existing monopolies of Defendants in those clusters. Additionally, certain of the swap agreements and transactions referenced in this Complaint contain express covenants not to compete and other provisions restricting the ability of Comcast's competitors to re-enter or otherwise compete with Comcast in Comcast's clusters.

65.     Although Comcast and AT&T did, in fact, compete against each other in the Philadelphia and Chicago clusters before the merger of AT&T and Comcast on November 18, 2002, according to their own submissions to the FCC in connection with the merger, Comcast and AT&T represented to the FCC that they did not compete against each other in their respective cable television markets before the companies combined, the companies did not study or evaluate the feasibility of such competition, and the companies did not intend to compete in each other's cable markets. Defendants' representations to the FCC, while contrary to fact, because they had previously competed in the Philadelphia and Chicago markets, demonstrate that AT&T and Comcast did not intend to compete because they had allocated and divided markets between themselves through market allocating swap agreements, including those set forth in this Complaint.

66.     As a result of Defendants' antitrust violations set forth in this Complaint, and beginning prior to and continuing throughout the Class Period, Defendants have maintained

prices for non-basic cable services at, and have further increased such prices to, supra-competitive levels in the Philadelphia and Chicago clusters.

67. Plaintiffs and other members of the Classes at all times relevant to this Complaint have been, and continue to be, injured in their property and have suffered, and continue to suffer, damages as a result of Defendants' antitrust violations. Plaintiffs and members of the Classes have paid and continue to pay supra-competitive prices for cable services in Comcast's Philadelphia and Chicago clusters as a result of Defendants' antitrust violations set forth in this Complaint.

68. Defendants' unlawful conduct, including the unlawful swapping and other transactions, set forth in this Complaint constitutes a continuing course of conduct that has harmed and continues to harm Plaintiffs and members of the Classes through Defendants' maintenance of, and further increases to, the supra-competitive rates charged by Defendants for cable services in Comcast's Philadelphia and Chicago clusters.

## VIOLATIONS ALLEGED

## COUNT I

### Violations of Section 1 of the Sherman Act

69. Plaintiffs incorporate all of the above paragraphs as if fully set forth herein.

70. Defendants have conspired and engaged in a strategy of allocating territories, markets and customers among competitors at the same level of the cable television market structure.

71. Defendants have imposed horizontal market restraints, specifically the allocation of territories, markets and customers through agreements to "swap" or exchange cable television assets, including subscribers, with other cable companies. Examples of such swap agreements and transactions are set forth above in paragraphs 55 and 56.

72.     Defendants conspired, entered into and implemented such market allocating "swap" agreements for the purpose, and with the effect of, eliminating, suppressing and preventing actual and potential competition for cable television service and unreasonably restraining trade in the Philadelphia and Chicago clusters.

73.     Defendants' conduct of imposing horizontal territory, market and customer allocations by conspiring with and entering into and implementing unlawful swap agreements, arrangements or devices constitutes violations, including *per se* violations, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

74.     Defendants' conduct, including Defendants' acquisitions of competitor cable companies and their cable subscribers in the Philadelphia and Chicago clusters, as set forth in this Complaint, constitutes contracts and conduct in restraint of trade in violation of Section 1 of the Sherman Act.

75.     As a proximate result of Defendants' restraints on trade and the horizontal territory, market and customer allocations effected through the swap agreements entered into and implemented by Defendants, Plaintiffs and members of each of the Classes have paid more, and will continue to pay more for cable programming services than they would have otherwise paid and, accordingly, have suffered, and will continue to suffer injury and damages in an amount to be determined according to proof at the time of trial.

## COUNT II

### Monopolization

76.     Plaintiffs incorporate all of the above paragraphs as if fully set forth herein.

77.     Beginning before and continuing throughout the Class Period, Defendants possessed, and Comcast continues to possess, monopoly power in the relevant product market within each of the relevant geographic markets.

78.     The relevant geographic markets are Comcast's Philadelphia cluster, as defined in paragraph 31.a.(2), and Comcast's Chicago cluster, as defined in paragraph 31.a.(3).

79.     The relevant product market is defined as multichannel video programming services, which are distributed by multichannel video programming distributors ("MVPDs"), including cable television operators such as Defendants, overbuilders and direct broadcast satellite operators.

80.     Upon information and belief, Comcast controls virtually 100% of cable subscribers within the relevant Philadelphia area geographic market.  Upon information and belief, Comcast possesses approximately a 94% share of the relevant product market within the relevant Philadelphia area geographic market.

