## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARTHA KRISTIAN, | ) | Civil Action No. 03-CV-12466-EFH |
| Plaintiff | ) | |
| v. | ) | |
| COMCAST CORPORATION, COMCAST HOLDINGS CORPORATION, COMCAST CABLE COMMUNICATIONS, INC., COMCAST CABLE  HOLDINGS, LLC, and COMCAST MO GROUP, INC. | ) | |
| Defendants. | ) | |
| JACK ROGERS and PAUL PINELLA, | ) | Civil action No. 04-CV-10142-EFH |
| Plaintiffs | ) | |
| v. | ) | |
| COMCAST CORPORATION and AT&T BROADBAND | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Timothy C. Blank
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Telephone: (617) 728-7100
Facsimile: (617) 426-6567

Attorneys for Defendants

Michael S. Shuster
Sheron Korpus
David G. Hille
Alycia Regan Benenati
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Attorneys for Defendants

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ........................................................................................................ 3

I     PLAINTIFFS HAVE FAILED TO PLEAD FACTS
SHOWING ANTITRUST INJURY OR CAUSATION ................................... 5

     A.   Plaintiffs Are Required To Plead Facts Showing They Have Antitrust Standing ...... 5

     B.   The Complaint Fails To Plead Facts Showing That Plaintiffs'
Claimed Injury Was Caused By The Transactions ..................................... 8

II.    PLAINTIFFS' SECTION 1 CLAIM MUST BE DISMISSED ........................ 12

     A.   The Complaint Does Not Plead A *Per Se* Violation Of The Sherman Act ............. 12

     B.   The Complaint Fails To State A Claim Under The Rule Of Reason ........................ 15

          1.    Plaintiffs Have Failed To Plead Anti-Competitive Effects ........................ 16

          2.    Plaintiffs Fail To Define A Plausible Market ............................................ 17

III.   PLAINTIFFS' SECTION 2 CLAIM MUST BE DISMISSED ........................ 18

     A.   Plaintiffs Fail To Plead A Relevant Geographic Market ........................................ 18

     B.   The Cable System Transactions Did Not Constitute  Predatory
Conduct Actionable Under Section 2 ...................................................... 18

IV.   THE COMPETITOR-RELATED ALLEGATIONS IN THE COMPLAINT DO NOT
STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT ............. 19

     A.   Plaintiffs Lack Antitrust Standing To Assert Claims
Based On Conduct Directed At RCN or BELD ...................................... 19

     B.   Plaintiffs Fail To State A Section 2 Claim
Based On The Competitor-Related Conduct ........................................... 22

          1.    Plaintiffs Do Not Allege A Relevant Geographic Market ....................... 22

          2.    The Competitor-Related Conduct Alleged In The Complaint
Is Not Actionable Under Section 2 Of The Sherman Act ........................ 22

               a.    NECN .......................................................................................... 22

        b.      Price Discounts/Disconnection of Lines .......................................22

CONCLUSION ...........................................................................................................24

(ii)

TABLE OF AUTHORITIES

CASES

Addamax Corp. v. Open Software Foundation, Inc., 152 F.3d 48 (1st Cir. 1998)..................13, 14

Affiliated Capital Corp. v. City of Houston, 735 F.2d 1555 (5th Cir. 1984) ................................18

America Telegraph & Telegraph Co. v. IMR Capital Corp., 888 F. Supp. 221 (D. Mass. 1995) ........................................................................................................................................3, 4, 6

Amtrol, Inc. v. Vent-Rite Valve Corp., 646 F. Supp. 1168 (D. Mass. 1986) .........................10, 16

Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268 (3d Cir. 1999) ........................................8

Arroyo-Melecio v. P.R. America Insurance Co., 398 F.3d 56 (1st Cir. 2005) .........................6, 20

Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985) ..................................23

Associated General Contractors Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983)...........................................................................................................5, 8

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) .......................................6, 22

Augusta News Co. v. Hudson News Co., 269 F.3d 41 (1st Cir. 2001)...........................................13

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994) ............................................................................7

Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227 (1st Cir. 1983)....................................22

Betkerur v. Aultman Hospital Association, 78 F.3d 1079 (6th Cir. 1996) ....................................14

Blue Shield of Va. v. McCready, 457 U.S. 465 (1982) ...................................................................6

Boston Scientific Corp. v. Schneider (Eur.) AG, 983 F. Supp. 245 (D. Mass. 1997) ..................11

Bristol-Myers Squibb Co. v. Copley Pharm., Inc., 144 F. Supp. 2d 21 (D. Mass. 2000)............5, 7

Broadcast Music, Inc. v. Columbia Broadcast System, Inc., 441 U.S. 1 (1979).....................13, 14

CCBN.com, Inc. v. Thomson Financial, Inc., 270 F. Supp. 2d 146 (D. Mass. 2003) ....................3

Copp v. Hague, 1994 Mass. App. Div. 11 (Mass. App. Div. 1994) ..............................................12

CTC Communications. Corp. v. Bell Atlantic Corp., 77 F. Supp. 2d 124 (D. Me. 1999) ...........23

City of Pittsburgh v. West Penn Power Co., 147 F.3d 256 (3d Cir. 1998)......................................7

Dartmouth Review v. Dartmouth College, 889 F.2d 13 (1st Cir. 1989)...................................4, 11

Day v. Fallon Community Health Plan, 917 F. Supp. 72 (D. Mass. 1996) .................................3, 4

Dry v. Methodist Med. Ctr. of Oak Ridge, Inc., 893 F.2d 1334  1990 WL 3489 (6th Cir.
    1990) .....................................................................................................................................12

Eastern Food Serv., Inc. v. Pontifical Catholic University of P.R. Serv. Association, Inc.,
    222 F. Supp. 2d 131 (D. P.R. 2002).......................................................................................3

Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir. 2001)...........................................................8, 15

Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1 (1st Cir. 1979) .........................10, 13, 16

Fraser v. Major League Soccer LLC, 97 F. Supp. 2d 130 (D. Mass. 2000), aff'd, 284 F.3d
    47 (1st Cir. 2002) ................................................................................................................7, 8

Fraser v. Major League Soccer LLC, 284 F.3d 47,59 (1st Cir. 2002).........................................14

Glaberson v. Comcast Corp., 2006 WL 2559479, at *7 (E.D. Pa. Aug. 31, 2006) ......................21

Gooley v. Mobil Oil Corp., 851 F.2d 513 (1st Cir. 1988) .....................................................4, 11

Hanover Shoe, Inc. v. United Shoe Machine Corp., 392 U.S. 481 (1968) .....................................6

Hecht v. Pro-Football, Inc., 570 F.2d 982 (D.C. Cir. 1977) ...................................................10, 16

IDT Corp. v. Building Owners and Managers Association International, 2005 WL
    3447615 (D.N.J. Dec. 15, 2005) ............................................................................................14

LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003).....................................................................23

Luke Brothers v. Krusell, C.A. No. 94-11701-MLW, 1997 U.S. Dist. LEXIS 23589 (D.
    Mass. June 27, 1997) .............................................................................................................15

M&H Tire Co. v. Hoosier Racing Tire Corp., 733 F.2d 973 (1st Cir. 1984) ...............................14

Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986) .................11

In re Microcrystalline Cellulose Antitrust Litigation, 218 F.R.D. 79 (E.D. Pa. 2003).................10

Mid-Mich. Radiology Associate v. Central Mich. Committee Hospital, No. 94-CV-
    10057-BC, 1995 WL 239360 (E.D. Mich. Feb. 14, 1995) ......................................................6