81.     Upon information and belief, Comcast controls virtually 100% of cable subscribers within the relevant Chicago area geographic market.  Upon information and belief, Comcast possesses approximately a 92% share of the relevant product market within the relevant Chicago area geographic market.

82.     Defendants have willfully obtained or maintained their monopolies through anticompetitive means as set forth in this Complaint.

83.     Defendants have imposed unreasonable, horizontal market restraints, specifically the allocation of territories, markets and customers in connection with agreements to "swap" or exchange cable television assets, including subscribers, with other cable companies in order to monopolize the relevant geographic markets.  Examples of such "swap" agreements and transactions are set forth above in paragraphs 55 and 56.

84.     As a result of such unlawful "swap" agreements and transactions, Defendants' competitors were removed from the relevant geographic markets and Defendants were able to

exclude competitors from, and raise prices within, the relevant geographic markets. The purpose and effect of such swap agreements and transactions was to unreasonably restrain, suppress and eliminate competition for cable television service in the relevant geographic markets.

85.     Defendants' conduct of imposing horizontal territory, market and customer allocations by conspiring with and entering into swap agreements, arrangements or devices with other cable companies, which is unlawful as a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and unreasonably restraining trade through the acquisitions of competitor cable companies and their cable subscribers in the Philadelphia and Chicago clusters in further violation of Section 1 of the Sherman Act, constitutes anticompetitive conduct through which, in part, Defendants have willfully acquired or maintained monopoly power in the relevant markets.

86.     Comcast has further engaged in conduct excluding or preventing competition, including competition from an overbuilder, RCN Telecom Services, Inc. ("RCN"), a Delaware corporation presently based in Herndon, Virginia.

87.     For example, upon information and belief, Comcast initially refused to provide to, and then provided only on a short-term basis to RCN, a competitor of Comcast, access to essential video programming, including sports programming, controlled by Comcast and needed by competitors such as RCN in order to gain entry into, and compete against Comcast in the relevant Philadelphia area geographic market.

88.     Comcast holds a majority ownership interest (a 78% ownership interest) in "Comcast Sportsnet," a regional sports network which provides professional sports video programming in the Philadelphia area. Comcast owns a majority interest in two major-league sports franchises, the Philadelphia Flyers National Hockey League franchise and the Philadelphia 76ers National Basketball Association franchise; Philadelphia's two major indoor sports arenas;

56326                                      28

and several minor league baseball and hockey teams. Comcast's "Comcast Sportsnet" carries a majority of the regular season games of the Philadelphia Flyers and the Philadelphia 76ers', as well as Philadelphia Phillies' baseball games. Upon information and belief, Comcast owns exclusive rights to broadcast games of the Philadelphia Kixx of the national soccer league, and football and basketball games of regional colleges and universities. Comcast distributes its "Comcast Sportsnet" video programming terrestrially, thereby allowing Comcast to avoid the program access rules of the Cable Television Consumer Protection and Competition Act of 1992, which were designed to provide competitive access to vertically integrated satellite service programming, and which require vertically integrated cable operators, such as Comcast, to make satellite-delivered cable programming available to rival MVPDs at reasonable and non-discriminatory terms.

89.     "Comcast Sportsnet," which reaches approximately 2.9 million subscribers, offers a significant competitive marketing advantage, access to which is critically important for competitors to be able to compete against Comcast. Access to regional sports programming such as "Comcast Sportsnet" is considered "must have" programming needed by potential competitors to compete effectively. In fact, Comcast in its own promotional material touts the competitive importance of access to "Comcast Sportsnet." For example, Comcast has stated in its promotional materials: "Sportsnet provides a significant marketing advantage against satellite TV and other competition."

90.     Upon information and belief, Comcast initially denied RCN access to "Comcast Sportsnet" programming in Philadelphia. Comcast then provided RCN access to "Comcast Sportsnet" programming only on a short-term basis and refused to provide access to "Comcast Sportsnet" to RCN on a long-term basis. More specifically, Comcast refused to enter into a

stable, multi-year contract for local sports programming via "Comcast Sportsnet" in Philadelphia

with RCN, but, instead, provided such essential programming to RCN only on the basis of short-

term contracts, denying RCN access to a long-term contract that is standard in the industry.

After years of attempting to obtain such access, and after the filing of this action, RCN recently

obtained a longer-term agreement with Comcast for "Comcast Sportsnet" programming.