N.Y. Citizens Committee on Cable TV v. Manhattan Cable TV, Inc., 651 F. Supp. 802
    (S.D.N.Y. 1986) .........................................................................................................6, 18

Otter Tail Power Co. v. United States, 410 U.S. 366 (1973)......................................................18

PSW, Inc. v. Visa U.S.A, Inc., C.A. No. 04-347T, 2006 U.S. Dist. LEXIS 11763 (D. R.I.
    Feb. 3, 2006) ..............................................................................................................................7

Palmer v. BRG of Ga., Inc., 498 U.S. 46 (1990) ..................................................................6, 13

RSA Media Inc. v. AK Media Group, Inc., 260 F.3d 10 (1st Cir. 2001) ......................................5

Recetas Por Menos, Inc. v. Five Development Corp., 368 F. Supp. 2d 124 (D. P.R. 2005).........18

Reiter v. Sonotone Corp., 442 U.S. 330 (1979)...........................................................................6

SAS of P.R., Inc. v. P.R. Telegraph Co., 48 F.3d 39 (1st Cir. 1995) ...................................3, 6, 21

SMS System Maintenance Services Inc. v. Digital Equipment Corp., 188 F.3d 11 (1st
    Cir. 1999) ................................................................................................................................19

Serpa Corp. v. McWane, Inc., 199 F.3d 6 (1st Cir. 1999) ...........................................................5

Storer Cable Commc'ns v. City of Montgomery, 826 F. Supp. 1338, vacated, 866 F.
    Supp. 1336 (M.D. Ala. 1993) ..................................................................................................18

Sullivan v. Tagliabue, 25 F.3d 43 (1st Cir. 1994)........................................................................5

TV Signal Co. of Aberdeen v. AT&T Co., Number Civ. 70-6N, 1981 WL 2049 (D.S.D.
    March 13, 1981) .......................................................................................................................18

Texaco, Inc. v. Dagher, 126 S. Ct. 1276 (2006) .................................................................2, 14, 17

United States v. AVX Corp., 962 F.2d 108 (1st Cir. 1992).......................................................3, 11

United States v. Andreas, 216 F.3d 645 (7th Cir. 2000)..............................................................13

United States v. Radio Corp. of America, 358 U.S. 334 (1959).....................................................13

United States v. Sealy, 388 U.S. 350 (1967) ..............................................................................13

United States v. Topco, 405 U.S. 596 (1972) .............................................................................13

<u>Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP</u>,
540 U.S. 398 (2004)............................................................................................2, 17, 19

<u>Wojcieszek v. New England Telegraph & Telegraph Co.</u>, 977 F. Supp. 527 (D. Mass.
1997) ...............................................................................................................3, 5, 6, 7

<u>Yangtze Optical Fibre v. Ganda LLC, Number CA 04-474ML</u>, 2006 WL 1666180
(D.R.I. June 9, 2006).............................................................................................8

<u>Yeager's Fuel, Inc. v. PA Power & Light Co.</u>, 953 F. Supp. 617 (E.D. Pa. 1997) ........................23

<u>STATUTES</u>

47 U.S.C. §§ 541-43 ...............................................................................................................9

<u>OTHER AUTHORITIES</u>

Cable Television Consumer Protection and Competition Act, Pub. L. No. 102-385,
§ 2(a)(1), 106 Stat. 1460 (1992)...........................................................................9

(vi)

Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Holdings, LLC, Comcast MO Group, Inc. and AT&T Broadband (collectively "Comcast") respectfully submit this reply memorandum of law in further support of their motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint For Violations of the Sherman Antitrust Act and the Massachusetts Antitrust Act, dated July 28, 2006 (the "Complaint").

## PRELIMINARY STATEMENT

Plaintiffs' opposition memorandum leaves unanswered the core question presented by Comcast's motion to dismiss, namely, why should this Court - indeed, how <u>can</u> this Court - permit this antitrust case to go forward when Plaintiffs' Complaint does not allege any facts whatsoever to support its conclusory allegations that the two transactions complained of harmed competition.  Plaintiffs repeat their conclusory allegations, and make irrelevant arguments to the effect that consumers can have antitrust standing - a point neither disputed nor pertinent - but nowhere in their voluminous brief do Plaintiffs point to any <u>facts</u> alleged in the Complaint that would support their refrain that competition was injured.  Put simply, although this purports to be a case about competition, the Complaint contains no facts concerning the existence of competition or how any such competition was injured.

If there had really been competition or potential competition between, on the one hand, Comcast's predecessor, AT&T Broadband, and, on the other, Cablevision or MediaOne, the counterparties to the transactions complained of, Plaintiffs should have had no problem setting forth the facts of such competition in the Complaint.  Doing so would have obviated this motion.  Similarly, the motion having been made, and it being premised in substantial part on the absence of any factual allegations of pre-transaction competition or post-transaction harm to competition,

Plaintiffs should have taken pains in their opposition memorandum to quote chapter and verse from their Complaint the factual allegations that Comcast asserts to be lacking. They do not (because they cannot).

The First Circuit and the Supreme Court have made it crystal clear that <u>factual</u> allegations are necessary - without them, there is no antitrust injury, and without such injury, antitrust plaintiffs lack antitrust standing. Furthermore, without alleging facts to support a conclusory allegation of anti-competitive effect an antitrust plaintiff stands no chance of making out a Section 1 claim.

Plaintiffs' opposition brief attempts to justify their assertion that their Complaint states a *per se* violation of Section 1 by arguing an irrelevancy - that "horizontal market allocations" are one of the categories of *per se* liability established by the courts. Plaintiffs' opposition brief simply ignores or brushes aside the Supreme Court and First Circuit cases directing that, where a specific type of transaction - like the asset swap alleged here - has never been held to be a *per se* violation, attaching to it the words "market allocation" or any other label is meaningless and of no effect. The higher courts have made clear that the *per se* category is to be restricted, not expanded. Asset swaps have <u>never</u> been treated as *per se* violations, let alone asset swaps in the cable industry. Similarly, transactions, like the one complained of here, that have been reported to the Department of Justice or the Federal Communications Commission, and approved by them, have <u>never</u> received *per se* treatment by the Courts, for reasons that are obvious and that have been explained recently by the Supreme Court in two separate decisions (<u>Verizon v. Trinko</u> and <u>Texaco v. Dagher</u>) (complete citations *infra*).

Finally, Plaintiffs' Section 2 claims, which are not predicated upon transactions, are misconceived throw-ins where Plaintiffs, ironically, complain that *low* prices offered to and

2

accepted by certain members of the putative class disadvantaged Comcast's existing competitors. These "monopolization" and "attempted monopolization" causes of action are tactics, not viable claims, and are asserted solely to explain away the fact that Comcast in fact continues to face competition from other wireline cable providers (in addition to direct broadcast companies, which any purchaser of multi-channel video services in this market knows are formidable competitors to cable).

Plaintiffs' opposition memorandum fails to set forth any reason why the dismissal sought by Comcast should not be granted.