91.     Upon information and belief, Comcast has also substantially interfered with

RCN's access to contractors needed by RCN to build and offer competing cable television

services in Comcast's Philadelphia cluster. In order to compete with Comcast, competitor cable

companies such as RCN must establish a network capable of providing service to a certain

number of homes within specified time periods. Upon information and belief, Comcast has

actively sought to prevent and limit competition in its Philadelphia cluster by interfering with the

ability of a competitor, RCN, to hire construction and installation contractors and thereby delay

or impede RCN's development of its competing network and its ability to connect customers to

RCN's cable system in a timely manner. Specifically, Comcast has prevented, or attempted to

prevent, key contractors, comprising a substantial and significant portion of the area contractors

in the Philadelphia, Pennsylvania geographic market, from doing business with RCN by entering

into or enforcing non-compete clauses in contracts between Comcast (or its predecessor,

Suburban Cable) and contractors, by threatening contractors with loss of work from Comcast if

the contractors perform work for RCN, and/or by otherwise substantially interfering with access

by RCN to needed contractor and construction services in the relevant Philadelphia area

geographic market. Through such anticompetitive conduct designed to gain a competitive

advantage for Comcast and foreclose competition, Comcast has prevented or attempted to

prevent a substantial and significant portion of contractors needed by a competitor to compete with Comcast from doing business with the competitor.

92.     Plaintiffs and members of the Philadelphia Class were injured in their business or property by Comcast's anticompetitive conduct set forth in the immediately preceding paragraph in that through such anticompetitive practices that have prevented or constrained effective competition, Comcast has been able to maintain its monopoly power and its supra-competitive prices, and Plaintiffs and members of the Philadelphia Class have been required to pay such supra-competitive prices, for Comcast's cable services.

93.     Comcast has engaged in anticompetitive targeted marketing campaigns and price discounts in areas in which an overbuilder has begun providing competitive services. For example, in or about the summer of 2000, RCN entered Delaware County, Pennsylvania communities served by Comcast, including Folcroft, Pennsylvania. Upon information and belief, in an attempt to prevent or eliminate competition from, and lock out RCN, Comcast, beginning in or around March 2000 and prior to RCN's entry into the market, organized a "Swat Team" of sales representatives and directed sales representatives to sign up Comcast's customers in Folcroft, Pennsylvania, to long-term (eighteen-month) contracts in exchange for lower prices for their cable services. Comcast paid its sales representatives special commissions and bonuses for signing up such customers to the eighteen-month contracts. These contracts provided for a penalty in the event the customer subsequently canceled the contract and switched cable providers. Comcast directed its sales representatives not to inform Comcast customers who were signing up to the eighteen-month contracts of RCN's anticipated entry into the market.

94.     Plaintiffs and members of the Classes were injured in their business or property by Comcast's anticompetitive targeted price discounts in areas in which Comcast faced potential

56326                                    31

competition. As a result of such anticompetitive conduct designed to prevent or destroy

competition, Comcast was able to maintain its monopoly power and impose supra-competitive

cable prices within its clusters. Plaintiffs and members of the Classes were required to pay such

supra-competitive prices and to subsidize, through the payment of such prices, the discounted

cable prices Comcast made available only to subscribers offered the anticompetitive, targeted

discount rates.

95.     In approving the joint applications filed by Comcast Corporation and AT&T for

approval to transfer control of certain licenses, the FCC stated that it was not limited by antitrust

law principles and applied standards different from those of antitrust enforcement authorities. *In

the Matter of Applications for Consent to the Transfer of Control of Licenses from Comcast

Corporation and AT&T Corp., Transferors, to AT&T Comcast Corporation, Transferee*, MB

Docket No. 02-70, Memorandum Opinion and Order, released November 14, 2002 at ¶28.

Nevertheless, in its Memorandum and Order, the FCC, in its discussion of complaints by certain

overbuilders, including RCN, alleging that Comcast engaged in targeted pricing discounts,

reported as follows:

> ¶ 120. *Discussion.* Although the Applicants deny that they have engaged in
> predatory pricing behavior, their representations leave open the substantial
> possibility that the Applicants may well have engaged in questionable marketing
> tactics and targeted discounts designed to eliminate MVPD competition and that
> these practices ultimately may harm consumers. We also disagree with
> Applicants' claim that targeted discounts merely reflect healthy competition; in
> fact, although targeted pricing between and among established competitors of
> relatively equal market power may be procompetitive, targeted pricing discounts
> by an established incumbent with dominate market power may be used to
> eliminate nascent competitors and stifle competitive entry.