## ARGUMENT

The core issue for this Court to decide is whether the Complaint's conclusory allegations of harm to competition are sufficient to permit this massive antitrust case to go forward. Plaintiffs allege that Cablevision and MediaOne were "actual or potential competitors" of AT&T Broadband but never allege any facts concerning such supposed competition. Similarly, though Plaintiffs allege that the asset swap with Cablevision was a horizontal market allocation deserving of *per se* treatment, Plaintiffs never allege any facts to support this allegation. While Plaintiffs are entitled to favorable inferences for factual allegations, this does not "mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992).[1] "A reviewing court is obliged neither to 'credit bald assertions' …nor to honor

---

[1] Where a complaint's allegations are deficient, courts in this Circuit do not hesitate to dismiss antitrust claims at the motion to dismiss stage. See, e.g., SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39 (1st Cir. 1995) (affirming dismissal where Complaint did not adequately allege antitrust injury and therefore standing to sue); CCBN.com, Inc. v. Thomson Fin., Inc., 270 F. Supp. 2d 146 (D. Mass. 2003) (failure to state monopolization claim); Eastern Food Serv., Inc. v. Pontifical Catholic Univ. of P.R. Serv. Ass'n, Inc., 222 F. Supp. 2d 131 (D. P.R. 2002) (failure to allege a relevant geographic market); Wojcieszek v.

3

subjective characterizations ... . 'Empirically unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated facts,' deserve no deference." Id. (citations omitted). These are strong statements from this Circuit's highest court, statements of the law not open to question and not subject to distillation by decisions by district courts from other circuits.[2]

Another district court in this Circuit has correctly determined that, in attempting to distinguish between "sufficient facts and insufficient conclusions" and consistent with the First Circuit's admonition that "empirically unverifiable conclusions," not "supported by the stated facts" deserve "no deference," it should be guided by the following general parameters:

> Most often, facts are susceptible to objective verification. Conclusions, on the other hand, are empirically unverifiable in the usual case. They represent the pleader's reactions to, sometimes called 'inferences from,' the underlying facts. It is only when such conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that 'conclusions' become 'facts' for pleading purposes.

Day v. Fallon Cmty. Health Plan, 917 F. Supp. 72, 75 (D. Mass. 1996) (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989) (emphasis added)). "[I]t is the plaintiff's burden to make sufficient factual allegations in order to survive a Rule 12(b)(6) motion." Id. The Court "need not 'conjure up unpled allegations or contrive elaborately arcane scripts' in order to allow the plaintiff's Complaint to survive at this early stage of the litigation." Id. (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988)).

---

New England Tel. & Tel. Co., 977 F. Supp. 527 (D. Mass. 1997) (failure to allege antitrust injury and to state monopolization claim); Day v. Fallon Cmty. Health Plan, 917 F. Supp. 72 (D. Mass. 1996) (insufficient facts to state conspiracy or monopolization claim); Am. Tel. & Tel. Co. v. IMR Capital Corp., 888 F. Supp. 221 (D. Mass. 1995) (failure to sufficiently allege antitrust injury).

[2] Plaintiffs devote much of their opposition brief to the decision of the Eastern District of Pennsylvania in Glaberson v. Comcast, involving claims and arguments similar to those made here. Whatever pleading standards the Glaberson court applied – not the proper ones, in our respectful view – it is clear that this Court must be guided by its own interpretation of the standard applicable in this Circuit.

As discussed *infra*, Plaintiffs' opposition brief fails to show why, under the standards prevailing in this Circuit, the Complaint should not be dismissed for its failure to plead <u>facts</u> establishing harm to competition sufficient to demonstrate Plaintiffs' standing to assert an antitrust claim, or the anticompetitive effects necessary to establish a Section 1 claim.

## I.     PLAINTIFFS HAVE FAILED TO PLEAD FACTS <u>SHOWING ANTITRUST INJURY OR CAUSATION</u>

### A.     Plaintiffs Are Required To Plead Facts <u>Showing They Have Antitrust Standing</u>

An antitrust plaintiff must have antitrust standing. <u>See</u> <u>Serpa Corp. v. McWane, Inc.</u>, 199 F.3d 6 (1st Cir. 1999). Without antitrust injury, an antitrust plaintiff lacks antitrust standing. <u>See</u> <u>Sullivan v. Tagliabue</u>, 25 F.3d 43, 46 (1st Cir. 1994); <u>RSA Media Inc. v. AK Media Group, Inc.</u>, 260 F.3d 10, 14 (1st Cir. 2001). To plead antitrust injury, a plaintiff must allege a cognizable injury, caused by the alleged antitrust violation (which itself must be spelled out factually (see *supra*)). <u>See</u> <u>Associated Gen. Contractors Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 537-45 (1983).

In defense of their Complaint and in opposition to Comcast's standing argument, Plaintiffs assert (i) that the Transactions were entered into and (ii) that they are consumers who are paying higher prices. (Opp. Br. at 9-11). To establish antitrust injury, however, Plaintiffs must allege facts to show that the higher prices they allege were <u>caused by</u> the transactions (the antitrust violation) they complain of. <u>See</u> <u>Bristol-Myers Squibb Co. v. Copley Pharm., Inc.</u>, 144 F. Supp. 2d 21 (D. Mass. 2000) (dismissing counterclaim where which failed to show a <u>causal link</u> between the alleged injury and the allegedly unlawful conduct); <u>Wojcieszek</u>, 977 F. Supp. at

5

534 (dismissing complaint which "offers no facts suggesting antitrust injury and no evidence that plaintiffs' alleged damages <u>resulted from</u> the defendants' unlawful acts").[3]

Here, the requisite causal connection can be sufficiently made out only by alleging facts showing that the transactions were between competitors, that previous to the transactions they competed in a manner that kept prices lower than they otherwise would have been, and that as a result of the transactions such competition was eliminated and, as a further result, prices went up (<u>i.e.</u>, the transactions had a competition-reducing effect).[4] "The antitrust injury requirement ensures that a plaintiff can recover only if [its] loss stems from [the] competition-<u>reducing</u> aspect or effect of the defendant's behavior." <u>Atlantic Richfield Co.</u>, 495 U.S. at 344.[5]

---

[3] Plaintiffs' assertions that consumers can have antitrust standing and that consumer overpayments may constitute antitrust injury (<u>see</u> Opp. Br. at 9-11, 14-16) address arguments Comcast never made. The point is that <u>every</u> private plaintiff who makes an antitrust claim "must prove the existence of antitrust injury." <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 334 (1990). This is true regardless of whether the plaintiff is a consumer or a competitor, or whether the challenged conduct is subject to <u>per se</u> treatment or a rule of reason analysis. <u>See</u> <u>Atlantic Richfield</u>, 495 U.S. at 344 ("[T]he right of action under § 4 of the Clayton Act is available <u>only</u> to those private plaintiffs who have suffered antitrust injury.").

[4] Unlike here, where the Complaint fails to allege any facts supporting its conclusions that competition was harmed, in each of the cases cited by Plaintiffs (Opp. Br. at 9-10) such facts were pled. <u>See, e.g.</u>, <u>Reiter v. Sonotone Corp.</u>, 442 U.S. 330 (1979) (Opp. Br. at 9) (facts showing competitors fixed prices for hearing aids); <u>Blue Shield of Va. v. McCready</u>, 457 U.S. 465 (1982) (facts showing a group boycott excluded a competitor psychologist); <u>Palmer v. BRG of Ga., Inc.</u>, 498 U.S. 46 (1990) (facts showing one defendant who had previously competed in the market stopped competing with another for a percentage of revenues); <u>Hanover Shoe, Inc. v. United Shoe Mach. Corp.</u>, 392 U.S. 481, 491 (1968) (unlawful monopolization based on prior judgment entered in suit brought by U.S.); <u>Arroyo-Melecio v. P.R. Am. Ins. Co.</u>, 398 F.3d 56, 72 (1st Cir. 2005) (facts showing a group boycott among car insurers excluded a broker and its clients); <u>N.Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.</u>, 651 F. Supp. 802, 812 (S.D.N.Y. 1986) (subscribers association pleaded sufficient facts to show that cable operator improperly excluded unaffiliated programmers, where it was "rational to infer that competition ... would be likely to result" in the absence of the exclusion). <u>SAS of P.R., Inc.</u>, 48 F.3d at 44 actually supports <u>Comcast's</u> position because in that case the court dismissed the complaint for lack of standing where it found the plaintiffs' allegations of antitrust injury to be insufficient.