> ¶ 121 … We do not agree with Applicants that targeted pricing enhances
> competition. To the contrary, targeted pricing may keep pricing artificially high
> for consumers who do not have overbuilders operating in their areas because of
> the overbuilders' inability to compete against an incumbent who uses such

56326

strategies. Thus, we believe that targeted pricing as described in this record could harm MVPD competition.

...

¶ 122. Mounting consumer frustration regarding secretive pricing practices and the threat that such practices pose to competition in this market suggests, however, that regulatory intervention may be required either at the local, state, or federal level ....

*Id.* at 47-48.

96.     Potential cable company competitors, including overbuilders, face significant barriers to entry into the market. These high barriers to entry into the MVPD market faced by potential cable company competitors, include, among other things, overcoming the significant capital costs required for entry or re-entry; obtaining the necessary cable franchises from local governmental authorities; accessing essential video programming, including local sports programming; overcoming the "clustering" scheme engaged in by Defendants and other large cable operators; and overcoming anticompetitive acts and practices of the incumbent monopolist cable company, including Defendants' acts and practices as set forth in this Complaint.

97.     Defendants' willful acquisition or maintenance of monopoly power in the relevant markets was the result of the exclusionary, anticompetitive conduct alleged in this Complaint. Such conduct by Defendants includes, among other things, conspiring with and entering into and implementing illegal agreements with other cable companies to allocate territories, markets and customers in connection with the "swapping" of cable television systems and subscribers, in Comcast's Philadelphia and Chicago clusters; unreasonably restraining trade and willfully acquiring or maintaining monopoly power through acquisitions of competitor cable companies and their cable subscribers in the Philadelphia and Chicago clusters; denying or withholding access by RCN, an overbuilder, to essential sports programming, providing such programming only on a short-term basis, contrary to industry standard long-term programming contracts and

only recently providing longer-term access to RCN; substantially interfering with RCN's access

to contractors needed to build competing cable television facilities and systems in the relevant

geographic market; and engaging in targeted anticompetitive pricing and sales practices aimed at

areas in which Comcast may face competition from an overbuilder, such as RCN.

     98.     Comcast has exercised and continues to exercise its monopoly power by raising

prices for its cable television subscribers to artificially high, noncompetitive levels within the

relevant geographic markets.

     99.     Defendants' anticompetitive conduct in the relevant markets, as set forth in this

Complaint, has had the following effects, among others:

     a.     Competition, including price competition, for cable programming services

     has been, and will continue to be restrained, suppressed and/or eliminated.

     b.     Competitors or potential competitors have been, and will continue to be,

     restrained from entering into the relevant markets and Defendants'

     unlawful conduct has raised entry barriers to potential competition,

     including from overbuilder competitors and from former competitors that

     ceased or reduced cable operations and sold or abandoned infrastructure

     necessary to effective competition in the Philadelphia and Chicago

     clusters.

     c.     Defendants have maintained and increased prices for cable services at

     artificially high, supra-competitive levels and, unless enjoined, will

     continue to maintain and increase prices at such levels.

     d.     Subscribers to cable services have been, and will continue to be deprived

     of the benefits of free and open competition, including lower prices for

Defendants' cable services in both the Philadelphia and Chicago clusters
that would otherwise result from effective competition.

    e.    Prices for Comcast's cable services in the Philadelphia and Chicago
clusters would be lower in the absence of Comcast's violations of the
Sherman Act as set forth in this Complaint.

100.    Defendants' willful acquisition or maintenance of monopoly power was not the
result of a superior product, business acumen or historical accident.

101.    There is no legitimate procompetitive business justification for the
anticompetitive actions and conduct which facilitated Defendants' monopolization of the
relevant markets.

102.    Defendants' possession and willful acquisition or maintenance of monopoly
power in the relevant markets and Defendants' exclusionary, anticompetitive conduct as alleged
in this Complaint violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

103.    Plaintiffs and members of the Classes were injured in their business or property
by Defendants' monopolization of the relevant markets as alleged in this Complaint. Without
limiting the generality of the foregoing, Plaintiffs and members of the Classes have been forced
to pay higher prices for cable television in the relevant markets than they would have paid in the
absence of Defendants' unlawful conduct.