[5] Plaintiffs' argument that the existence of antitrust injury is not typically resolved through motions to dismiss (Opp. Br. at 9) is also wrong. <u>See, e.g.</u>, <u>SAS of P.R., Inc.</u>, 48 F.3d at 46 (affirming dismissal where plaintiff did not adequately allege antitrust injury and therefore lacked standing to sue); <u>Wojcieszek</u>, 977 F. Supp. at 534 (failure to allege antitrust injury); <u>Am. Tel. & Tel. Co.</u>, 888 F. Supp. at 253 (third-party plaintiff failed to sufficiently allege antitrust injury). <u>See also</u> <u>Mid-Mich. Radiology</u>

An antitrust injury caused by harm to competition cannot be shown where the challenged conduct occurs in a market in which there is no alleged competition to begin with.  See, e.g., Fraser v. Major League Soccer LLC, 97 F. Supp. 2d 130, 140 (D. Mass. 2000) ("[A] competitor adversely affected by a transaction that does not actually reduce the level of competition in the relevant market has no remedy under the antitrust laws....Competition that does not exist cannot be decreased."), aff'd, 284 F.3d 47 (1st Cir. 2002); City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 266-67 (3d Cir. 1998) (because challenged conduct did not bring about any "lessening of competition. . . there was no antitrust injury" ("under the Sherman Act agreements can only restrain that which has occurred, is occurring, or is reasonably likely to occur.")); Balaklaw v. Lovell, 14 F.3d 793, 798 (2d Cir. 1994) (antitrust injury not shown where "[f]rom the consumers' point of view, nothing about the market ... changed"); Bristol-Myers Squibb Co., 144 F. Supp. 2d at 25 (defendant lacked standing to bring antitrust counterclaim where legal requirements, rather than alleged anti-competitive conduct, prevented defendant from entering the market).

Antitrust injury also cannot be shown where, even if the complaint does allege facts showing there was competition to begin with, the complaint fails to plead facts showing that the challenged conduct has harmed such competition.  See, e.g., PSW, Inc. v. Visa U.S.A, Inc., C.A. No. 04-347T, 2006 U.S. Dist. LEXIS 11763, at *20-21 (D. R.I. Feb. 3, 2006) (plaintiff's "failure to allege an injury to competition is fatal to its antitrust claim"); Wojcieszek, 997 F. Supp. at 535

---

Assoc. v. Cent. Mich. Comm. Hosp., No. 94-CV-10057-BC, 1995 WL 239360, at *4 (E.D. Mich. Feb. 14, 1995) (relying on Atlantic Richfield in rejecting plaintiffs' argument that "they need not show reduction in competition" to allege antitrust injury; "[a]lthough plaintiff's averments regard the *type* of injury protected by antitrust laws, i.e. prices and competition, under the alleged facts, there has been no change in the market.").

#: 1430468

(the term "anti-competitive" refers to "actions that harm the competitive process") (emphasis added).

The court in Glaberson v. Comcast Corp. did not consider that these well-established principles required dismissal of the Complaint in that case, and chose to credit Plaintiffs' conclusory pleadings.[6] The Third Circuit, however, has made its position clear:

> It is well-established that an antitrust injury reflects an activity's anti-competitive effect on the competitive market. We have consistently held that an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market.

Eichorn v. AT&T Corp., 248 F.3d 131, 140 (3d Cir. 2001) (emphasis added). Neither the Third nor any other Circuit relieves an antitrust plaintiff of its most fundamental pleading obligation - the requirement of establishing its antitrust standing by alleging facts showing that the injuries it claims resulted from anticompetitive conduct. See Associated Gen. Contractors of Cal., 459 U.S. at 542 (establishing the requirement that there be a causal connection between the harm claimed and the antitrust violation alleged).

### B.    The Complaint Fails To Plead Facts Showing That Plaintiffs' Claimed Injury Was Caused By The Transactions

Plaintiffs complain about higher cable prices resulting from diminished price competition. (Complaint, ¶¶ 1, 11, 61-62; see also Opp. Br. at 11-16) The Complaint alleges that price competition for cable programming depends upon the presence or absence of a second

---

[6] Plaintiffs, like the Glaberson court, erroneously rely on a footnote in Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 275 n.2 (3d Cir. 1999) for the incorrect proposition that a court should not incorporate the issue of anticompetitive market effect into its standing analysis. See Opp. Br. at 11 (citing Yangtze Optical Fibre v. Ganda LLC, No. CA 04-474ML, 2006 WL 1666180, at *3 (D.R.I. June 9, 2006) (in turn, citing Angelico)). To the extent that Angelico and Yangtze can be read broadly, both decisions are inconsistent with precedent both from the Third Circuit and this District. See Eichorn, 248 F.3d at 140; Fraser, 97 F. Supp. 2d at 140. Moreover, the court in Yangtze found that the plaintiff had demonstrated that its injury was directly caused by conduct that lowered competition across the market as a whole. See Yangtze, 2006 WL 1666180, at *5.

8

cable provider - what the Complaint properly refers to as an "overbuilder."

Cable service can only be provided pursuant to franchises awarded at the municipal or local level. See Moving Br. at 4. In any service area, there is an incumbent, franchised wireline cable provider. The term "overbuilder" refers to any cable provider who wishes to or does obtain a second franchise to service a given area.[7] Any such cable provider looking to offer cable service in competition with the service offered by the franchised, incumbent provider must build its own cable infrastructure - it is not by law permitted to use the incumbent's cable to provide the service. The second franchisee, if any - and there are few anywhere in the United States; this entire source of "competition" is more theoretical than real - must literally (and at enormous cost and risk) lay its cable "over" the existing cable belonging to the franchised incumbent. Hence the term, "overbuilder."[8]

Plaintiffs, in their own Complaint, drafted of their own volition and by their own lawyers' hand, allege that only cable overbuilders - not direct broadcast satellite companies, and not anyone else - provide price competition for incumbent franchised cable providers. (Complaint ¶¶45-46) In support of this allegation, the Complaint cites to a variety of reports issued by the General Accounting Office (GAO) and the Federal Communications Commission (FCC).[9] (Id.)

Given that Plaintiffs' own Complaint alleges that price competition for franchised cable

---

[7] These matters are not open to dispute - the franchise requirement is a matter of law. See 47 U.S.C. §§ 541-43.

[8] Congress has formally found that few communities are served by overbuilders due to the "extraordinary expense" involved. See Cable Television Consumer Protection and Competition Act, Pub. L. No. 102-385, § 2(a)(1), 106 Stat. 1460 (1992) ("For a variety of reasons, including local franchising requirements and the extraordinary expense of constructing more than one cable television system to serve a particular geographic area, most cable television subscribers have no opportunity to select between competing cable systems.").