## COUNT III

### Attempted Monopolization

104.    Plaintiffs incorporate all of the above paragraphs as if fully set forth herein.

56326           35

105.    Defendants have engaged in the anticompetitive conduct alleged in this Complaint with the specific intent to monopolize the relevant product market in each of the relevant geographic markets.

106.    Defendants' conduct as set forth in this Complaint constitutes and demonstrates a dangerous probability of Defendants achieving monopoly power in the relevant product market in each of the relevant geographic markets.

107.    Defendants' attempt to monopolize the relevant product market in each of the relevant geographic markets constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

108.    Plaintiffs and members of the Classes have been, and continue to be, injured in their business or property by Defendants' attempt to monopolize the relevant markets as alleged in this Complaint.  Without limiting the generality of the foregoing, Plaintiffs and members of the Classes have been forced to pay higher prices for cable television services in the relevant markets than they would have paid in the absence of Defendants' unlawful conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A.    That this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and that reasonable notice to the Classes be provided in compliance with Fed. R. Civ. P. 23(c)(2);

B.    That the Court adjudge and decree that the horizontal territory, market and customer allocation agreements and other transactions as set forth in this Complaint are unreasonable restraints of trade in violation of Section 1 of the Sherman Act;

C.     That the Court adjudge and decree that Defendants' conduct as alleged in this Complaint constitutes unlawful monopolization, or attempted monopolization, in violation of Section 2 of the Sherman Act;

D.     That judgment be entered against Comcast and in favor of the Plaintiffs and the members of the Classes for damages as allowed by law, together with costs of suit (including expert costs), and reasonable attorney fees as provided by law;

E.     That the judgment so entered include trebling of damages determined to have been sustained by Plaintiffs and the members of the Classes for damages as allowed by law, together with costs of suit (including expert costs), and reasonable attorney fees as provided by law;

F.     That Comcast be enjoined from continuing the unlawful monopolization, or attempt to monopolize conduct alleged in this Complaint;

G.     That the Court award Plaintiffs and members of the Classes pre-judgment and post-judgment interest as permitted by law; and

H.     That the Court award Plaintiffs and members of the Classes such other and further relief as may be necessary and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

DATED:  May 23, 2006

                                        Anthony J. Bolognese (#36937)
                                        Joshua H. Grabar (#82525)  —  JHG 1707
                                        BOLOGNESE & ASSOCIATES, LLC
                                        1617 JFK Blvd., Suite 650
                                        Philadelphia, PA  19103
                                        Tel: (215) 814-6750
                                        Fax: (215) 814-6764

56326

37

Samuel D. Heins
Stacey L. Mills
Alan I. Gilbert
David Woodward
Jessica N. Servais
HEINS MILLS & OLSON, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Tel:  (612) 338-4605
Fax:  (612) 338-4692

Barry Barnett
John Turner
Jason Fulton
SUSMAN GODFREY LLP
901 Main Street, Suite 4100
Dallas, TX  75202
Tel:  (214) 754-1900
Fax:  (214) 754-1933

Marc H. Edelson (#51834)
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA  18901
Tel:  (215) 230-8043
Fax:  (215) 230-8735

Robert N. Kaplan
Gregory K. Arenson
Christine M. Fox
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY  10022
Tel:  (212) 687-1980
Fax:  (212) 687-7714

Gary L. Specks
KAPLAN FOX & KILSHEIMER LLP
203 North LaSalle Street, Suite 2100
Chicago, IL  60601
Tel:  (312) 558-1584
Fax:  (312) 558-1585

Lynn Lincoln Sarko
Mark A. Griffin
John H. Bright
Raymond J. Farrow
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Tel:  (206) 623-1900
Fax:  (206) 623-3384

56326

Michael Hausfeld
Stewart Weltman
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

Ann D. White
LAW OFFICES OF ANN D. WHITE, P.C.
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA 19046
Tel: (215) 481-0274
Fax: (215) 481-0271

Carol A. Mager
MAGER & GOLDSTEIN, LLP
Liberty Place, 21st Floor
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 640 -3280
Fax: (215) 640 -3281

John Peter Zavez (#555721)
Noah Rosmarin (#630632)
ADKINS KELSTON & ZAVEZ, P.C.
90 Canal Street
Boston, MA 02114
Tel: (617) 367-1040
Fax: (617) 742-8280

Ted Donner
DONNER & COMPANY
LAW OFFICES LLC
203 North LaSalle Street, Suite 2100
Chicago, IL 60601
Tel: (312) 805-2100
Fax: (312) 556-1369

**Counsel for Plaintiffs**