[9] Plaintiffs - again, in their own Complaint - allege that there is a dearth of overbuilders nationwide, and that, nationally, "only approximately 1.3% of cable customers are served by an overbuilder." (Complaint ¶ 44) (emphasis added)

9

incumbents comes only from overbuilders, their Complaint would be expected to allege that the parties with which Comcast entered into the Transactions had overbuilt Comcast's cable infrastructure in order to provide competition to Comcast, and that the Transactions eliminated these companies as competitors to Comcast. Alternately, at a minimum, the Complaint would be expected to allege that the Transaction counterparties were potential overbuilders, and would have had to set forth the factors that courts require to allege potential competition (essentially, concrete, factual allegations that such potential entrants were ready, able and willing to enter, and had taken concrete steps to do so, and that particularities of the market would not have prevented them from doing so).[10] Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 9 (1st Cir. 1979) (to find a *per se* market allocation between competitors, plaintiff must show that one of the potential competitors had "the necessary desire, intent and capability" to enter the other's market); Hecht v. Pro-Football, Inc., 570 F.2d 982, 994 (D.C. Cir. 1977) (potential competitor must demonstrate not just intention, but preparedness to enter industry); Amtrol, Inc. v. Vent-Rite Valve Corp., 646 F. Supp. 1168, 1177 (D. Mass. 1986) (company must show that it is a "serious potential competitor, distinguishable from the great horde of opportunists who 'would've, could've, or might,'ve'"). Here, the Plaintiffs would be unable to muster facts to support a bald allegation that the Transaction counterparties were potential overbuilder entrants,

---

[10] Plaintiffs' efforts to distinguish these cases by arguing that Plaintiffs are subscribers, rather than potential competitors, are unavailing. (Pl. Br. 18) Irrespective of the fact that they are consumers, Plaintiffs' theory depends on the assumption that *actual or potential competition* was eliminated from the putative cluster as a result of Comcast's conduct. Plaintiffs' reliance on In re Microcrystalline Cellulose Antitrust Litig., 218 F.R.D. 79, 90 (E.D. Pa. 2003) (cited at Opp. Br. at 16-17) is also misplaced. In that case, which involved an alleged agreement among two manufacturers of microcrystalline cellulose to divide worldwide markets, the court found, in considering Plaintiffs' class certification motion, that "plaintiffs make a strong argument that they will be able to prove that Asahi would have competed for all of FMC's customers during the class period had it been allowed to do so." 218 F.R.D. at 91 (finding, based on the expert testimony, that "influential competition from Asahi would not have been so difficult to establish"). The conclusory allegations of the Complaint fall far short of that standard.

and their Complaint would fail in any event, but that is the necessary consequence of their argument that only overbuilders provide price competition to the franchised, incumbent cable provider.

Despite Plaintiffs' own allegations that <u>only</u> overbuilders provide price competition to cable incumbents, the Complaint does NOT allege that the Transaction counterparties were actual or potential overbuilders, and does NOT allege that the Transactions in any way removed overbuilders from the market. This is the glaring and fatal deficiency at the core of the Complaint, and nothing in Plaintiffs' opposition brief addresses it, let alone explains why the Complaint should not be dismissed on this ground.[11]

The Complaint's failure to plead <u>facts</u> showing that the counterparties to the Cable System Transactions were actual or potential competitors renders meaningless their conclusory assertions to that effect. As stated above, the import of the First Circuit's decisions in <u>United States v. AVX</u>, <u>Dartmouth</u> and <u>Gooley v. Mobil</u> is that such conclusory allegations should not be credited. In the antitrust injury context, courts have not hesitated to dismiss complaints that include nothing but conclusory allegations of competitive injury without any factual predicate. <u>See, e.g.</u>, <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) ("[I]f the factual context renders [plaintiff's] claim implausible – if the claim is simply one that makes no economic sense – [plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary."); <u>Boston Scientific Corp. v. Schneider (Eur.) AG</u>, 983 F. Supp. 245, 253 (D. Mass. 1997) ("[i]nvocation of antitrust terms of art does not confer immunity from a motion to dismiss"); <u>Dry v. Methodist Med. Ctr. of Oak Ridge, Inc.</u>, 893

---

[11] Instead, Plaintiffs point to the fact that the <u>Glaberson</u> court did not dismiss on this basis. This was the main deficiency of Judge Padova's decision. His Honor ignored ample case law requiring plaintiffs to plead <u>facts</u> in support of their conclusory allegations.

11

F.2d 1334 (table), 1990 WL 3489, at *3 (6th Cir. 1990) (affirming Rule 12(b)(6) dismissal for lack of antitrust injury where plaintiff "alleged no facts in his complaint to support his assertion that he is a consumer or competitor ... in the [relevant] market").[12]

Because the Complaint fails to allege any facts showing that the Cable System Transactions resulted in any reduction in competition, the Court should not accept the Complaint's bald conclusions of competition and should dismiss the Transaction-based allegations in the Complaint for failure to show antitrust standing.

## II.     PLAINTIFFS' SECTION 1 CLAIM MUST BE DISMISSED

### A.     The Complaint Does Not Plead A
### *Per Se* Violation Of The Sherman Act

Comcast's Memorandum in Support sets forth bedrock Supreme Court case law for the proposition that the *per se* category is exceptional, applied restrictively and not expanded to transaction types not previously accorded *per se* treatment. Put simply, *per se* treatment of Section 1 claims is not a growing area of antitrust law, and certainly not one in which district courts (or even circuit courts) establish new precedents. (See Opp. Br. at 16-18)

Despite the clear line of authority in this area, and the absence of any precedent to support their position, Plaintiffs insist in their opposition brief that the exchange of assets effected by the Cablevision Swap is *per se* illegal. (See id., pp. 24 et. seq.) Plaintiffs are wrong

---

[12] Plaintiffs' argument that the presence of a non-compete clause in AT&T Broadband's swap agreement with Cablevision demonstrates that those companies were "competitors" is unavailing. (Pl. Br. at 13). The inclusion of a routine covenant, properly limited in time (3 years) and scope (the affected franchise areas only) in an agreement for a sale of a business does not mean that AT&T Broadband considered Cablevision a competitor, much less that Cablevision would have undertaken the substantial risk and expense of overbuilding the very same areas it had just sold to AT&T Broadband. (See Moving Br. at 13). Non-compete provisions are routinely included when assets are transferred between companies that did not formerly compete. See e.g. Copp v. Hague, 1994 Mass. App. Div. 11 (Mass. App. Div. 1994) (court upheld contract of sale including non-competition clause, where buyer and seller had not previously competed).

for several reasons.[13]

First, Plaintiffs do not identify (nor has Comcast been able to find) a single case in which an acquisition of assets (whether by purchase or exchange) has been treated under the *per se* rule.[14] Indeed, the *per se* actionable agreements in those cases (cited at Opp. Br. at 26) involved either (i) express divisions of markets in which competitors were previously in direct competition,[15] or (ii) agreements between parties who were not already in competition not to enter and compete in each others' territories in the future.[16] The Cablevision Swap does not fit into either category.

In Broadcast Music, Inc. v. Columbia Broadcast System, Inc., 441 U.S. 1 (1979), after noting that it had "never examined a practice like this one before" (Id., at 10), the Supreme Court

---

[13] Plaintiffs now concede that the MediaOne transaction is not subject to *per se* treatment. (See Opp. Br. at 34-36). Plaintiffs' suggestion that the unconsummated swap with Charter was also an unlawful market allocation (Pl. Br. at 29) is preposterous. Plaintiffs cite no authority for the proposition that an asset acquisition *that was never completed* can form the basis for a *per se* claim under the Sherman Act.

[14] Fourteen of the fifteen cases cited by Plaintiffs (at Opp. Br. at 25-26) do not even involve mergers or acquisitions. In the one case cited that did involve an asset exchange, United States v. Radio Corp. of Am., 358 U.S. 334 (1959), the challenged transaction was not analyzed as a market allocation or found to be *per se* illegal. Engine Specialties, Inc., 605 F.2d at 11, is also inapposite. In Engine Specialties, plaintiff sufficiently pled facts demonstrating that one of the potential competitors had "the necessary desire, intent and capability" to enter the other's market. Id. at 9. No such facts are pled here. Moreover, the court in Engine Specialties specifically relied on a Supreme Court decision authorizing the application of the *per se* rule under the facts of that case, which included a finding that the market allocation agreement was not ancillary to the parties' joint venture, but rather a separate, naked restraint. See id., 605 F.2d at 11 (citing United States v. Sealy, 388 U.S. 350 (1967)). Also inapposite are Augusta News Co. v. Hudson News Co., 269 F.3d 41, 47 (1st Cir. 2001), where the court actually *rejected* plaintiffs' characterization of the "horizontal market division" in that case as a *per se* violation, and Addamax Corp. v. Open Software Found., Inc., 152 F.3d 48, 51 (1st Cir. 1998), where the court also rejected plaintiff's efforts to pursue a *per se* claim.

[15] See Palmer, 498 U.S. 46 (1990) (agreement between competitors in Georgia's bar-exam review market that one would exit in return for licensing agreement with remaining competitor); United States v. Andreas, 216 F.3d 645 (7th Cir. 2000) (existing competitors in lysine market agreed to allocate volumes and fix prices).

[16] See, e.g., United States v. Topco, 405 U.S. 596 (1972) (agreement among small supermarket chains not to compete in one another's exclusive territories); Sealy, 388 U.S. 350 (agreements between licensees who had not been competitors not to compete in the future).

proceeded to examine how the Department of Justice and the lower courts had treated licensing arrangements similar to the one at issue, and noted that "there is no nearly universal view" that a blanket license is "a form of price fixing" subject to *per se* rather than rule of reason analysis. Id., at 16.  Similarly, in Texaco, Inc. v. Dagher, 126 S. Ct. 1276, 1279 (2006), the Supreme Court noted that it has been reluctant to adopt per se rules "where the economic impact of certain practices is not immediately obvious"; see also Addamax Corp., 152 F.3d at 51 (cited in Opp. Br. at 25) (recognizing that "courts have been very careful to confine *per se* treatment to conduct of the type that is almost always actually or potentially anticompetitive and has no redeeming benefits (*e.g.*, reduced costs, increased competition) worthy of being weighed against the negative effects)"; M&H Tire Co. v. Hoosier Racing Tire Corp., 733 F.2d 973, 977 (1st Cir. 1984) ("even when confronted with examples of conduct ordinarily considered 'illegal per se,' such as price fixing, the Supreme Court has eschewed per se analysis when the context was novel, and therefore outside the established categories of business behavior which experience had confirmed were anticompetitive and without redeeming virtue.").

Other courts have similarly recognized that precedents—not easy labels—dictate whether the *per se* rule applies to challenged conduct. See Fraser v. Major League Soccer LLC, 284 F.3d 47,59 (1st Cir. 2002) (rejecting plaintiff's application of label of per se "price fixing" to inter-club competition); Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1085 (6th Cir. 1996) (ruling that challenged agreement was not a *per se* violation despite plaintiff's characterization of it as a "group boycott," "price-fixing," and an "unlawful combination among 'horizontal' competitors"); IDT Corp. v. Building Owners and Managers Ass'n Int'l, 2005 WL 3447615, at *10-12 (on Rule 12(b)(6) motion, rejecting plaintiff's characterization of defendant's conduct as *per se* illegal "price fixing" and "group boycott," and dismissing claims under rule of reason for

14

failure to plead facts showing anticompetitive effect); <u>Luke Bros. v. Krusell</u>, C.A. No. 94-11701-MLW, 1997 U.S. Dist. LEXIS 23589, *27-28 (D. Mass. June 27, 1997) (noting that application of the per se rule has narrowed, and "even when a litigant characterizes a restraint as a form of "price fixing," courts do not apply *per se* treatment "unless they are satisfied that the challenged practice is of a type that is worthy of that sometimes overused label").

There is not a single case law precedent holding <u>any</u> asset swaps, let alone cable industry asset swaps, to be *per se* violations. The Supreme Court and Circuit Courts consider themselves bound by legal precedent to not create a new *per se* precedent for these kinds of deals. That the <u>Glaberson</u> court did not deem itself similarly constrained affords little guidance to this Court.[17]

Because the challenged "swap" does not fall within the *per se* category, and because Plaintiffs have expressly disavowed any attempt to plead a rule of reason claim with respect to it,[18] Plaintiffs' Section 1 claim based on the Cablevision Swap must be dismissed.

**B.    <u>The Complaint Fails To State A Claim Under The Rule Of Reason</u>**

As Comcast demonstrated in its moving brief, the Complaint fails to state a viable rule of reason claim because it does not plead facts establishing that the Cable System Transactions

---

[17] Indeed, the <u>Glaberson</u> court's ruling that Plaintiffs stated *per se* claims based on the asset swaps at issue in that case, despite the total absence of authority supporting the application of the fatal *per se* rule to such transactions, is irreconcilable with the Third Circuit's <u>Eichorn</u> decision, its most recent teaching on the subject. There, rather than simply crediting plaintiff's bald characterization of challenged no-hire agreements as *per se* horizontal price fixing and group boycotts, the Third Circuit examined the case law to determine how other courts had analyzed such agreements. See <u>Eichorn</u>, 248 F.3d at 143-44. Finding "no support within the relevant case law" for applying the *per se* label, <u>id.</u>, the Court held that the challenged agreements must be analyzed under the rule of reason. See <u>id.</u> at 144 ("Cognizant that there are no Supreme Court cases holding [that] no-hire agreements entered upon the legitimate sale of a business to a third party are *per se* antitrust violations, and recognizing that the only two federal courts that have addressed the issue have declined to apply the *per se* rule, we hold the no-hire agreement is more appropriately analyzed under the rule of reason.").

[18] See <u>Opp. Br.</u> at 28 (claiming that defendants "improperly invoke a rule of reason analysis as to their challenged swap conduct and argue that Plaintiffs have failed to demonstrate anticompetitive effects.... Since Plaintiffs have alleged a per se violation of § 1, the Court does not need to consider the alleged anticompetitive effects")

#: 1430468

were in themselves illegal or that they produced anticompetitive effects which could have proximately caused the harm of which Plaintiffs complain. (See Moving Br. at 22-25) Plaintiffs' arguments on opposition cannot cure these fundamental pleading defects.

### 1.    Plaintiffs Have Failed To Plead Anti-Competitive Effects

Plaintiffs do not dispute that they must allege as an element of a Section 1 rule of reason claim that the conduct or transactions complained of had an anticompetitive effect. Plaintiffs insist that they have shown anticompetitive effect by alleging that "Cablevision was removed from the Boston area" as a result of the Cable System Transactions. (Opp. Br. at 30) The Complaint fails to allege any facts, however, establishing that Cablevision was a Comcast "competitor" - that it overbuilt Comcast's cable infrastructure in any area, or that it competed in any other respect (this is purely theoretical - without overbuilding one cable provider cannot compete with another). See supra at 3; Moving Br. at 11.

Plaintiffs' related assertion - that Cablevision "has not reentered" the market (Opp. Br., at 31) - is equally flawed. Facts not having been alleged to show that Cablevision was ever in "the market" as a competitor to Comcast, the allegation that it has not "reentered" is meaningless and nonsensical. If Plaintiffs wish to complain that Cablevision was a "potential competitor" to Comcast, Plaintiffs must allege facts showing "that the potential competitor ... had the necessary desire, intent, and capability to enter the market ... ." Engine Specialties, Inc., 605 F.2d at 9. Accord Hecht, 570 F.2d at 994; Amtrol, Inc., 646 F. Supp. at 1177. The Complaint does not allege any such facts.

Finally, Plaintiffs insist that, because the FCC "is not an antitrust court" (Pl. Br. at 33 n.17) and because the DOJ's determination not to challenge mergers has "no legal significance" (see Opp. Br. at 33), this Court should view as "irrelevant" the fact that the Cable System

16

Transactions were extensively vetted and approved by the FCC, the DOJ, and hundreds of state and local franchising authorities. The Supreme Court does not share Plaintiffs' view. Indeed, as the Supreme Court has recently made clear, regulatory approval and oversight are highly *significant* considerations in assessing whether regulated conduct is actionable under the antitrust laws:

> One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such a structure exists, the additional benefit to competition provided by [judicial] antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny.

Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 412 (2004). See also Texaco Inc., 126 S. Ct. at 1280 n.1 ("We presume for purposes of these cases that Equilon is a lawful joint venture. Its formation has been approved by federal and state regulators, and there is no contention here that it is a sham . . . Had respondents challenged Equilon itself, they would have been required to show that its creation was anticompetitive under the rule of reason.").

### 2.    Plaintiffs Fail To Define A Plausible Market

As set forth in Comcast's moving brief, Plaintiffs do not plead a rational geographic market for their Section 1 claims. (See Moving Br. at 18-22). Plaintiffs' argument that their gerrymandered market is valid because "courts have routinely approved market definitions that track a provider's service and/or franchise territory" (Opp. Br. at 39) is unpersuasive.[19]

In each of the cases cited by Plaintiffs (at Opp. Br. at 39-40) where the market definition was sustained, the geographic market was defined as either: (i) defendants' <u>entire</u> service area, in

---

[19] Also unpersuasive is Plaintiffs' argument that market definition is a "question of fact" that cannot be decided on a motion to dismiss. (Opp. Br. 38-39). Courts have not hesitated to dismiss cases under Rule 12(b)(6) for failure to plead a plausible market. See Moving Br. at 18.

cases brought by or on behalf of consumers, see Otter Tail Power Co. v. United States, 410 U.S. 366 (1973) (market defined as aggregate of all towns served by defendant); N.Y. Citizens Comm. on Cable, 651 F. Supp. at 805 (market defined as MCTV's service area (lower Manhattan)); or (ii) the intersection of plaintiffs' and defendants' service areas, in cases brought by competitors, see Affiliated Capital Corp. v. City of Houston, 735 F.2d 1555 (5th Cir. 1984) (market defined as city of Houston, where plaintiff was allegedly prevented from obtaining franchise due to actions of defendants); Storer Cable Commc'ns v. City of Montgomery, 826 F. Supp. 1338 (market defined as city of Montgomery, where plaintiff competed directly against defendant cable operator for subscribers), vacated, 866 F. Supp. 1336 (M.D. Ala. 1993); TV Signal Co. of Aberdeen v. AT&T Co., No. Civ. 70-6N, 1981 WL 2049, at *1 (D.S.D. March 13, 1981) (market defined as city of Aberdeen, as the "area of most effective competition between [plaintiff] and Defendants").[20]

## III.    PLAINTIFFS' SECTION 2 CLAIM MUST BE DISMISSED

### A.    Plaintiffs Fail To Plead A Relevant Geographic Market

For the reasons discussed *supra* and in Comcast's Moving Brief at 25-26, Plaintiffs fail to plead a relevant geographic market for their Section 2 claims. A cluster-wide geographic market is wholly inappropriate given that the conduct complained of under Section 2 was allegedly directed to competitors who only participated in a small segment of the cluster.

### B.    The Cable System Transactions Did Not Constitute
### Predatory Conduct Actionable Under Section 2

Because the "mere possession of monopoly power" is not unlawful, a putative monopolist will not have violated Section 2 of the Sherman Act unless the manner by which it

---

[20] In Recetas Por Menos, Inc. v. Five Dev. Corp., 368 F. Supp. 2d 124, 132 (D. P.R. 2005) (cited at Opp. Br. 39), the court actually *rejected* Plaintiffs' market definition as being overly narrow.

has gone about acquiring or maintaining its dominant position "is accompanied by an element of anticompetitive conduct." <u>Trinko</u>, 540 U.S. at 407. <u>See also SMS Sys. Maint. Servs. Inc. v. Digital Equip. Corp.</u>, 188 F.3d 11, 25 (1st Cir. 1999) ("When a party brings a Section 2 claim, it is not enough simply to show that there is monopoly power. Monopoly power may be obtained through legitimate means. An antitrust problem arises only when an improper use of that power, to the detriment of the forces of competition, occurs. Thus, to make out a Section 2 claim, the plaintiff must show that the alleged monopolist has engaged in improper exclusionary conduct."). In their opposition brief, Plaintiffs simply reiterate the elements of Section 2 monopolization and attempted monopolization claims and assert in conclusory fashion that they have alleged each of those elements. (<u>See</u> Opp. Br. at 23-33) As detailed in Comcast's Moving Brief and summarized above, the Complaint does <u>not</u> plead facts showing that the Cable System Transactions negatively impacted the competitive landscape in the putative "cluster" or had a dangerous probability of doing so. (<u>See</u> Moving Br. at 13-16, 22-25, 26-27); <u>see also</u> *supra*, pp. 9-12, 16-17) Plaintiffs' Section 2 claim based on those transactions should therefore be dismissed.

## IV.    THE COMPETITOR-RELATED ALLEGATIONS IN THE COMPLAINT DO NOT STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

### A.    Plaintiffs Lack Antitrust Standing To Assert Claims Based On Conduct Directed At RCN or BELD

As discussed in Comcast's moving brief, Plaintiffs lack antitrust standing to pursue these claims for two reasons. First, Plaintiffs have failed to plead facts showing that the Competitor-Related Conduct either harmed the competitive landscape or proximately caused any injury to Plaintiffs. (<u>See</u> Moving Br. at 26-27, 30-35) Second, it is clear from the very nature of the

19

conduct Plaintiffs challenge that there exists a more direct victim who would be better situated to bring antitrust claims predicated on conduct directed at them (namely, RCN and BELD).  (See Moving Br. at 29)

Plaintiffs fail to respond meaningfully to either of these points in their opposition papers. For example, Plaintiffs do not even address Comcast's antitrust injury argument, but instead simply recapitulate the six Associated General standing elements and insist (without citation to the Complaint) that they have satisfied each element.  (See Opp. Br. at 19-22)  Plaintiffs offer no explanation whatsoever as to how either (i) the Competitor-Related Conduct enabled Comcast to impose supra-competitive prices in those portions of the putative Boston cluster where overbuilders are present and competing, or (ii) how the competitive landscape could conceivably have been harmed in areas where the challenged conduct did not occur (viz., the remainder of the Boston cluster where no overbuilders are alleged to exist).

Similarly unpersuasive is Plaintiffs' attempt to demonstrate that they are best situated to bring this claim because they are consumers in the market where trade was allegedly restrained. None of the named Plaintiffs reside in any of the communities where overbuilders are alleged to be present.  (Complaint ¶¶ 15-17, 88, 90).  Nor have Plaintiffs pled any facts demonstrating that trade in the entire putative cluster was allegedly restrained by any of the Competitor-Related Conduct. [21]

---

[21] The cases cited by Plaintiffs (Opp. Br. 23-24), which assert the general proposition that "consumers" and "competitors" are "presumptively" proper plaintiffs to allege antitrust injury do not support the sort of speculative and attenuated claim proposed by Plaintiffs here.  In the one case Plaintiffs cite which found that consumers had standing, the court required the consumer plaintiffs to establish that they had suffered appropriate antitrust injury.  See Arroyo-Melecio, 398 F.3d at 60 (finding that plaintiffs had sufficiently alleged a boycott of a participant in the insurance market for selling compulsory insurance in contravention of the agreement not to).  The remaining cases relied on by Plaintiffs involved claims brought by parties who were neither consumers nor competitors and do not suggest that consumers are in any way relieved of the requirement that they show antitrust injury.

#: 1430468

Plaintiffs also rely on the <u>Glaberson</u> court's erroneous conclusion that the plaintiffs in that case had standing to pursue analogous RCN-related claims because any recovery sought by those plaintiffs would not be duplicative of any recovery sought by RCN under a lost profits theory. <u>See</u> <u>Glaberson v. Comcast Corp.</u>, 2006 WL 2559479, at *7 (E.D. Pa. Aug. 31, 2006). However, the First Circuit has recognized that

> even where an [antitrust] violation exists and a plaintiff has been damaged by it, the courts – for reasons of prudence – have sought to limit the right of private parties to sue for damages or injunctions.... One set of limitations ... is concerned with the <u>remoteness of the injury and the speculative character of the injury</u> or the connection. Another set reflects an <u>unwillingness to award antitrust damages to one who suffered from pro-competitive or irrelevant effects</u> of an otherwise anticompetitive transaction. These elements sometimes overlap; and the list is not exhaustive. It is not surprising that no simple rule has emerged for choosing the best antitrust plaintiff and deciding when second-best plaintiffs should be barred.

<u>SAS of P.R., Inc.</u>, 48 F.3d at 43. Moreover, the First Circuit has recognized that the "concern [for the speculative character of either the injury or the relationship between the violation and the injury] may operate even in cases, like this one, where no duplicative recovery is threatened." <u>SAS of P.R., Inc.</u>, 48 F.3d at 45.[22] Here, Plaintiffs' allegations concerning the Competitor-Related Conduct are precisely the type of speculative and remote claims of injury that courts have sought to limit through the standing inquiry.

---

[22] The First Circuit has also recognized that the "presumptively proper" plaintiff in an antitrust suit often is a "customer who obtains services in the threatened market or a competitor who seeks to serve that market." <u>SAS of P.R., Inc.</u>, 48 F.3d at 44. However, as discussed <u>supra</u> at 5-8, Plaintiffs' status as consumers does not automatically confer standing where antitrust injury is either non-existent or speculative. Moreover, as Plaintiffs agree, the market for cable service is inherently local. (Opp. Br. at 42). Here, none of the named Plaintiffs resides in a franchise area where the alleged competitor-related conduct occurred.

### B.    Plaintiffs Fail To State A Section 2 Claim Based On The Competitor-Related Conduct

#### 1.    Plaintiffs Do Not Allege A Relevant Geographic Market

For the reasons discussed *supra* and in Comcast's moving brief, to the extent that Plaintiffs purport to base their monopolization claims on the alleged Competitor-Related Conduct, their market definition ("Comcast's Boston cluster") is entirely deficient.

#### 2.    The Competitor-Related Conduct Alleged In The Complaint Is Not Actionable Under Section 2 Of The Sherman Act

##### a.    NECN

In their opposition papers, although Plaintiffs claim that they do not intend their allegations concerning NECN to state a Section 2 refusal to deal (or "essential facilities") claim they claim that Comcast denied NECN "essential programming" (See Opp. Br. at 43-46) Moreover, Plaintiffs admit that Comcast was not legally required to provide its competitors with access to NECN. (Opp. Br. at 45). Here, Plaintiffs have pleaded no facts suggesting that Comcast's refusal to provide access to NECN was based solely on a desire to harm competitors. Therefore, for the reasons stated in Comcast's moving papers (Moving Br. at 30-31) Comcast was well within its rights to select who would receive access to NECN.

##### b.    Price Discounts/Disconnection of Lines

Plaintiffs admit that they are not trying to assert a predatory pricing claim (nor could they). (Opp. Br. at 50). However, Plaintiffs ignore the Supreme Court's admonition that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition [and thus] cannot give rise to antitrust injury." Atlantic Richfield Co., 495 U.S. at 340 (emphasis added). Accordingly, the discounts offered by Comcast were "not activity forbidden by the antitrust laws." Id. at 340. Plaintiffs also ignore the

22

myriad of authorities from this Circuit and elsewhere which have held that courts should not interfere with the charging of low, non-predatory prices. <u>See</u>, <u>e.g.</u>, <u>Barry Wright Corp. v. ITT Grinnell Corp.</u>, 724 F.2d 227, 231 (1st Cir. 1983) ("a legal precedent or rule of law that prevents a firm from unilaterally cutting its prices risk interference with one of the Sherman Act's most basic objectives: the low price levels that one would find in well-functioning competitive markets"). <u>See</u> <u>also</u> Moving Br. at 32-33 (citing cases).[23]

---

[23] The cases Plaintiffs cite (at Opp. Br. at 51) involved conduct completely unlike that alleged in the Complaint. <u>See</u>, <u>e.g.</u>, <u>LePage's, Inc. v. 3M</u>, 324 F.3d 141 (3d Cir. 2003) (actionable conduct was product tying); <u>Yeager's Fuel, Inc. v. PA Power & Light Co.</u>, 953 F. Supp. 617 (E.D. Pa. 1997) (actionable conduct constituted exclusive dealing); <u>CTC Commc'ns. Corp. v. Bell Atl. Corp.</u>, 77 F. Supp. 2d 124, 144-45 (D. Me. 1999) (actionable conduct was refusal to sell certain telecommunications services at wholesale prices to resellers); <u>Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u>, 472 U.S. 585, 603-604 (1985) (actionable conduct was refusal to cooperate with smaller competitor in jointly-offered all access lift ticket program).

## CONCLUSION

For the reasons stated above and in Comcast's moving brief, the Complaint should be dismissed in its entirety, without further leave to amend.

Dated: November 1, 2006

_____
Timothy C. Blank
DECHERT LLP
200 Clarendon Street, 27th Floor
Boston, MA 02116-5021
Telephone:  (617) 728-7100
Facsimile:  (617) 426-6567

Michael S. Shuster
Sheron Korpus
David G. Hille
Alycia Regan Benenati
KASOWITZ, BENSON, TORRES &
  FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

Attorneys for Defendants Comcast
Corp., Comcast Holdings Corp., Comcast
Cable Communications, Inc., Comcast
Cable Holdings, LLC, Comcast MO
Group, Inc. and AT&T Broadband

24